

EXHIBIT
1



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: COMPLAINT W PRELIMINARY JUDICIAL REPORT**
**September 30, 2025 19:46**

By: MATTHEW G. VANSUCH 0079328

Confirmation Nbr. 3631064

DEUTSCHE BANK AG, NEW YORK BRANCH                    CV 25 125588

     vs.

HH CLEVELAND HUNTINGTON, L.P., ET AL            **Judge:**  CASSANDRA COLLIER-WILLIAMS

**Pages Filed:**  286

 Common Pleas Court of Cuyahoga County, Ohio

**DESIGNATION FORM TO BE USED TO INDICATE THE CLASSIFICATION OF THE CAUSE**

Deutche Bank AG, New York Branch
_____

Plaintiff

Vs.

HH Cleveland Huntington, L.P.
_____

Defendant

Case Number: _____

Date: 9/30/25

Has this case been previously filed and dismissed? Yes ☐ No ☑
Case #: _____    Judge: _____

Is this case related to any new cases now pending or previously filed? Yes ☐ No ☑
Case #: _____    Judge: _____

**CIVIL CLASSIFICATIONS:** *Place an (X) In ONE Classification Only.*

**Professional Torts:**
☐ 1311 Medical Malpractice
☐ 1315 Dental Malpractice
☐ 1316 Optometric Malpractice
☐ 1317 Chiropractic Malpractice
☐ 1312 Legal Malpractice
☐ 1313 Other Malpractice

**Product Liability:**
☐ 1330 Product Liability

**Other Torts:**
☐ 1310 Motor Vehicle Accident
☐ 1314 Consumer Action
☐ 1350 Misc. Tort

**Workers Compensation:**
☐ 1550 Workers Compensation
☐ 1531 Workers Comp. Asbestos

**Foreclosures:**
☐ Utilize Separate Foreclosure Designation Form

**Commercial Docket:**
☐ 1386 Commercial Docket
☑ 1387 Commercial Docket with Foreclosure

**Administrative Appeals:**
☐ 1540 Employment Services
☐ 1551 Other

**Other Civil:**
☐ 1500 Replevin/Attachment
☐ 1382 Business Contract
☐ 1384 Real Estate Contract
☐ 1388 Consumer Debt
☐ 1390 Cognovit
☐ 1391 Other Contracts
☐ 1490 Foreign Judgment
☐ 1491 Stalking Civil Protection Order
☐ 1501 Misc. Other
☐ 1502 Petition to Contest Adam Walsh Act
☐ 1503 Certificate of Qualification for Employment

**Amount of Controversy:**
☐ None Stated
☐ Less than $25,000
☑ Prayer Amount  33,383,959
appointment of receiver

**Parties have previously attempted one of the following prior to filing:**
☐ Arbitration
☐ Early Neutral Evaluation
☐ Mediation
☐ None

*I certify that to the best of my knowledge the within case is not related to any now pending or previously filed, expect as noted above.*

Roetzel & Andress, LPA
_____
Firm Name (Print or type)

6550 Seville Dr., Ste. B
_____
Address

Canfield, OH 44406
_____
Address

(330) 533-6195
_____
Phone

Timothy M. Reardon; Matthew G. Vansuch
_____
Attorney of Record (Print or Type)

(0059631; 0079328)
_____
Supreme Court #

TReardon@ralaw.com; MVansuch@ralaw.com
_____
Email Address

/s/ Matthew G. Vansuch
_____
Signature

# COMMON PLEAS COURT
## CUYAHOGA COUNTY, OHIO

DESIGNATION FORM TO BE USED FOR FORECLOSURE ACTIONS

Deutche Bank AG, New York Branch

*Plaintiff*

Case No. _____

vs.

Judge _____

HH Cleveland Huntington, L.P.

*Defendant*

| | | | |
|---|---|---|---|
| Has this case been previously filed & dismissed? | Yes ☐ | No ☑ | |
| Case No. _____ | Judge _____ | | |
| Is this case related to any cases now pending or previously filed | Yes ☐ | No ☑ | |
| Case No. _____ | Judge _____ | | |

## Foreclosure Classifications: Place an (X) in ONE Classification Only.

☐ 1460 Foreclosure
☐ 1465 Tax Foreclosure (Cnty Prosecutor)
☐ 1466 Tax Certificate Foreclosure
☐ 1467 BOR Tax Foreclosure

☐ 1470 Quiet Title
☐ 1480 Partition
☐ 1481 Other _____

Prayer Amount:

33,383,959

Field Service Representative or other contact:

Name _____

Number _____

| Permanent Parcel No. | 101-36-001 | | |
|---|---|---|---|
| 925 Euclid Ave. | Cleveland | | 44115 |
| Address | City | | Zip |
| Permanent Parcel No. | 101-26-002 | | |
| 925 Euclid Ave. | Cleveland | | 44115 |
| Address | City | | Zip |
| Permanent Parcel No. | 101-36-013 | | |
| 925 Euclid Ave. | Cleveland | | 44115 |
| Address | City | | Zip |
| Permanent Parcel No. | | | |
| Address | City | | Zip |

*I certify that to the best of my knowledge the within case is not related to any now pending or previously filed, except as noted above*

Roetzel & Andress, LPA

*Firm Name*

6550 Seville Dr., Ste. B, Canfield, OH 4440

*Address*

(330) 533-6195

*Telephone*

Matthew G. Vansuch (0079328)

(rpe)                    *Bar No.*

Email Address: TReardon@ralaw.com; MVansuch@ralaw.com

<div align="center">

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

</div>

| | | |
|---|---|---|
| **DEUTSCHE BANK AG, NEW YORK** | : | **Case No.** |
| **BRANCH** | : | |
| One Columbus Circle | : | |
| New York, NY 10019 | : | **COMPLAINT – COMMERCIAL** |
| | : | **PROMISSORY NOTE; COMMERCIAL** |
| | : | **GUARANTY; COMMERCIAL** |
| *Plaintiff,* | : | **FORECLOSURE (PRELIMINARY** |
| | : | **JUDICIAL REPORT ATTACHED);** |
| **vs.** | : | **APPOINTMENT OF RECEIVER** |
| | : | |
| **HH CLEVELAND HUNTINGTON,** | : | |
| **L.P., AN OHIO LIMITED** | : | |
| **PARTNERSHIP** | : | **The Centennial Building** |
| c/o Frank T. Sinito, Registered Agent | : | **925 Euclid Ave., Cleveland, OH 44115** |
| 4000 Key Tower, 127 Public Square | : | **Parcel ID: 101-36-001** |
| Cleveland, OH 44114 | : | **101-36-002** |
| | : | **101-36-013** |
| **FRANK T. SINITO** | : | |
| 4000 Key Tower, 127 Public Square | : | |
| Cleveland, OH 44114 | : | |
| | : | |
| *Also Serve at:* | : | |
| 6820 Eagle Mills Rd. | : | |
| Waite Hill, OH 44094 | : | |
| | : | |
| **COUNTY OF CUYAHOGA** | : | |
| c/o Robert D. Manoloff, Director of Law | : | |
| 2079 East Ninth Street | : | |
| Cleveland, OH 44115 | : | |
| | : | |
| **BRAD COMES, AS TREASURER OF** | : | |
| **CUYAHOGA COUNTY** | : | |
| 2079 East Ninth Street | : | |
| Cleveland, OH 44115 | : | |
| | : | |
| *Defendants.* | : | |

Plaintiff Deutsche Bank AG, New York Branch (the "Plaintiff"), through undersigned

counsel, states for its Complaint against the above defendants:

<div align="center">

**PARTIES, JURISDICTION, AND VENUE**

</div>

1.      Plaintiff Deutsche Bank AG, New York Branch, One Columbus Circle, is a branch of Deutsche Bank AG, a German corporation, which is registered with the Ohio Secretary of State (#5482143).[1]

2.      Defendant HH Cleveland Huntington L.P. (the "Borrower") is an Ohio limited partnership registered with the Ohio Secretary of State (Entity #2392205) with its principal place of business at 4000 Key Tower, 127 Public Square, Cleveland, OH 44114, and is the fee owner of the Property (as that term is defined below). The Borrower has designated Frank T. Sinito as its registered agent for service of process at that address.

3.      Defendant Frank T. Sinito ("Sinito") is an individual who resides at 6820 Eagle Mills Rd., Waite Hill, OH 44094 in Lake County, Ohio, and whose principal place of business is within Cuyahoga County at 4000 Key Tower, 127 Public Square, Cleveland, OH 44114.

4.      Defendant Brad Cromes, in his capacity as Fiscal Officer of Cuyahoga County, Ohio, is the duly appointed Fiscal Officer of the county in which a portion of the Property sits and has statutory responsibility for the collection of real estate taxes, assessments, and other fees.

5.      Defendant County of Cuyahoga is a body politic and corporate with all the rights granted by its Charter and by general law.

6.      The Property is located at 925 Euclid Avenue in the City of Cleveland (PPN 101-36-001, 101-36-002, 101-36-013), and, in the past, has been referred to as the Union Trust Building and the Huntington Building. The legal description for the Property (the "Property") is as follows:

Parcel No. 1: (For informational purposes only: PPN: 101-36-013)

---

[1] https://businesssearch.ohiosos.gov?=businessDetails/5482143

2

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being part of Original Two Acre Lot Nos. 154 and 155, and Sublots Nos, 45, 46, 47, 48, 49 and part of Sublot 50 in J.M. Woolsey's Subdivision of part of Original Two Acre Lot Nos. 156 to 167 both inclusive, as shown by the recorded plat of said subdivision in Volume N of Deeds, Page 486 of Cuyahoga County Records, together forming a parcel of land, bounded and described as follows:

Beginning on the northerly line of Euclid Avenue at a point 145 feet 9-1/8 inches easterly, measured along said northerly line, from its point of intersection with the easterly line of East 9th Street (formerly Erie Street); Thence westerly along said northerly line of Euclid Avenue, 145 feet 9-1/8 inches to its point of intersection with the easterly line of East 9th Street; Thence northerly along said easterly line of East 9th Street 258 feet 6-5/8 inches to its point of intersection with the southerly line of Chester Avenue N.E. (formerly known as Chestnut Avenue); Thence easterly along said southerly line of Chester Avenue N.E. 385 feet 1/4 inch to a point 12 feet westerly measured along said southerly line, from the northeasterly corner of said Sublot No. 50, which point is also at the intersection of said southerly line with the westerly line of a 12 foot alley; Thence southerly along said westerly line of said alley 133 feet, more or less, to a point on the southerly line of said Sublot 50 which is also the northerly line of Hickory Court N.E. (formerly Hickory Lane) 12 feet westerly measured along said southerly line of Sublot 50, from the southeasterly corner of said Sublot 50; Thence westerly along the southerly line of said Sublot Nos. 50, 49, 48, and 47, 170 feet 11-1/2 inches to its point of intersection with a line drawn northerly at right angles with said northerly line of Euclid Avenue from the place of beginning; Thence southerly 200 feet 9-1/4 inches to the place of beginning, according to the survey made by The F.A. Pease Engineering Company, August, 1919.  Be the same more or less, but subject to all legal highways.

Parcel No. 2: (For informational purposes only: PPN: 101-36-002)

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being Sublot No. 52 in J.M. Woolsey's Subdivision of part of Original Two Acre Lot Nos. 156 to 167 both inclusive, as shown by the recorded plat of said Subdivision in Volume N of Deeds, Page 486 of Cuyahoga County Records, bounded and described as follows:

Beginning at a point in the southerly line of Chester Avenue N.E. (formerly Chestnut Avenue) 463 feet 1/4 inch easterly measured along said southerly line from its point of intersection with the easterly line of East 9th Street (formerly

3

Erie Street), said point of beginning, being also the northeasterly corner of land described in a lease to Frank C. Newcomer dated July 16, 1919 and recorded in Lease Volume 92, Page 16 of Cuyahoga County Records; Thence easterly along said southerly line of Chester Avenue N.E. 66 feet to the northeasterly corner of said Sublot 52; Thence southerly along the easterly line of Sublot 52, 133 feet to the southeast corner of said Sublot 52; Thence westerly along the southerly line of Sublot 52, which is also the northerly line of Hickory Court N.E. (formerly Hickory Lane), 66 feet to the southwest corner of said Sublot 52; Thence northerly along the westerly line of said Sublot 52, 133 feet to the place of beginning, as appears by said plat, be the same more or less, but subject to all legal highways, and the rights of the public, if any, in the portion of the foregoing parcel which is used as an alley and approach to loading docks.

Parcel No. 3: (For informational purposes only: PPN: 101-36-001)

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being the northerly part of Sublot 51 in J.M. Woolsey's Subdivision of part of Original Two Acre Lot Nos. 156 to 167 both inclusive, as shown by the recorded plat of said subdivision in Volume N of Deeds, Page 486 of Cuyahoga County Records, bounded and described as follows:

Beginning at a point in the southerly line of Chester Avenue N.E. (formerly Chestnut Avenue) 397 feet 1/4 inch easterly measured along said southerly line from its point of intersection with the easterly line of East 9th Street (formerly Erie Street), said point of beginning being also the point of intersection of said southerly line with the easterly line of a 12 foot alley; Thence southerly along the westerly line of said Sublot 51, which is also the easterly line of said 12 foot alley, 100 feet; Thence easterly parallel with the southerly line of Chester Avenue N.E. 66 feet to the easterly line of said Sublot 51; Thence northerly along said easterly line of Sublot 51, 100 feet to said southerly line of Chester Avenue N.E.; Thence westerly along said southerly line of Chester Avenue N.E. 66 feet to the place of beginning, as appears by said plat, be the same more or less, but subject to all legal highways.

Parcel No. 4:

Part A:

Together with an appurtenant right established by Ordinance No. 58,522 as shown by the City Record Volume 19, Page 767, granting Union Lennox Co., its successors and assigns the authority and permission to construct, maintain and use a bridge over East 11th Place.

4

Part B:

Together with an easement for pedestrian tunnel granted by the City of Cleveland to The Union Commerce Bank, dated December 15, 1967, filed for record December 15, 1967, and recorded in Volume 12183, Page 181 of Cuyahoga County Records.

7.     This Court has subject-matter jurisdiction over this action under R.C. § 2305.01 and because the real property subject to this commercial foreclosure action is situated in Cuyahoga County.

8.     This Court possesses personal jurisdiction over the Borrower and Sinito under R.C. § 2307.381(A)(1) and (8).

9.     Venue is proper in this Court under Civ.R. 3(C)(1), (2), (3), and (5).

### COUNT ONE – BREACH OF CONTRACT (NOTE AGAINST BORROWER)

10.     The Plaintiff restates and incorporates by reference the above allegations as if fully rewritten herein.

11.     The Plaintiff and the Borrower entered into a Loan Agreement on July 1, 2021 under which the Plaintiff agreed to make a loan ("Loan") to the Borrower in the amount of $35,422,000 (the "Loan Amount"), the proceeds of which were to be applied by the Borrower to convert the building at the Property to a multifamily apartment housing facility, among other uses, consisting of a total of approximately 870 units and related personal property and equipment that the Borrower referred to as "The Centennial." A true and accurate copy of the Loan Agreement is attached as **Exhibit A**.

12.     The Plaintiff is in possession of the original, and is entitled to enforce, a Promissory Note in the face amount of $35,422,000 dated July 15, 2021 and executed by the

5

Borrower (the "Note"). A true and accurate copy of the Note payable to Plaintiff is attached as **Exhibit B**.

13.     The Plaintiff and Borrower executed a First Omnibus Amendment and Allonge to Promissory Note ("First Amendment") on November 15, 2021. A true and accurate copy of the First Amendment is attached as **Exhibit C**.

14.     The Plaintiff and Borrower executed a Second Omnibus Amendment and Allonge to Promissory Note ("Second Amendment") on October 19, 2022. A true and accurate copy of the Second Amendment is attached as **Exhibit D**. Of note, the Second Amendment modified the Loan Agreement by (a) amending the definition of "Required Paydown Date" in Exhibit A to the Loan Agreement to mean December 9, 2022, (b) amending the definition of "Required Paydown Amount" in Exhibit A to the Loan Agreement to mean $2,000,000, (c) amending the definition of "Maturity Date" in the Note to mean March 31, 2023, (d) replacing Schedule A to the Note in its entirety with a new Schedule A (Principal and Interest Payments), (e) replacing Schedule B to the Note in its entirety with a new Schedule B (Benchmark Replacement Setting). The Second Amendment also modified Sections 6.22(d) and 6.23(d) of the Loan Agreement to revise the requirements for the Debt Service Account and the Operating Expense Account. With respect to the latter, as of October 19, 2022, there was a shortfall of $1,017,130 in the Operating Expense Account, and the Plaintiff allowed the Borrower to provide evidence of a line of credit with Erie Bank to satisfy a portion of the OEA Shortfall to fund a portion of the OEA Shortfall.

15.     The Note (as amended) has been – and currently is –in default due to Borrower's repeated failure to make principal, interest, and other payments when due under the terms of the Note.

6

16.     On April 13, 2023, the Plaintiff, the Borrower, and Sinito entered into a Forbearance Agreement ("First Forbearance Agreement"). A true and accurate copy of the First Forbearance Agreement is attached as **Exhibit E**. In the First Forbearance Agreement, the parties agreed on the following:

(a)     The Borrower and Sinito acknowledged that, as of that date, the aggregate Indebtedness under the Loan Documents (including outstanding principal, accrued interest, and unpaid fees and costs, but excluding attorneys' fees and costs) was $30,599,718.47 and that interest, fees and costs will continue to accrue on such amounts pursuant to the Loan Documents with interest accruing at the Default Rate.

(b)     The Borrower and Sinito acknowledged that certain Events of Default had occurred and were continuing to occur under the Loan Documents (which included the Guaranty), which were the following: (i) Borrower's failure to pay and satisfy the $2,000,000 Required Paydown Amount prior to December 9, 2022 (the Required Paydown Date) pursuant to Section 2.6 of the Loan Agreement, as amended (the "Paydown Default"); (ii) Borrower's failure to pay and deposit the $1,495,104 New DSA Deposit Amount prior to November 18, 2022, the date such deposit was required to be made pursuant to Section 6.22(d) of the Loan Agreement, as amended (the "DSA Deposit Default"); (iii) Borrower's failure to pay and deposit the $1,017,130 OEA Shortfall prior to November 18, 2022, the date such deposit was required to be made pursuant to Section 6.23(d) of the Loan Agreement, as amended (the "OEA Shortfall Deposit Default"); Borrower's failure to pay and satisfy a late charge in the amount of $36,636.59 (the "Delinquent Late Charge"), which is due and payable as the result of the Borrower's failure to timely pay and satisfy the monthly interest payment due pursuant to the Note and Loan Agreement on December 1, 2022 and thereafter; and Borrower's failure to pay and satisfy an interest payment shortfall in the amount of $72,621.88 due pursuant to the Note for the period of November 1, 2022 through March 1, 2023 (the "Interest Shortfall") (collectively the "Acknowledged Events of Default").

(c)     The Borrower and Sinito acknowledged that the Borrower would not be able to pay and satisfy the Loan on the Maturity Date of March 31, 2023 and that the failure to do so would be an Event of Default under the Loan Documents.

(d)     The Borrower and Sinito acknowledged that, as a result of the Acknowledged Events of Default, Lender is entitled to exercise its rights and remedies under the Loan Documents and Guaranty Agreements including: (i) declaring all Indebtedness evidenced by such Loan Documents to be immediately due and

7

payable in full; (ii) foreclosing its liens and security interests; and/or (iii) obtaining a judgment against the Borrower and, subject to the terms and conditions of the Guaranty Agreements, Sinito.

(e)     The Borrower and Sinito asked the Plaintiff to (i) forbear from exercising its rights and remedies pursuant to the Loan Documents and applicable law on account of the Acknowledged Events of Default and the prospective Maturity Event of Default to permit Borrower to, on or before May 19, 2023, obtain a loan from a third-party lender sufficient in amount to pay and satisfy all obligations owing from Borrower to Lender pursuant to the Note and Loan Agreement on or before May 19, 2023 (the "Refinancing Loan"); and (ii) permit the Borrower to pay monthly payments of interest on or before each Loan Payment Date prior to May 19, 2023 in an amount set by the Interest Rate and not by the Default Rate.

(f)     The Plaintiff agreed to forbear and modify the Borrower's payment obligations in certain ways and under certain conditions, as outlined in the First Forbearance Agreement and incorporated herein ("First Forbearance Conditions").

(g)     The Borrower and Sinito covenanted to the Borrower that the Plaintiff has timely performed all of its obligations under the Loan Documents, and neither had any defenses, offsets, counterclaims, claims or demands of any nature which can be asserted against the Plaintiff (or any affiliate of the Plaintiff for damages), with respect to the Loan Documents, or to reduce or eliminate all or any part of the Indebtedness or other obligations owing to Lender under the Loan Documents.

17.     On June 27, 2023, the Plaintiff, the Borrower, and Sinito entered into a Second Forbearance Agreement ("Second Forbearance Agreement"). A true and accurate copy of the Second Forbearance Agreement is attached as **Exhibit F**. In the Second Forbearance Agreement, the parties agreed on the following:

(a)     The Borrower and Sinito acknowledged that, as of that date, the aggregate Indebtedness under the Loan Documents (including outstanding principal, accrued interest, and unpaid fees and costs, but excluding attorneys' fees and costs) was $30,240,460 and that interest, fees and costs will continue to accrue on such amounts pursuant to the Loan Documents with interest accruing at the Default Rate.

(b)     The Borrower and Sinito acknowledged that they had failed to timely and fully perform the First Forbearance Conditions ("First Forbearance Conditions Defaults") and that, as a result, as a result, the Plaintiff was entitled to exercise its rights and remedies under the Loan Documents and Guaranty Agreements

8

including but not limited to: (i) declaring all Indebtedness evidenced by such Loan Documents to be immediately due and payable in full; (ii) foreclosing its liens and security interests; and/or (iii) obtaining a judgment against the Borrower and, subject to the terms and conditions of the Guaranty Agreements, Sinito.

(c)    The Borrower and Sinito asked the Plaintiff to forbear from exercising its rights and remedies pursuant to the Loan Documents and applicable law on account of the Acknowledged Events of Default, the Maturity Event of Default and the First Forbearance Conditions Defaults to permit Borrower to, on or before July 31, 2023, obtain a loan from Reef Private Capital, LLC ("Reef") in amount sufficient to pay and satisfy all (or a portion, as the case may be) of the obligations owing from Borrower to Lender pursuant to the Loan Documents (the "Refinancing Loan").

(d)    The Plaintiff agreed to forbear and modify the Borrower's payment obligations in certain ways and under certain conditions, as outlined in the Second Forbearance Agreement and incorporated herein ("Second Forbearance Conditions"). The Second Forbearance Conditions included, but are not limited to, (i) the Borrower paying $500,000 towards the outstanding principal amount of the Loan by July 11, 2023; (ii) the Borrower executing and delivering certain equity interest pledges or developer fee pledges for certain properties owned by The Millennia Companies; (iii) the Borrower timely and fully performing its obligations under the Loan Documents with some exceptions, including the depositing of certain amounts into the Operating Expense Account or the Debt Service Account during the Second Forbearance Period; (iv) the Borrower delivering certain receivables to the Plaintiff in regard to the Refinancing Loan; and (v) Sinito delivering a new promissory note to the Plaintiff if, upon the closing of the Refinancing Loan and the accompanying paydown of the Loan, the net proceeds of the Refinancing Loan received by the Borrower (or the Plaintiff on behalf of the Borrower) were insufficient to pay off the Loan in full.

(e)    The Borrower and Sinito covenanted to the Borrower that the Plaintiff had timely performed all of its obligations under the Loan Documents, and neither had any defenses, offsets, counterclaims, claims or demands of any nature which can be asserted against the Plaintiff (or any affiliate of the Plaintiff for damages), with respect to the Loan Documents, or to reduce or eliminate all or any part of the Indebtedness or other obligations owing to Lender under the Loan Documents.

18.    On September 27, 2023, the Plaintiff, the Borrower, and Sinito entered into a Third Forbearance Agreement ("Third Forbearance Agreement"). A true and accurate copy of

9

the Third Forbearance Agreement is attached as **Exhibit G**. In the Third Forbearance Agreement, the parties agreed on the following:

(a)     The Borrower and Sinito acknowledged that, as of that date, the aggregate Indebtedness under the Loan Documents (including outstanding principal, accrued interest, and unpaid fees and costs, but excluding attorneys' fees and costs) was $30,018,887.90 and that interest, fees and costs will continue to accrue on such amounts pursuant to the Loan Documents with interest accruing at the Default Rate.

(b)     The Borrower and Sinito acknowledged that they had failed to timely and fully perform the Second Forbearance Conditions ("Second Forbearance Conditions Defaults") and that, as a result, as a result, the Plaintiff was entitled to exercise its rights and remedies under the Loan Documents and Guaranty Agreements including but not limited to: (i) declaring all Indebtedness evidenced by such Loan Documents to be immediately due and payable in full; (ii) foreclosing its liens and security interests; and/or (iii) obtaining a judgment against the Borrower and, subject to the terms and conditions of the Guaranty Agreements, Sinito.

(c)     The Borrower and Sinito asked the Plaintiff to forbear from exercising its rights and remedies pursuant to the Loan Documents and applicable law on account of the Acknowledged Events of Default, the Maturity Event of Default,  the First Forbearance Conditions Defaults, and the Second Forbearance Conditions Defaults to permit Borrower to, on or before November 15, 2023, obtain a loan from Reef Private Capital, LLC ("Reef") or another lender in amount sufficient to pay and satisfy all (or a portion, as the case may be) of the obligations owing from Borrower to Lender pursuant to the Loan Documents (the "Refinancing Loan").

(d)     The Plaintiff agreed to forbear and modify the Borrower's payment obligations in certain ways and under certain conditions, as outlined in the Third Forbearance Agreement and incorporated herein ("Third Forbearance Conditions"). The Third Forbearance Conditions included, but are not limited to, (i) the Borrower pledging all direct or indirect right, title, and interest of Sinito and Sinito's wife in certain properties; (ii) the Borrower executing and delivering certain equity interest pledges or developer fee pledges for certain properties owned by The Millennia Companies (the Pledge Agreement also executed on September 27, 2023 is not attached hereto); (iii) the Borrower timely and fully performing its obligations under the Loan Documents with some exceptions, including the depositing of certain amounts into the Operating Expense Account or the Debt Service Account during the Third Forbearance Period; (iv) the Borrower delivering certain receivables to the Plaintiff in regard to the Refinancing Loan; and (v) Sinito delivering a new promissory note to the Plaintiff if, upon the closing of the Refinancing Loan and the accompanying paydown of the Loan, the net proceeds

10

of the Refinancing Loan received by the Borrower (or the Plaintiff on behalf of the Borrower) were insufficient to pay off the Loan in full.

(e)     The Borrower and Sinito covenanted to the Borrower that the Plaintiff had timely performed all of its obligations under the Loan Documents, and neither had any defenses, offsets, counterclaims, claims or demands of any nature which can be asserted against the Plaintiff (or any affiliate of the Plaintiff for damages), with respect to the Loan Documents, or to reduce or eliminate all or any part of the Indebtedness or other obligations owing to Lender under the Loan Documents.

19.     On January 17, 2024, the Plaintiff, the Borrower, and Sinito entered into a Fourth Forbearance Agreement ("Fourth Forbearance Agreement"). A true and accurate copy of the Fourth Forbearance Agreement is attached as **Exhibit H**. In the Fourth Forbearance Agreement, the parties agreed on the following:

(a)     The Borrower and Sinito acknowledged that, as of that date, the aggregate Indebtedness under the Loan Documents (including outstanding principal, accrued interest, and unpaid fees and costs, but excluding attorneys' fees and costs) was $29,312,464.07 and that interest, fees and costs will continue to accrue on such amounts pursuant to the Loan Documents with interest accruing at the Default Rate.

(b)     The Borrower and Sinito acknowledged that they had failed to timely and fully perform one or more of the Third Forbearance Conditions ("Third Forbearance Conditions Defaults") and that, as a result, as a result, the Plaintiff was entitled to exercise its rights and remedies under the Loan Documents and Guaranty Agreements including but not limited to: (i) declaring all Indebtedness evidenced by such Loan Documents to be immediately due and payable in full; (ii) foreclosing its liens and security interests; and/or (iii) obtaining a judgment against the Borrower and, subject to the terms and conditions of the Guaranty Agreements, Sinito.

(c)     The Borrower and Sinito asked the Plaintiff to forbear from exercising its rights and remedies pursuant to the Loan Documents and applicable law on account of the Acknowledged Events of Default, the Maturity Event of Default,  the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults, and the Third Forbearance Conditions Defaults to permit Borrower to, on or before November 15, 2023, obtain a loan from a third-party lender in amount sufficient to pay and satisfy all (or a portion, as the case may be) of the obligations owing from Borrower to Lender pursuant to the Loan Documents (the

11

"Refinancing Loan") or otherwise pay such obligations in full from other sources and proceeds.

(d) The Plaintiff agreed to forbear and modify the Borrower's payment obligations in certain ways and under certain conditions, as outlined in the Third Forbearance Agreement and incorporated herein ("Fourth Forbearance Conditions"). The Fourth Forbearance Conditions included, but are not limited to, (i) the Borrower making certain payments under the Loan Documents; (ii) Sinito providing certain receivables to the Plaintiff regarding the Refinancing Loan and the sale of certain other properties; (iii) the Borrower timely and fully performing its obligations under the Loan Documents with some exceptions, including the depositing of certain amounts into the Operating Expense Account or the Debt Service Account during the Fourth Forbearance Period; (iv) the Borrower providing written evidence that deferred maintenance on the Property had been fully completed by January 31, 2024; and (v) Sinito delivering a new promissory note to the Plaintiff if, upon the closing of the Refinancing Loan and the accompanying paydown of the Loan, the net proceeds of the Refinancing Loan received by the Borrower (or the Plaintiff on behalf of the Borrower) were insufficient to pay off the Loan in full.

(e) The Borrower and Sinito covenanted to the Borrower that the Plaintiff had timely performed all of its obligations under the Loan Documents, and neither had any defenses, offsets, counterclaims, claims or demands of any nature which can be asserted against the Plaintiff (or any affiliate of the Plaintiff for damages), with respect to the Loan Documents, or to reduce or eliminate all or any part of the Indebtedness or other obligations owing to Lender under the Loan Documents.

(f) The Plaintiff, the Borrower, and Sinito agreed to amend the Note to provide that the Margin (as such term is defined in the Note) be increased to 6.25% effective January 1, 2024.

20. On July 8, 2024, the Plaintiff, the Borrower, and Sinito entered into a Fifth Forbearance Agreement ("Fifth Forbearance Agreement"). A true and accurate copy of the Fifth Forbearance Agreement is attached as **Exhibit I**. In the Fifth Forbearance Agreement, the parties agreed on the following:

(a) The Borrower and Sinito acknowledged that, as of that date, the aggregate Indebtedness under the Loan Documents (including outstanding principal, accrued interest, and unpaid fees and costs, but excluding attorneys' fees and costs) was $29,609,883.77 and that interest, fees and costs will continue to accrue

12

on such amounts pursuant to the Loan Documents with interest accruing at the Default Rate.

(b)    The Borrower and Sinito acknowledged that they had failed to timely and fully perform one or more of the Fourth Forbearance Conditions ("Fourth Forbearance Conditions Defaults") and that, as a result, as a result, the Plaintiff was entitled to exercise its rights and remedies under the Loan Documents and Guaranty Agreements including but not limited to: (i) declaring all Indebtedness evidenced by such Loan Documents to be immediately due and payable in full; (ii) foreclosing its liens and security interests; and/or (iii) obtaining a judgment against the Borrower and, subject to the terms and conditions of the Guaranty Agreements, Sinito.

(c)    The Borrower and Sinito asked the Plaintiff to forbear from exercising its rights and remedies pursuant to the Loan Documents and applicable law on account of the Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults, the Third Forbearance Conditions Defaults, and the Fourth Forbearance Conditions Defaults to permit Borrower to, on or before November 15, 2023, obtain a loan from a third-party lender in amount sufficient to pay and satisfy all (or a portion, as the case may be) of the obligations owing from Borrower to Lender pursuant to the Loan Documents (the "Refinancing Loan") or otherwise pay such obligations in full from other sources and proceeds.

(d)    The Plaintiff agreed to forbear and modify the Borrower's payment obligations in certain ways and under certain conditions, as outlined in the Fourth Forbearance Agreement and incorporated herein ("Fifth Forbearance Conditions") until the earlier of certain events or 11:59 pm on February 1, 2025 ("Fifth Forbearance Period"). The Fifth Forbearance Conditions included, but are not limited to, (i) the Borrower making certain payments under the Loan Documents; (ii) Sinito providing certain receivables to the Plaintiff regarding the Refinancing Loan and the sale of certain other properties, including the payment to the Plaintiff of any net proceeds from the sale of any pledged assets; (iii) Sinito executing an amended and restated Pledge Agreement (restating in its entirety that certain Pledge Agreement dated September 27, 2023) of the pledges made thereunder, a revised draft of the Pledge summary, and confirmation and additional pledges of certain interests in the pledged assets; (iv) the Borrower timely and fully performing its obligations under the Loan Documents with some exceptions, including the depositing of certain amounts into the Operating Expense Account or the Debt Service Account during the Fifth Forbearance Period; (v) the Borrower providing written evidence that deferred maintenance on the Property had been fully completed by July 15, 2024; and (vi) Sinito delivering a new promissory note to the Plaintiff if, upon the closing of the Refinancing Loan and the accompanying paydown of the Loan, the net proceeds of the Refinancing

13

Loan received by the Borrower (or the Plaintiff on behalf of the Borrower) were insufficient to pay off the Loan in full.

(e)     The Borrower and Sinito covenanted to the Borrower that the Plaintiff had timely performed all of its obligations under the Loan Documents, and neither had any defenses, offsets, counterclaims, claims or demands of any nature which can be asserted against the Plaintiff (or any affiliate of the Plaintiff for damages), with respect to the Loan Documents, or to reduce or eliminate all or any part of the Indebtedness or other obligations owing to Lender under the Loan Documents.

(f)     The Borrower and Sinito agreed that, notwithstanding any provision in the Loan Documents (including the Guaranty Agreements) or any other documents executed pursuant to this Agreement requiring written notice from the Plaintiff, prior to the Plaintiff pursuing its rights or remedies under such document or applicable law, upon the occurrence of a Fifth Forbearance Default or expiration of the Fifth Forbearance Period, the Plaintiff shall immediately be entitled to pursue its rights and remedies under any or all of the Loan Documents (including the Guaranty Agreements), any documents executed pursuant to this Agreement and applicable law without notice.

21.     The Borrower and Sinito did not meet the obligations of the Fifth Forbearance

Agreement.

(a)     Condition 5(a) of Fifth Forbearance did not occur. The Borrower's last interest payment was in April 2024 for the payment due March 1, 2024, and that was untimely. (See **Exhibit J**.) The interest payments referenced therein (April through September 2024) that were due to be paid in full by September 3, 2024 were not paid until April 23, 2025, when the Sinitos closed on the sale of one of the pledged properties and some of the net proceeds thereof in the amount of $4,252,800.65 were applied as follows: $1,736,688.16 for escrow and $2,516,112.49 for interest payments, which included the 5(a) forbearance payments of April through September 2024 and for October, November, and part of December 2024. (See **Exhibit J**.) But no payments have been received since then.

(b)     There are several requirements under Condition 5(b) of the Fifth Forbearance. Only the three noted as having been satisfied within the Fifth Forbearance Agreement itself [(1), (2), and (3)] when the document was executed actually occurred. The conditions necessary for the Borrower and the Sinitos to sell their Pledged Assets [(4), (5), and (6)] were not met, and the Borrower did not repay the Loan in full by the specified date, February 1, 2025. Further, the conditions relating to the granting of a security interest in the net proceeds from the sale of Pledged Assets and properties were not satisfied because Sinito and his related

14

companies (The Millennia Companies) were in default with the equity investors and limited partners in their other projects and properties so, when pledged properties were sold, the net proceeds went to the other investors or limited partners to cure those defaults and there were not sufficient proceeds to flow to Deutsche Bank that had been anticipated or promised by Sinito. In other words, the pledges that the Borrower and Sinito gave to Deutsche Bank had diminished to little value in fulfilling the Borrower's obligations to Deutsche Bank on the Centennial Project.

(c)     In violation of Condition 5(k), Sinito had already pledged the equity in some of these assets and properties to lenders other than Deutsche Bank.

(d)     In violation of Condition 5(d), neither the Borrower nor Sinito have provided written evidence that any of the items of deferred maintenance identified in the documents attached to the Fifth Forbearance Agreement as Exhibit D have been fully completed, let alone all of these obligations. This deferred maintenance included leaking roofs at several locations and water infiltration into several areas of the Property that has led to mold.

22.     As a result of the Note's maturity and the Borrower's repeated defaults thereunder (including under the various forbearance agreements), the principal amounts, accrued and unpaid interest, and other fees (including the Exit Fee under the Loan Agreement) are due on the Note. Among other reasons, the Fifth Forbearance Period has expired and the Loan balance remains unpaid and due and owing as of the date of this filing, which is a default under the Maturity Date. A true and accurate copy of the transaction listings for the Loan (as of August 18, 2025) is attached as **Exhibit J**.

23.     All conditions precedent to the Plaintiff's enforcement of the Note have occurred.

24.     The Plaintiff is entitled to default interest from February 3, 2025, the date that the Fifth Forbearance Period expired. The interest rate charged on the Note is variable throughout the life of the Note. The current default interest rate is 15.42122%, which consists of 3m SOFR of 4.17122%, the contractual margin of 6.25%, and the default rate premium of 5%.

<center>15</center>

25.     As a result of the above maturity and default, the Plaintiff is presently owed on the Note and the Mortgage (as that term is defined below) the following, as of September 30, 2025:

| | |
|---|---:|
| Principal | 29,040,460.00 |
| Accrued Interest 11/1/24 through 9/30/25 | 2,595,552.00 |
| Default Interest 2/3/25 through 9/30/25 | 684,987.00 |
| Custodial & Administrative Expenses | 300.00 |
| Exit Fee | 1,062,660.00 |
| **TOTAL ($) as of 9/30/25** | **33,383,959** |

plus regular and default interest that continues to accrue at the per diem rate of $11,260.70, plus fees and advances that continue to accrue, plus the Plaintiff's attorney fees and costs accrued to date and those which it will continue to accrue thereafter.

26.     Accordingly, the Plaintiff is entitled to judgment against the Borrower on the Note, as of September 30, 2025, the total sum of $33,383,959, together with interest as and from September 30, 2025 at the current rate of $11,260.70 per day, and the costs of collection and enforcement, which include, but are not limited to, the reasonable attorneys' fees incurred by the Plaintiff, and interest on the principal balance from September 30, 2025.

**COUNT TWO – BREACH OF CONTRACT (GUARANTY AGAINST SINITO)**

27.     The Plaintiff restates and incorporates by reference each of the foregoing allegations as if fully rewritten herein.

28.     To secure repayment of the Note, and as part of the same transaction, Sinito executed a Guaranty (the "Guaranty") dated July 1, 2021. A true and accurate copy of the Guaranty is attached as **Exhibit K**.

16

29.    By executing the Guaranty, Sinito irrevocably and unconditionally guaranteed to the Plaintiff the payment and performance of the Borrower's obligations under the Note when the same become due and payable, including by acceleration.

30.    The Borrower's obligations under the Note have fully matured as set forth above, but the amounts due on the Note remain unpaid.

31.    The Guaranty is in default by virtue of Sinito's failure to pay the Borrower's obligations under the Note to the Plaintiff. Notwithstanding, under the Guaranty, as a condition to pursuing any claim against Sinito in connection with the Loan Maturity Guaranty, the Plaintiff agreed to first exhaust its remedies against the Borrower under the Loan Documents and, after realizing on the value of the property (referred to as the Project Facilities in the Guaranty) through a foreclosure sale or deed in lieu of foreclosure, the Guaranty, and specifically the Loan Payment Guaranty, would serve as a guaranty to the Plaintiff of any shortfall that may be due and owing to the Plaintiff.

32.    The Property has not been sold or deed in lieu of foreclosure has not been executed so the amount that Sinito owes the Plaintiff under the Guaranty is not presently known or ascertainable.

33.    Nevertheless, the Plaintiff is entitled to judgment against Sinito on the Guaranty in an amount to be determined at trial, together with interest as and from September 30, 2025 at the current rate of $11,260.70 per day, and the costs of collection and enforcement, which include, but are not limited to, the reasonable attorneys' fees incurred by the Plaintiff, and interest on the principal balance from September 30, 2025.

## COUNT THREE – COMMERCIAL FORECLOSURE

17

34.     The Plaintiff restates and incorporates by reference each of the foregoing allegations as if fully rewritten herein.

35.     To secure repayment of the Note, and as part of the same transaction, the Borrower executed a Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing (the "Mortgage") on the Property, dated July 1, 2021, and that was recorded on July 16, 2021 as Instrument No. 202107160455 of the Cuyahoga County Records. A true and accurate copy of the Mortgage is attached as **Exhibit L**.

36.     The Mortgage constitutes a valid first lien upon the real estate described in Exhibit A of the Mortgage and which is described above.

37.     Because of the Borrower's failure to make principal, interest, and other payments due under the Note, the Mortgage is in default, the conditions of defeasance contained in the Mortgage have been broken, and the Plaintiff is entitled to have the Mortgage foreclosed.

38.     All conditions precedent to the Plaintiff's enforcement of the Mortgage have occurred.

39.     County of Cuyahoga may claim an interest in the Property by virtue of an Open-Ended Mortgage Deed and Assignment of Rents and Leases and Security Agreement dated November 5, 2021 and recorded on November 12, 2021 as Instrument No. 202111120689 of the Cuyahoga County Records. Any claim or interest is inferior to the interest of the Plaintiff.

40.     Defendant Brad Comes, as Treasurer of Cuyahoga County, Ohio, may claim an interest in the Property by virtue of any unpaid real estate taxes, assessments, and other fees currently due and which may become due and owing while this action is pending.

18

41.     By virtue of the defaults under the Note and the Mortgage, the Plaintiff is entitled to have the Mortgage foreclosed and for the equity of redemption of all Defendants named herein forever cutoff and barred, the Property sold, and the proceeds applied to the payment of the Plaintiff's claims as set forth herein

42.     The required Preliminary Judicial Report is attached as **Exhibit M**.

43.     Section 5.11(a) of the Mortgage provides that the "MORTGAGE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF OHIO, WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PRINCIPLES."

44.     Section 5.11(b) of the Mortgage provides that, "NOTWITHSTANDING THE FOREGOING, TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES STIPULATE AND AGREE THAT THE MORTGAGEE [WHICH IS THE PLAINTIFF] MAY ENFORCE, IN ACCORDANCE WITH THE LAW OF THE STATE OF OHIO, ANY OR ALL OF ITS RIGHTS TO SUE THE MORTGAGOR [THE BORROWER], TO COLLECT ANY INDEBTEDNESS IN OHIO OR ELSEWHERE, BEFORE OR AFTER FORECLOSURE."

**COUNT FOUR – ASSIGNMENT OF LEASES AND RENTS**

45.     The Plaintiff restates and incorporates by reference each of the foregoing allegations as if fully rewritten herein.

46.     The Assignment of Rents and Leases (which is included within the Mortgage) constitutes a present, absolute, and unconditional assignment by the Borrower of all leases, subleases, licenses, rental agreements, issues, income, profits, and other rights generated by and associated with the Property (collectively, the "Rents").

19

47.     Because of the Borrower's failure to make principal, interest, and other payments when due under the Note, the license that Plaintiff granted the Borrower in the Assignment of Rents to collect the Rents is automatically revoked, and the Plaintiff is now entitled to collect and receive all Rents from the Property.

48.     All conditions precedent to the Plaintiff's enforcement of the Assignment of Rents have occurred.

## COUNT FIVE – POSSESSION OF COLLATERAL UNDER SECURITY AGREEMENT

49.     The Plaintiff restates and incorporates by reference each of the foregoing allegations as if fully rewritten herein.

50.     To further secure repayment of the Note, and as part of the same transaction and in the same document as the Mortgage, the Borrower pledged the fixtures and personal property described in Article 4 of the Mortgage (the "Security Interest").

51.     The Security Interest was perfected by the recording of a UCC Financing Statement with the Ohio Secretary of State at File No. OH00254681402 on July 19, 2021("Financing Statement"), a true and accurate copy of which is attached as **Exhibit N**, and by the recording of another UCC Financing Statement on July 16, 2021 as Instrument No. 202107169196 of the Cuyahoga County Records ("Fixture Filing"), a true and accurate copy of which is attached as **Exhibit O**.

52.     The Security Interest, as perfected by the Plaintiff's Financing Statement, constitutes a valid lien on all the personal property described in Article 4 of the Mortgage.

53.     Because of the Borrower's failure to make principal, interest, and other payments when due under the Note, the Plaintiff is entitled to exercise all its rights under the Security

20

Interest and gain immediate possession of all the personal property described in Article 4 of the Mortgage or, in the alternative, to have those items included in the appraisal of the Property and sold or auctioned off as part of the Property.

54. All conditions precedent to the Plaintiff's enforcement of the Security Interest have occurred.

<div align="center"><strong><u>COUNT SIX – APPOINTMENT OF A RECEIVER</u></strong></div>

55. The Plaintiff restates and incorporates by reference each of the foregoing allegations as if fully rewritten herein.

56. The terms of the Mortgage and the Loan Agreement entitle the Plaintiff to the appointment of a receiver for the Property upon the default of the Borrower.

57. As a consequence of the Borrower's failure to make principal, interest, and other payments when due under the Note, the Borrower is in default of the terms of the Mortgage and the Loan Agreement.

58. As a result of the above-described defaults, the Plaintiff is entitled to the appointment of a receiver over the Property, the Rents, and the personal property pledged under the Security Interest.

**WHEREFORE**, the Plaintiff prays for judgment as follows:

A. On Count One, against the Borrower, in the amount of $33,383,959, which consists of $29,040,460.00 in principal, $2,595,552.00 in accrued and unpaid interest, $684,98.00 in default interest, an accelerated exit fee of $1,062,660, applicable charges of $300, and costs and expenses that are incurred through the date of judgment, which include, but are not limited to, the reasonable attorneys' fees incurred by the Plaintiff that have not yet been fully

<div align="center">21</div>

calculated, and interest on the principal balance at the current rate of $11,260.70 per day from September 30, 2025;

B.    On Count Two, against Sinito, in an amount to be determined at trial, together with interest as and from September 30, 2025 at the current rate of $11,260.70 per day, and the costs of collection and enforcement, which include, but are not limited to, the reasonable attorneys' fees incurred by the Plaintiff, and interest on the principal balance from September 30, 2025;

C.    On Count Three, that the Mortgage be adjudged a valid lien upon the Property, and that said lien be foreclosed; and that the Property be ordered sold and that Plaintiff be paid out of the proceeds of such sale; and for such other relief, legal and equitable, as may be proper and necessary; and that all the other defendants herein be required to set up their liens or interest in the Property or be forever barred from asserting the same;

D.    On Count Four, for an order that the Plaintiff is entitled to exercise all its rights under the Assignment of Rents and further ordering the Borrower to turn over all Rents it is holding, and that the Plaintiff may receive and collect all Rents from the Property;

E.    On Count Five, for an order granting the Plaintiff possession of the personal property described in Article 4 of the Mortgage or, in the alternative, to include that personal property in the appraisal of the Property and auctioned off as part of the Property;

F.    On Count Six, for the appointment of a receiver for the Property, the Rents, and the personal property pledged under the Security Interest;

G.    On all Counts, for interest, its costs, attorney fees, and expenses;

22

H.     On all Counts, for all other relief to which the Plaintiff is entitled in law and in equity.

Respectfully submitted,

/s/ Matthew G. Vansuch
Timothy M. Reardon (0059631)
Matthew G. Vansuch (0079328)
Roetzel & Andress LPA
6500 Seville Dr., Ste. B
Canfield, OH 44406
(330) 533-6195
Fax (330) 533-6198
TReardon@ralaw.com
MVansuch@ralaw.com
*Attorneys for Plaintiff*

[23707252.10]

23

# EXHIBITS TO THE COMPLAINT

| Ex. | Description |
|-----|-------------|
| A | Loan Agreement dated July 1, 2021 |
| B | Promissory Note dated July 1, 2021 |
| C | First Omnibus Amendment and Allonge to Promissory Note dated November 15, 2021 |
| D | Second Omnibus Amendment and Allonge to Promissory Note dated October 19, 2022 |
| E | Forbearance Agreement dated April 13, 2023 |
| F | Second Forbearance Agreement dated June 27, 2023 |
| G | Third Forbearance Agreement dated September 27, 2023 |
| H | Fourth Forbearance Agreement dated January 17, 2024 |
| I | Fifth Forbearance Agreement dated July 8, 2024 |
| J | Account Transaction Listings |
| K | Guaranty dated July 1, 2021 |
| L | Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated July 1, 2021 |
| M | Preliminary Judicial Report |
| N | UCC Financing Statement SOS No. OH00254681402 on July 19, 2021 |
| O | UCC Financing Statement Cuyahoga County Fixture Filing on July 16, 2021 |

| Ex. | Description |
|-----|-------------|
| A | Loan Agreement dated July 1, 2021 |

**LOAN AGREEMENT**

by and between

**HH CLEVELAND HUNTINGTON L.P.,**
an Ohio limited partnership

and

**DEUTSCHE BANK AG, NEW YORK BRANCH**

Dated as of July 1, 2021

Relating to:

**HH CLEVELAND HUNTINGTON L.P.**
**$35,422,000 TAXABLE MULTIFAMILY HOUSING MORTGAGE NOTE**
**(THE CENTENNIAL)**

Table of Contents

Page

ARTICLE 1   DEFINITIONS ................................................................................... 1

    Section 1.1    Definitions.......................................................................... 1
    Section 1.2    Rules of Construction; Time of Day ..................................... 1

ARTICLE 2   LOAN AND PROVISIONS FOR REPAYMENT .................................... 1

    Section 2.1    Basic Loan and Repayment Terms ...................................... 1
    Section 2.2    Fees ................................................................................. 2
    Section 2.3    Termination and Voluntary Prepayment............................. 2
    Section 2.4    Obligations Absolute ......................................................... 2
    Section 2.5    INDEMNIFICATION........................................................... 2

ARTICLE 3   SECURITY ....................................................................................... 5

    Section 3.1    Mortgage and Other Loan Documents................................. 5
    Section 3.2    Financing Statements ........................................................ 5

ARTICLE 4   CONDITIONS PRECEDENT; REPRESENTATION OF LENDER ........... 6

    Section 4.1    Conditions Precedent to the Effectiveness of this Agreement............ 6
    Section 4.2    Representation of Lender.................................................... 7

ARTICLE 5   REPRESENTATIONS AND WARRANTIES OF THE BORROWER ........ 7

    Section 5.1    Existence .......................................................................... 7
    Section 5.2    Power, Authorization and No Conflicts................................ 7
    Section 5.3    Governmental Authorizations and Other Approvals ............. 7
    Section 5.4    Validity and Binding Effect................................................ 8
    Section 5.5    No Litigation..................................................................... 8
    Section 5.6    No Violations .................................................................... 8
    Section 5.7    Compliance ...................................................................... 8
    Section 5.8    Title to Properties; Liens and Encumbrances ..................... 8
    Section 5.9    Utilities and Access........................................................... 9
    Section 5.10    Financial Information........................................................ 9
    Section 5.11    ERISA .............................................................................. 9
    Section 5.12    Environmental Representations ......................................... 10
    Section 5.13    Outstanding Obligations and Material Contracts................. 10
    Section 5.14    Solvency........................................................................... 10
    Section 5.15    Full Disclosure ................................................................. 10
    Section 5.16    Loan Documents............................................................... 11
    Section 5.17    Illegal Activity ................................................................. 11
    Section 5.18    Executive Order 13224 ..................................................... 11
    Section 5.19    No Broker......................................................................... 11
    Section 5.20    Survey ............................................................................. 11
    Section 5.21    Flood Plain ....................................................................... 11
    Section 5.22    Rent Roll ...........................................**Error! Bookmark not defined.**

ARTICLE 6   GENERAL COVENANTS ................................................................. 12

Table of Contents
(continued)

Page

| | | |
|---|---|---|
| Section 6.1 | Conduct of Business; Maintenance of Existence; Mergers | 12 |
| Section 6.2 | Compliance with Legal Requirements; Payment of Impositions | 12 |
| Section 6.3 | Maintenance of Governmental Authorizations | 12 |
| Section 6.4 | Maintenance of Insurance | 13 |
| Section 6.5 | Compliance with Other Contracts and Loan Documents | 16 |
| Section 6.6 | Maintenance of Project Facilities | 16 |
| Section 6.7 | Inspection Rights | 17 |
| Section 6.8 | Keeping of Books | 17 |
| Section 6.9 | Reporting Requirements | 17 |
| Section 6.10 | Single Purpose Entities | 19 |
| Section 6.11 | Negative Pledge; No Sale | 20 |
| Section 6.12 | Payment of Indebtedness; Accounts Payable; Restrictions on Indebtedness | 21 |
| Section 6.13 | Environmental Covenants | 21 |
| Section 6.14 | Lender Representative | 23 |
| Section 6.15 | Tax Returns | 23 |
| Section 6.16 | Leases | 23 |
| Section 6.17 | Further Assurances | 23 |
| Section 6.18 | Management Agreement | 24 |
| Section 6.19 | Use of Proceeds | 24 |
| Section 6.20 | Compliance With Anti-Terrorism Regulations | 24 |
| Section 6.21 | Special Servicing Costs | 25 |
| Section 6.22 | Tax and Insurance Escrow Account | 25 |
| ARTICLE 7 | DEFAULTS AND REMEDIES | 27 |
| Section 7.1 | Defaults | 27 |
| Section 7.2 | Remedies | 29 |
| Section 7.3 | No Waivers; Consents | 30 |
| Section 7.4 | No Waiver; Remedies Cumulative | 30 |
| Section 7.5 | Set-Off | 30 |
| Section 7.6 | Borrower to Give Notice of Default | 30 |
| Section 7.7 | Replacement Guarantor | 30 |
| ARTICLE 8 | MISCELLANEOUS | 31 |
| Section 8.1 | Notices | 31 |
| Section 8.2 | Successors and Assigns; Third Party Beneficiaries | 32 |
| Section 8.3 | Survival of Covenants | 32 |
| Section 8.4 | Counterparts; Electronic Signature | 32 |
| Section 8.5 | Costs, Expenses and Taxes | 32 |
| Section 8.6 | Severability; Interest Limitation | 32 |
| Section 8.7 | Conflicts | 33 |
| Section 8.8 | Complete Agreement | 33 |
| Section 8.9 | Consent to Jurisdiction; Venue; Waiver of Jury Trial | 33 |
| Section 8.10 | Nonrecourse; Recourse Exceptions | 33 |

Table of Contents
(continued)

Page

| | | |
|---|---|---|
| Section 8.11 | Governing Law | 36 |
| Section 8.12 | Headings | 36 |
| Section 8.13 | Sale of Note and Secondary Market Transaction | 37 |
| Section 8.14 | Publicity | 39 |
| Section 8.15 | Determinations by the Lender and Lender Representative | 39 |
| Section 8.16 | Reinstatement | 39 |
| Section 8.17 | Further Assurances | 40 |
| Section 8.18 | Amendments. | 40 |
| EXHIBIT A | DEFINITIONS | A-1 |
| SCHEDULE 1 | SCHEDULE OF LITIGATION | S1-1 |
| SCHEDULE 2 | SCHEDULE OF OBLIGATIONS AND MATERIAL CONTRACTS | S2-1 |

Electronically Filed 09/30/2025 19:46 / / CV 25 125588 / Confirmation Nbr. 3631064 / CLPXC

## LOAN AGREEMENT

This **LOAN AGREEMENT** (as amended, modified or supplemented from time to time, this "Agreement") made as of July 1, 2021, by and between **DEUTSCHE BANK AG, NEW YORK BRANCH** (together with its successors and assigns the "Lender") and **HH CLEVELAND HUNTINGTON L.P.**, a limited partnership duly organized and validly existing under the laws of the State of Ohio (together with its permitted successors and assigns, the "Borrower").

## WITNESSETH:

**WHEREAS**, the Lender has determined to make a loan (the "Loan") to the Borrower in the amount of $35,422,000 (the "Loan Amount"), the proceeds of which are being applied by the Borrower to refinance a building owned by the Borrower, among other uses, which building is to be converted to a multifamily apartment housing facility, among other uses, and consists of a total of approximately 870 units and related personal property and equipment, located in Cleveland, Ohio, and to be known as "The Centennial" (the "Project Facilities"); and

NOW, THEREFORE, IN CONSIDERATION OF THE FOREGOING AND THE UNDERTAKINGS HEREIN SET FORTH AND OTHER GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY AND RECEIPT OF WHICH ARE HEREBY ACKNOWLEDGED, AND INTENDING TO BE LEGALLY BOUND, THE BORROWER AND THE LENDER HEREBY AGREE AS FOLLOWS:

## ARTICLE 1
## DEFINITIONS

Section 1.1    Definitions.  In this Agreement (except as otherwise expressly provided for or unless the context otherwise requires), any capitalized terms used, but not defined herein, shall have the meanings ascribed to them in the attached Exhibit A.

Section 1.2    Rules of Construction; Time of Day.  In this Agreement, unless otherwise indicated, (i) defined terms may be used in the singular or the plural and the use of any gender includes all genders, (ii) the words "hereof", "herein", "hereto", "hereby" and "hereunder" refer to this entire Agreement, (iii) all references to particular Articles or Sections are references to the Articles or Sections of this Agreement, (iv) the terms "agree" and "agreements" contained herein are intended to include and mean "covenant" and "covenants", (v) the term "including" shall mean "including, but not limited to," and (vi) the terms "best knowledge" or "knowledge" shall mean the actual knowledge of any Authorized Person of the Borrower after due inquiry.  References to any time of the day in this Agreement shall refer to Eastern standard time or Eastern daylight saving time, as in effect in New York, New York on such day.

## ARTICLE 2
## LOAN AND PROVISIONS FOR REPAYMENT

Section 2.1    Basic Loan and Repayment Terms.

(a)    The Lender agrees, upon the terms and conditions contained in this Agreement, to make the Loan to the Borrower, in one advance on the date of this Agreement.  The Borrower's obligation to repay the Loan shall be evidenced by the Note.

(b)    The Borrower hereby agrees to pay the Note and repay the Loan made pursuant to this Agreement by paying or causing to be paid to the Lender Representative in immediately available funds

for the account of the Lender the amounts set forth in the Note, in accordance with the terms of the Note and this Agreement.

Section 2.2    Fees

(a)    The Borrower shall pay or cause to be paid (i) on the date of execution and delivery of this Agreement, to Lender an up-front fee equal to 2% of the principal amount of the Loan and (ii) any and all special servicing fees or costs in accordance with Section 6.21 hereof.

(b)    At the Maturity Date or on the date of any replacement, assignment or cancellation of the Note (for any reason other than the payment in full of the Loan Amount and all other Indebtedness) occurring on or prior to the Maturity Date, the Borrower shall pay or cause to be paid to Lender an exit fee equal to 3% of the principal amount of the Loan (the "Exit Fee"); provided however that, notwithstanding the foregoing, Borrower shall not be required to pay said Exit Fee if (i) the Loan is paid off upon a condemnation or casualty event or (ii) the Project Facilities and the Loan are refinanced with Lender's direct placement financing facilitated by the Lender Representative, such as a refinancing described in the term sheet dated on or about July 9, 2021, and executed by the Borrower and the Lender Representative.

Section 2.3    Termination and Voluntary Prepayment.

(a)    Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, the Lender Representative's and the Lender's rights, interests and remedies hereunder and under the other Loan Documents shall not terminate or expire or be deemed to have been discharged or released until the payment in full of the Note. No such termination, expiration or release shall affect the survival of the indemnification provisions of this Agreement, which provisions shall survive any such termination, expiration or release as further set forth herein.

(b)    Additionally, the Borrower shall have, and is hereby granted, the option to prepay the unpaid principal amount of the Loan, in whole or in part, together with interest thereon to the extent provided in the Note.

Section 2.4    Obligations Absolute. The obligations of the Borrower under this Agreement shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement, under all circumstances whatsoever, including without limitation the following circumstances: (i) any lack of validity or enforceability of the Loan Documents or any other agreement or document relating thereto; (ii) any amendment or waiver of or any consent to or departure from the Loan Documents or any document relating thereto; (iii) any failure of consideration or (iv) the existence of any claim, set-off, defense or other right which the Borrower may have at any time against the Lender (or any persons or entities for whom the Lender may be acting) or any other Person, whether in connection with this Agreement, the transactions described herein or any unrelated transaction. The Borrower understands and agrees that no payment by the Borrower under any other agreement (whether voluntary or otherwise) shall constitute a defense to its obligations hereunder, except to the extent that the Loan evidenced hereby has been indefeasibly paid in full, whether owing under this Agreement or under the other Loan Documents.

Section 2.5    INDEMNIFICATION.    THE BORROWER COVENANTS TO DEFEND, INDEMNIFY AND HOLD HARMLESS THE LENDER, THE LENDER REPRESENTATIVE AND EACH OF THEIR RESPECTIVE AFFILIATES AND EACH OF THEIR AND THEIR AFFILIATES' RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, REPRESENTATIVES, AGENTS, AND STOCKHOLDERS (COLLECTIVELY, THE "INDEMNIFIED PARTIES"), EXCEPT AS LIMITED BELOW, FROM AND AGAINST ANY AND ALL CLAIMS, COMPENSATORY ECONOMIC DAMAGES AND ACTUAL LOSSES, LIABILITIES, ACTUAL COSTS OR OUT-OF-POCKET

EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES FOR COUNSEL OF EACH OF THE INDEMNIFIED PARTIES' CHOICE) WHATSOEVER WHICH THE INDEMNIFIED PARTIES MAY SUFFER OR INCUR (OR WHICH MAY BE CLAIMED AGAINST ANY OF THE INDEMNIFIED PARTIES BY ANY PERSON WHATSOEVER) BY REASON OF OR IN CONNECTION WITH:

(a) THE NOTE, LOAN AGREEMENT, OR THE EXECUTION OR AMENDMENT HEREOF OR THEREOF OR IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, INCLUDING THE ISSUANCE, SALE OR RESALE OF THE NOTE;

(b) ANY BREACH BY THE BORROWER OF ANY REPRESENTATION, WARRANTY, COVENANT, TERM OR CONDITION IN, OR THE OCCURRENCE OF ANY DEFAULT UNDER, THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS;

(c) THE INVOLVEMENT OF ANY OF THE INDEMNIFIED PARTIES IN ANY LEGAL SUIT, INVESTIGATION, PROCEEDING, INQUIRY OR ACTION AS A CONSEQUENCE, DIRECT OR INDIRECT, OF THE LENDER REPRESENTATIVE'S OR THE LENDER'S ACTIONS TAKEN PURSUANT TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR ANY OTHER EVENT OR TRANSACTION CONTEMPLATED BY ANY OF THE FOREGOING;

(d) ANY UNTRUE STATEMENT OR ALLEGED UNTRUE STATEMENT BY BORROWER OR ANY AFFILIATE CONTAINED OR INCORPORATED BY REFERENCE IN ANY OFFERING OR REOFFERING MATERIALS PREPARED IN RESPECT OF THE NOTE, OR ANY SUPPLEMENT OR AMENDMENT THEREOF, OR THE OMISSION OR ALLEGED OMISSION BY BORROWER OR ANY AFFILIATE TO STATE THEREIN A MATERIAL FACT NECESSARY TO MAKE SUCH STATEMENTS IN LIGHT OF THE CIRCUMSTANCES IN WHICH THEY ARE OR WERE MADE NOT MISLEADING;

(e) THE ACCEPTANCE OR ADMINISTRATION OF THE LOAN DOCUMENTS OR THE SECURITY INTERESTS THEREUNDER OR THE PERFORMANCE OF DUTIES UNDER THE LOAN DOCUMENTS OR ANY LOSS OR DAMAGE TO PROPERTY OR ANY INJURY TO OR DEATH OF ANY PERSON THAT MAY BE OCCASIONED BY ANY CAUSE WHATSOEVER PERTAINING TO THE PROJECT FACILITIES OR THE USE THEREOF, INCLUDING WITHOUT LIMITATION ANY LEASE THEREOF OR ASSIGNMENT OF ITS INTEREST IN THIS AGREEMENT;

(f) ANY ACT OR OMISSION OF THE BORROWER OR ANY OF ITS AGENTS, CONTRACTORS, SERVANTS, EMPLOYEES OR LICENSEES IN CONNECTION WITH THE ADVANCES OR THE PROJECT FACILITIES, THE OPERATION OF THE PROJECT FACILITIES, OR THE CONDITION, ENVIRONMENTAL OR OTHERWISE, OCCUPANCY, USE, POSSESSION, CONDUCT OR MANAGEMENT OF WORK DONE IN OR ABOUT, OR FROM THE PLANNING, DESIGN, ACQUISITION AND/OR REHABILITATION, AS APPLICABLE, OF THE IMPROVEMENTS OR ANY PART THEREOF;

(g) ANY LIEN (OTHER THAN A PERMITTED ENCUMBRANCE) OR CHARGE UPON PAYMENTS BY THE BORROWER TO THE LENDER HEREUNDER, OR ANY TAXES (INCLUDING, WITHOUT LIMITATION, ALL AD VALOREM TAXES AND SALES TAXES), ASSESSMENTS, IMPOSITIONS AND OTHER CHARGES IMPOSED ON THE LENDER IN RESPECT OF ANY PORTION OF THE PROJECT FACILITIES;

(h) ANY VIOLATION OR ALLEGED VIOLATION OF ANY APPLICABLE LAW OR REGULATION INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS OR ANY INSPECTION, REVIEW OR TESTING WITH RESPECT TO, OR THE RELEASE OF ANY TOXIC SUBSTANCE FROM, THE PROJECT FACILITIES OR ANY PART THEREOF;

(i) THE ENFORCEMENT OF, OR ANY ACTION TAKEN BY THE LENDER OR ANY INDEMNIFIED PARTY, RELATED TO REMEDIES UNDER, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS;

(j) ANY ACTION, SUIT, CLAIM OR DEMAND CONTESTING OR AFFECTING THE TITLE OF THE PROJECT FACILITIES;

(k) THE INVESTIGATION OF, PREPARATION FOR OR DEFENSE OF ANY LITIGATION, PROCEEDING OR INVESTIGATION IN CONNECTION WITH THE PROJECT FACILITIES OR THE TRANSACTIONS TO BE CONSUMMATED IN CONNECTION THEREWITH OF ANY NATURE WHATSOEVER, COMMENCED OR THREATENED AGAINST THE BORROWER, THE PROJECT FACILITIES OR ANY INDEMNIFIED PARTY; AND

(l) ANY BROKERAGE COMMISSIONS OR FINDERS' FEES CLAIMED BY ANY BROKER OR OTHER PARTY IN CONNECTION WITH THE NOTE OR THE PROJECT FACILITIES.

THE INDEMNIFICATION SHALL INCLUDE THE REASONABLE COSTS AND EXPENSES OF DEFENDING ITSELF OR INVESTIGATING ANY CLAIM OF LIABILITY AND OTHER REASONABLE EXPENSES AND ATTORNEYS' FEES INCURRED BY THE INDEMNIFIED PARTIES (INCLUDING WITHOUT LIMITATION REASONABLE ATTORNEYS' FEES WHETHER INCURRED BY AN INDEMNIFIED PARTY IN A DISPUTE OR LITIGATION INVOLVING THE BORROWER OR INVOLVING A THIRD PARTY), PROVIDED THE BORROWER SHALL NOT BE REQUIRED TO INDEMNIFY ANY OF THE INDEMNIFIED PARTIES FOR ANY CLAIMS, DAMAGES, LOSSES, LIABILITIES, COSTS OR EXPENSES TO THE EXTENT CAUSED BY THE WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF ANY INDEMNIFIED PARTY AS DETERMINED IN A FINAL NONAPPEALABLE JUDGMENT OF A COURT OF COMPETENT JURISDICTION.  THE OBLIGATIONS OF THE BORROWER UNDER THIS SECTION SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, THE BORROWER AGREES (I) NOT TO ASSERT ANY CLAIM OR INSTITUTE ANY ACTION OR SUIT AGAINST THE LENDER, ITS EMPLOYEES OR AGENTS, OR THE LENDER REPRESENTATIVE, ITS EMPLOYEES OR AGENTS ARISING FROM OR IN CONNECTION WITH ANY INVESTMENT OF FUNDS MADE BY THE LENDER IN GOOD FAITH AS DIRECTED BY THE BORROWER, THE LENDER REPRESENTATIVE OR THE LENDER, AND (II) TO DEFEND, INDEMNIFY AND HOLD THE LENDER AND ITS EMPLOYEES HARMLESS AGAINST ANY LIABILITY, COMPENSATORY ECONOMIC DAMAGES AND ACTUAL LOSSES, ACTUAL COSTS OR OUT-OF-POCKET EXPENSES, CAUSES OF ACTION, SUITS, CLAIMS, DEMANDS AND JUDGMENTS OF ANY NATURE ARISING FROM OR IN CONNECTION WITH ANY SUCH INVESTMENT. NOTHING IN THIS SECTION IS INTENDED TO LIMIT THE BORROWER'S OBLIGATIONS CONTAINED IN SECTION 2.1 AND 2.2 HEREOF.  AMOUNTS PAYABLE TO THE LENDER HEREUNDER SHALL BE DUE AND PAYABLE TEN (10) BUSINESS DAYS AFTER DEMAND AND WILL ACCRUE INTEREST AT THE DEFAULT RATE, COMMENCING WITH THE EXPIRATION OF THE TEN (10) BUSINESS DAY PERIOD.  WHEN THE LENDER INCURS OUT-OF-POCKET EXPENSES OR

RENDERS SERVICES IN CONNECTION WITH ANY BANKRUPTCY OR INSOLVENCY PROCEEDING, SUCH EXPENSES (INCLUDING THE REASONABLE FEES AND EXPENSES OF ITS COUNSEL) AND THE COMPENSATION FOR SUCH SERVICES ARE INTENDED TO CONSTITUTE EXPENSES OF ADMINISTRATION UNDER ANY BANKRUPTCY LAW OR LAW RELATING TO CREDITORS' RIGHTS GENERALLY. THE OBLIGATIONS OF BORROWER TO THE INDEMNIFIED PARTIES UNDER THIS SECTION SHALL NOT BE SUBJECT TO THE RECOURSE LIMITATIONS OF SECTION 8.10 HEREOF.

     Section 2.6    Required Paydown from Municipal Funds.

    (a)    On or prior to the Required Paydown Date, the Borrower is required to prepay the Loan in an amount not less than the Required Paydown Amount from the Municipal Funds or other sources. if such prepayment does not occur prior to the Required Paydown Date, the Guarantor shall be responsible (in accordance with the terms of the Loan Guaranty) for payment of the shortfall between (i) the amount of the Borrower's prepayment from the Municipal Funds on or before the Required Paydown Date and (ii) the Required Paydown Amount.

    (b)    Should the Borrower receive excess loan proceeds from other municipal, governmental or other sources (above the proceeds of the Municipal Funds) prior to the Maturity Date, the Borrower shall apply such proceeds to further pay down the Loan (in accordance with Section 8 of the Note); provided, however, at no time prior to the Maturity Date shall the outstanding principal balance of the Loan be less than $5,000,000 (the "Loan Floor"). Should the Borrower have excess loan proceeds that, because of the Loan Floor, cannot be used to further prepay the Loan, the Borrower shall promptly transfer such excess proceeds to the Lender Representative to be utilized for the following purposes and in the following order:

    (i)    to replenish the Operating Expense Account for any permitted draws thereupon to fund pre-development costs of the Project Facilities in accordance with Section 6.23(c) hereof;

    (ii)    for deposit into a separate subaccount in the Operating Expense Account for the purpose of paying additional pre-development costs of the Project Facilities, such funds to be released from such subaccount upon written request by the Borrower and approval by the Lender, in its sole but reasonable discretion;

    (iii)    for release to the Borrower in an amount not to exceed $3,500,000; and

    (iv)    any remainder to be deposited in a separate subaccount of the Debt Service Account to be held as additional security for the Loan; provided, however, such funds may be released to the Borrower to pay additional pre-development costs of the Project Facilities, upon written request by the Borrower and upon approval by the Lender, in its sole but reasonable discretion.

## ARTICLE 3
## SECURITY

    Section 3.1    Mortgage and Other Loan Documents.  To further secure the Borrower's obligations under this Agreement, the Borrower shall, at its sole expense, execute and deliver to the Lender (and where required, duly record), the Mortgage and each of the other Loan Documents.

    Section 3.2    Financing Statements.  The Borrower hereby authorizes the Lender, without the signature of the Borrower, to file such financing statements and continuation statements, and perform such other acts, under the Uniform Commercial Code of the State or other applicable Legal Requirements as are

necessary or advisable to perfect and maintain perfection of the Lender's security interests under this Agreement, the Note, the Mortgage and the other Loan Documents. The Borrower will pay upon demand the costs of filing the foregoing financing or continuation statements and the Financing Statements required in such public offices as the Lender Representative may designate.

### ARTICLE 4
### CONDITIONS PRECEDENT; REPRESENTATION OF LENDER

Section 4.1    Conditions Precedent to the Effectiveness of this Agreement. This Agreement shall not be effective until the following conditions shall have been satisfied and Lender shall have no obligation to fund any portion of the Loan unless and until the following conditions have been satisfied:

(a)    The representations and warranties made by the Borrower, the General Partner and the Guarantor in the Loan Documents, and in any certificate, document, or financial or other statement furnished by the Borrower, the General Partner or the Guarantor pursuant to or in connection therewith, shall be true and correct on and as of the Closing Date.

(b)    Lender shall have received fully executed and, where appropriate, acknowledged counterparts of this Agreement, each of the other Loan Documents and all other documents, agreements, instruments, certificates and other items that are expressly required under the Loan Documents or Lender shall otherwise require, each of which shall be dated as of the Closing Date, unless otherwise expressly stated (all of which shall be in such form, substance and content as Lender shall require).

(c)    Lender and Lender Representative shall have received payment of all fees and expenses required to be paid pursuant to this Agreement or the other Loan Documents.

(d)    No Default or Event of Default shall have occurred and be continuing.

(e)    No casualty shall have occurred to any portion of the Project Facilities. No Taking of any portion of the Projects or any modification, realignment or relocation of any streets or roadways abutting the Project Facilities or denial of access to the Project Facilities, from any point of access (public or private), shall have occurred or be threatened or pending.

(f)    The Borrower and the Guarantor shall have delivered to Lender such balance sheets and other financial statements of the Borrower, the General Partner and the Guarantor as Lender may request.

(g)    The Borrower and the Guarantor shall have delivered to Lender evidence that the Borrower and the Guarantor have complied fully with all other conditions to funding set forth in the Term Sheet and Lender shall have, in its sole and absolute discretion, approved the Loan.

(h)    The Borrower shall have delivered to Lender such other documents, instruments (including, without limitation, the Construction Contract, the Plans and Specifications, architects agreements and other similar documents related to the rehabilitation, improvement and equipping of the Project Facilities), opinions, reports, estoppel certificates, subordination agreements and approvals as Lender or Lender's counsel shall have requested.

(i)    The Borrower shall have delivered to Lender (i) a permanent loan term sheet with Lender and (ii) letters of intent from tax credit equity investors for LIHTC, HTC, TMUD and State of Ohio Catalytic Credits.

(j)      The Borrower shall have delivered to Lender commitment letters for the City of Cleveland Loan and the Cuyahoga County Loan.

(k)      Lender shall be satisfied that there has been no material disruption or material adverse change in financial, banking or capital market conditions that could materially impair the sale or syndication of the Loan and that there has been no outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war, and shall have received all internal underwriting approvals to make the Loan and otherwise pertaining to the Borrower, the Guarantor and all other relevant parties.

(l)      All of the items set forth in (a) through (k) above shall be in form and substance reasonably acceptable to Lender.

Section 4.2      Representation of Lender.  The Lender represents and warrants to the Borrower that the Lender has all necessary power and authority to execute and deliver this Agreement and the other related documents and agreements to which it is a party, and to perform its duties and discharge its obligations hereunder and thereunder.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF THE BORROWER

The Borrower represents and warrants to and for the benefit of the Lender and the Lender Representative as follows:

Section 5.1      Existence.  The Borrower is a limited partnership, duly organized, validly existing and in good standing under the Legal Requirements of the state of its organization and is duly qualified to do business in the State.  The Borrower has furnished to the Lender and the Lender Representative true and complete copies of its Partnership Agreement and certificate of limited partnership (with evidence of filing). The Borrower owns and will own no other assets other than the Project Facilities.  The Borrower has been, is and will be engaged solely in the business of acquiring, owning, rehabilitating, managing and operating the Project Facilities and activities incident thereto.  The General Partner of the Borrower is 925 Euclid Manager, LLC, a limited liability company, validly existing, duly qualified to do business and in good standing under the laws of the State.  The General Partner has furnished to the Lender and the Lender Representative true and complete copies of its Operating Agreement and certificate of formation (with evidence of filing).

Section 5.2      Power, Authorization and No Conflicts.  The Borrower has all requisite power and authority and the legal right to own and operate its properties and to conduct its business and operations as they are currently being conducted and as proposed to be conducted by it.  The execution, delivery, observance and performance by the Borrower of this Agreement and the other Loan Documents to which the Borrower is a party (i) are within the Borrower's powers, (ii) have been duly authorized by all necessary company and legal action by or on behalf of the Borrower, and (iii) do not contravene the Partnership Agreement, Operating Agreement, certificate of limited partnership or certificate of formation of the Borrower or the General Partner, as applicable, or any Legal Requirement applicable to the Borrower or the General Partner or any Material Contract or restriction binding on or affecting the Borrower, the General Partner or any of their respective assets, or result in the creation of any Lien upon any of its assets other than as provided by the terms thereof.

Section 5.3      Governmental Authorizations and Other Approvals.  The Borrower and the General Partner have, or will timely have, all necessary Governmental Actions and qualifications, and have complied with all applicable Legal Requirements necessary to conduct their business as it is presently

conducted and to own, renovate, improve and operate the Project Facilities in accordance with the provisions of the Loan Documents.

Section 5.4    Validity and Binding Effect.  This Agreement and the other Loan Documents to which the Borrower is a party are the legal, valid and binding obligations of the Borrower, enforceable against it in accordance with their respective terms, subject to the application by a court of general principles of equity and to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar Legal Requirement affecting creditors' rights generally.

Section 5.5    No Litigation.  Except as disclosed on Schedule 1 attached hereto, there is no pending action or proceeding, including eminent domain proceedings, before any Governmental Authority or arbitrator against or involving the Borrower, the General Partner, the Guarantor or to the Borrower's knowledge after due inquiry, the Project Facilities and, to the best knowledge of the Borrower and the General Partner, there is no threatened action or proceeding, including eminent domain proceedings, affecting the Borrower, the Guarantor or the General Partner before any Governmental Authority or arbitrator which, in any case, might materially and adversely affect the business, operations, assets, condition (financial or otherwise) or prospects of the Borrower or the General Partner, or the validity or enforceability of this Agreement, the Note, or the Loan Documents, or the operation or ownership of the Project Facilities.

Section 5.6    No Violations.  The Borrower and the General Partner, respectively, are in compliance with, and not in breach of or default under (a) any applicable Governmental Actions or Legal Requirements with respect to the Project Facilities of any Governmental Authority having jurisdiction, or (b) the Loan Documents or any other credit agreement, indenture, mortgage, agreement or other instrument to which it is a party or otherwise subject.  To the best of Borrower's knowledge, no event has occurred and is continuing which, with the passage of time or the giving of notice or both, would constitute an event of default on the part of any other Person under any such agreement or instrument described in (b) of the preceding sentence.  The Borrower is not in violation, nor is there any notice or other record of any violation of any Legal Requirements, restrictive covenants or other restrictions applicable to any of the Project Facilities that has not been corrected.  All tax returns (federal, state and local) required to be filed by or on behalf of the Borrower and the General Partner, respectively, have been timely filed, and all taxes shown thereon to be due, including interest and penalties, except such, if any, as are being actively contested by the Borrower or the General Partner, as the case may be, in good faith, have been paid or adequate reserves have been made for the payment thereof which reserves, if any, are reflected in the audited financial statements described therein.  The Borrower enjoys the peaceful and undisturbed possession of the Project Facilities.

Section 5.7    Compliance.  The ownership of the Project Facilities, the rehabilitation and the improvement of the Project Facilities, and the use and operation of the Project Facilities as contemplated hereby do and shall, in all material respects, comply with, and are lawful and permitted uses under all applicable building, fire, safety, zoning, subdivision, sewer, Environmental Laws, health, insurance, plan approval conditions and other Legal Requirements of any Governmental Authority.

Section 5.8    Title to Properties; Liens and Encumbrances.  The Borrower has good and indefeasible title in fee simple to the Project Facilities, free and clear of all Liens except for the Permitted Encumbrances.  All such real property, fixtures and equipment necessary to the conduct of the business of the Borrower and the operation of the Project Facilities are and will be in reasonable working order and are suitable for the purposes for which they are and will be used.  There exist no Liens or other charges against the Project Facilities (including without limitation statutory and other Liens of mechanics, workers, contractors, subcontractors, suppliers, taxing authorities and others), except Permitted Encumbrances.  As of the Closing Date and as of the date of the recording of the Mortgage, no construction work or other work

requested or authorized by Borrower or any Affiliate of Borrower, or of which Borrower otherwise has knowledge, and that could give rise to a mechanic's or materialman's Lien under applicable law has been performed on or with respect to the Project Facilities.

Section 5.9    Utilities and Access.  All utility services necessary for the operation of the Project Facilities in the manner contemplated hereby, including water supply, storm and sanitary sewer facilities, gas, electricity and telephone facilities are or will be available within the boundaries of the Project Facilities; and all roads necessary for the full utilization of the Project Facilities in the manner contemplated hereby either have been completed or rights-of-way therefor have been acquired by the appropriate governmental authority or others or have been dedicated to public use and accepted by such Governmental Authority.

Section 5.10    Financial Information.

(a)    All of the financial information furnished to the Lender Representative and the Lender with respect to the Borrower, the Guarantor and the General Partner in connection with this Agreement (i) is complete and correct in all material respects as of the date hereof; and (ii) accurately presents the financial condition of such party as of the date hereof. Since the date of the financial information described in the 1st sentence of this Section 5.10(a), there has been no materially adverse change in the financial condition, operations or business of the Borrower, the Guarantor or the General Partner from that set forth in said financial statements. None of the Borrower, the Guarantor or the General Partner has any material liability or contingent liability not disclosed to the Lender Representative and the Lender in writing; and

(b)    Since the date the current limited and general partners of the Borrower acquired their equity interests in the Borrower, each of the Borrower and the General Partner has conducted its operations in the ordinary course, and no material adverse change has occurred in the business, operations, assets or financial condition of the Borrower or the General Partner.

Section 5.11    ERISA.  No employee pension plan maintained by the Borrower, the General Partner or any ERISA Affiliate which is subject to Part 3 of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") has an accumulated funding deficiency (as defined in Section 302(a) of ERISA), no reportable event (as defined in Section 4043 of ERISA) has occurred with respect to any employee pension plan maintained for employees of the Borrower, the General Partner or any ERISA Affiliate and covered by Title IV of ERISA, no liability has been asserted against the Borrower, the General Partner or any ERISA Affiliate by the Pension Benefit Guaranty Corporation ("PBGC") or by a trustee appointed pursuant to Section 4042(b) or (c) of ERISA, and no Lien has been attached and no Person has threatened to attach a Lien to any of the Borrower's, the General Partner's or any ERISA Affiliate's property as a result of failure to comply with ERISA or as a result of the termination of any employee pension plan covered by Title IV of ERISA. Each employee pension plan (as defined in Section 3(2) of ERISA) maintained for employees of the Borrower, the General Partner or any ERISA Affiliate which is intended to be qualified under Section 401(a) of the Code, including all amendments to such plan or to any trust agreement, group annuity or insurance contract or other governing instrument, is the subject of a favorable determination by the Internal Revenue Service with respect to its qualification under Section 401(a) of the Code. With respect to any multi-employer pension plan (as defined in Section 3(37) of ERISA) to which the Borrower, the General Partner or any ERISA Affiliate is or has been required to contribute after September 25, 1980, (i) no withdrawal liability (within the meaning of Section 4201 of ERISA) has been incurred by the Borrower, the General Partner or any ERISA Affiliate, (ii) no withdrawal liability has been asserted against the Borrower, the General Partner or any ERISA Affiliate by a sponsor or an agent of a sponsor of any such multi-employer plan, (iii) no such multi-employer pension plan is in reorganization (as defined in Section 4241(a) of ERISA), and (iv) neither the Borrower, the General Partner nor any ERISA Affiliate has any unfilled obligation to contribute to any such multi-employer pension plan. As used in this Agreement, "ERISA Affiliate" means (i) any corporation included with the Borrower or the General Partner

in a controlled group of corporations within the meaning of Section 414(b) of the Code, (ii) any trade or business (whether or not incorporated or for-profit) which is under common control with the Borrower or the General Partner within the meaning of Section 414(c) of the Code, (iii) any member of an affiliated service group of which the Borrower or the General Partner is a member within the meaning of Section 414(m) of the Code, and (iv) any other entity treated as being under common control with the Borrower or the General Partner under Section 414(o) of the Code.

Section 5.12    Environmental Representations.  Except as set forth on the Environmental Audit delivered to the Lender Representative (a) the Borrower has no knowledge of any activity at the Project Facilities, or any storage, treatment or disposal of any Hazardous Substances connected with any activity at the Project Facilities, which has been conducted, or is being conducted, in violation of any Environmental Laws; (b) the Borrower has no knowledge of any of the following which could give rise to material liabilities, material costs for remediation or a material adverse change in the business, operations, assets, or financial condition of the Borrower: (i) Contamination present at the Project Facilities, (ii) polychlorinated biphenyls present at the Project Facilities, (iii) asbestos or materials containing asbestos present at the Project Facilities, (iv) urea formaldehyde foam insulation present at the Project Facilities, or (v) lead-based paint at the Project Facilities; (c) no portion of the Project Facilities constitutes an Environmentally Sensitive Area; (d) the Borrower has no knowledge of any investigation of the Project Facilities for the presence of radon; (e) no tanks presently or formerly used for the storage of any liquid or gas above or below ground are present at any of the Project Facilities; (f) to the best of Borrower's knowledge, no condition, activity or conduct exists on or in connection with the Project Facilities which constitutes a violation of Environmental Laws; (g) no written notice has been issued by any Governmental Authority to the Borrower or the General Partner identifying the Borrower or the General Partner as a potentially responsible party under any Environmental Laws; (h) the Borrower has no knowledge of any investigation, action, proceeding or claim by any Governmental Authority or by any third party which could result in any liability, penalty, sanctions or judgment under any Environmental Laws with respect to the Project Facilities; and (i) the Borrower is not required to obtain any permit or approval from any Governmental Authority or need notify any Governmental Authority pursuant to any Environmental Laws with regard to any future rehabilitation of the Project Facilities, as may be applicable.

Section 5.13    Outstanding Obligations and Material Contracts.  Attached hereto as Schedule 2 is (i) a complete list of all Obligations of the Borrower and the General Partner as of the date of execution and delivery hereof, together with a description of the instruments evidencing, governing or securing such Obligations (provided that no description need be provided of the Obligations hereunder) and (ii) a complete list of all other Material Contracts.  To the best of Borrower's knowledge, there exists no default under any such instrument.  Except for the Obligations listed on Schedule 2, none of the Borrower or the General Partner has incurred any Obligations, secured or unsecured, direct or contingent.  Each of the Borrower and the General Partner has complied with all provisions of such Material Contracts in all material respects, to the extent such contract is applicable to such party, and there exists no default or event which, with the giving of notice or the passage of time, or both, would constitute a default by the Borrower or the General Partner, under any such Material Contract.

Section 5.14    Solvency.  Each of the Borrower, the Guarantor and the General Partner is and, after giving effect to this Agreement and all other agreements of the Borrower, the Guarantor and the General Partner being entered into on the date of execution and delivery of this Agreement, will be Solvent.

Section 5.15    Full Disclosure.  This Agreement, the exhibits hereto and the other documents, certificates, opinions, schedules and statements furnished to the Lender Representative and the Lender by or on behalf of the Borrower, the Guarantor or the General Partner in connection with the transactions contemplated hereby or by the Loan Documents, do not contain any untrue statement of a material fact with respect to the Borrower, the Guarantor, the General Partner or the Project Facilities and do not omit to state

a material fact with respect to the Borrower, the Guarantor, the General Partner or the Project Facilities necessary in order to make the statements contained therein not misleading in any material respect in light of the circumstances under which they were made. There is no fact known to the Borrower, the Guarantor or the General Partner which materially adversely affects or in the future may materially adversely affect the business, operations, properties, assets or financial condition of the Borrower, the Guarantor or the General Partner which has not been set forth in this Agreement or in the other documents, certificates, opinions, schedules and statements furnished to the Lender Representative and the Lender on behalf of any such party before the date of execution and delivery of this Agreement in connection with the transactions contemplated hereby.

Section 5.16    Loan Documents. Each of the Borrower, the Guarantor and the General Partner has provided the Lender Representative and the Lender with true, correct and complete copies of: (i) all Loan Documents, including all amendments thereto; (ii) all management and service contracts entered into by the Borrower in connection with the Project Facilities, including all amendments thereto; and (iii) all documentation, if any, relating to governmental grants, subsidies or loans or any other loans, lines of credit or other subordinate financing relating to the Borrower or the Project Facilities, whether or not secured by the Project Facilities. Each of the representations and warranties on the Borrower's part made in the Loan Documents to which the Borrower is a party remain true and correct in all material respects and no Default exists under any covenants on the Borrower's part to perform under the Loan Documents to which the Borrower is a party.

Section 5.17    Illegal Activity. No portion of any of the Project Facilities has been or will be acquired, rehabilitated, fixtured, equipped or furnished with proceeds of any illegal activity conducted by the Borrower.

Section 5.18    Executive Order 13224. None of the Borrower, the General Partner or any Person holding any legal or beneficial interest whatsoever in any of those entities is included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the persons or entities referred to or described in Executive Order 13224 — Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended. It shall constitute an Event of Default hereunder if the foregoing representation and warranty shall ever become false.

Section 5.19    No Broker. The Borrower has used no broker in connection with the execution hereof and the transactions contemplated hereby.

Section 5.20    Survey. To the Borrower's knowledge, the survey for the Project Facilities delivered to the Lender and the Lender Representative does not fail to reflect any material matter of survey affecting the Project Facilities or the title thereto.

Section 5.21    Flood Plain. No part of the Project Facilities is located in an area identified by the Federal Emergency Management Agency as an area having special flood hazard or to the extent any part of the Project Facilities is an area identified as an area having special flood hazard, flood insurance in an amount equal to 100% of the appraised insurable value of the Project Facilities has been obtained by the Borrower.

. To the Borrower's actual knowledge: (i) each Commercial Lease at the Project Facilities is in full force and effect; (ii) the tenants under the Commercial Leases have accepted possession of and are in occupancy of all of their respective demised Project Facilities, have commenced the payment of rent under such leases, and there are no offsets, claims, or defenses to the enforcement thereof; (iii) all rents due and payable under the Commercial Leases have been paid prior to delinquency and no portion thereof has been paid for any

11

period more than thirty (30) days in advance; (iv) the rent payable under each lease is the amount of fixed rent set forth therein, and there is no claim or basis for a claim by tenant thereunder for an adjustment to the rent; (v) no tenant has made any claim against the Borrower, as landlord, under the Commercial Leases which remains outstanding, there are no defaults on the part of the Borrower, as landlord, under any Commercial Lease, and no event has occurred which, with the giving of notice or passage of time, or both, would constitute such a default; and (vi) to the Borrower's best knowledge, there is not present a material default by the tenant under any Commercial Lease. The Borrower will hold any security deposits under the Commercial Leases in an account in such manner as complies with the requirements of all applicable laws relating to the segregation of tenant deposits or otherwise. None of the Commercial Leases contain any option to purchase or right of first refusal to purchase the Project Facilities or any part thereof. Neither the Commercial Leases nor the Rents thereunder have been assigned or pledged to any Person and no Person has any interest therein except the tenants thereunder.

## ARTICLE 6
## GENERAL COVENANTS

So long as any amount is due and owing hereunder, the Borrower covenants and agrees, except to the extent the Lender shall otherwise consent in writing, to perform and comply with each of the following covenants:

Section 6.1    Conduct of Business; Maintenance of Existence; Mergers.  The Borrower will (i) engage solely in the business of financing, owning and operating the Project Facilities, and activities incident thereto, (ii) preserve and maintain in full force and effect its respective existence as a limited partnership under the Legal Requirements of the state of its organization, and its rights and privileges and its qualification to do business in the State, (iii) not dissolve or otherwise dispose of all or substantially all of its assets, (iv) except for Permitted Transfers, not divide and not consolidate with or merge into another entity or permit one or more other entities to consolidate with or merge into it, and (v) not amend any provision of its certificate of limited partnership or its Partnership Agreement, as applicable, relating to its purpose, management, payment of Obligations, distribution of cash flow or operations without the prior written consent of the Lender. The General Partner will (i) preserve and maintain in full force and effect its respective existence as a limited liability company under the Legal Requirements of the state of its organization, and its rights and privileges and its qualification to do business in the State, and (ii) not amend any provision of its certificate of formation or its Partnership Agreement, as applicable, relating to its purpose, management, payment of Obligations, distribution of cash flow or operations without the prior written consent of the Lender.

Section 6.2    Compliance with Legal Requirements; Payment of Impositions.  The Borrower will comply in all material respects with all Legal Requirements applicable to the Borrower or the Project Facilities.  Subject to Section 6.23 hereof, the Borrower will pay all Impositions and insurance premiums prior to delinquency and will make the applicable deposits required by Section 6.4 of this Agreement for such purposes.

Section 6.3    Maintenance of Governmental Authorizations.  The Borrower shall timely obtain any Governmental Actions required and shall provide copies thereof to the Lender Representative and the Lender upon receipt. The Borrower will maintain in full force and effect all of its Governmental Actions and qualifications necessary for the conduct of its business as it is presently being conducted and the ownership, renovation, improvement and operation of the Project Facilities as they are presently being operated and/or as contemplated by the terms of the Loan Documents. The Borrower will promptly furnish copies of all reports and correspondence relating to a loss or proposed revocation of any such qualification to the Lender Representative.

Section 6.4    Maintenance of Insurance.

(a)    The Borrower, at its sole cost and expense, shall obtain and maintain, or cause to be maintained, the following insurance policies (collectively, the "Policies" or in the singular, the "Policy"):

(1)    Insurance against loss customarily included under standard Special Causes of Loss Form (formerly known as "All Risk") Policies including, earthquake and, if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area", flood hazard insurance in an amount equal to the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended (the "Flood Insurance Acts"), plus such greater amount as Lender shall require with a sublimit for earth movement and, if applicable, flood, in an amount approved by Lender (with the sublimits for flood and earthquakes set forth above), terrorism, windstorm and hail (including named windstorms), vandalism, and malicious mischief, boiler and machinery, earth movement, if the Project Facilities are located in an area with a high degree of seismic activity as determined by Lender, and the probable maximum loss ("PML") as determined by Lender in the event of an earthquake would exceed 20% of the full replacement cost of the Improvements, earthquake insurance in form and substance satisfactory to Lender in an amount not less than one hundred percent (100%) of the PML or such additional amount as may be required by Lender, plus loss of rents or business interruption; with such PML being based on a 475 year return period, exposure period of 50 years and a 10% probability of exceedance, and such other insurable hazards as, under good insurance practices, from time to time are insured against for other property and buildings similar to the Improvements in nature, use, location, height, and type of construction. Such Policy shall also include law & ordinance, including coverage for loss to the undamaged portion, costs of demolition and increased cost of construction in amounts acceptable to Lender. The amount of such insurance shall be not less than one hundred percent (100%) of the replacement cost value of the Improvements. Each such Policy shall be written on a replacement cost basis and either on a no coinsurance form or shall contain an agreed amount endorsement. If the insurance required under this paragraph is provided by blanket insurance policies, each such Policy shall be endorsed to provide full replacement cost of the Improvements with the same protection for the Improvements as would be provided by a separate Policy covering only the Improvements in compliance with the provisions of this Section, subject to typical sublimits. Lender shall determine whether any such blanket Policy provides sufficient limits of insurance.

(2)    Rent loss and/or business interruption insurance for all perils required in this Section 6.4 on an actual loss sustained basis in an amount equal to one hundred percent (100%) of the projected gross revenue from the Improvements (less non-continuing expenses) for a minimum period of restoration of twenty four (24) months plus an extended period of indemnity endorsement of at least twelve (12) months. The amount of such insurance shall be determined prior to the date hereof and no more than once each year thereafter based on Borrower's reasonable estimate of the gross revenue from the Improvements (less non-continuing expenses) for the succeeding 12 month period. Lender shall be named as Loss Payee as respects this coverage. All proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied to the Indebtedness secured by the Loan Documents from time to time due and payable hereunder and under the Note unless and insofar as Lender, in its sole discretion, releases insurance proceeds to be applied to the payment of operating expenses of the Project Facilities; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligation to pay the Indebtedness on the respective dates of payment provided for in the Note and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance.

se

Case: 1:25-cv-02332  Doc #: 1-1  Filed:  10/29/25  46 of 287.  PageID #: 54

(3)     Comprehensive Boiler and Machinery/Equipment Breakdown coverage, if applicable, with a minimum limit as shall be required by Lender, for all mechanical and electrical equipment against physical damage, rent loss and improvements loss, with exclusions for testing removed.

(4)     Liability insurance, including, without limitation, Commercial General Liability insurance, including vacant buildings if applicable; Owned, Hired and Non Owned Auto Liability, if applicable; and Umbrella Liability coverage for Personal Injury, Bodily Injury, Death, Accident and property Damage, providing in combination no less than $10,000,000 per occurrence; and in the annual aggregate on per location basis, if aggregate limits are shared with other locations the amount of Umbrella Liability insurance to be provided shall be not less than $10,000,000. The policies described in this paragraph shall cover, without limitation: elevators, escalators, independent contractors, Contractual Liability (covering, to the maximum extent permitted by law, Borrower's obligation to indemnify the Indemnified Parties as required under this Agreement), and Products and Completed Operations Liability coverage. Such insurance shall name Borrower as the insured and Lender as an additional insured and shall include coverage for terrorism.

(5)     Workers' Compensation, Employers Liability and Disability insurance as required by applicable law.

(6)     At all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the property or liability coverage forms do not otherwise apply, (A) commercial general liability and umbrella liability insurance covering claims related to the construction, repairs or alterations being made which are not covered by or under the terms or provisions of the commercial general liability and umbrella liability insurance policy required as set forth in Section 6.4(a)(4) above; and (B) the insurance provided for in Section 6.4(a)(1) above written on a so-called Builder's Risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to Section 6.4(a)(1) above, (3) including permission to occupy the property, and (4) with an agreed amount endorsement waiving co-insurance provisions.

(7)     Such other types and amounts of insurance with respect to the Improvements as are customary for similar properties in similar affordable locations as may from time to time be reasonably required by Lender.

(b)     All insurance provided for in this Section 6.4 shall be obtained under valid and enforceable Policies, and, to the extent not specified above, shall be subject to the approval of Lender as to deductibles, loss payees and insureds. Not less than five (5) days prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the Policies acceptable to Lender shall be delivered by Borrower to Lender. Subject to Section 6.23 hereof, evidence satisfactory to Lender of payment of the premiums due thereunder (the "Insurance Premiums") shall be delivered by Borrower to Lender within forty-five (45) days after commencement (or such earlier date that the Insurance Premiums become due and payable) of the new or renewal Policy. Upon request by Lender, Borrower shall deliver to Lender a full copy (as required pursuant to this paragraph) of a renewal or replacement Policy or Policies, or such other documentation reasonably acceptable to Lender.

(c)     [Reserved.]

(d)     Unless otherwise specified, all Policies of insurance provided for or contemplated by this Section 6.4 shall name Borrower as the insured and Lender and its successors and/or assigns as their interests may appear as additional insureds with respect to Policies of liability insurance, in the case of

Electronically Filed 09/30/2025 19:46 / / CV 25 125588 / Confirmation Nbr. 3631064 / CLPXC
14

property damage, builder's risk, boiler and machinery/equipment breakdown and testing, flood and earthquake insurance, name Borrower as the insured and Lender and its successors and/or assigns as their interests may appear as the loss payee and shall contain a standard non-contributing mortgagee clause or its equivalent in favor of Lender (including Lender as mortgagee and loss payee) providing that the loss thereunder shall be payable to Lender and, where available, providing thirty (30) days' advance notice of cancellation to Lender.

(e)     All property insurance also shall include a co-insurance waiver and Agreed Amount Endorsement. The amount of any deductible under any Policy shall not exceed $25,000, except for windstorm and earthquake which shall not exceed five percent (5%) of the total insurance value of the Improvements. Without Lender's prior written consent, Borrower shall not name any Person other than Lender, as loss payee, as it pertains to the Improvements, nor shall Borrower carry separate or additional insurance coverage covering the Improvements concurrent in form or contributing in the event of loss with that required by this Agreement or; provided that, if blanket Policies are obtained, this sentence shall not apply to property covered by such blanket Policies other than the Improvements and such tenant improvements and betterments that Borrower is required to insure pursuant to the applicable Leases.

(f)     Each Policy shall contain clauses or endorsements to the effect that, if obtainable by Borrower using commercially reasonably efforts, the insurer: (i) agrees that such Policy shall not be canceled or terminated, the coverage, deductible, and limits of such Policy shall not be modified, other provisions of such Policy shall not be modified if such Policy, after giving effect to such modification, would not satisfy the requirements of this Agreement, and such Policy shall not be so modified, canceled or fail to be renewed, without in each case, at least ten (10) days' prior written notice to Lender, (ii) waives any right to claim any Insurance Premiums and commissions against Lender, provided that the Policy need not waive the requirement that the Insurance Premiums be paid in order for a claim to be paid to the insured and (iii) provides that Lender is permitted to make payments to effect the continuation of such policy upon notice of cancellation due to nonpayment of premiums. In the event any Policy (except for general and other liability and Workers' Compensation insurance) shall contain breach of warranty provisions, such Policy shall not be invalidated by and shall insure Lender regardless of (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such Policy by any named insured, (B) the occupancy or use of the Improvements for purposes more hazardous than permitted by the terms thereof, or (C) any foreclosure or other action or proceeding taken by Lender pursuant to any provision of the Mortgage or any other Loan Document.

(g)     Subject to Section 6.23 hereof, Borrower shall pay the Insurance Premiums for the Policies as the same become due and payable and such Policies shall not contain any clause or provision that would make Lender liable for any Insurance Premiums thereon or subject to any assessments thereunder. Borrower shall deliver to Lender full copies of the Policies, or such other documents reasonably acceptable to Lender, required to be maintained pursuant to this Section 6.4; provided, however, Lender shall not be deemed by reason of custody of such Policies to have knowledge of the contents thereof. Borrower also shall deliver to Lender within ten (10) days after Lender's request, a statement setting forth the particulars as to all such Policies, indicating that all Insurance Premiums due thereon have been paid and that the same are in full force and effect.

(h)     If at any time Lender is not in receipt of written evidence that all insurance required hereunder is maintained in full force and effect, Lender shall have the right (but not the obligation), upon ten (10) days' written notice to Borrower, to take such action as Lender deems necessary to protect Lender's interest in the property, including, without limitation, the obtaining of such insurance coverage as Lender deems appropriate and all Insurance Premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and

until paid shall be secured by the Mortgage, as determined by Lender, and shall bear interest at the Default Rate.

(i)     In the event of foreclosure of the Mortgage or other transfer of title to the Project Facilities in extinguishment in whole or in part of the obligations under the Note, all right, title and interest of Borrower in and to the Policies that are not blanket Policies then in force concerning the Project Facilities and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

(j)     The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the state in which the Project Facilities are located and having a claims paying ability rating of "A:X" or better by A.M. Best Company, Inc. and at least "A-" or better from S&P, and (i) shall contain a waiver of subrogation against Lender, (ii) shall contain such provisions as Lender deems reasonably necessary or desirable to protect its interest, including endorsements providing for a deductible per loss of an amount not more than that which is customarily maintained by prudent owners of properties with a standard of operation and maintenance comparable to and in the general vicinity of the Improvements, but in no event in excess of an amount reasonably acceptable to Lender, and (iii) shall be satisfactory in form and substance to Lender and shall be approved by Lender as to amounts, form, risk coverage, deductibles, loss payees and insureds. No insurance policy required hereunder shall include any so called "terrorist exclusion" or similar exclusion or exception to insurance coverage relating to the acts of terrorist groups or individuals; provided that, for so long as the Terrorism Risk Insurance Act of 2002, as extended and modified by the Terrorism Risk Insurance Program Reauthorization Act of 2015 ("TRIPRA") is in effect and continues to cover both foreign and domestic acts, Lender shall accept terrorism insurance with coverage against acts which are "certified" within the meaning of TRIPRA. Notwithstanding the foregoing, for so long as TRIPRA is in effect (including any extensions thereof or if another federal governmental program is in effect relating to "acts of terrorism" which provides substantially similar protections as TRIPRA), Lender shall accept terrorism insurance which covers against "certified acts" as defined by TRIPRA (or such other program) as full compliance with Section 6.04 as it relates to the risks that are required to be covered hereunder but only in the event that TRIPRA (or such other program) continues to cover both domestic and foreign acts of terrorism. In the event TRIPRA expires or is otherwise no longer in effect for any reason, Borrower shall not be required to pay any Insurance Premiums solely with respect to such terrorism coverage in excess of the applicable Terrorism Premium Cap (hereinafter defined); provided that if the Insurance Premiums payable with respect to such terrorism coverage exceeds the Terrorism Premium Cap, Borrower shall purchase a terrorism insurance policy providing the maximum amount of coverage for acts of terrorism as is available with funds equal to the Terrorism Premium Cap. As used herein, "Terrorism Premium Cap" means, for any applicable policy period, an amount equal to two times the amount of the then current insurance premium that is payable at such time in respect of the property and business interruption/rental loss insurance required hereunder (without giving effect to the cost of the terrorism and earthquake components), and if the cost of terrorism insurance exceeds such amount, Borrower shall purchase the maximum amount of terrorism insurance available with funds equal to such amount.

Section 6.5     Compliance with Other Contracts and Loan Documents. The Borrower will comply in all material respects with all of its covenants and agreements under the Loan Documents to which it is a party, as the same may hereafter be amended or supplemented from time to time. The Borrower shall comply in all materials respects with, or cause to be complied with, all requirements and conditions of all Material Contracts and insurance policies which relate to the Borrower or the Project Facilities.

Section 6.6     Maintenance of Project Facilities. The Borrower will, at its sole expense, (i) maintain and preserve the Project Facilities in its current condition (reasonable wear and tear excepted); (ii) not permit, commit or suffer any waste or abandonment of the Project Facilities (normal wear and tear

excepted); (iii) not use (and use reasonable efforts to not permit tenants to use) the Project Facilities for any unlawful purpose and use reasonable efforts to not permit any nuisance to exist thereon; (iv) promptly make such repairs or replacements (structural or nonstructural, foreseen or unforeseen) as are required for the current operation of the Project Facilities in an economical and efficient manner and consistent with customary and prudent practices, standards and procedures applicable to properties of like size and type which are scheduled for redevelopment; (v) perform all repairs or replacements in a good and workmanlike manner, and in compliance with all applicable Governmental Actions and Legal Requirements; (vi) keep and maintain abutting grounds, sidewalks, roads, parking and landscape areas which may be owned by the Borrower in good and neat order and repair; (vii) not take (or fail to take) any action, which if taken (or not so taken) would increase in any way the risk of fire or other hazard occurring to or affecting the Project Facilities; and (viii) not sell, lease (other than pursuant to residential leases), cause a Sale of or otherwise dispose of any part of the Project Facilities, except as otherwise permitted hereunder and under the other Loan Documents.

Section 6.7    Inspection Rights.  The Borrower will, at any reasonable time and from time to time, and upon reasonable advance notice during normal business hours, permit the Lender Representative, the Lender and the agents or representatives of the Lender Representative or the Lender, to examine and copy and make abstracts from the records and books of account of, and visit the properties of, the Borrower, and to discuss the affairs, finances and accounts of the Borrower with the General Partner and the Accountant.  Upon reasonable prior notice, and upon reasonable advance notice during normal business hours, and subject to the rights of tenants, the Borrower will permit the Lender Representative or its agents to inspect, or cause to be inspected, the Project Facilities at any reasonable time or times as the Lender Representative may direct.  The Borrower shall pay or reimburse the Lender Representative on demand for fees and expenses incurred in connection with such inspections.

Section 6.8    Keeping of Books.  The Borrower will keep proper books of record and account, in which full and correct entries shall be made of financial transactions and the assets and operations of the Borrower in accordance with GAAP, and have a complete audit of such books of record and account made by the Accountant for each Fiscal Year.

Section 6.9    Reporting Requirements.  The Borrower will furnish or cause to be furnished to the Lender and the Lender Representative the following, in form satisfactory to the Lender and in such number of copies as the Lender may reasonably require:

(a)    As soon as available and in any event within forty-five (45) days after the close of each fiscal quarter of each Fiscal Year of the Borrower:

(1)    unaudited financial statements for the Borrower and the Project Facilities, including a balance sheet and related statement of income as of the end of such fiscal quarter and for such fiscal quarter and the current Fiscal Year to the end of such fiscal quarter, which shall be internally prepared and presented on a consistent basis;

(2)    an occupancy report stating as of the last day of the month prior to the date of delivery thereof, with respect to each lease of all or any part of the Project Facilities, the tenant's name, the date thereof, the premises demised, the term, the rent, the security deposits, any advance rent payments in excess of one month and any defaults by the tenant or the Borrower in respect thereof (including, without limitation, the amounts of arrearages; and

(3)    a certificate signed by an Authorized Person stating that, except as disclosed in such certificate, (i) during such fiscal quarter the Borrower has observed and

performed all of its covenants and agreements set forth in this Agreement and the other Loan Documents and (ii) no Default or Event of Default has occurred or exists (or, if a Default exists, the nature of the Default and the measures being implemented by Borrower to cure such Default).

(b)     As soon as available and in any event within one hundred twenty (120) days after the close of each Fiscal Year of the Borrower:

(1)     audited financial statements for the Borrower including a balance sheet and related statements of income and changes in financial position as of the end of such Fiscal Year and for such Fiscal Year, which shall be prepared and reported on without qualification by the Accountant in accordance with GAAP, and shall fairly present the financial condition of the Borrower and the Project Facilities as of the end of such Fiscal Year;

(2)     a certificate signed by an Authorized Person on behalf of the Borrower stating that, except as disclosed in such certificate, (i) during such Fiscal Year the Borrower has observed and performed all of its covenants and agreements set forth in this Agreement and the other Loan Documents, and (ii) no Default or Event of Default has occurred or exists (or, if a Default exists, the nature of the Default and the measures being implemented by the Borrower to cure such Default); and

(3)     an occupancy report stating as of the last day of the month prior to the date of delivery thereof, with respect to each lease of all or any part of the Project Facilities, the tenant's name, the date thereof, the premises demised, the term, the rent, the security deposits, any advance rent payments in excess of one month and any defaults by the tenant or the Borrower in respect thereof (including, without limitation, the amounts of arrearages).

(c)     At the request of the Lender, the Borrower shall provide operating statements of the Project Facilities certified by an Authorized Person on behalf of the Borrower and containing itemized information regarding all items of expense and income as well as occupancy reports and, if required by the Lender Representative, other reports such as a rent roll and reports on concessions, security deposits and advance rents, all in such detail as may be required by the Lender Representative.

(d)     At the request of the Lender, an occupancy report for the Project Facilities, certified by an Authorized Person of the Borrower.

(e)     Upon receipt thereof by the Borrower, copies of any material letter or report with respect to the management, operations or properties of the Borrower submitted to the Borrower by the Accountant in connection with any annual or interim audit of the Borrower's accounts, and a copy of any written response of the Borrower to any such material letter or report.

(f)     As soon as possible and in any event within fifteen (15) days after receipt of notice thereof, notice of any pending or threatened litigation, investigation or other proceeding involving the Borrower, the General Partner, the Guarantor or the Project Facilities: (i) which could have a material adverse effect on the operations or financial condition of the Borrower, the General Partner, the Guarantor or the Project Facilities; or (ii) wherein the potential damages, in the reasonable judgment of the Borrower based upon the advice of counsel experienced in such matters,

are not fully covered by the Policies maintained by the Borrower (except for the deductible amounts applicable to such Policies).

(g)　　As soon as possible, notice of any material adverse change in the operations or financial condition of the Borrower, the General Partner, the Guarantor or the Project Facilities.

(h)　　Copies of any reports, certifications, compliance documents or audits relating to the Project Facilities or the Borrower.

(i)　　As soon as possible and in any event within fifteen (15) days after the occurrence of a Default or an Event of Default of which Borrower or an Affiliate of Borrower has knowledge, a certificate of an Authorized Person setting forth the details of such Default or Event of Default and the action which the Borrower proposes to take with respect thereto.

(j)　　Upon receipt thereof, copies of all real estate tax bills and insurance bills.

(k)　　Promptly following filing thereof, all tax returns of the Borrower, the Guarantor and the General Partner.

(l)　　Such other information respecting the operations and properties, financial or otherwise, of the Borrower as the Lender or the Lender Representative may from time to time reasonably request.

Section 6.10　　Single Purpose Entities.

(a)　　The Borrower shall (i) not engage in any business or activity, other than the ownership, renovation, improvement, operation and maintenance of the Project Facilities and activities incidental thereto; and (ii) not acquire, own, hold, lease, operate, manage, maintain, develop or improve any assets other than the Project Facilities and such personal property as may be necessary for the operation of the Project Facilities and shall conduct and operate its business as presently conducted and operated.

(b)　　The Borrower shall (i) not maintain its assets in a way difficult to segregate and identify; (ii) ensure that business transactions between the Borrower and any Affiliate of the Borrower or any Affiliate of the General Partner be entered into upon terms and conditions that are substantially similar to those that would be available on an arms-length basis with a third Person other than the General Partner or any Affiliate thereof; (iii) solely with respect to Borrower, not incur or contract to incur any obligations, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Indebtedness evidenced by this Agreement and the other Loan Documents; (iv) not make any loans or advances to any third Person (including any Affiliate of the Borrower or the General Partner), except as otherwise permitted under this Agreement and the Loan Documents; (v) do or cause to be done all things necessary to preserve its existence; (vi) not amend, modify or otherwise change its certificate of limited partnership or Partnership Agreement without obtaining the prior written consent of the Lender, not to be unreasonably withheld; provided that no consent shall be required for changes or amendments to the Partnership Agreement to the extent such change or amendment is solely required to effect a Permitted Transfer, except for a change or amendment required to effect a Permitted Transfer that could reasonably be expected to materially and adversely affect the rights and interests of the Lender, which shall require Lender consent in its sole and absolute discretion; (vii) conduct and operate its business as presently conducted and operated; (viii) maintain its books and records and bank accounts separate from those of its Affiliates; (ix) be, and at all times shall hold itself out to the public as, a legal entity separate and distinct from any other Person (including any Affiliate); (x) file its own tax returns; (xi) maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its

contemplated business operations and in any event not less than that required under State law in order to remain a separate legal entity; (xii) not seek or consent to the dissolution or winding up, in whole or in part, of the Borrower or the General Partner; (xiii) not commingle the funds and other assets of the Borrower with those of the General Partner, any Affiliate thereof or any other Person; and (xiv) not enter into any transaction with an Affiliate without the prior written consent of the Lender or as permitted pursuant under the Loan Documents.

(c)      The General Partner shall (i) not maintain its assets in a way difficult to segregate and identify; (ii) ensure that business transactions between the Borrower and any Affiliate of the Borrower or any Affiliate of the General Partner shall be entered into upon terms and conditions that are substantially similar to those that would be available on an arms-length basis with a third Person other than the General Partner or any Affiliate thereof; (iii) do or cause to be done all things necessary to preserve its existence; (iv) not amend, modify or otherwise change its certificate of formation or Operating Agreement without obtaining the prior written consent of the Lender, not to be unreasonably withheld, conditioned or delayed; provided that no consent shall be required for changes or amendments to the Operating Agreement to the extent such change or amendment is solely required to effect a Permitted Transfer, except for a change or amendment required to effect a Permitted Transfer that could reasonably be expected to materially and adversely affect the rights and interests of the Lender, which shall require Lender consent in its sole and absolute discretion; (v) conduct and operate its business as presently conducted and operated; (vi) maintain its books and records and bank accounts separate from those of its Affiliates; (vii) be, and at all times shall hold itself out to the public as, a legal entity separate and distinct from any other Person (including any Affiliate); (viii) file its own tax returns; (ix) maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations and in any event not less than that required under State law in order to remain a separate legal entity; (x) not seek or consent to the dissolution or winding up, in whole or in part, of the Borrower or the General Partner; and (xi) not commingle the funds and other assets of the Borrower with those of the General Partner, any Affiliate thereof or any other Person.

Section 6.11      Negative Pledge; No Sale.

(a)      The Borrower will not create, incur, assume or permit to exist any mortgage, pledge, security interest, encumbrance or other Lien upon the Project Facilities or any property, tangible or intangible, now owned or hereafter acquired (including without limitation property leased to or being acquired by the Borrower under capital leases or installment sale agreements), by the Borrower (the sale with recourse of receivables or any "sale and lease back" of any fixed assets being deemed to be the giving of a Lien thereon for money borrowed), other than Permitted Encumbrances.

(b)      Other than Permitted Transfers and the making of residential leases, the Borrower shall not sell, assign, transfer, convey or otherwise dispose of the Project Facilities, or any part thereof, or permit or consent to a Sale without in each instance obtaining the express prior written consent of the Lender, which consent may be withheld or granted (and be subject to the payment of such fees and the satisfaction of other conditions as set forth in Section 1.12 of the Mortgage) in the Lender's sole and absolute discretion, in each case except in connection with an arm's length sale of the Project Facilities and the payment in full of the Indebtedness, in which case no Lender consent shall be required.

Section 6.12    Payment of Indebtedness; Accounts Payable; Restrictions on Indebtedness.

(a)     The Borrower will pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all of the Borrower's Indebtedness under the Loan Documents and all of its other Obligations, whether now existing or hereafter arising, and comply with all covenants and agreements set forth in agreements evidencing Obligations of the Borrower.

(b)     The Borrower shall pay or cause to be paid all expenses of the Project Facilities and its other accounts payable with respect to and costs of operation and maintenance of the Project Facilities within thirty (30) days of receipt of an invoice therefor, or before they become delinquent.  The Borrower shall make no distribution of funds to its partners unless no Default or Event of Default exists, such distribution is in accordance with the provisions of the Partnership Agreement, and all current accounts payable shall have been paid and funds shall have been set aside for the payment of accounts payable becoming due within thirty (30) days of said distribution.  In addition, Borrower shall not make any payment to the General Partner or to any officers or partners thereof, prior to the required monthly payment of the Borrower's Indebtedness under the Loan Documents, the funding of any required reserves under the Loan Documents and the payment of any of its other Obligations then due and payable.

(c)     Without obtaining the prior written consent of the Lender, the Borrower will not create, incur, assume, guarantee or be or remain liable for any Indebtedness or Obligations other than (i) Indebtedness under the Loan Documents; (ii) current liabilities of the Borrower relating to the Project Facilities incurred in the ordinary course of business but not incurred through the borrowing of money or obtaining of credit; (iii) secured or unsecured subordinate loans related to the delivery of the Municipal Funds and (iv) any unsecured loans or guaranteed payments from the partners of the Borrower or the Guarantor pursuant to the Partnership Agreement.

Section 6.13    Environmental Covenants.

(a)     The Borrower will cause all activities at the Project Facilities during the term of this Agreement to be conducted in full compliance with all applicable Environmental Laws.  The Borrower will obtain all Governmental Actions and will make all notifications, as required by Environmental Laws, and will, at all times, comply with the terms and conditions of any such Governmental Actions or notifications. During the term of this Agreement, if requested by the Lender Representative, the Borrower will provide to the Lender Representative copies of (i) applications or other materials submitted to any Governmental Authority in compliance with Environmental Laws, (ii) any notifications submitted to any Person pursuant to Environmental Laws, (iii) any Governmental Action granted pursuant to Environmental Laws, (iv) any record or manifest required to be maintained pursuant to Environmental Laws, and (v) any correspondence, notice of violation, summons, order, complaint or other document received by the Borrower, its lessees, sub-lessees or assigns, pertaining to compliance with any Environmental Laws with respect to the Project Facilities.

(b)     The Borrower will, at all times during the term of this Agreement, cause Hazardous Substances used at the Project Facilities to be handled, used, stored and disposed in accordance with all Environmental Laws and in a manner which will not cause an undue risk of Contamination.

(c)     The Borrower will cause all construction of new structures at the Project Facilities during the term of this Agreement to use design features which safeguard against or mitigate the accumulation of radon or radon products in concentrations exceeding the Environmental Protection Lender's recommended threshold of 4.0pCi/L.

(d)     The Borrower shall not install or permit to be installed any temporary or permanent tanks for storage of any liquid or gas above or below ground, except after obtaining written permission from the Lender Representative to do so and in compliance with Environmental Laws.

(e)     The Borrower shall comply with the following procedures and requirements related to moisture management and control:

(i)     Engage in (a) periodic inspections of the Improvements at the Project Facilities for Mold (as defined below) and routine maintenance to limit and remove Mold, and (b) removing or cleaning up any Mold outside ordinary maintenance activities in a manner consistent with best industry practices and, if necessary, utilizing an experienced remediation contractor reasonably acceptable to the Lender Representative;

(ii)     Insofar as reasonably recommended by Lender Representative, adopt and implement a formal moisture management and control program (the "Moisture Management Program") for the Improvements at the Project Facilities to prevent the occurrence of mold, dangerous fungi, bacterial or microbial matter contamination or pathogenic organisms that reproduces through the release of spores or the splitting of cells (collectively, "Mold"), at, on or under the Project Facilities, which Moisture Management Program shall include, at a minimum: (a) the items identified under subpart (i) above, and (b) in the event that the Mold identified at the Improvements at the Project Facilities cannot be removed or cleaned from any impacted building materials (e.g., porous materials such as carpeting, certain types of ceiling materials, etc.) and/or equipment, removing all such impacted building materials and/or equipment from the Project Facilities, all in accordance with the procedures set forth in the United States Environmental Protection Agency's ("EPA") guide entitled "Mold Remediation in Schools and Commercial Buildings", EPA No. 402-K-01-001, dated March 2001 and in a manner consistent with best industry practices and utilizing an experienced remediation contractor reasonably acceptable to the Lender Representative; and

(iii)     Include as part of every residential lease a Mold/Mildew Addendum.  The Borrower further covenants and agrees that, in connection with any mold remediation undertaken by or on behalf of the Borrower hereunder, the source (e.g., leaking pipe, water damage, water infiltration, etc.) of any Mold at the Improvements at the Project Facilities shall be promptly identified and corrected to prevent the occurrence or re-occurrence of any Mold.

(f)     Upon the occurrence and continuation of an Event of Default, or if the Lender Representative has reason, in its reasonable discretion, to believe that there has occurred and is continuing a violation of Environmental Laws or that there exists a condition that could give rise to any Governmental Action in respect of an actual or alleged violation of Environmental Laws, the Lender Representative may, at its discretion, commission an investigation at the Borrower's expense of (i) compliance at the Project Facilities with Environmental Laws, (ii) the presence of Hazardous Substances or Contamination at the Project Facilities, (iii) the presence at the Project Facilities of materials which are described in clause (b) of Section 5.12, (iv) the presence at the Project Facilities of Environmentally Sensitive Areas, (v) the presence at the Project Facilities of radon products, (vi) the presence at the Project Facilities of tanks of the type described in paragraph (e) of Section 5.12 or in paragraph (d) of Section 6.13 above, or (vii) the presence of Mold at the Project Facilities. In connection with any investigation pursuant to this paragraph, the Borrower will comply with any reasonable request for information made by the Lender Representative or its agents in connection with any such investigation.  Any response to any such request for information will be full and complete.  The Borrower will assist the Lender Representative and its agents to obtain any records pertaining to the Project Facilities or to the Borrower and the lessees, sub-lessees or assigns of the Borrower in connection with an investigation pursuant to this paragraph.  The Borrower will permit the

Lender Representative and its agents access to all areas of the Project Facilities at reasonable times and in reasonable manners in connection with any investigation pursuant to this paragraph. No investigation commissioned pursuant to this paragraph shall relieve the Borrower from any responsibility for its representations and warranties under Section 5.12 hereof or under the Environmental Indemnity.

(g)     In the event of any Contamination affecting the Project Facilities, whether or not the same originates or emanates from the Project Facilities or any contiguous real estate, or if the Borrower otherwise shall fail to comply with any of the requirements of Environmental Laws, the Lender Representative may, at its election, but without the obligation so to do, give such notices, cause such work to be performed at the Project Facilities (after reasonable notice and opportunity to cure by the Borrower) and take any and all other actions as the Lender Representative shall deem necessary or advisable in order to remedy said Contamination or cure said failure of compliance and any amounts paid as a result thereof, together with interest thereon at the Default Rate from the date of payment by the Lender Representative, shall be due and payable by the Borrower within five (5) Business Days of notice by Lender and until paid shall be added to and become a part of the Indebtedness and shall have the benefit of the Lien hereby created as a part thereof prior to any right, title or interest in or claim upon the Project Facilities attaching or accruing subsequent to the Lien of the Mortgage on the Project Facilities.

Section 6.14     Lender Representative. The Borrower acknowledges and agrees that (i) the Lender has the sole and exclusive right to arrange for servicing of the Loan and to appoint another Person to serve as its representative hereunder and under the other Loan Documents; (ii) the Lender has appointed Berkadia Commercial Mortgage LLC to serve in the capacity of Lender Representative hereunder and under the other Loan Documents; and (iii) the Lender retains the sole and exclusive right to appoint, remove or replace the Lender Representative, without the consent or approval of the Borrower. The Borrower shall comply with the directions of the Lender Representative made on behalf of the Lender.

Section 6.15     Tax Returns. The General Partner will timely file all tax returns for themselves and for the Borrower, pay or cause to be paid prior to delinquency all taxes imposed on their operations, assets, income or properties, and, upon request, provide to the Lender Representative copies of such returns and receipts for payment of such taxes.

Section 6.16     Leases. The Borrower hereby represents that there are no leases or agreements to lease all or any part of the Project Facilities now in effect except for the Commercial Leases, residential leases, if any, and leases for services associated with residential rental property (such as laundry and cable leases) copies of which have been provided to the Lender Representative. Except for the Commercial Leases, residential leases and leases for services associated with residential rental properties (such as laundry and cable leases), the Borrower shall not enter into or become liable under, any leases or agreements to lease all or any part of the Project Facilities without the prior written approval thereof and of the prospective tenant by the Lender Representative.

Section 6.17     Further Assurances. The Borrower will promptly and duly execute, acknowledge and deliver from time to time such further instruments and take such further actions as may be reasonably required by the Lender or the Lender Representative to carry out the purposes and provisions of this Agreement and the other Loan Documents, to confirm the priority and/or perfection of any Lien created or intended to be created by this Agreement and to assure the Lender Representative and the Lender of the subrogation and security rights in favor of the Lender contemplated by this Agreement and by the other Loan Documents; provided, however, that nothing in the foregoing shall impose any additional obligations on the Borrower or reduce any of the Borrower's rights hereunder without Borrower's written consent, in its sole discretion.

Section 6.18    Management Agreement.

(a)    The Borrower has entered into a property management agreement in a form approved by the Lender Representative with the Property Manager (the Management Agreement dated as of January 1, 2019, together with any extension and replacements thereof and as the same may be amended, modified or supplemented from time to time the "Management Agreement"). Under the Management Agreement, the Property Manager shall provide certain management services and shall be entitled to receive compensation for those services. All amounts due the Property Manager shall be subordinated to the payment by the Borrower of all principal of, premium, if any, and interest due on the Note. The sole and exclusive compensation (exclusive of reimbursement for expenses pursuant to the applicable Management Agreement) paid to manage the Project Facilities under the Management Agreement shall be as described in this Section 6.18. The Borrower shall have no employees whatsoever.

(b)    The Borrower shall not replace the Property Manager for the Project Facilities without the Lender's prior written approval, and the Management Agreement shall not be terminated or modified without the Lender Representative's prior written approval. In the event the Property Manager resigns or is removed, the Borrower shall promptly seek a replacement Property Manager and submit such Property Manager and its proposed form of Management Agreement to the Lender for approval; if the Borrower has not done so within thirty (30) days of becoming aware of such resignation or removal, the Lender may (but shall not be required to) engage a new Property Manager on terms satisfactory to the Lender in its sole discretion and at the expense of the Borrower. The Property Manager shall execute a consent to the Assignment of the Management Agreement pursuant to which the Property Manager shall agree that the Management Agreement shall be terminable by the Lender Representative, with or without cause, on thirty (30) days' notice following and during the existence of an Event of Default.

Section 6.19    Use of Proceeds. The Borrower agrees that the proceeds of the Note will be allocated exclusively to (i) refinance the Project Facilities, (ii) fund the Debt Service Account, (iii) fund the Operating Expense Account and (iv) repay the Borrower for funding the initial payment to the general contractor for the Project Facilities, pursuant to the terms of the Construction Contract and in the amount of $250,000.

Section 6.20    Compliance With Anti-Terrorism Regulations. Neither the Borrower, the General Partner nor any Person holding any legal or beneficial interest whatsoever in the Borrower shall at any time during the Term be described in, covered by or specially designated pursuant to or be affiliated with any Person described in, covered by or specially designated pursuant to Executive Order 13224 —Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended, or any similar list issued by OFAC or any other department or agency of the United States of America. Notwithstanding the foregoing, the Borrower and the General Partner hereby each confirm that if it becomes aware or receives any notice of any violation of the foregoing covenant and agreement (an "OFAC Violation"), the Borrower or the General Partner, as applicable, will immediately (i) give notice to the Lender of such OFAC Violation, and (ii) comply with all Legal Requirements applicable to such OFAC Violation, including, without limitation, Executive Order 13224; the International Emergency Economic Powers Act, 50 U.S.C. Sections 1701-06; the Iraqi Sanctions Act, Pub. L. 101-5 13, 104 Stat. 2047-55; the United Nations Participation Act, 22 U.S.C. Section 287c; the Antiterrorism and Effective Death Penalty Act, (enacting 8 U.S.C. Section 219, 18 U.S.C. Section 2332d, and 18 U.S.C. Section 2339b); the International Security and Development Cooperation Act, 22 U.S.C. Section 2349 aa-9; the Terrorism Sanctions Regulations, 31 C.F.R. Part 595; the Terrorism List Governments Sanctions Regulations, 31 C.F.R. Part 596; and the Foreign Terrorist Organizations Sanctions Regulations, 31 C.F.R. Part 597 (collectively, the "Anti-Terrorism Regulations"), and the Borrower and the General Partner hereby authorize and consent to the Lender's taking any and all reasonable steps the Lender deems necessary, in its sole discretion, to comply with all Legal Requirements applicable to any such OFAC Violation,

including the requirements of the Anti-Terrorism Regulations. Notwithstanding anything to the contrary in this Section, the Borrower shall not be deemed to be in violation of the covenants and agreements set forth in the first sentence of this Section if the Borrower timely complies with all requirements imposed by the foregoing sentence and all requirements of the Antiterrorism Regulations and all other applicable Legal Requirements relating to such OFAC Violation.

Section 6.21 Special Servicing Costs. In accordance with industry standards, the Lender Representative, as servicer of the Loan, may charge the Borrower additional (but reasonable) servicing fees and costs for special servicing requests. The Borrower shall pay as and when due all such special servicing fees or costs.

Section 6.22 Debt Service Account.

(a) On the Closing Date, a portion of the Loan proceeds, in an amount equal to $1,682,545 (the "Debt Service Deposit"), shall be transferred to the Lender Representative to be deposited in a segregated account held by the Lender Representative (the "Debt Service Account"). The Debt Service Deposit is sized in an amount equal to the projected interest payments to accrue and come due on the Loan through the Maturity Date.

(b) On or prior to the first business day of each month, commencing August 2, 2021, funds shall be transferred from the Debt Service Account to the Lender to pay the accrued interest amount then due on the Loan, in accordance with and calculated pursuant to the terms of the Note.

(c) Upon prepayment of the Loan by the Borrower from the Municipal Funds on or prior to the Required Paydown Date (in accordance with Section 2.6 hereof), the required Debt Service Deposit shall be re-sized to account for the decreased outstanding principal amount of the Loan after such prepayment and the amount of interest projected to accrue and come due on such remaining principal through the Maturity Date. Any excess amount in the Debt Service Account after such re-sizing shall be released to the Borrower to pay pre-development costs of the Project Facilities.

(d) Notwithstanding any of the foregoing, on January 1, 2022 and April 1, 2022, the Lender Representative shall calculate the amount of the Debt Service Deposit necessary to account for the interest payments to accrue on the then-outstanding principal amount of the Loan as of such dates and through the Maturity Date based at the then-current Interest Rate (as defined in the Note), as calculated pursuant to the Note. If upon calculation of such new Debt Service Amount, and after delivery of such calculation in writing to the Borrower, there is a shortfall in the Debt Service Account, the Borrower shall transfer to the Lender Representative the funds necessary to fully fund the Debt Service Account within ten (10) Business Days. Failure to do so shall be an Event of Default hereunder.

(e) Upon the occurrence and continuation of an Event of Default, all moneys and investments in the Debt Service Account may be disbursed to pay any costs and expenses of the Project Facilities, to pay any costs of enforcement of the Loan Documents and to pay any and all amounts owed by the Borrower under the Loan Documents, in whatever amounts and whatever order the Lender Representative may reasonably determine.

(f) The Lender Representative shall have the right to invest or withdraw any deposited funds or to direct the liquidation of any investments held in order to pay the amounts required under this Agreement and the other Loan Documents. Any income or gain realized on such investments shall be credited to and become part of the Operating Expense Account and reinvested and applied as provided in this Agreement.

(g)     Upon maturity of the Loan or earlier prepayment in full, any amounts remaining in the Debt Service Account shall be applied as an offset to the outstanding amounts owed hereunder and under the Note, with any balance remaining thereafter being paid to the Borrower.

(h)     The Borrower hereby agrees that it has no right, title or interest in the funds held in the Debt Service Account, except as expressly set forth in this Section 6.22.

Section 6.23     Operating Expense Account.

(a)     On the Closing Date, a portion of the Loan proceeds, in an amount equal to $2,621,075 (the "Operating Expense Deposit"), shall be transferred to the Lender Representative to be deposited in a segregated account held by the Lender Representative (the "Operating Expense Account"). Such Operating Expense Deposit is sized in an amount equal to projected operating expenses for the Project Facilities through the Maturity Date.

(b)     On or prior to the first business day of each month, commencing August 2, 2021, funds shall be transferred from the Operating Expense Account to the Borrower to pay the various operating expenses and utilities coming due in said month, including, but not limited to, insurance premiums, taxes, utilities and security costs, such monthly payment to be made in accordance with a certificate provided by the Borrower to the Lender Representative not less than five (5) days prior to the first Business Day of the succeeding month, showing all such expenses coming due in said succeeding month with invoices attached, to the extent possible.

(c)     Additionally, between the Closing Date and January 1, 2022, the Borrower shall be entitled to withdraw funds from the Operating Expense Account (nor to exceed one half (1/2) of the Operating Expense Deposit) to fund pre-development costs related to the rehabilitation of the Project Facilities, such withdrawals to be requested in writing and approved by the Lender in its sole but reasonable discretion.

(d)     Notwithstanding any of the foregoing, if any portion of the Loan remains outstanding on January 1, 2022, the Borrower shall, subject to Section 2.6(b)(i) hereof, be required to replenish the Operating Reserve Account in an amount necessary to fully fund the Operating Reserve Account through the Maturity Date, in an amount as calculated by the Lender Representative necessary to pay Operating Expenses for the balance of the Loan Term.  The Lender Representative shall deliver such calculation to the Borrower in writing and the Borrower shall transfer to the Lender Representative all funds necessary to fully fund the Debt Service Account within ten (10) Business Days.  Failure to do so shall be an Event of Default hereunder.

(e)     Upon the occurrence and continuation of an Event of Default, all moneys and investments in the Operating Expense Account may be disbursed to pay any costs and expenses of the Project Facilities, to pay any costs of enforcement of the Loan Documents and to pay any and all amounts owed by the Borrower under the Loan Documents, in whatever amounts and whatever order the Lender Representative may determine.

(f)     The Lender Representative shall have the right to invest or withdraw any deposited funds or to direct the liquidation of any investments held in order to pay the amounts required under this Agreement and the other Loan Documents.  Any income or gain realized on such investments shall be credited to and become part of the Operating Expense Account and reinvested and applied as provided in this Agreement.

(g)    Upon maturity of the Loan or early prepayment in full, any amounts remaining in the Operating Expense Account shall be applied as an offset to the outstanding amounts owed hereunder and under the Note, with any balance remaining thereafter being paid to the Borrower.

(h)    The Borrower hereby agrees that it has no right, title or interest in the funds held in the Operating Expense Account, except as expressly set forth in this Section 6.23.

## ARTICLE 7
## DEFAULTS AND REMEDIES

Section 7.1    Defaults.  Each of the following shall constitute an event of default hereunder ("Event of Default"):

(a)    (i) Failure by the Borrower to pay any principal, premium or interest as and when required to be paid by the Borrower under the Note, this Agreement or the other Loan Documents when the same shall become due and payable or (ii) failure of the Borrower to pay any other amount required to be paid by the Borrower under this Agreement or any of the other Loan Documents within ten (10) Business Days after demand for payment of the same;

(b)    Failure by the Borrower to perform or comply with any of the terms or conditions contained in Sections 2.6, 6.1, 6.10, 6.11, 6.22(d) or 6.23(d) hereof;

(c)    Other than as described in any other subsection of this Section 7.1, failure by the Borrower to perform or comply with any of the terms or conditions contained in this Agreement and any of the other Loan Documents to which the Borrower is a party, and continuation of such failure for thirty (30) days after written notice from the Lender or the Lender Representative to the Borrower, or such longer period to which the Lender may agree in the case of a default not curable by the exercise of commercially reasonable efforts within such thirty (30) day period, if such default is curable and the Borrower shall have commenced a cure of such default within such thirty (30) day period and shall be diligently pursuing such cure as quickly as reasonably possible;

(d)    Any of the representations or warranties of the Borrower set forth in this Agreement, any of the other Loan Documents or any other document furnished to the Lender or the Lender Representative pursuant to the terms hereof proves to have been false or misleading in any material respect when made;

(e)    (i) Any material provision of this Agreement or any of the other Loan Documents to which the Borrower or the Guarantor is a party (A) for any reason ceases to be valid and binding on the Borrower or the Guarantor or is declared to be null and void, and such occurrence is reasonably determined by Lender to be materially adverse to the security for the Indebtedness, or to the ability of Borrower to repay the Indebtedness as contemplated under the Loan Documents, or (B) is violative of any applicable Legal Requirement relating to a maximum amount of interest permitted to be contracted for and such violation is not cured by the savings clause under the Note, or (ii) the validity or enforceability of this Agreement or any of the other Loan Documents is contested by the Borrower or the Guarantor (excepting only, in each case, the good faith assertion of applicable legal defenses with respect to individual provisions of this Agreement and the other Loan Documents) or any Governmental Authority, or the Borrower or the Guarantor denies that it has any or further liability or obligation under this Agreement or any of the Loan Documents to which the Borrower or the Guarantor is a party.

(f)    The occurrence of an event of default under and as defined in the other Loan Documents;

(g)    The Borrower, the Guarantor or the General Partner (i) applies for or consents to the appointment of a receiver, trustee, liquidator or custodian or the like of the Borrower, the Guarantor or the General Partner, as applicable, or of property of any such party or (ii) admits in writing the inability of the Borrower, the Guarantor or the General Partner to pay its debts generally as they become due, or (iii) makes a general assignment for the benefit of creditors, (iv) is adjudicated bankrupt or insolvent, (v) commences a voluntary case under the Bankruptcy Code or files a voluntary petition or answer seeking reorganization, an arrangement with creditors or an order for relief or seeking to take advantage of any insolvency law or files an answer admitting the material allegations of a petition filed against the Borrower, the Guarantor or the General Partner in any bankruptcy, reorganization or insolvency proceeding, or action of the Borrower, the Guarantor or the General Partner is taken for the purpose of effecting any of the foregoing, or (vi) has instituted against it, without the application, approval or consent of the Borrower, the Guarantor or the General Partner, as applicable, a proceeding in any court of competent jurisdiction, under any Legal Requirements relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking in respect of the Borrower, the Guarantor or the General Partner an order for relief or an adjudication in bankruptcy, reorganization, dissolution, winding up or liquidation, a composition or arrangement with creditors, a readjustment of debts, the appointment of a trustee, receiver, liquidator or custodian or the like of the Borrower, the Guarantor or the General Partner or of all or any substantial part of the assets of such party or other like relief in respect thereof under any Legal Requirements relating to bankruptcy or insolvency law, and, if such proceeding is being contested by the Borrower, the Guarantor or the General Partner, as applicable, in good faith, the same (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed and undischarged for a period of ninety (90) days;

(h)    The Borrower fails to maintain in full force and effect any insurance required pursuant to this Agreement;

(i)    The Project Facilities suffer a loss by fire or other casualty and such loss is not fully insured and any deficiency in the amount of insurance proceeds paid with respect to such loss is not posted with the Lender within thirty (30) days of the determination of such deficiency;

(j)    Any one or more non-appealable judgments or orders are entered against the Borrower, the Guarantor or the General Partner, and (1) are in excess of $50,000 and continue unsatisfied and unstayed for thirty (30) days or (2) a judgment Lien on any property of the Borrower, the Guarantor or the General Partner is recorded in respect thereof and is not stayed pending appeal by a bond or other arrangement given or obtained by the Borrower, the Guarantor or the General Partner on terms which do not violate any of the Borrower's covenants under this Agreement;

(k)    Any litigation or administrative proceeding ensues, and is not dismissed within thirty (30) days, involving the Borrower, the General Partner, the Guarantor or any instrument, contract or document delivered by the Borrower to the Lender Representative or the Lender in compliance with this Agreement, and the adverse result of such litigation or proceeding would have, in the Lender's reasonable opinion, a materially adverse effect on the Borrower's or any Guarantor's ability to pay its obligations and comply with the covenants under this Agreement or any of the other Loan Documents;

(l)    The Guarantor fails to Control the General Partner; or

(m)      Failure by the Borrower or the Guarantor (1) to make any payment or payments in respect of any Obligation or Indebtedness (unless a bona fide dispute exists as to whether such payment is due), when such payment or payments are due and payable (after the lapse of any applicable grace period) in an amount in excess of $50,000 with respect to Borrower or $100,000 with respect to the Guarantor, (2) to perform any other obligation or covenant under any such obligation or obligations or (3) to pay or perform any obligation or covenant under any Material Contract, any of which (x) results in the acceleration of such Obligation or Indebtedness or enables the holder or holders of such Obligation or Indebtedness or any Person acting on behalf of such holder or holders to accelerate the maturity of such obligation in an amount in excess of $50,000 with respect to Borrower or $100,000 with respect to the Guarantor or (y) would have, in the Lender's reasonable opinion, a materially adverse effect on either the Borrower's or the Guarantor's ability to pay its obligations and comply with the covenants under this Agreement or any of the other Loan Documents.

Section 7.2      Remedies.  If an Event of Default has occurred and is continuing uncured, the Lender may:

(a)      Declare the principal of the Note and the interest accrued thereon to be due and payable; and

(b)      Declare the Borrower's obligations hereunder, under the Note and under the other Loan Documents to be, whereupon the same shall become, immediately due and payable, provided, no such declaration shall be required, and acceleration shall be automatic, upon occurrence of an event set forth in Section 7.1(g) hereof; and

(c)      (1) Enter upon or take possession of the Project Facilities and call upon or employ suppliers, agents, managers, maintenance personnel, security guards, architects, engineers and inspectors to complete, manage or operate the Project Facilities or to protect the Project Facilities from injury; (2) pay out additional sums (which sums shall be immediately due and payable by the Borrower to the Lender) and use any property of the Borrower associated with the Project Facilities, or any property of the Borrower in which the Lender has or obtains an interest for application to or as a reserve for payment of any or all of the following with respect to the protection, management, operation or maintenance of the Project Facilities or the protection of the Lender's interest therein, and in such connection deliver or disburse the same to such entities in such amounts and with such preferences and priorities as the Lender in its sole discretion shall determine, either with or without vouchers or orders executed by the Borrower: (A) all sums due from the Borrower to the Lender; (B) premiums and costs of title and any other insurance; (C) leasing fees and brokerage or sales commissions; (D) fees, costs and expenses of the Lender and Lender Representative and their respective counsel in connection with the enforcement and performance of this Agreement, the other Loan Documents and the other documents contemplated hereby; (E) any taxes (including federal, state and local taxes) or other governmental charges; (F) any sums required to indemnify and hold the Lender and the Lender Representative and their respective agents harmless from any act or omission of the Lender or Lender Representative or their respective agents (except such as are grossly negligent or due to its willful misconduct) under Section 2.5 hereof, the other Loan Documents or any other document; (G) architectural and engineering costs or any sums due to contractors, subcontractors, mechanics or materialmen for work or services actually furnished on or for the Project Facilities; (H) claims of any Governmental Authority for any required withholding of taxes on wages payable or paid by the Borrower; and (I) other costs and expenses which are required to complete, manage or operate the Project Facilities or to protect the Project Facilities from injury or maintain the Lender's security position before the rights of all others; (3) place additional encumbrances upon the Project Facilities; and (4) employ leasing and sales agents

and negotiate and execute leases, sales contracts and financing undertakings in connection with all or any part of the Project Facilities; and

      (d)    Subject to all Legal Requirements, require the Borrower to transfer all security deposits to the Lender; and

      (e)    Exercise, or cause to be exercised, any and all such remedies as it may have under this Agreement, the other Loan Documents or at law or in equity.

      Section 7.3    No Waivers; Consents. No waiver of, or consent with respect to, any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.

      Section 7.4    No Waiver; Remedies Cumulative. No failure on the part of the Lender or the Lender Representative to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; and no single or partial exercise of any right hereunder shall preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies available under any other document or at law or in equity.

      Section 7.5    Set-Off. Upon the occurrence and during the continuation of an Event of Default hereunder, the Lender is hereby authorized at any time and from time to time without notice to the Borrower or the General Partner (any such notice being expressly waived by the Borrower and the General Partner) and, to the fullest extent permitted by applicable Legal Requirements, to set off and to apply any and all balances, credits, deposits (general or special, time or demand, provisional or final), accounts or moneys at any time held and other indebtedness at any time owing by the Lender to or for the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement, the Loan Documents or any other agreement or instrument delivered by the Borrower to the Lender in connection therewith, whether or not the Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured. The rights of the Lender under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) which the Lender may have.

      Section 7.6    Borrower to Give Notice of Default. The Borrower covenants that it will promptly give to the Lender and the Lender Representative written notice of the occurrence of any Event of Default under this Agreement, and any act, event or circumstance which, with the passage of time, or notice, or both, would constitute such an Event of Default of which the Borrower shall have actual knowledge or written notice.

      Section 7.7    Replacement Guarantor. Notwithstanding any of the foregoing in this Article VII or in any of the other Loan Documents, if an event occurs with respect to the Guarantor that causes an Event of Default hereunder or under any of the other Loan Documents, then, notwithstanding anything to the contrary set forth herein or in any of the other Loan Documents, the Borrower may cure such Event of Default by providing a replacement guarantor, satisfactory to the Lender in its sole and absolute discretion (the "Replacement Guarantor"), with a net worth, financial condition and liquidity acceptable to Lender (and in no case at levels less than the levels required for the Guarantor on the Closing Date) within thirty (30) days after the occurrence of such Event of Default, and within such thirty (30) day period, the Replacement Guarantor shall execute an environmental indemnity and guaranty agreements on forms substantially similar to the existing Environmental Indemnity, the Loan Guaranty and the Recourse Guaranty. In addition, the Borrower shall promptly execute any amendments required by the Lender to this Agreement and the other Loan Documents which are reasonably necessary to reflect such Replacement

Guarantor (the cost of which new Environmental Indemnity, Loan Guaranty and Recourse Guaranty, and any necessary amendments to this Agreement or the other Loan Documents, shall be paid by the Borrower).

Notwithstanding any of the foregoing, during the above-referenced thirty (30) day period, the Lender shall not be prohibited from pursuing remedies not specific to the Guarantor that may be available to the Lender upon an Event of Default hereunder or under any of the other Loan Documents.

## ARTICLE 8
## MISCELLANEOUS

Section 8.1    Notices.   All notices that may be required or otherwise provided for or contemplated under the terms of this Agreement to be given by Borrower or by Lender (or Lender Representative) will, whether so stated, be in writing, and if not in writing, will not be deemed to have been given, and a copy of all such notices shall be provided to the party receiving such notice, and their counsel, via electronic mail at the email addresses provided below.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) 1 Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) 1 Business Day after being sent to the recipient by electronic mail as set forth below, or (iv) 4 Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below.

| | |
|---|---|
| To the Borrower: | HH Cleveland Huntington L.P.<br>c/o The Millennia Companies<br>127 Public Square, Suite 4000<br>Cleveland, Ohio 44114-1309<br>Attention: Frank T. Sinito |
| With a copy to: | Baker & Hostetler LLP<br>Key Tower<br>127 Public Square, Suite 2000<br>Cleveland, Ohio 44114<br>Attention: Larry Lindberg<br>Email:  llindberg@bakerlaw.com |
| If to the Lender Representative: | Berkadia Commercial Mortgage LLC<br>127 Public Square, Suite 1440<br>Cleveland, Ohio 44114<br>Attention: Dan Geuther<br>Email: Daniel.Geuther@berkadia.com |
| If to the Lender: | Deutsche Bank AG, New York Branch<br>60 Wall Street, Third Floor<br>New York, New York 10005<br>Attention:  Municipal Capital Markets |
| With a copy to: | Kutak Rock LLP<br>2300 Main Street, Suite 800<br>Kanas City, Missouri 64108<br>Attention:  Jacob S. Lowry<br>Email:  Jacob.Lowry@kutakrock.com |

The above parties may change the address to which notices to it are to be sent by written notice given to the other Persons listed in this Section.

Section 8.2      Successors and Assigns; Third Party Beneficiaries.  This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns, including, without limitation, the Lender.  The Lender Representative is an express third party beneficiary of this Agreement, entitled to enforce this Agreement as set forth herein.  The Borrower may not assign its interests in or its rights, duties or obligations under this Agreement, other than pursuant to a Permitted Transfer, without the prior written consent of the Lender in its sole discretion.  The Borrower and the Lender intend that no Person other than the parties hereto, the Lender Representative and their respective successors and assigns as permitted hereunder, shall have any claim or interest under this Agreement or right of action hereon or hereunder.

Section 8.3      Survival of Covenants.  All covenants made by the Borrower herein and in any document delivered pursuant hereto shall survive the delivery of the Note, the delivery of this Agreement and the payment of any amounts under the Loan Documents.

Section 8.4      Counterparts; Electronic Signature.  The execution hereof by each party hereto shall constitute a contract between them for the uses and purposes herein set forth, and this Agreement may be executed in any number of counterparts, with each executed counterpart constituting an original and all counterparts together constituting one agreement.  To the fullest extent permitted by applicable law, facsimile or electronically transmitted signatures shall be treated as original signatures for all purposes hereunder.

Section 8.5      Costs, Expenses and Taxes.  The Borrower agrees to pay on the Closing Date and thereafter within thirty (30) days after demand, all reasonable and actual costs and expenses of the Lender and the Lender Representative in connection with the preparation, execution, delivery and administration of this Agreement, the other Loan Documents and any other documents that may be delivered in connection with this Agreement or the other Loan Documents or any amendments or supplements thereto, including, without limitation, the fees and expenses of the Lender Representative, the cost of an annual appraisal (but only upon the occurrence and during the continuation of an Event of Default) of the Project Facilities by an appraiser selected by the Lender Representative, and the reasonable fees and expenses of counsel for the Lender and the Lender Representative with respect thereto and with respect to advising the Lender and the Lender Representative as to their respective rights and responsibilities under this Agreement, the other Loan Documents and such other documents, and all actual costs and expenses, if any, (including, without limitation, reasonable counsel fees and expenses of the Lender Representative and the Lender) in connection with the enforcement of this Agreement, the other Loan Documents and such other documents.

Section 8.6      Severability; Interest Limitation.  If any provision hereof is found by a court of competent jurisdiction to be prohibited or unenforceable in any jurisdiction, it shall be ineffective as to such jurisdiction only to the extent of such prohibition or unenforceability, and such prohibition or unenforceability shall not invalidate the balance of such provision as to such jurisdiction to the extent it is not prohibited or unenforceable, nor invalidate such provision in any other jurisdiction, nor invalidate the other provisions hereof, all of which shall be liberally construed in favor of the Lender in order to effect the provisions of this Agreement.  Notwithstanding anything to the contrary herein contained, the total liability of the Borrower for payment of interest pursuant hereto shall not exceed the maximum amount, if any, of such interest permitted by applicable Legal Requirements to be contracted for, charged or received, and if any payments by the Borrower to the Lender include interest in excess of such a maximum amount, the Lender shall apply such excess to the reduction of the unpaid principal amount due pursuant hereto, or if none is due, such excess shall be refunded to the Borrower, provided that, to the extent permitted by applicable Legal Requirements, in the event the interest is not collected, is applied to principal or is refunded

pursuant to this sentence and interest thereafter payable pursuant hereto shall be less than such maximum amount, then such interest thereafter so payable shall be increased up to such maximum amount to the extent necessary to recover the amount of interest, if any, theretofore uncollected, applied to principal or refunded pursuant to this sentence. Any such application or refund shall not cure or waive any Event of Default. In determining whether or not any interest payable under this Agreement exceeds the highest rate permitted by applicable Legal Requirements, any non-principal payment (except payments specifically stated in this Agreement to be "interest") shall be deemed, to the extent permitted by applicable Legal Requirements, to be an expense, fee, premium or penalty rather than interest.

Section 8.7    Conflicts. Insofar as possible the provisions of this Agreement shall be deemed complementary to the terms of the other Loan Documents, but in the event of conflict the terms hereof shall control to the extent such are enforceable under applicable Legal Requirements.

Section 8.8    Complete Agreement. Taken together with the other Loan Documents and the other instruments and documents delivered in compliance herewith, this Agreement is a complete memorandum of the agreement of the Borrower and the Lender with respect to the subject matter hereof.

Section 8.9    Consent to Jurisdiction; Venue; Waiver of Jury Trial. The parties hereby irrevocably (i) agree that any suit, action or other legal proceeding arising out of or relating to this Agreement or the other Loan Documents may be brought in any federal court located in the State and consents to the jurisdiction of such court in any such suit, action or proceeding; (ii) agree that any suit, action or other legal proceeding relating to the Loan Documents against the Lender or the Lender Representative shall be brought solely in a federal or state court located in the state of New York and (iii) waive any objection which it may have to the laying of venue of any such suit, action or proceeding in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. The parties hereby irrevocably consent to the service of any and all process in any such suit, action or proceeding by mailing of copies of such process to such party at its address provided under or pursuant to Section 8.1 hereof. The parties agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable legal requirements. All mailings under this Section shall be by certified or registered mail, return receipt requested. Nothing in this Section shall affect the right of the Lender Representative and the Lender to serve legal process in any other manner permitted by applicable Legal Requirements. **THE PARTIES HERETO HEREBY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING UNDER THIS AGREEMENT, ANY OF THE OTHER LOAN DOCUMENTS OR OTHERWISE IN CONNECTION HEREWITH.**

Section 8.10    Nonrecourse; Recourse Exceptions.

(a)    Notwithstanding anything to the contrary contained in this Agreement (other than Sections 8.10(b) through (e) hereof) or the other Loan Documents, the Lender agrees that, in connection with the exercise of any rights or remedies available to the Lender under this Agreement or any of the other Loan Documents (other than the Environmental Indemnity and the other guaranty agreements of the Guarantor), the Lender shall look solely to the enforcement of the lien and security interest created by this Agreement and the other Loan Documents and to the collateral and other security held by the Lender and all assets of the Borrower.

(b)    Notwithstanding the preceding subsection, the Borrower and the Guarantor shall have full recourse and personal liability for, and be subject to, judgments and deficiency decrees arising from and to the extent of any actual loss, compensatory economic damage or expense suffered or incurred by the Lender or the Lender Representative as a result of the occurrence of any of the following events:

(i)    the Borrower fails to pay to the Lender or the Lender Representative upon demand after an Event of Default all Rents to which the Lender is entitled under Section 2 of the Mortgage and the amount of all security deposits collected by Borrower from tenants then in residence, if any. However, Borrower will not be personally liable for any failure described in this Section 8.10(b)(i) if Borrower is unable to pay to the Lender all Rents and security deposits as required by the Mortgage because of a valid order issued in a bankruptcy, receivership, or similar judicial proceeding;

(ii)    the Borrower fails to apply all insurance proceeds or casualty or condemnation proceeds as required by the Loan Documents. However, Borrower will not be personally liable for any failure described in this Section 8.10(b)(ii) if Borrower is unable to apply insurance or casualty or condemnation proceeds as required by the Loan Documents because of a valid order issued in a bankruptcy, receivership, or similar judicial proceeding;

(iii)    if an Event of Default has occurred and is continuing, the Borrower fails to deliver all books and records relating to the Mortgaged Property or its operation in accordance with the provisions of Section 6.8 or 6.9 of this Agreement;

(iv)    the Borrower engages in any willful act of material physical waste of the Project Facilities;

(v)    the Borrower or the General Partner fails to comply with any provision of Section 6.10(b) hereof;

(vi)    the occurrence of any of the following transfers:

(A)    any Person that is not an Affiliate creates a mechanic's Lien or other involuntary Lien, other than a Permitted Encumbrance, against the Project Facilities and Borrower has not complied with the provisions of this Agreement;

(B)    a transfer of property by devise, descent or operation of law occurs upon the death of a natural person in violation of the requirements set forth in the Loan Documents;

(C)    the Borrower grants an easement that does not meet the requirements set forth in the Loan Documents (other than easements for utilities or similar purposes in the ordinary course provided such easements do no impair the use of the Project Facilities or diminish the value of the Project Facilities); or

(D)    the Borrower executes a Lease in violation of Section 6.11 of this Agreement;

(vii)    any act of fraud or willful misconduct or any criminal act of the Borrower, the General Partner or the Guarantor or any officer, director, partner or member of the Borrower or the General Partner;

(viii)    the costs of any audit under Section 6.7 of this Agreement;

(ix)    [reserved];

(x)    any actual costs and expenses incurred by the Lender and the Lender Representative in connection with the collection of any amount for which Borrower is personally liable under this Section 8.10, including reasonable attorneys' fees and costs and the costs of conducting any independent audit of Borrower's books and records to determine the amount for which Borrower has personal liability;

(xi)    the Borrower's misappropriation of funds or other collateral pledged to the Lender hereunder or in the other Loan Documents; or

(xii)    any litigation or other legal proceeding related to the Indebtedness filed by any of the Borrower, the Guarantor, or any of their Affiliates, or any other action of any such Person that delays, opposes, impedes, hinders, enjoins or otherwise interferes with or frustrates the efforts of Lender to exercise any rights and remedies available to Lender provided herein or in the other Loan Documents which is dismissed on summary judgment.

(c)    The Borrower and the Guarantor shall have full recourse and personal liability for all of the Indebtedness (and the limitation on liability in the first sentence of Section 8.10(a) hereof shall be null and void) as a result of the occurrence of any of the following:

(i)    a violation of Section 6.10(a), 6.11(b) or 6.12(c) hereof;

(ii)    the Borrower or the General Partner fails to comply with any provision of Section 6.10(b) or (c), respectively, hereof and a court of competent jurisdiction holds or determines that such failure or combination of failures is the basis, in whole or in part, for the substantive consolidation of the assets and liabilities of the Borrower or the General Partner with the assets and liabilities of a debtor pursuant to Title 11 of the Bankruptcy Code;

(iii)    a transfer that is an Event of Default under Section 7.1 hereof occurs (other than a transfer described in Section 8.10(b)(vi)(B) above, for which Borrower will have personal liability for any loss or damage); provided, however, that Borrower will not have any personal liability for a transfer consisting solely of the involuntary removal or involuntary withdrawal of the General Partner;

(iv)    there was fraud or written material misrepresentation by the Borrower, the General Partner or any officer, director, partner, member or employee of the Borrower, the General Partner or their respective agents or representatives in connection with the application for or creation of the Indebtedness or there is fraud in connection with any request for any action or consent by the Lender or Lender Representative;

(v)    the Borrower or the General Partner voluntarily files for bankruptcy protection under the Bankruptcy Code;

(vi)    the Borrower or the General Partner voluntarily becomes subject to any reorganization, receivership, insolvency proceeding, or other similar proceeding pursuant to any other federal or state law affecting debtor and creditor rights;

(vii)    the Project Facilities or any part of the Project Facilities becomes an asset in a voluntary bankruptcy or becomes subject to any voluntary reorganization, receivership, insolvency proceeding, or other similar voluntary proceeding pursuant to any other federal or state law affecting debtor and creditor rights;

(viii)   an order of relief is entered against the Borrower or the General Partner pursuant to the Bankruptcy Code or other federal or state law affecting debtor and creditor rights in any involuntary bankruptcy proceeding initiated or joined in by an Affiliate;

(ix)   an involuntary bankruptcy or other involuntary insolvency proceeding is commenced against the Borrower or the General Partner (by a party other than the Lender) but only if the Borrower or the General Partner, as applicable, has failed to use commercially reasonable efforts to dismiss such proceeding or has consented to such proceeding. "Commercially reasonable efforts" will not require any direct or indirect interest holders in the Borrower or the General Partner to contribute or cause the contribution of additional capital to the Borrower or the General Partner; or

(x)   the Borrower's or the Guarantor's actions delay or hinder the Lender or Lender Representative in the appointment of a receiver or foreclosure following an Event of Default (excepting only the good faith assertion of applicable legal defenses).

(d)   The Borrower and the Guarantor shall have full recourse and personal liability for all of the following:

(i)   the performance of and compliance with all of Borrower's obligations under Sections 5.12 and 6.13 of this Agreement (relating to environmental matters) or the Borrower's failure to comply with the provisions of the Environmental Indemnity; and

(ii)   Borrower's indemnity obligations pursuant to Sections 2.5 and 8.13 hereof.

(e)   Further, nothing contained in this Section shall be deemed to limit, vary, modify or amend any obligation owed under any guaranty, master lease or indemnification agreement, including the Environmental Indemnity and the other guaranty agreements of the Guarantor and any future guarantors, furnished in connection with financing of the acquisition, rehabilitation and equipping of the Project Facilities, as may be applicable, recourse under which is not, by its terms, expressly limited in accordance with this Section 8.10.

(f)   Notwithstanding anything to the contrary, Lender and Lender Representative shall not be deemed to have waived any right such Persons may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of Borrower's and Guarantor's Indebtedness under the Loan Documents or to require that all collateral shall continue to secure all Indebtedness under the Loan Documents.

Section 8.11   Governing Law.  THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT UNDER, AND TOGETHER WITH ANY DISPUTES OR CONTROVERSIES ARISING OUT OF OR RELATING TO THIS AGREEMENT, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS AND LEGAL REQUIREMENTS OF THE STATE OF NEW YORK AND APPLICABLE FEDERAL LAW, WITHOUT REGARD TO CHOICE OF LAW RULES OTHER THAN NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1401 (OR ANY SUCCESSOR STATUTE THERETO).

Section 8.12   Headings.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 8.13    Sale of Note and Secondary Market Transaction.

(a)    At the Lender Representative or Lender's request (to the extent not already required to be provided by the Borrower under this Agreement), the Borrower shall use reasonable efforts to satisfy the market standards to which the Lender Representative or Lender customarily adheres or which may be reasonably required in the marketplace or by the Lender Representative or Lender in connection with obtaining a rating or one or more sales or assignments of all or a portion of the Note or participations therein or securitizations of single or multi-class securities (the "Securities") secured by or evidencing ownership interests in all or a portion of the Note (each such sale, assignment and/or securitization, a "Secondary Market Transaction"); provided that the Borrower shall not incur any third party or other out-of-pocket costs and expenses in connection with a Secondary Market Transaction, including the costs associated with the delivery of any Provided Information or any opinion required in connection therewith, and all such costs including, without limitation, any costs associated with receiving a rating on the Note, shall be paid by the Lender Representative or Lender, and shall not materially modify Borrower's rights or obligations. Without limiting the generality of the foregoing, the Borrower and the Lender shall, so long as the Loan is still outstanding:

(i)    (1) provide financial and other customary information with respect to the Note, and with respect to the Project Facilities, the Borrower, the General Partner or the contractor of the Project Facilities, (2) provide financial statements, audited, if available, relating to the Project Facilities with customary disclaimers for any forward looking statements or lack of audit, and (3) at the expense of the Lender Representative or Lender, perform or permit or cause to be performed or permitted such site inspection, appraisals, surveys, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's), engineering reports, termite and other insect infestation reports and other due diligence investigations of the Project Facilities, the Borrower, the Guarantor, the General Partner, the contractor and other third parties in connection with the Note, as may be reasonably requested from time to time by the Lender Representative or Lender or as may be necessary or appropriate in connection with a Secondary Market Transaction or Exchange Act requirements (the items provided to the Lender Representative or Lender pursuant to this paragraph (i) being called the "Provided Information"), together, if customary, with appropriate verification of and/or consents to the Provided Information through letters of auditors or opinions of counsel of independent attorneys acceptable to the Lender Representative or the Lender;

(ii)    provide a "bringdown" of the representations and warranties contained in the Loan Documents as of the date thereof and a representation that no Default or Event of Default has occurred and is continuing; and

(iii)    execute such amendments to the Loan Documents to accommodate such Secondary Market Transaction so long as such amendment does not affect the material economic terms of the Loan Documents and is not otherwise adverse to such party in its reasonable discretion.

(b)    The Borrower understands that certain of the Provided Information and the required records may be included in disclosure documents in connection with a Secondary Market Transaction, including a prospectus or private placement memorandum (each, a "Secondary Market Disclosure Document"), or provided or made available to investors or prospective investors in the Securities, service providers or other parties relating to the Secondary Market Transaction. In the event that the Secondary Market Disclosure Document is required to be revised, the Borrower shall cooperate, subject to Section 8.13(c) hereof, with the Lender Representative and Lender in updating the Provided Information or required records for inclusion or summary in the Secondary Market Disclosure Document or for other use reasonably required in connection with a Secondary Market Transaction by providing all current information pertaining to the Borrower and the Project Facilities necessary to keep the Secondary Market Disclosure Document

accurate and complete in all material respects with respect to such matters. The Borrower hereby consents to any and all such disclosures of such information.

(c)     In connection with a Secondary Market Disclosure Document, the Borrower, the General Partner or the Guarantor shall provide, or in the case of a Borrower-engaged third party such as the General Partner, cause it to provide, information reasonably requested by the Lender Representative or the Lender pertaining to the Borrower, the General Partner or the Guarantor, the Project Facilities or such third party (and portions of any other sections reasonably requested by the Lender Representative or the Lender pertaining to the Borrower, the General Partner or the Guarantor, the Project Facilities or the third party). The Borrower shall, if requested by the Lender Representative or the Lender, certify in writing that the Borrower has carefully examined those portions of such Secondary Market Disclosure Document, pertaining to the Borrower, the General Partner or the Guarantor, the Project Facilities or the third party, and such portions (and portions of any other sections reasonably requested and pertaining to the Borrower, the Project Facilities or the third party) do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; provided that the Borrower shall not be required to make any representations or warranties regarding any Provided Information obtained from a third party except with respect to information it provided to such third parties; provided further that the Borrower will make best efforts to cause such third parties to provide similar certifications with respect to any information not so certified by the Borrower. Furthermore, the Borrower hereby indemnifies the Lender Representative, the Lender and issuer, sponsor, guarantor and the underwriter group for any securities, and their affiliates, officers, directors, partners, members, agents, attorneys and controlling persons (the "Underwriter Group") for any liabilities to which any such parties may become subject to the extent such liabilities arise out of or are based upon any material error or omission by Borrower in the Provided Information used in a Secondary Market Disclosure Document.

(d)     In connection with filings under the Exchange Act or the Securities Act, the Borrower shall (i) defend and indemnify the Lender Representative, the Lender and the Underwriting Group for any liabilities to which the Lender Representative, the Lender or the Underwriter Group may become subject insofar as such liabilities arise out of or are based upon the omission or alleged omission by Borrower to state in the Provided Information of a material fact required to be stated by Borrower in the Provided Information in order to make the statements in the Provided Information, in the light of the circumstances under which they were made not misleading, and (ii) reimburse the Lender Representative, the Lender, the Underwriter Group and other indemnified parties listed above for any legal or other expenses reasonably incurred by the Lender Representative, the Lender or the Underwriter Group in connection with defending or investigating the liabilities; provided that the Borrower shall not provide any indemnification regarding any Provided Information obtained from unrelated third parties except with respect to information it provided to such parties, but shall make best efforts to require such third parties to provide such indemnification with respect to information they certify.

(e)     Promptly after receipt by an indemnified party under this Section 8.13 of notice of the commencement of any action for which a claim for indemnification is to be made against the Borrower, such indemnified party shall notify the Borrower in writing of such commencement, but the omission to so notify the Borrower will not relieve the Borrower from any liability that it may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the Borrower. In the event that any action is brought against any indemnified party, and it notifies the Borrower of the commencement thereof, the Borrower will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice of commencement, to assume the defense thereof with counsel selected by the Borrower and reasonably satisfactory to such indemnified party in its sole discretion. After notice from the Borrower to such indemnified party under this Section 8.13 and provided that the Borrower duly

provides the defense and indemnity herein described, including payment of all required fees, expenses and liabilities, the Borrower shall not be responsible for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation. No indemnified party shall settle or compromise any claim for which the Borrower may be liable hereunder without the prior written consent of the Borrower.

(f)     In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in this Section 8.13 is for any reason held to be unenforceable by an indemnified party in respect of any liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under this Section 8.13, the Borrower shall contribute to the amount paid or payable by the indemnified party as a result of such liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) the indemnified parties and the Borrower's relative knowledge and access to information concerning the matter with respect to which the claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances. The parties hereto hereby agree that it may not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

Section 8.14     Publicity.  The Borrower hereby authorizes the Lender Representative or the Lender and their respective Affiliates, only upon the prior written consent of the Borrower, in its sole and absolute discretion, to use the Borrower's and its Affiliates' name(s), logo(s) and photographs related to the Project Facilities in its advertising, marketing and communications materials on a national and/or international basis. Such materials may include web pages, print ads, direct mail and various types of brochures or marketing sheets, and various media formats other than those listed (including without limitation video or audio presentations through any media form). In these materials, the Lender Representative or the Lender also may discuss at a high level the types of services and solutions the Lender Representative or the Lender has provided the Borrower. This authorization, once provided, shall remain in effect unless the Borrower notifies the Lender Representative in writing in accordance with the notice provisions set forth herein that such authorization is revoked. Subject to Borrower's prior written consent, in its sole and absolute discretion, the Lender Representative or the Lender shall also have the right to publicize its involvement in the financing of the Project Facilities, including the right to maintain a sign indicating such involvement at a location at the Project Facilities reasonably acceptable to the Borrower.

Section 8.15     Determinations by the Lender and Lender Representative.  Subject to specific provisions in this Agreement to the contrary, in any instance under this Agreement where the consent or approval of the Lender Representative or the Lender may be given or is required, or where any determination, judgment or decision is to be rendered by the Lender Representative or the Lender under this Agreement, the granting, conditioning, withholding or denial of such consent or approval and the rendering of such determination, judgment or decision shall be made or exercised by the Lender Representative or the Lender, as applicable (or its designated representative) at its sole and absolute discretion.

Section 8.16     Reinstatement.  This Agreement and each other Loan Document shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Indebtedness or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by Borrower, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Indebtedness shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

Section 8.17    Further Assurances.  The Borrower will promptly and duly execute, acknowledge and deliver from time to time such further instruments and take such further actions as may be reasonably required by the Lender or the Lender Representative to carry out the purposes and provisions of this Agreement and to the other Loan Documents, to make elections or take actions (or, as requested, to refrain from making elections or taking actions) related to the audit procedures involving the Borrower and/or its members set forth in the Bipartisan Budget Act of 2015 so that the Borrower's members, equity holders, shareholders and partners will be directly responsible for any audit adjustments, changes or modifications rather than the Borrower, to confirm the priority and/or perfection of any Lien created or intended to be created by this Agreement and the other Loan Documents and to assure the Lender Representative and the Lender of the subrogation and security rights in favor of the Lender contemplated by this Agreement and by the other Loan Documents in connection with any of the foregoing and such approvals shall be in form satisfactory to the Lender; provided, however, Borrower shall not be required under this Agreement to agree to deliver instruments or take actions which shall have the effect of (a) materially increasing any obligation undertaken by or imposed upon Borrower under this Agreement or any of the other Loan Documents, or (b) materially changing the applicability, scope or effect of any covenant, condition or restriction from that contained in this Agreement or any of the other Loan Documents, or (c) changing the essential economic terms of the Loan.

Section 8.18    Amendments.  This Agreement may not be amended or modified by course of dealing, oral acknowledgement or agreement or by any writing, unless it is a writing which is expressly stated to constitute an amendment of this Agreement and is signed by an authorized officer of the Lender and the Borrower.

[The remainder of this page is left blank intentionally.]

IN WITNESS WHEREOF, the Lender and the Borrower have caused this Agreement to be duly executed and delivered on the day and year first above written.

**DEUTSCHE BANK AG, NEW YORK BRANCH**

By:
Name: Don Goldberg
Title: VP


By:
Name:
Title:

**VINCENT MERCERON
DIRECTOR**

[LOAN AGREEMENT – THE CENTENNIAL]

S-1

**HH CLEVELAND HUNTINGTON L.P.,**
an Ohio limited partnership

By:  925 Euclid Manager, LLC,
      an Ohio limited liability company,
      its General Partner

      By: _____

          Frank T. Sinito, Managing Member

[LOAN AGREEMENT – THE CENTENNIAL]

S-2

**EXHIBIT A**
**DEFINITIONS**

"**Accountant**" means an accounting firm selected by Borrower and approved in writing by the Lender Representative.

"**Accounts**" means the Debt Service Account and the Operating Expense Account.

"**Affiliate**" means, with respect to any designated Person, each Person who directly, or indirectly through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, another designated Person, pursuant to the organizational document(s) of an entity or by other express, written agreement.

"**Anti-Terrorism Regulations**" shall have the meaning ascribed to such term in Section 6.20 of this Agreement.

"**Architect**" means Sandvick Architects, Inc.

"**Assignment of Management Agreement and Consent**" means the Assignment of Management Agreement dated as of July 1, 2021, by the Borrower to and for the benefit of the Lender and consented to by the Property Manager.

"**Assignment of Project Documents**" means the Assignment of Project Documents dated as of July 1, 2021, by the Borrower in favor of the Lender.

"**Authorized Person**" means one or more individuals duly authorized to bind the Borrower in connection with the administration of the Project Facilities as the Borrower may designate in writing from time to time. The initial Authorized Person of the Borrower is Frank T. Sinito.

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended, and any successor statute or statutes having substantially the same function.

"**Borrower**" shall have the meaning given to such term in the recitals to this Agreement.

"**Business Day**" means other than (i) a Saturday, a Sunday or another day on which banking institutions in the State of Ohio or New York, New York, or the Principal Office of the Lender is authorized or obligated by law or executive order to be closed; (ii) a day on which the New York Stock Exchange is authorized or obligated by law or executive order to be closed; (iii) a New York state holiday when the Lender is authorized or obligated to be closed; or (iv) the day after Thanksgiving.

"**City of Cleveland Loan**" means the $15,000,000 loan from the City of Cleveland (the "City") having a term of 20 years with interest at LIBOR plus 0.75%. Interest only is paid quarterly for the first ten (10) years of the term then the loan amortizes over the next ten (10) years with quarterly payments of interest and annual principal payments. Payments on the City of Cleveland Loan will be expressly subordinate to any permanent or bridge loans on the Project Facilities, including the Loan, and will be pari-passu with the Cuyahoga County Loan.

"**Closing Date**" means July 15, 2021, the date on which the Note is delivered to the Lender.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rulings and regulations (including temporary and proposed regulations) promulgated thereunder.

"**Cogent Lease**" means that certain Lease dated as of October 1, 2012, between the Borrower, as successor in interest to Optima 925, LLC, and Cogent Communications, Inc., as amended from time to time.

"**Commercial Lease(s)**" means collectively, the HNB Lease, the Cogent Lease and the Verizon Lease.

"**Contamination**" means the uncontained release, discharge or disposal of any Hazardous Substances at, on, upon or beneath the Project Facilities, whether or not originating at the Project Facilities, or arising from the Project Facilities into or upon any land or water or air, or otherwise into the environment, which may require remediation under any applicable Legal Requirements.

"**Control**" means, when used with respect to any specific Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person whether through ownership of voting securities, beneficial interests, by contract or otherwise.  The definition is to be construed to apply equally to variations of the word "Control" including "Controlled," "Controlling" or "Controlled by."

"**Construction Contract**" means the AIA Construction Contract dated June 16, 2021 between the Borrower and Marous/Gilbane, a Joint Venture.

"**Cuyahoga County Loan**" means the $5,000,000 loan from Cuyahoga County, Ohio (the "County") having a term of twenty (20) years with interest of 2.5% per annum.  Interest only is payable quarterly for the first five (5) years.  Beginning in the 6th year, the loan will be amortized over the 15-year balance of the term with monthly payments of principal and interest.  Payments on the Cuyahoga County Loan will be expressly subordinate to any permanent or bridge loans on the Project Facilities, including the Loan, and will be pari-passu with the City of Cleveland Loan.

"**Debt Service Account**" has the meaning assigned to such term in Section 6.22 hereof.

"**Default**" means an event or condition which is, or which after giving notice or lapse of time or both would be, an Event of Default.

"**Default Interest**" means interest payable at the Default Rate.

"**Default Rate**" shall have the meaning set forth in the Note.

"**Environmental Audit**" means the written Phase I environmental site assessment for the Project Facilities prepared by ATC Group Services LLC dated April 16, 2021.

"**Environmental Indemnity**" means the Environmental Indemnity Agreement dated as of July 1, 2021, by the Borrower and the Guarantor in favor of the Lender.

"**Environmental Laws**" means all Legal Requirements governing or relating to the protection of the environment, natural resources or human health concerning (i) activities at any of the Project Facilities, (ii) repairs or rehabilitation of any Improvements, (iii) handling of any materials at any of the Project Facilities, (iv) releases into or upon the air, soil, surface water or ground water from any of the Project Facilities, and (v) storage, distribution, use, treatment, transport or disposal of any waste at or connected with any activity at any of the Project Facilities, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 42 U.S.C. §§ 9601 et seq., as amended from time to time; the Hazardous Materials Transportation Act 49 U.S.C. §§ 5101 et seq., as amended from

time to time; the Resource Conservation and Recovery Act 42 U.S.C. §§ 6901 et seq., as amended from time to time; the Federal Water Pollution Control Act 33 U.S.C. §§ 1251 et seq., as amended from time to time; and comparable State statutes.

"**Environmentally Sensitive Area**" means (i) a wetland or other "water of the United States" for purposes of Section 404 of the federal Clean Water Act or any similar area regulated under any State or local Legal Requirements, (ii) a floodplain or other flood hazard area as defined pursuant to any applicable state Legal Requirements, (iii) a portion of the coastal zone for purposes of the federal Coastal Zone Management Act, or (iv) any other area development of which is specifically restricted under applicable Legal Requirements by reason of its physical characteristics or prior use.

"**EPA**" shall have the meaning ascribed to such term in Section 6.13(e) of this Agreement.

"**ERISA**" shall have the meaning ascribed to such term in Section 5.11 of this Agreement.

"**ERISA Affiliate**" shall have the meaning ascribed to such term in Section 5.11 of this Agreement.

"**Event of Default**" means, with respect to this Agreement, any of the events specified in Section 7.1 hereof.

"**Financing Statements**" means any and all financing statements (including continuation statements) or other instruments filed or recorded to perfect the Security Interest created in this Agreement.

"**Fiscal Year**" means the annual accounting year of the Borrower, which currently begins on January 1 of each calendar year.

"**GAAP**" means generally accepted accounting principles in effect in the United States from time to time, consistently applied.

"**General Partner**" means 925 Euclid Manager, LLC, an Ohio limited liability company, together with its successors and assigns, as permitted by the Lender Representative and the restrictions described in the definition of "Permitted Transfer" herein.

"**Governmental Action**" means all material permits, authorizations, registrations, consents, certifications, approvals, waivers, exceptions, variances, claims, orders, judgments and decrees, licenses, exemptions, publications, filings, notices to and declarations of or with any Governmental Authority and shall include all material permits and licenses required to rehabilitate, use, operate and maintain any of the Project Facilities.

"**Governmental Authority**" means any federal, state, or local governmental or quasi - governmental subdivision, authority, or other instrumentality thereof and any entity asserting or exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and having jurisdiction over the Borrower and/or the Project Facilities.

"**Government Lists**" shall mean (1) the Specially Designated Nationals and Blocked Persons Lists maintained by the Office of Foreign Assets Control ("OFAC"), (2) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that the Lender notified the Borrower in writing is now included in "Government Lists," or (3) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other Governmental Authority or pursuant to any Executive Order of the President of the United States of America that the Lender notified the Borrower in writing is now included in "Government Lists."

**"Guarantor"** means Frank T. Sinito, an individual.

**"Hazardous Substances"** means any petroleum or petroleum products and their by-products, flammable explosives, radioactive materials, toxic chemicals and substances, radon, asbestos in any form that is or could become friable, urea formaldehyde foam insulation and polychlorinated biphenyls (PCB), asbestos-containing materials (ACMs), lead-containing or lead-based paint (LBP), radon, Mold, medical waste and other bio-hazardous materials and any chemicals, pollutants, materials or substances defined as or included in the definition of "hazardous substances" as defined pursuant to the federal Comprehensive Environmental Response, Compensation and Liability Act, "regulated substances" within the meaning of subtitle I of the federal Resource Conservation and Recovery Act and words of similar import under applicable Environmental Laws.

**"HNB Lease"** means that certain Lease dated March 11, 2021, between the Borrower, as successor in interest to Optima 925, LLC, and Huntington National Bank.

**"Impositions"** means, with respect to the Project Facilities, all taxes including, without limitation, all real and personal property taxes, water charges and sewer rents, any special assessments, charges or claims and any other item which at any time may be or become a Lien upon the Project Facilities.

**"Improvements"** means all buildings and other improvements included in the Project Facilities.

**"Indebtedness"** means, collectively, and includes all present and future indebtedness, liabilities and obligations of any kind or nature whatsoever of the Borrower to the Lender or the Lender Representative, now existing and hereafter arising, under or in connection with the Loan or the Note or any of the other Loan Documents, including future advances, principal, interest, premiums (including, without limitation, any make whole interest payments), indemnities, other fees, late charges, enforcement costs and other costs and expenses whether direct or contingent, matured or unmatured and all other obligations of the Borrower to the Lender or the Lender Representative.

**"Indemnified Parties"** shall have the meaning given to such term in Section 2.5 of this Agreement.

**"Lease"** shall have the meaning assigned to such term in the Mortgage.

**"Legal Requirements"** means all statutes, codes, laws, ordinances, regulations, rules, policies, or other federal, state, local and municipal requirements of any Governmental Authority whether now or hereafter enacted or adopted, and all judgments, decrees, injunctions, writs, orders or like action of an arbitrator or a court or other Governmental Authority of competent jurisdiction (including those pertaining to the health, safety or the environment).

**"Lender Representative"** means any entity designated in writing by the Lender in a written notice to the Borrower to act as a Lender Representative hereunder. If at any time a Lender Representative has not been designated by the Lender, all references herein and in other Loan Documents to "Lender Representative" shall refer to the Lender. The initial Lender Representative is Berkadia Commercial Mortgage LLC.

**"Lien"** means any lien, mortgage, security interest, tax lien, pledge, encumbrance, assignment, conditional sale or title retention arrangement, or any other interest in property designed to secure the repayment of indebtedness, whether arising by written agreement or under any statute or law, or otherwise.

**"Loan"** means the Loan from the Lender to the Borrower, as evidenced by the Note and made pursuant to the terms of this Agreement.

"**Loan Agreement**" shall have the meaning given to such term in the recitals to this Agreement.

"**Loan Amount**" has the meaning ascribed to such term in the recitals to this Agreement.

"**Loan Documents**" means, collectively, this Agreement, the Note, the Mortgage, the Environmental Indemnity, the Assignment of Management Agreement and Consent, the Assignment of Project Documents, the Loan Guaranty, the Recourse Guaranty and all other agreements or instruments relating to, or executed in connection with the issuance of the Note, including all modifications, amendments or supplements thereto.

"**Loan Guaranty**" means the Loan Guaranty dated as of July 1, 2021, by the Guarantor in favor of the Lender.

"**Management Agreement**" shall have the meaning ascribed to such term in Section 6.18 of this Agreement.

"**Maturity Date**" shall have the meaning set forth in the Note.

"**Material Contract**" means each indenture, mortgage, agreement or other written instrument or contract to which the Borrower is a party or by which any of its assets are bound (including, without limitation, any employment or executive compensation agreement, collective bargaining agreement, agreement relating to an Obligation, agreement for the acquisition, refinance, rehabilitation, repair or disposition of real or personal property, agreement for the purchasing or furnishing of services, operating lease, joint venture agreement, agreement relating to the acquisition or disposition of an Affiliate or agreement of merger or consolidation) which (i) evidences, secures or governs any outstanding obligation of the Borrower of $100,000 or more per annum, or (ii) if canceled, breached or not renewed by any party thereto, would have a material adverse effect on the business operations, assets, condition (financial or otherwise) or prospects of the Borrower.

"**Moisture Management Program**" shall have the meaning ascribed to such term in Section 6.13(e) of this Agreement.

"**Mold**" shall have the meaning ascribed to such term in Section 6.13(e) of this Agreement.

"**Mortgage**" means the Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of July 1, 2021, by the Borrower to the Lender covering the Project Facilities.

"**Municipal Funds**" means, collectively, proceeds of the City of Cleveland Loan, the Cuyahoga County Loan and any other governmental or quasi-governmental loan or grant made to the Borrower in connection with the Project Facilities.

"**Note**" means that certain promissory note of the Borrower, dated the Closing Date, and payable to the Lender, titled IHI Cleveland Huntington L.P. $35,422,000 Taxable Multifamily Housing Mortgage Note (The Centennial).

"**Obligations**" means any and all obligations of the Borrower or the General Partner, as applicable, for the payment of money including without limitation any and all (i) obligations for money borrowed, (ii) obligations evidenced by bonds, debentures, notes, guaranties or other similar instruments, (iii) obligations under construction contracts, installment sale agreements and other purchase money obligations in connection with the performance of work, sale of property or rendering of services, (iv) obligations under leases evidencing the acquisition of capital assets, (v) obligations under any applicable ground lease, (vi)

reimbursement obligations in connection with letters of credit and other credit enhancement facilities, (vii) obligations for unfunded pension liabilities, (viii) obligations under guaranties of any such obligation of a third party, and (ix) any such obligations of third parties secured by assets of the Borrower; but excluding obligations incurred in the ordinary course of business under contracts for supplies, services and pensions allocable to current all expenses of the Project Facilities during the current or future Fiscal Years in which the supplies are to be delivered, the services rendered or the pension paid within 30 days of the date such amounts are due.

"**OFAC Violation**" shall have the meanings ascribed to such term in Section 6.20 of this Agreement.

"**Operating Expense Account**" has the meaning assigned to such term in Section 6.23 hereof.

"**Partnership Agreement**" means the Fourth Amended and Restated Limited Partnership Agreement of the Borrower dated as of January 4, 2020, as amended, modified or supplemented from time to time.

"**Patriot Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended from time to time.

"**Patriot Act Offense**" shall mean any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (A) the criminal laws against terrorism; (B) the criminal laws against money laundering, (C) the Bank Secrecy Act, as amended, (D) the Money Laundering Control Act of 1986, as amended, or (E) the Patriot Act. "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense.

"**PBGC**" shall have the meaning ascribed to such term in Section 5.11 of this Agreement.

"**Permitted Encumbrances**" means only:

      (i)     the Mortgage;

      (ii)    the HNB Lease;

      (iii)   for Impositions not yet due and payable or being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted if such proceedings do not in the opinion of the Lender involve the risk of the sale, forfeiture or loss of the property subject to such Lien or interfere with the operation of the Project Facilities, and provided that the Borrower shall have established a reserve or made other appropriate provision, if any, as shall be required by the Lender, and any foreclosure, distraint, sale or other similar proceedings shall have been effectively stayed;

      (iv)   statutory Liens of landlords and Liens of carriers, warehouseman, mechanics and materialmen incurred in the ordinary course of business for sums not yet due or being contested by appropriate proceedings promptly initiated and diligently conducted if (1) such proceedings do not in the opinion of the Lender involve the risk of the sale, forfeiture or loss of the property subject to such Lien or interfere with the operation of the Project Facilities, and provided (2) such Liens have been bonded or the Borrower shall have established a reserve or made other appropriate provision, if any, as shall be required by the Lender; and

(v)     the exceptions listed in the Title Policy and any other matters affecting title which are approved in writing by the Lender.

**"Permitted Transfer"** means (i) a transfer by devise or descent or by operation of law upon the death of a direct or indirect owner in the Borrower, so long as such transfer does not result in a change of management or control of the Borrower, (ii) the transfer of a direct or indirect ownership interest in the General Partner for estate planning purposes, so long as such transfer does not result in a change of management or control of the General Partner, (iii) any transfer of indirect interests in the General Partner or in any limited partner of the Borrower; provided, that, after giving effect to any such transfer (A) the Guarantor shall collectively continue to own, directly or indirectly, at least 35% of the direct or indirect common equity ownership interests in the Borrower, (B) the Guarantor shall continue to Control the Borrower, and (C) in connection with any transfer in which a Person that did not previously own twenty percent (20%) or more of the aggregate indirect ownership interests (at any tier of ownership) in the General Partner shall acquire such a twenty percent (20%) direct and/or indirect ownership interest (at any tier of ownership) in the General Partner, the Borrower shall, at least twenty (20) days before such transfer, provide such information as the Lender shall reasonably request regarding the proposed transferee and the transfer so as to conduct such background checks, investigations, Patriot Act, OFAC and regarding "know your customer" searches and diligence and similar requirements) as the Lender shall reasonably require (at the Borrower's sole cost and expense), and such transfer shall not be a Permitted transfer solely if the Lender in good faith determines within fifteen (15) days after receipt of the notice of such transfer from the Borrower that (I) such transfer will result in a violation of Legal Requirements, or (II) that the transferee is on a Government List or has been indicted or convicted of, or pleaded guilty or no contest to a Patriot Act Offense or is otherwise not a Qualified Equity Transferee; and (iv) a transfer of a direct or indirect owner in the Borrower to Deutsche Bank AG, New York Branch or any of its Affiliates.

**"Person"** means any individual, for-profit or not-for-profit corporation, partnership, joint venture, association, limited liability company, limited liability partnership, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

**"Plans and Specifications"** means, with respect to the Project Facilities, the plans and specifications for the rehabilitation and improvement of the Project Facilities, as prepared by the Architect.

**"Project Facilities"** means the land and the facility to consist of a multifamily apartment housing facilities, among other uses, comprised of a total of approximately 870 units and related personal property and equipment, located in Cleveland, Ohio, the refinancing of which, among other uses as described herein, is being financed by the proceeds of the Note.

**"Property Manager"** means Millennia Commercial Group, Ltd., an Ohio limited liability company, together with its permitted successors and assigns.

**"Qualified Equity Transferee"** shall mean a transferee of any direct or indirect interest in the Borrower for whom, prior to the effectiveness of the transfer, the Lender shall have received (a) evidence that (i) such proposed transferee (x) has never been convicted of, or plead guilty or no contest to a felony for a crime of moral turpitude and (y) has never been indicted or convicted of, or plead guilty or no contest to a Patriot Act Offense and is not on any Government List, and (ii) that such proposed transferee shall not have, in the past five (5) years, been the subject of a voluntary or involuntary bankruptcy or other insolvency proceeding, and (b) such other customary "know-your-customer" searches against such proposed transferee as reasonably requested by the Lender.

**"Recourse Guaranty"** means the Guaranty of Recourse Obligations dated as of July 1, 2021, by the Guarantor in favor of the Lender.

"**Rents**" shall have the meaning assigned to such term in the Mortgage.

"**Required Paydown Amount**" means $19,000,000.

"**Required Paydown Date**" means October 15, 2021.

"**Sale**" means the direct or indirect sale, agreement to sell, assignment, transfer, conveyance, hypothecation, lien, mortgage, grant of a security interest in or a deed to secure debt or deed of trust with respect to, encumbrance, lease, sublease or other disposition of the Project Facilities, or any part thereof or interest therein whether voluntary, involuntary, by operation of law or otherwise, other than (i) the leasing of individual residential units to tenants, (ii) the extension, amendment, renewal or replacement of commercial leases currently in effect, and (iii) the grant of easements for utilities and similar purposes in the ordinary course provided, such easements do not impair the use of the Project Facilities or diminish the value of the Project Facilities. "Sale" shall also include (a) the direct or indirect sale, transfer, assignment, pledge, hypothecation or conveyance of legal or beneficial ownership of (i) an equity ownership interest in the Borrower, or (ii) a controlling interest in the aggregate, at any time or times, of the equity ownership interests in the General Partner, or (b) the substitution of a new member in the Borrower without the Lender's prior written consent, which it may withhold in its sole discretion; provided, however, that "Sale" shall not include a Permitted Transfer.

"**Secondary Market Transaction**" shall have the meaning given to such term in 8.12(a) of this Agreement.

"**Securities**" shall have the meaning given to such term in Section 8.13(a) of this Agreement.

"**Security Interest**" or "**Security Interests**" means the security interests created herein and shall have the meanings set forth in the U.C.C.

"**Solvent**" shall mean, as to any Person, that (a) the sum of the assets of such Person, at a fair valuation, exceeds its liabilities, including contingent liabilities, (b) such Person has sufficient capital with which to conduct its business as presently conducted and as proposed to be conducted and (c) such Person has not incurred debts, and does not intend to incur debts, beyond its ability to pay such debts as they mature. For purposes of this definition, "debt" means any liability on a claim, and "claim" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. With respect to any such contingent liabilities, such liabilities shall be computed in accordance with GAAP at the amount which, in light of all the facts and circumstances existing at the time, represents the amount which can reasonably be expected to become an actual or matured liability.

"**State**" means the State of Ohio.

"**Taking**" shall mean a condemnation or taking pursuant to the lawful exercise of the power of eminent domain.

"**Title Company**" means Fidelity National Title Insurance Company.

**"Title Policy"** means the mortgagee's title insurance policy relating to the Project Facilities issued by the Title Company to the Lender, effective on the date of recording of the Mortgage, as the same may be subsequently down-dated or endorsed from time to time, with the approval of the Lender Representative.

**"U.C.C."** means the Uniform Commercial Code of the State as now in effect or hereafter amended.

**"Underwriter Group"** shall have the meaning given to such term in Section 8.13 of this Agreement.

**"Verizon Lease"** means that certain Telecommunications License Agreement between the Borrower, as successor in interest to Optima 925 II, LLC, successor in interest to the Huntington National Bank, and MCImetro Access Transmission Services Corp., successor in interest to Metropolitan Fiber Systems of Ohio, Inc., as amended from time to time.

**SCHEDULE 1**
**SCHEDULE OF LITIGATION**

[None]

**SCHEDULE 2**
**SCHEDULE OF OBLIGATIONS AND MATERIAL CONTRACTS**

1. Indebtedness
2. Loan Documents
3. Management Agreement
4. Construction Contract
5. Architect's Agreement

| Ex. | Description |
|-----|-------------|
| B | Promissory Note dated July 1, 2021 |

<div align="center">

**PROMISSORY NOTE**

**$35,422,000**
**HH CLEVELAND HUNTINGTON L.P.**
**TAXABLE MULTIFAMILY HOUSING MORTGAGE NOTE**
**(THE CENTENNIAL)**

**NEW YORK, NEW YORK**

</div>

$35,422,000                    July 15, 2021                    CUSIP No. N/A

Loan No. GCT1780472

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR REGISTERED OR QUALIFIED UNDER ANY SECURITIES OR BLUE SKY LAW OF ANY STATE. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES THAT THIS NOTE MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND ONLY (I) TO A PERSON THAT IS NOT A "U.S. PERSON" (AS DEFINED IN RULE 902(k) OF REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS SECURITY IN RELIANCE ON THE EXEMPTION FROM THE SECURITIES ACT REGISTRATION PROVIDED BY SUCH REGULATION, (II) TO THE SPONSOR OR ITS AFFILIATES, OR PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A") TO A PERSON THAT THE HOLDER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A (A "QIB"), PURCHASING FOR ITS OWN ACCOUNT OR A QIB PURCHASING FOR THE ACCOUNT OF A QIB, WHOM THE HOLDER HAS INFORMED, IN EACH CASE, THAT THE REOFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, PURCHASING FOR INVESTMENT AND NOT FOR DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, SUBJECT TO THE RECEIPT BY THE HOLDER OF EVIDENCE THAT SUCH REOFFER, RESALE, PLEDGE OR TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS, (III) PURSUANT TO ANOTHER EXEMPTION AVAILABLE UNDER THE SECURITIES ACT AND IN ACCORDANCE WITH ANY APPLICABLE STATE SECURITIES LAWS, OR (IV) PURSUANT TO A VALID REGISTRATION STATEMENT.

FOR VALUE RECEIVED, the undersigned (the "Borrower") promises to pay to the order of DEUTSCHE BANK AG, NEW YORK BRANCH, together with its successors and assigns, the original principal sum of THIRTY-FIVE MILLION FOUR HUNDRED TWENTY-TWO THOUSAND AND 00/100 DOLLARS ($35,422,000), with interest on the unpaid principal balance from time to time outstanding at the annual rate as set forth on Schedule A. The date of this Note as set forth above is for reference purposes only, and this Note will not be effective and binding until the Closing Date.

1.    **Defined Terms.** As used in this Note, the following terms shall have the following definitions:

(a)    "Borrower" means HH Cleveland Huntington L.P., an Ohio limited partnership.

(b)     "Business Day" means any day other than (i) a Saturday or a Sunday, or (ii) a day on which federally insured depository institutions in New York are authorized or obligated by law, regulation, governmental decree or executive order to be closed.

(c)     "Closing Date" shall mean July 15, 2021, the date that the proceeds of the Loan are disbursed pursuant to the Loan Agreement.

(d)     "Default Rate" shall have the meaning set forth in Section 7 of this Note.

(e)     "Exit Fee" has the meaning assigned to such term in Section 2.2 of the Loan Agreement.

(f)     "First Payment Date" means the first Business Day of the month following the month in which the Closing Date occurs, or, if the Closing Date occurs after the 20th day of a month, means the first Business Day of the second month following the month in which the Closing Date occurs.

(g)     "Indebtedness" means the principal of, interest on, and all other amounts due at any time under, this Note or any other Loan Document, including the Exit Fee, if any, late charges, default interest, and advances to protect the security of the Mortgage as described in the Loan Agreement.

(h)     "Interest Rate" shall have the meaning set forth in Paragraph 1 of Schedule A to this Note.

(i)     "Lender" means Deutsche Bank AG, New York Branch, and any subsequent holder of this Note.

(j)     "Lender Representative" has the meaning set forth in the Loan Agreement.

(k)     "Loan" means the loan evidenced by this Note.

(l)     "Loan Agreement" means that certain Loan Agreement dated as of July 1, 2021, by and between the Borrower and Lender.

(m)     "Loan Document" has the meaning set forth in the Loan Agreement.

(n)     "Loan Month" means the period commencing on a Loan Payment Date and ending on the day preceding the next succeeding Loan Payment Date (without adjustment in either case for Business Day conventions).

(o)     "Loan Payment Date" means the first Business Day of each month, commencing on the First Payment Date.

(p)     [Reserved].

(q)     "Maturity Date" means the earlier to occur of (i) July 1, 2022, or (ii) any earlier date on which the unpaid principal balance of this Note becomes due and payable, by acceleration or otherwise.

(r)     "Maximum Rate" means the maximum interest rate that may be paid on the Loan under State law.

(s) "Note" means this HH Cleveland Huntington L.P. $35,422,000 Taxable Multifamily Housing Mortgage Note (The Centennial).

(t) "Note Interest" shall have the meaning set forth in Paragraph 1 of Schedule A to this Note.

(u) "State" shall mean the State of Ohio.

All other capitalized terms used but not defined in this Note shall have the meanings given to such terms in the Loan Agreement.

2. **Method of Payment.** All payments due under this Note shall be payable to the Lender Representative or its successor (as may be communicated to the Borrower by the Lender). Each such payment shall be made by wire transfer of immediately available funds in accordance with wire transfer instructions that the Lender or the Lender Representative shall supply by written notice to the Borrower from time to time. The foregoing is subject to Section 6.22 of the Loan Agreement.

3. **Payment of Principal and Interest.** Principal and interest shall be paid as follows:

(a) Subject to Section 6.22 of the Loan Agreement, Borrower shall pay all amounts due under this Note at the times and in the amounts set forth herein and in the Loan Agreement. Borrower shall make its payments under this Note in immediately available funds.

(b) Subject to Section 6.22 of the Loan Agreement, Borrower shall pay monthly payments of interest as set forth on Schedule A attached hereto, in successive monthly installments commencing on the First Payment Date and continuing on each Loan Payment Date thereafter until and including the Maturity Date. Such payments shall be made to the Lender by 2:00 p.m., New York City time, on each Loan Payment Date.

(c) Any accrued interest remaining past due may, at Lender's discretion, be added to and become part of the unpaid principal balance and shall bear interest at the rate or rates specified in this Note, and any reference below to "accrued interest" shall refer to accrued interest that has not become part of the unpaid principal balance.

(d) [Reserved].

(e) Subject to Section 6.22 of the Loan Agreement, Borrower shall pay all unpaid principal of and interest on this Note on the Maturity Date and any other amounts due under subsection 3(a) hereof.

(f) Any regularly scheduled monthly installment of interest that is received by Lender before the date it is due shall be deemed to have been received on the due date solely for the purpose of calculating interest due.

(g) Borrower shall make all payments of principal and interest under this Note without relief from valuation and appraisement laws.

(h) Borrower acknowledges that the calculation of all interest payments shall be made by the Lender and shall be final and conclusive, absent manifest error.

4.      **Application of Payments**.  If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, Lender may apply that payment to amounts then due and payable under this Note in any manner and in any order determined by Lender, in Lender's discretion.  Borrower agrees that neither Lender's acceptance of a payment from Borrower in an amount that is less than all amounts then due and payable nor Lender's application of such payment shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.

5.      **Acceleration**.  If an Event of Default has occurred and is continuing, the entire unpaid principal balance, Exit Fee, if any, any accrued interest, and all other amounts payable under this Note and any other Loan Document shall at once become due and payable, at the option of Lender, without any prior notice to Borrower (except if notice is required by applicable law, then after such notice).  Lender may exercise this option to accelerate regardless of any prior forbearance.

6.      **Late Charge**.  Excluding any payments of principal due on the Maturity Date, if any amount payable under this Note or under any other Loan Document is not received by Lender when such amount is due (unless applicable law requires a longer period of time before a late charge may be imposed, in which event, such longer period shall be substituted), Borrower shall pay to Lender, immediately and without demand by Lender, a late charge equal to five percent (5.0%) of such amount (unless applicable law requires a lesser amount be charged, in which event such lesser amount shall be substituted).  Notwithstanding the foregoing, with regard to each regularly scheduled monthly installment of principal and interest payable pursuant to this Note, such late charge shall not become due and payable to Lender so long as the Borrower makes such payment on or prior to the tenth (10th) calendar day following the date upon which such payment is due (or the Business Day immediately following such tenth (10th) calendar day if such tenth (10th) calendar day is not a Business Day).  Any accrued but unpaid late charges shall be added to and become part of the unpaid principal balance of this Note, shall bear interest at the rate or rates specified in this Note, and shall be secured by the other applicable Loan Documents.  Borrower acknowledges that its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, and that it is extremely difficult and impractical to determine those additional expenses.  Borrower agrees that the late charge payable pursuant to this Section represents a fair and reasonable estimate, taking into account all circumstances existing on the Closing Date, of the additional expenses Lender will incur by reason of such late payment, and such late charge shall be deemed liquidated damages and not additional interest or a penalty.  The late charge is payable in addition to, and not in lieu of, any interest payable at the Default Rate pursuant to Section 7.  Notwithstanding anything to the contrary in any other Loan Document, if a Lender Representative has been appointed by Lender, any late charges payable hereunder shall not be remitted to Lender and shall instead be paid directly to Lender Representative, who shall apply such late charges in accordance with the terms of the applicable servicing agreement.  Any action regarding the collection of a Late Charge will be without prejudice to any other rights, and shall not act as a waiver of any other rights that the Lender Representative or the Lender may have as provided herein, in the other Loan Documents, or at law or in equity.

7.      **Default Rate**.  So long as (a) any monthly installment under this Note remains past due, or (b) any other Event of Default has occurred and is continuing, interest under this Note shall accrue, in the case of (a), on the unpaid installment of interest and/or principal, and in the case of (b), on the unpaid principal balance, in each case, from the earlier of the due date of the first unpaid monthly installment or the occurrence of such other Event of Default, as applicable, at a rate per annum (the "Default Rate") equal to the lesser of the Maximum Rate or a rate equal to the Interest Rate plus five percent (5%), in each case compounded monthly (computed in accordance with Schedule A in the same manner in which Note Interest is computed).  If the unpaid principal balance and all accrued interest are not paid in full on the Maturity Date, the unpaid principal balance and all accrued interest shall bear interest from the Maturity

Date at the Default Rate until the unpaid principal balance and all accrued interest are paid in full. Borrower also acknowledges that its failure to make timely payments will cause Lender to incur additional expenses in servicing and processing the Loan, that, during the time that any monthly installment under this Note is delinquent, Lender will incur additional costs and expenses arising from its loss of the use of the money due and from the adverse impact on Lender's ability to meet its other obligations and to take advantage of other investment opportunities, and that it is extremely difficult and impractical to determine those additional costs and expenses. Borrower also acknowledges that, during the time that any monthly installment under this Note is delinquent or any other Event of Default has occurred and is continuing, Lender's risk of nonpayment of this Note will be materially increased and Lender is entitled to be compensated for such increased risk. Borrower agrees that the increase in the rate of interest payable under this Note to the Default Rate as provided above represents a fair and reasonable estimate, taking into account all circumstances existing on the Closing Date, of the additional costs and expenses Lender will incur by reason of Borrower's delinquent payment and the additional compensation Lender is entitled to receive for the increased risks of nonpayment associated with a delinquent loan.

8.    **Voluntary and Involuntary Prepayments.**

(a)    Provided no Event of Default has occurred and is continuing (either on the date of notice of prepayment or the date of prepayment), Borrower may voluntarily prepay the unpaid principal balance of this Note, in whole or in part, on any date, if: (i) Borrower has given Lender prior written notice of its intention to make such prepayment at least ten (10) days prior to the proposed prepayment date (or such shorter time as agreed to by Lender in its sole discretion) (which notice to prepay may be rescinded by Borrower up to three (3) Business Days prior to the proposed date of such prepayment) and (ii) Borrower pays the full amount of the principal to be prepaid as set forth in the above-referenced notice plus, (A) all accrued interest on such principal through the date of prepayment, and (B) the Exit Fee, if any, and other sums due Lender at the time of such prepayment.

Notwithstanding the foregoing, by not later than the Required Paydown Date, the Borrower is required to prepay a portion of the Loan (not less than the Required Paydown Amount) in accordance with Section 2.6 of the Loan Agreement.

(b)    Any amounts required to be prepaid under this Note pursuant to Sections 1.04 or 1.06 of the Mortgage, as applicable, shall be paid (or caused to be paid) by Borrower in accordance with the provisions of Sections 1.04 or 1.06, as applicable and applied to the outstanding principal balance of this Note, accrued interest, the Exit Fee, if any, and any other sums due Lender at the time of such prepayment.

(c)    In connection with any prepayment pursuant to this Section, the Borrower shall wire transfer the amount required hereunder in immediately available funds by 2:00 p.m., New York City time, on the date of prepayment. For all purposes including the accrual of interest, any prepayment received by Lender on any day other than the last calendar day of a Loan Month shall be deemed to have been received on the last calendar day of such Loan Month.

(d)    Upon Lender's exercise of any right of acceleration under this Note, Borrower shall pay to Lender, in addition to the entire unpaid principal balance of this Note outstanding at the time of the acceleration, all accrued interest, Exit Fee, and all other sums due Lender.

(e)    Any permitted or required prepayment of less than the entire unpaid principal balance of this Note shall not extend or postpone the due date of any subsequent monthly installments or change the amount of such installments, unless Lender agrees otherwise in writing.

9.    **Costs and Expenses**.  To the fullest extent allowed by applicable law, Borrower shall pay all actual expenses and costs, including, without limitation, out-of-pocket expenses and reasonable fees of attorneys (including, without limitation, in-house attorneys) and expert witnesses and costs of investigation, incurred by Lender as a result of any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial foreclosure proceeding.

10.    **Forbearance**.  Any forbearance by Lender in exercising any right or remedy under this Note or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of that or any other right or remedy.  The acceptance by Lender of any payment after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments or to exercise any right or remedy with respect to any failure to make prompt payment.  Enforcement by Lender of any security for Borrower's obligations under this Note shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender.

11.    **Waivers**.  Borrower hereby waives presentment, demand for payment, protest, notice of dishonor, notice of protest or nonpayment, notice of intent to accelerate, notice of acceleration of maturity, and diligence in connection with the enforcement of this Note or the taking of any action to collect sums owing hereunder.  Borrower hereby further waives and renounces, to the fullest extent permitted by law, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshaling, forbearance, valuation, stay, extension, redemption, appraisement, exemption, and homestead now or hereafter provided by the laws of the United States of America and of each state thereof, both as to itself and in and to all of its property, real and personal, against the enforcement and collection of the obligations evidenced by this Note or the other Loan Documents.  Borrower hereby further waives any rights to designate how payments will be applied, and acknowledges and agrees that Lender shall have the right in its sole discretion to determine the order and method of the application of payments on this Note or any other Loan Document.

12.    **Loan Charges**.  Neither this Note nor any of the other Loan Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest permitted to be charged under applicable law.  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower in connection with the Loan is interpreted so that any interest or other charge provided for in any Loan Document, whether considered separately or together with other charges provided for in any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate that violation.  The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the unpaid principal balance of this Note.  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness that constitutes interest, as well as all other charges made in connection with the Indebtedness that constitute interest, shall be deemed to be allocated and spread ratably over the stated term of this Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of this Note.

13.    **Obligations of the Borrower Absolute and Unconditional**.  The obligations of the Borrower to make all payments required under this Note and the other Loan Documents on or before the date the same become due, and to perform all of its other obligations, covenants and agreements hereunder and under the other Loan Documents shall be primary, absolute, unconditional and irrevocable,

and shall be paid or performed strictly in accordance with the terms of this Note and the other Loan Documents under any and all circumstances, without notice or demand, and without abatement, deduction, set-off, counterclaim, recoupment or defense or any right of termination or cancellation arising from any circumstance whatsoever, whether now existing or hereafter arising. Provided further, the obligations of the Borrower under this Note and the other Loan Documents shall not be affected by:

      (a)    any lack of validity or enforceability of any Loan Document (other than this Note);

      (b)    any claim of lack of consideration, frustration of purpose or commercial impracticability;

      (c)    any amendment of, or any waiver or consent with respect to, any of the Loan Documents, except as set forth in a waiver signed by the Lender or an amendment signed by the Borrower and the Lender;

      (d)    the existence of any claim, set-off, defense or other rights which the Borrower, the General Partner or the Guarantor may have at any time against the Lender (other than the defense of payment in accordance with the terms of this Note or the other Loan Documents) or any other Person, whether in connection with this Note or any other Loan Document or any transaction contemplated thereby or any unrelated transaction;

      (e)    any breach of contract or other dispute between the Borrower, the General Partner or the Guarantor and Lender; or

      (f)    any exchange, release or nonperfection of any lien or security interest in any collateral pledged or otherwise provided to secure any of the obligations contemplated herein, in any other Loan Document.

The Borrower hereby waives the application to it of the provisions of any statute or other law now or hereafter in effect contrary to any of its obligations, covenants or agreements under this Note or the other Loan Documents or which releases or purports to release the Borrower therefrom. Nothing contained herein shall be construed as prohibiting the Borrower from pursuing any rights or remedies it may have against any Person in a separate legal proceeding.

    14.    **Commercial Purpose.** Borrower represents that the Indebtedness is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise, and not for personal, family, household or agricultural purposes.

    15.    **Counting of Days.** Except where otherwise specifically provided, any reference in this Note to a period of "days" means calendar days, not Business Days.

    16.    **Notices.** All notices, demands and other communications required or permitted to be given by Lender to Borrower pursuant to this Note shall be made in accordance with Section 8.1 of the Loan Agreement.

    17.    **Payments on Non-Business Day.** If the date for the making of any payment under this Note is not a Business Day, such payment shall be due and payable on the next succeeding Business Day.

    18.    **Terms of Note Governing Payment Matters Control in the Event of any Conflict.** In the event the provisions of the Loan Agreement or the other Loan Documents (other than this Note)

conflict with the provisions of this Note which govern the terms of repayment of the Loan or the payment of other amounts due in connection with the Loan (including, without limitation, the provisions of this Note which govern the required payments of principal, interest and other amounts due in connection with the Loan, the manner of payment, the calculation of interest, the payment of the Lender's costs and expenses, the application of payments received by the Lender, the acceleration of amounts owed by the Borrower, late charges, default rates of interest, or maximum rates of interest or similar charges), the provisions of this Note shall govern and control.

19. **Determinations by Lender**. Except to the extent expressly set forth in this Note to the contrary, in any instance where the consent or approval of Lender may be given or is required, or where any determination, judgment or decision is to be rendered by Lender under this Note, the granting, withholding or denial of such consent or approval and the rendering of such determination, judgment or decision shall be made or exercised by Lender, as applicable (or its designated representative) at its sole and exclusive option and in its sole and absolute discretion.

20. **Release; Indemnity**.

(a) *Release*. Borrower covenants and agrees that, in performing any of its rights or duties under this Note, neither the Lender, nor its agents or employees, shall be liable for any losses, claims, damages, liabilities and expenses that may be incurred by any of them as a result of such performance, except to the extent such liability for any losses, claims, damages, liabilities or expenses arises out of the willful misconduct or gross negligence of such party.

(b) *Indemnity*. Borrower hereby agrees to indemnify and hold harmless the Lender and its agents and employees from and against any and all losses, claims, compensatory economic damages and actual losses, liabilities and out-of-pocket expenses including, without limitation, reasonable attorneys' fees and costs and disbursements, which may be imposed or incurred by any of them in connection with this Note, except that no such party will be indemnified for any losses, claims, damages, liabilities or expenses arising out of the willful misconduct or gross negligence of such party.

21. **Governing Law**. THIS NOTE SHALL BE DEEMED TO BE A CONTRACT UNDER, AND TOGETHER WITH ANY DISPUTES OR CONTROVERSIES ARISING OUT OF OR RELATING TO THIS NOTE, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS AND LEGAL REQUIREMENTS OF THE STATE OF NEW YORK AND APPLICABLE FEDERAL LAW, WITHOUT REGARD TO CHOICE OF LAW RULES OTHER THAN NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1401 (OR ANY SUCCESSOR STATUTE THERETO).

22. **Consent to Jurisdiction and Venue**. The parties hereby irrevocably (i) agree that any suit, action or other legal proceeding arising out of or relating to this Note or the other Loan Documents may be brought in any federal court located in the State and consent to the jurisdiction of such court in any such suit, action or proceeding; (ii) agree that any suit, action or other legal proceeding relating to this Note against the Lender or the Lender Representative shall be brought solely in a federal or state court located in the State of New York and (iii) waive any objection which it may have to the laying of venue of any such suit, action or proceeding in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. The parties hereby irrevocably consent to the service of any and all process in any such suit, action or proceeding by mailing of copies of such process to such party at its address provided under or pursuant to Section 8.1 of the Loan Agreement. The parties agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable legal requirements. All mailings under this Section shall be by certified or registered mail, return receipt

requested. Nothing in this Section shall affect the right of the Lender Representative and the Lender to serve legal process in any other manner permitted by applicable Legal Requirements.

23. **Severability**. The invalidity, illegality or unenforceability of any provision of this Note shall not affect the validity, legality or enforceability of any other provision, and all other provisions shall remain in full force and effect.

24. **Remedies Cumulative**. In the event of Borrower's default under this Note, the Lender may exercise all or any one or more of its rights and remedies available under this Note, at law or in equity. Such rights and remedies shall be cumulative and concurrent, and may be enforced separately, successively or together, and the exercise of any particular right or remedy shall not in any way prevent the Lender from exercising any other right or remedy available to the Lender. The Lender may exercise any such remedies from time to time as often as may be deemed necessary by the Lender.

25. **No Agency or Partnership**. Nothing contained in this Note shall constitute Lender as a joint venturer, partner or agent of Borrower, or render Lender liable for any debts, obligations, acts, omissions, representations or contracts of Borrower.

26. **Entire Agreement; Amendment and Waiver**. This Note and the other Loan Documents contain the complete and entire understanding of the parties with respect to the matters covered. This Note may not be amended, modified or changed, nor shall any waiver of any provision hereof be effective, except by a written instrument signed by the party against whom enforcement of the waiver, amendment, change, or modification is sought, and then only to the extent set forth in that instrument. No specific waiver of any of the terms of this Note shall be considered as a general waiver.

27. **Further Assurances**. Borrower shall at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action that may be reasonably necessary or desirable, or that Lender may reasonably request, in order to protect any right or interest granted by this Note or to enable Lender to exercise and enforce its rights and remedies under this Note. Notwithstanding the foregoing sentence, in no event shall Borrower be required to execute and deliver any document or perform any act otherwise required pursuant to the foregoing sentence to the extent such document or act imposes a material additional obligation or liability on Borrower or materially adversely affects the rights of Borrower under any Loan Document.

28. **Captions**. The captions of the sections of this Note are for convenience only and shall be disregarded in construing this Note.

29. **Lender Representative**. Borrower hereby acknowledges and agrees that, pursuant to the terms of the Loan Documents: (a) from time to time, Lender may appoint a servicer (with written notice to Borrower thereof) to collect payments, escrows and deposits, to give and to receive notices under this Note or the other Loan Documents, and to otherwise service the Loan and (b) unless Borrower receives written notice from Lender to the contrary, any action or right which shall or may be taken or exercised by Lender may be taken or exercised by such servicer with the same force and effect.

30. **Waiver of Trial by Jury**. TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW, EACH OF BORROWER AND (BY ITS ACCEPTANCE HEREOF) LENDER (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS NOTE OR THE RELATIONSHIP BETWEEN THE PARTIES THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY

EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

     31.    **Time of the Essence.**  Time is of the essence with respect to this Note.

     32.    **Non-Recourse.**  Notwithstanding anything to the contrary contained herein, Borrower's liability hereunder shall be limited to the extent provided in Section 8.10 of the Loan Agreement.

     33.    **Attached Schedules.**  The following Schedules are attached to this Note and are incorporated by reference herein as if more fully set forth in the text hereof:

**Schedule A – Interest Rate**

**Schedule B – Benchmark Replacement Setting**

<div align="center">

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

</div>

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Note or caused this Note to be duly executed and delivered by its authorized representative as of the date first set forth above.

**HH CLEVELAND HUNTINGTON L.P.,**
an Ohio limited partnership

By: 925 Euclid Manager, LLC,
    an Ohio limited liability company,
    its General Partner

By: _____
    Frank T. Sinito, Managing Member

[CENTENNIAL – PROMISSORY NOTE]

## SCHEDULE A

### PRINCIPAL AND INTEREST PAYMENTS

1.    **Interest Rate**.  Except as provided in Paragraphs 7 and 12 of this Note, interest ("Note Interest") shall accrue on the unpaid principal of this Note from, and including, the Closing Date until paid in full at an annual rate (the "Interest Rate") as follows:

(a)    Interest Rate.  Note Interest shall accrue at the Adjustable Rate on the unpaid principal balance hereof during the term of the Loan.

(b)    Interest Rate Adjustment.  The Adjustable Rate shall be determined by Lender on each Rate Determination Date and shall be adjusted on each Reset Date until the Loan is repaid in full.

(c)    Maximum Rate.  Notwithstanding any other provision of this Note to the contrary, Note Interest shall not exceed the Maximum Rate, as the Maximum Rate may change in accordance with this Note.

(d)    Interest Accrual.  Note Interest shall accrue for each Accrual Period and shall be computed on the basis of the actual number of days in the period in respect of which payment is being made divided by 360.  Accrued interest on this Note shall be paid in arrears on each Loan Payment Date.  The Interest Rate and related terms shall be subject to the Benchmark Replacement Setting provisions and defined terms set forth in Schedule B attached hereto and Schedule B is made a part hereof in its entirety.  In the case of any conflict between the provisions in the body of this Note or this Schedule A and the provisions of Schedule B, the provisions of Schedule B shall control.

2.    **Definitions**.  For purposes of this Schedule A, the following terms shall have the meanings set forth below:

"**Accrual Period**" means the period commencing on the first calendar day of each month and continuing to but excluding the first calendar day of the following month (without adjustment in either case for Business Day payment conventions).  The initial Accrual Period shall be the period commencing on the Closing Date and continuing to but excluding the first calendar day of the month in which the First Payment Date occurs.

"**Adjustable Rate**" means the sum of (i) the Current Index and (ii) the Margin, which sum is then rounded to five decimal places.

"**Current Index**" means the Index (or New Index, under the circumstances defined in the definition of "Index" herein) that is determined by the Lender on each Rate Determination Date, with the qualification that the Current Index shall never be less than 0.25% (twenty-five basis points).

"**Index**" means the London Inter-Bank Offered Rate for 3-month U.S. Dollar-denominated deposits administered by the ICE Benchmark Administration Limited (formerly administered by the British Bankers Association, or such other person which takes over the administration of that rate) which appears on Reuters Screen LIBOR01 Page (or any successor page) as of 11:00 a.m., London time, on the Rate Determination Date.  Upon the occurrence of a Benchmark Replacement Date, as defined in Schedule B, then Lender, in its sole and absolute discretion, will select a Benchmark Replacement in accordance with the provisions of Schedule B (the "New Index").  Lender shall provide written notice to the Borrower of such choice along with an explanation of how the New Index shall be determined.  Each

A-1

calculation by the Lender of the Index shall be conclusive and binding for all purposes, absent manifest error.

"**London Business Day**" shall mean any Business Day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency) in the City of London, England.

"**Margin**" means (i) from the Closing Date through December 31, 2021, 4.25% (425 basis points), and (ii) from January 1, 2022 through the Maturity Date, 4.75% (475 basis points).

"**Rate Determination Date**" means two (2) London Business Days prior to the applicable Reset Date.

"**Reset Date**" means the first day of each Accrual Period during the term of the Loan.

3.     [Reserved].

4.     **Notification of Note Interest**.  Promptly following each Rate Determination Date, Lender shall re-calculate the Adjustable Rate and shall notify Borrower (in the manner specified in Section 16 of this Note for giving notices) of the new Adjustable Rate.

5.     **Error in Calculation**.  If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amount of the amounts due hereunder (whether because of a miscalculation of the Adjustable Rate or otherwise), then Lender shall give prompt notice to Borrower of the corrected amount of the amounts due hereunder (and the corrected Adjustable Rate, if applicable) and (a) if the corrected amount of the amounts due hereunder represents an increase, then Borrower shall, within thirty (30) calendar days thereafter, pay to Lender any sums that Borrower would have otherwise been obligated under this Note to pay to Lender had the amount of the amounts due hereunder not been miscalculated, or (b) if the corrected amount of the amounts due hereunder represents a decrease thereof and Borrower is not otherwise in breach or default under any of the terms and provisions of this Note or any other Loan Document, then Borrower shall thereafter be paid the sums that Borrower would not have otherwise been obligated to pay to Lender had the amount of the amounts due hereunder not been miscalculated.

## SCHEDULE B

## BENCHMARK REPLACEMENT SETTINGS

(a)    *Benchmark Replacement*. Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then, (x) if a Benchmark Replacement is determined in accordance with clause (1) or (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date in connection with a Benchmark Transition Event, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Note or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (3) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date in connection with an Early Opt-in Election, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Borrower without any amendment to this Note or any other Loan Document, or further action or consent of the Borrower.

(b)    *Benchmark Replacement Conforming Changes*. In connection with the implementation of a Benchmark Replacement, the Lender will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of the Borrower.

(c)    *Notices; Standards for Decisions and Determinations*. The Lender will promptly notify the Borrower of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (d) below and (v) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Lender pursuant to this Schedule B titled "Benchmark Replacement Setting," including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from the Borrower, except, in each case, as expressly required pursuant to this Schedule B titled "Benchmark Replacement Setting."

(d)    *Unavailability of Tenor of Benchmark*. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR or USD LIBOR) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Lender in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then the Lender may modify the definition of "Accrual Period" for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Lender may modify the

A-3

definition of "Accrual Period" for all Benchmark settings at or after such time to reinstate such previously removed tenor.

    (e)    *[Reserved]*

    (f)    *Certain Defined Terms.* As used in this Schedule B titled "Benchmark Replacement Setting":

    *"Available Tenor"* means, as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark or payment period for interest calculated with reference to such Benchmark, as applicable, that is or may be used for determining the length of an Accrual Period pursuant to this Note as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Accrual Period" pursuant to clause (d) of this Section.

    *"Benchmark"* means, initially, USD LIBOR; provided that if a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have occurred with respect to USD LIBOR or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (a) of this Schedule B titled "Benchmark Replacement Setting."

    *"Benchmark Replacement"* means, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Lender for the applicable Benchmark Replacement Date:

    (1)    the sum of: (a) Term SOFR and (b) the related Benchmark Replacement Adjustment;

    (2)    the sum of: (a) Daily Simple SOFR and (b) the related Benchmark Replacement Adjustment;

    (3)    the sum of: (a) the alternate benchmark rate that has been selected by the Lender as the replacement for the then-current Benchmark for the applicable Corresponding Tenor and (b) the related Benchmark Replacement Adjustment;

provided that, in the case of clause (1), such Unadjusted Benchmark Replacement is displayed on a screen or other information service that publishes such rate from time to time as selected by the Lender in its reasonable discretion. If the Benchmark Replacement as determined pursuant to clause (1), (2) or (3) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Note and the other Loan Documents.

    *"Benchmark Replacement Adjustment"* means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Accrual Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement:

    (1) for purposes of clauses (1) and (2) of the definition of "Benchmark Replacement," the first alternative set forth in the order below that can be determined by the Lender:

        (a)    the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Accrual Period that has been selected or recommended by the Relevant Governmental Body for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for the applicable Corresponding Tenor;

(b)    the spread adjustment (which may be a positive or negative value or zero) as of the Reference Time such Benchmark Replacement is first set for such Accrual Period that would apply to the fallback rate for a derivative transaction referencing the ISDA Definitions to be effective upon an index cessation event with respect to such Benchmark for the applicable Corresponding Tenor; and

(2) for purposes of clause (3) of the definition of "Benchmark Replacement," the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Lender for the applicable Corresponding Tenor, provided that, in the case of clause (1) above, such adjustment is displayed on a screen or other information service that publishes such Benchmark Replacement Adjustment from time to time as selected by the Lender in its reasonable discretion.

*"Benchmark Replacement Conforming Changes"* means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Business Day," the definition of "Accrual Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions and other technical, administrative or operational matters) that the Lender decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Lender in a manner substantially consistent with market practice (or, if the Lender decides that adoption of any portion of such market practice is not administratively feasible or if the Lender determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Lender decides is reasonably necessary in connection with the administration of this Note and the other Loan Documents).

*"Benchmark Replacement Date"* means the earliest to occur of the following events with respect to the then-current Benchmark:

(1)    in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof);

(2)    in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein; or

(3)    in the case of an Early Opt-in Election, the sixth (6th) Business Day after the date notice of such Early Opt-in Election is provided the Borrower.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

*"Benchmark Transition Event"* means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over  the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"*Benchmark Unavailability Period*" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with this Schedule B titled "Benchmark Replacement Setting" and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with this Schedule B titled "Benchmark Replacement Setting."

"*Corresponding Tenor*" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"*Daily Simple SOFR*" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Lender in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for business loans; provided, that if the Lender decides that any such convention is not administratively feasible for the Lender, then the Lender may establish another convention in its reasonable discretion.

"*Early Opt-in Election*" means, if the then-current Benchmark is USD LIBOR, the occurrence of:

(1)      a determination by the Lender that at least five currently outstanding U.S. dollar-denominated syndicated or bilateral credit facilities at such time contain (as a result of amendment or as originally executed) a SOFR-based rate (including SOFR, a term SOFR or any other rate based upon SOFR) as a benchmark rate, and

(2)    the election by the Lender to trigger a fallback from USD LIBOR and the provision by the Lender of written notice of such election to the Borrower.

*"Floor"* means the benchmark rate floor provided in this Note initially under the definition of "Current Index" (as of the execution of this Note, the modification, amendment or renewal of this Note or otherwise) with respect to USD LIBOR.

*"ISDA Definitions"* means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or and successor definitional booklet for interest rate derivatives published from time to time by the International Swaps and Derivatives Association, Inc., or such successor thereto.

*"Lender"* means Deutsche Bank AG, New York Branch, its successors and assigns.

*"Reference Time"* with respect to any setting of the then-current Benchmark means (1) if such Benchmark is USD LIBOR, 11:00 a.m. (London time) on the Rate Determination Date, and (2) if such Benchmark is not USD LIBOR, the time determined by the Lender in its reasonable discretion.

*"Relevant Governmental Body"* means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

*"SOFR"* means, with respect to any Business Day, a rate per annum equal to the secured overnight financing rate for such Business Day published by the SOFR Administrator on the SOFR Administrator's Website on the immediately succeeding Business Day.

*"SOFR Administrator"* means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

*"SOFR Administrator's Website"* means the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

*"Term SOFR"* means, for the applicable Corresponding Tenor as of the applicable Reference Time, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

*"Unadjusted Benchmark Replacement"* means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

*"USD LIBOR"* means the London interbank offered rate for U.S. dollars.

| Ex. | Description |
|-----|-------------|
| C | First Omnibus Amendment and Allonge to Promissory Note dated November 15, 2021 |

**FIRST OMNIBUS AMENDMENT AND ALLONGE TO PROMISSORY NOTE**

This FIRST OMNIBUS AMENDMENT AND ALLONGE TO PROMISSORY NOTE (this "**Amendment**") is made as of November 15, 2021 (the "**Effective Date**"), by and between **HH CLEVELAND HUNTINGTON L.P.**, an Ohio limited partnership (the "**Borrower**"), and **DEUTSCHE BANK AG, NEW YORK BRANCH** (the "**Lender**").

## <u>PRELIMINARY STATEMENT</u>

A.      Lender previously made a loan in the amount of $35,422,000 (the "**Loan**") to the Borrower as evidenced by that certain Promissory Note dated July 15, 2021 (the "**Original Note**"), delivered pursuant to that certain Loan Agreement dated as of July 1, 2021 (the "**Loan Agreement**"), between the Borrower and the Lender.

B.      The Borrower and the Lender are mutually agreeable to amending certain provisions set forth in the Original Note and the Loan Agreement.

C.      The Borrower and the Lender wish to amend the Original Note and the Loan Agreement as set forth below.

## <u>AGREEMENT</u>

For valuable consideration, as acknowledged in this Amendment, the Borrower and the Lender agree as follows:

Section 1.      <u>Defined Terms</u>.  All capitalized terms not otherwise defined in this Amendment shall have the meanings assigned to them in the Original Note or the Loan Agreement, as applicable.  From and after the Effective Date, all references to the term "Note", whether in this Amendment, the Original Note, the Loan Agreement or the other documents delivered in connection with the Loan, shall be deemed to refer to the Original Note as modified by this Amendment.

Section 2.      <u>Amendment to the Loan Documents</u>.  Each of the parties hereto agrees that the Original Note and the Loan Agreement shall be amended as follows:

(a)      The definition of "Required Paydown Date" found in Exhibit A to the Loan Agreement shall hereby mean January 31, 2022; and

(b)      The definition of Margin set forth in Schedule A to the Original Note shall be modified as follows:

"**Margin**" means (i) from the Closing Date through October 31, 2021, 4.25% (425 basis points), and (ii) from November 1, 2021 through the Maturity Date, 4.75% (475 basis points).

Section 3.      <u>Ratification.</u> Except as otherwise set forth in this Amendment, the Original Note and the Loan Agreement are unmodified and in full force and effect.  The Borrower hereby ratifies and confirms to the Lender as of the Effective Date that, except as otherwise expressly and specifically modified by this Amendment, all of the terms, representations, warranties, covenants, indemnifications and provisions of the Original Note and the Loan Agreement are and shall remain in full force and effect and are true and correct with respect to the Borrower without change.

Section 4.      <u>Allonge</u>.  This Amendment will act as an endorsement and allonge to the Original Note and shall be affixed to the Original Note by the Lender; however, this Amendment is enforceable regardless of whether affixed to the Original Note.

Section 5.      <u>Further Assurances</u>.  The parties, without further consideration, agree to execute and deliver such other documents and take such other action as may be reasonably necessary to effect this Amendment.

Section 6.      <u>Governing Law</u>.  This Amendment shall be construed in accordance with and governed by the laws of the State.

Section 7.      <u>Successors and Assigns</u>.  This Amendment shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and permitted assigns.

Section 8.      <u>Counterparts; Facsimile</u>.  This Amendment may be executed in one or more counterparts (and may be transmitted via facsimile or electronic scan (pdf)) each of which shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

*[Remainder of page intentionally left blank]*

This Amendment is executed as of the Effective Date.

"*Borrower*"

**HH CLEVELAND HUNTINGTON L.P.**,
an Ohio limited partnership

By:  925 Euclid Manager, LLC,
an Ohio limited liability company,
its General Partner

By: _____
Frank T. Sinito, Managing Member

"*Lender*"

**DEUTSCHE BANK AG, NEW YORK BRANCH**

By: _____
Name:    Paul Rizzo
Title:    Director

By: _____
Name:    Jack Hart
Title:    Vice President

[Signature Page to First Omnibus Amendment and Allonge to Promissory Note]

S-1

Electronically Filed 09/30/2025 19:46 / / CV 25 125588 / Confirmation Nbr. 3631064 / CLPXC

| Ex. | Description |
|---|---|
| D | Second Omnibus Amendment and Allonge to Promissory Note dated October 19, 2022 |

*Execution Copy*

## SECOND OMNIBUS AMENDMENT AND ALLONGE TO PROMISSORY NOTE

This SECOND OMNIBUS AMENDMENT AND ALLONGE TO PROMISSORY NOTE (this "**Amendment**") is made as of October 19, 2022 (the "**Effective Date**"), by and between **HH CLEVELAND HUNTINGTON L.P.**, an Ohio limited partnership (the "**Borrower**"), and **DEUTSCHE BANK AG, NEW YORK BRANCH** (the "**Lender**").

## PRELIMINARY STATEMENT

A.      The Lender previously made a loan in the amount of $35,422,000 (the "**Loan**") to the Borrower as evidenced by that certain Promissory Note dated July 15, 2021 (as previously amended by that certain First Omnibus Amendment and Allonge to Promissory Note dated November 15, 2021 (the "**First Omnibus Amendment**"), between the Borrower and the Lender, collectively, the "**Original Note**"), delivered pursuant to that certain Loan Agreement dated as of July 1, 2021 (as previously amended by the First Omnibus Amendment, collectively, the "**Loan Agreement**"), between the Borrower and the Lender.

B.      On or about November 24, 2021, the Borrower paid down the principal amount of the Loan in the amount of $4,931,540, thereby reducing the principal balance of the Loan to $30,490,460.

C.      The Borrower and the Lender are mutually agreeable to further amending certain provisions set forth in the Original Note and the Loan Agreement.

D.      The Borrower and the Lender wish to amend the Original Note and the Loan Agreement as set forth below.

## AGREEMENT

For valuable consideration, as acknowledged in this Amendment, the Borrower and the Lender agree as follows:

Section 1.      <u>Defined Terms</u>.  All capitalized terms not otherwise defined in this Amendment shall have the meanings assigned to them in the Original Note or the Loan Agreement, as applicable.  From and after the Effective Date, all references to the term "Note", whether in this Amendment, the Original Note, the Loan Agreement or the other documents delivered in connection with the Loan, shall be deemed to refer to the Original Note as modified by this Amendment.

Section 2.      <u>Amendment to the Loan Documents</u>.  Each of the parties hereto agrees that the Original Note and the Loan Agreement shall be amended as follows:

(a)      The definition of "Required Paydown Date" found in Exhibit A to the Loan Agreement shall hereby mean December 9, 2022;

(b)      The definition of "Required Paydown Amount" found in Exhibit A to the Loan Agreement shall hereby mean $2,000,000;

(c)      The definition of "Maturity Date" found in the Original Note shall hereby mean March 31, 2023;

(d)      <u>Schedule A</u> to the Original Note is hereby replaced in its entirety with <u>Schedule A</u> attached hereto; and

(e)      Schedule B to the Original Note is hereby replaced in its entirety with Schedule B attached hereto.

Section 3.      Modification of Debt Service Account.  In accordance with Section 6.22(d) of the Loan Agreement, and due to the extension of the Maturity Date on the Loan (as provided herein), the Lender hereby provides notice to the Borrower that the amount on deposit in the Debt Service Account pursuant to Section 6.22(a) of the Loan Agreement shall now be an amount not less than $1,495,104 (the "**New DSA Deposit Amount**").  Notwithstanding Section 6.22(d) of the Loan Agreement, the Borrower shall, by not later than November 18, 2022, deposit funds with the Lender Representative equal to the difference between the current balance on deposit in the Debt Service Account ($-0-) and the New DSA Deposit Amount (such difference being $1,495,104), for deposit by the Lender Representative in the Debt Service Account.

Section 4.      Modification of Operating Expense Account.  In accordance with Section 6.23(d) of the Loan Agreement, and due to the extension of the Maturity Date on the Loan (as provided herein), the Lender hereby provides notice to the Borrower that the amount on deposit in the Operating Expense Account pursuant to Section 6.23(a) of the Loan Agreement shall now be an amount not less than $1,017,130 (the "**New OEA Deposit Amount**").  Notwithstanding Section 6.23(d) of the Loan Agreement, the Borrower shall, by not later than November 18, 2022, deposit funds with the Lender Representative equal to the difference between the current balance on deposit in the Operating Expense Account ($-0-) and the New OEA Deposit Amount (such difference being $1,017,130 (the "**OEA Shortfall**")), for deposit by the Lender Representative in the Operating Expense Account.

Notwithstanding the foregoing, Section 6.23(d) of the Loan Agreement is hereby amended to permit the Borrower to provide evidence of a line of credit with Erie Bank (the "**Line of Credit**"), such Line of Credit to be available to satisfy a portion of the OEA Shortfall (in the amount of $409,153), which portion relates to the future Insurance Premiums and other operating expenses of the Project Facilities (but not including the portion of the Operating Expense Account related to future real estate tax payments of the Project Facilities), in lieu of funding that portion of the OEA Shortfall.  In connection therewith, the Borrower shall, by not later than November 18, 2022 (i) provide written evidence satisfactory to the Lender, in its sole discretion, of the existence of the Line of Credit and an undrawn balance thereupon in an amount sufficient to cover $409,153 (and such written evidence may be requested from time to time by the Lender), and (ii) deposit funds with the Lender Representative equal to the OEA Shortfall amount related to the ad valorem real property taxes to come due prior to the Maturity Date (in the amount of $607,977). Additionally, funds on deposit in the Operating Expense Account, after the deposit described in subsection (ii) above is made, shall only be utilized for the purpose of paying the ad valorem real property taxes coming due prior to the Maturity Date.  Other operating expenses of the Project Facilities, including required Insurance Premiums, shall be paid by the Borrower from proceeds drawn against the Line of Credit or from other funds of the Borrower.

Section 5.      Ratification. Except as otherwise set forth in this Amendment, the Original Note and the Loan Agreement are unmodified and in full force and effect.  The Borrower hereby ratifies and confirms to the Lender as of the Effective Date that, except as otherwise expressly and specifically modified by this Amendment, all of the terms, representations, warranties, covenants, indemnifications and provisions of the Original Note and the Loan Agreement are and shall remain in full force and effect and are true and correct with respect to the Borrower without change.

Section 6.      Allonge.  This Amendment will act as an endorsement and allonge to the Original Note and shall be affixed to the Original Note by the Lender; however, this Amendment is enforceable regardless of whether affixed to the Original Note.

Section 7.    <u>Further Assurances</u>.  The parties, without further consideration, agree to execute and deliver such other documents and take such other action as may be reasonably necessary to effect this Amendment.

Section 8.    <u>Governing Law</u>.  This Amendment shall be construed in accordance with and governed by the laws of the State.

Section 9.    <u>Successors and Assigns</u>.  This Amendment shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and permitted assigns.

Section 10.    <u>Counterparts; Facsimile</u>.  This Amendment may be executed in one or more counterparts (and may be transmitted via facsimile or electronic scan (pdf)) each of which shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

*[Remainder of page intentionally left blank]*

This Amendment is executed as of the Effective Date.

"*Borrower*"

**HH CLEVELAND HUNTINGTON L.P.,**
an Ohio limited partnership

By: 925 Euclid Manager, LLC,
     an Ohio limited liability company,
     its General Partner

     By: _____
          Frank T. Sinito, Managing Member

"*Lender*"

**DEUTSCHE BANK AG, NEW YORK BRANCH**

By: _____
Name:    Jack Hart
Title:     Vice President

By: _____
Name:    Vincent Merceron
Title:     Director

[Signature Page to Second Omnibus Amendment and Allonge to Promissory Note]

S-1

Electronically Filed 09/30/2025 19:46 / / CV 25 125588 / Confirmation Nbr. 3631064 / CLPXC

## SCHEDULE A

## PRINCIPAL AND INTEREST PAYMENTS

1.       **Interest Rate**.  Except as provided in Sections 7 and 12 of this Note, interest ("Note Interest") shall accrue on the unpaid principal of this Note from, and including, the Closing Date until paid in full at an annual rate (the "Interest Rate") as follows:

(a)       Interest Rate.  Note Interest shall accrue at the Adjustable Rate on the unpaid principal balance hereof during the term of the Loan.

(b)       Interest Rate Adjustment.  The Adjustable Rate shall be determined by Lender on each Rate Determination Date and shall be adjusted on each Reset Date until the Loan is repaid in full.

(c)       Maximum Rate.  Notwithstanding any other provision of this Note to the contrary, Note Interest shall not exceed the Maximum Rate, as the Maximum Rate may change in accordance with this Note.

(d)       Interest Accrual.  Note Interest shall accrue and be computed for each Accrual Period on the basis of the actual number of days in the period in respect of which payment is being made divided by 360.  Accrued interest on this Note shall be paid in arrears on each Loan Payment Date.  The Adjustable Rate and related terms shall be subject to the Benchmark Replacement Setting provisions and defined terms set forth below and in Schedule B attached hereto (and Schedule B is made a part hereof in its entirety).  In the case of any conflict between the provisions in the body of this Note or this Schedule A and the provisions of Schedule B, the provisions of Schedule B shall control.  Interest shall compound monthly on any amounts unpaid on each Loan Payment Date.

2.       **Definitions**.  For purposes of this Schedule A, the following terms shall have the meanings set forth below:

"**Accrual Period**" means the period commencing on the first calendar day of each month and continuing to but excluding the first calendar day of the following month (without adjustment in either case for Business Day payment conventions).  The initial Accrual Period shall be the period commencing on the Closing Date and continuing to but excluding the first calendar day of the month in which the First Payment Date occurs.

"**Adjustable Rate**" means the sum of (i) the Benchmark and (ii) the Margin, which sum is then rounded to five decimal places.

"**Benchmark**" means, initially, Term SOFR; provided that: (i) if Lender determines prior to the Reference Time that a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to Term SOFR or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement; and (ii) if the Benchmark or Replacement Benchmark would be less than the Floor on any Rate Determination Date, such Benchmark or Replacement Benchmark shall be deemed to be equal to the Floor for the purposes of this Note.

"**Benchmark Replacement**" means the first alternative set forth in the order below that can be determined by Lender as of the Benchmark Replacement Date, in a manner consistent with Lender's determination for other floating rate loans secured by mortgages on similar commercial real estate assets:

A-1

(a)     Compounded SOFR for an Accrual Period of one-month's duration if, on the applicable Rate Determination Date, Lender determines in its sole discretion that Compounded SOFR will be operationally, administratively, and technically feasible; or

(b)     the sum of (a) the alternate Benchmark rate that has been selected by Lender as the replacement for the then current Benchmark giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then current Benchmark for U.S. dollar-denominated secured real estate loans at such time and (b) the Benchmark Replacement Adjustment.

"**Benchmark Replacement Adjustment**" means, for purposes of clause (b) of the definition of "Benchmark Replacement," the spread adjustment (which may be a positive or negative value or zero) that has been selected by Lender giving due consideration to any industry-accepted spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the then-current Benchmark and in a manner consistent with Lender's determination for other floating rate loans secured by mortgages on similar commercial real estate assets.

"**Benchmark Replacement Conforming Changes**" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to Accrual Periods, the timing and frequency of determining rates and making payments of interest, length of lookback periods, rounding of amounts or tenors, and other technical, administrative or operational matters) that Lender decides may be appropriate to reflect the adoption of such Benchmark Replacement in a manner substantially consistent with market practice (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for use of the Benchmark Replacement exists, in such other manner as Lender determines is reasonably necessary in connection with the administration of this Note), in each case, in a manner consistent with Lender's determination for other floating rate loans secured by mortgages on similar commercial real estate assets.

"**Benchmark Replacement Date**" means the earliest to occur of the following events with respect to the then-current Benchmark (including the daily published component used in the calculation thereof):

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (1) the date of the public statement or publication of information referenced therein and (2) the date on which the administrator of the Benchmark permanently or indefinitely ceases to provide the Benchmark (or such component); or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein; or

(c)     in the case of clause (d) of the definition of "Benchmark Transition Event," the date specified in the notice to the Borrower.

For the avoidance of doubt, if the event that gives rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination.

"**Benchmark Source**" means with respect to (i) Compounded SOFR, the website of the SOFR Administrator, and (ii) Term SOFR, the website of CME Group Benchmark Administration Ltd., as applicable (or a successor administrator or benchmark source for Compounded SOFR or Term SOFR

Electronically Filed 09/30/2025 19:46 / / CV 25 125588 / Confirmation Nbr. 3631064 / CLPXC

selected by Lender in its reasonable discretion), in each case, in a manner consistent with Lender's determination for other floating rate loans secured by mortgages on similar commercial real estate assets.

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the then-current Benchmark (including the daily published component used in the calculation thereof):

      (a)     a public statement or publication of information by or on behalf of the administrator of the Benchmark (or such component) announcing that such administrator has ceased or will cease to provide the Benchmark (or such component), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Benchmark (or such component);

      (b)     a public statement or publication of information by the regulatory supervisor for the administrator of the Benchmark (or such component), the central bank for the currency of the Benchmark (or such component), an insolvency official with jurisdiction over the administrator for the Benchmark (or such component), a resolution authority with jurisdiction over the administrator for the Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for the Benchmark, which states that the administrator of the Benchmark (or such component) has ceased or will cease to provide the Benchmark (or such component) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Benchmark (or such component);

      (c)     a public statement or publication of information by the regulatory supervisor for the administrator of the Benchmark announcing that the Benchmark is no longer representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks; or

      (d)     a determination by the Lender by notice to the Borrower (in its sole discretion but after giving due consideration to any recommendation of a Relevant Governmental Body or industry standard) that the Benchmark is no longer representative.

"**Compounded SOFR**" means the compounded average of SOFR over a rolling 30-calendar day period as such rate is currently published on the Benchmark Source as "30-Day Average SOFR."

"**Floor**" means 1.00% (100 basis points).

"**Margin**" means (i) from the Closing Date through December 31, 2021, 4.25% (425 basis points), (ii) from January 1, 2022 through October 1, 2022, 4.75% (475 basis points) and (iii) from October 1, 2022 through the Maturity Date, 5.50% (550 basis points).

"**Rate Determination Date**" means 3:00 p.m. (New York time) on the day that is two U.S. Government Securities Business Days prior the first day of such Accrual Period; provided, however, that if the Benchmark has not been published by the SOFR Administrator and a Benchmark Replacement Date has not occurred, then the Benchmark will be the Benchmark published by the SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Benchmark was published by the SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than five U.S. Government Securities Business Days prior to such Rate Determination Date.

"**Reference Time**" with respect to any determination of the Benchmark means (1) if the Benchmark is Term SOFR or Compounded SOFR, the Rate Determination Date, and (2) if the Benchmark

is not a rate based on or referencing SOFR, the time determined by Lender after giving effect to the Benchmark Replacement Conforming Changes.

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**Reset Date**" means the first day of each Accrual Period.

"**SOFR**" means a rate per annum equal to the secured overnight financing rate for such U.S. Government Securities Business Day as such rate is currently published on the Benchmark Source.

"**SOFR Administrator**" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**Term SOFR**" means the forward-looking term rate with a tenor of approximately three (3) calendar months based on SOFR that is recommended by the Relevant Governmental Body.

"**U.S. Government Securities Business Day**" means any day except for a Saturday, a Sunday or a day on which the Securities Industry and Financial Markets Association (or a successor organization) recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in U.S. government securities

3.　　**Notification of Note Interest**.  Promptly following each Rate Determination Date, Lender shall re-calculate the Adjustable Rate and shall notify Borrower (in the manner specified in Section 16 of this Note for giving notices) of the new Adjustable Rate.

4.　　**Error in Calculation**.  If Lender at any time determines, in its sole but reasonable discretion, that it has miscalculated the amounts due hereunder (whether because of a miscalculation of the Adjustable Rate or otherwise), then Lender shall give prompt notice to Borrower of the corrected amount of the amounts due hereunder (and the corrected Adjustable Rate, if applicable) and (a) if the corrected amount of the amounts due hereunder represents an increase, then Borrower shall, within thirty (30) calendar days thereafter, pay to Lender any sums that Borrower would have otherwise been obligated under this Note to pay to Lender had the amount of the amounts due hereunder not been miscalculated, or (b) if the corrected amount of the amounts due hereunder represents a decrease thereof and Borrower is not otherwise in breach or default under any of the terms and provisions of this Note or any other Loan Document, then Borrower shall thereafter be paid the sums that Borrower would not have otherwise been obligated to pay to Lender had the amount of the amounts due hereunder not been miscalculated.

## **SCHEDULE B**

## **BENCHMARK REPLACEMENT SETTING**

**Benchmark Replacement.**

(a)     If Lender  determines prior to the relevant Reference Time that a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the then-current Benchmark, the Benchmark Replacement will replace the then-current Benchmark for all purposes relating to this Note in respect of all determinations on such date and for all determinations on all subsequent dates without any amendment to, or further action or consent of any other party to this Note.

(b)     In connection with the implementation of a Benchmark Replacement, Lender  will have the right to make Benchmark Replacement Conforming Changes from time to time.  Notwithstanding anything to the contrary in this Note or in any other Loan Documents, any amendments to this Note or the other Loan Documents implementing such Benchmark Replacement Conforming Changes will become effective and binding on Borrower upon notice by Lender to Borrower without the necessity of any action by or consent of any other party.

(c)     Any determination, decision or election that may be made by Lender  pursuant to this Note, including any determination with respect to administrative feasibility (whether due to technical, administrative or operational issues), a tenor, a rate, an adjustment or the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error, and, notwithstanding anything to the contrary in the documentation relating to this Note, will become effective without consent from any other party. Each such determination, decision and election will be in Lender's sole discretion.

(d)     Lender will promptly provide notice to the Borrower of (i) any Benchmark Replacement Date and the related Benchmark Replacement, (ii) the effectiveness of any Benchmark Replacement Conforming Changes, and (iii) the removal or reinstatement of any tenor of a Benchmark.  For the avoidance of doubt, any notice required to be delivered by the Lender as set forth herein may be provided, at the option of the Lender (in its sole discretion), in one or more notices and may be delivered together with, or as part of any amendment which implements any Benchmark Replacement or Benchmark Replacement Conforming Changes.

Lender does not warrant or accept any responsibility for, and shall not have any liability with respect to (i) the administration, submission or any other matter related to SOFR or with respect to any alternative or successor rate thereto, or replacement rate thereof (including, without limitation any Benchmark Replacement implemented hereunder), (ii) the composition or characteristics of any Benchmark Replacement, including whether it is similar to, or produces the same value or economic equivalence to SOFR (or any other Benchmark) or has the same volume or liquidity as did SOFR (or any other Benchmark), (iii) any actions or use of its discretion or other decisions or determinations made with respect to any matters covered by this Note including, without limitation, whether or not a Benchmark Transition Event has occurred, the removal or lack thereof of unavailable or non-representative tenors, the implementation or lack thereof of any Benchmark Replacement Conforming Changes, the delivery or non-delivery of any notices required hereby or otherwise in accordance herewith, and (iv) the effect of any of the foregoing provisions of this Note.

B-1

| Ex. | Description |
|-----|-------------|
| E | Forbearance Agreement dated April 13, 2023 |

## FORBEARANCE AGREEMENT

This FORBEARANCE AGREEMENT ("Agreement") is entered into as of April 13, 2023, by and among (i) DEUTSCHE BANK AG, NEW YORK BRANCH ("Lender"), (ii) HH CLEVELAND HUNTINGTON L.P., an Ohio limited partnership, as borrower ("Borrower"), and (iii) Frank T. Sinito, as guarantor ("Guarantor").

## PRELIMINARY STATEMENT

A.     Pursuant to the loan documents specifically described on the attached <u>Exhibit A</u> (the "Loan Documents"), Lender made a $35,422,000 loan (the "Loan") to Borrower on July 15, 2021, which loan is currently outstanding in the principal amount of $30,490,460.   Pursuant to the Loan Documents, Borrower agreed to pay and satisfy the Loan and fully perform each other term and provision of the Loan Documents.

B.     Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms on <u>Exhibit A</u> or in the Loan Documents (as applicable).

C.     Pursuant to the Mortgage, Borrower granted security interests and liens upon, inter alia, the property, including the Land and Improvements commonly known as 925 Euclid Avenue, Cleveland, OH 44115 (the "Property"), which liens and security interests secure Borrower's payment and performance of all obligations owing to Lender pursuant to the Loan Documents more specifically defined in the Mortgage as the "Secured Obligations".

D.     Also pursuant to the Mortgage, Borrower absolutely assigned to Lender all leases and rents arising from and generated by the Property as more specifically defined in the Mortgage as the "Rents".

E.     Through the Loan Guaranty and the Guaranty of Recourse Obligations, Guarantor irrevocably guaranteed, inter alia, the payment and performance by Borrower of each of Borrower's obligations owing to Lender pursuant to the Loan Documents subject to the terms and conditions set forth in, respectively, the Loan Guaranty, the Guaranty of Recourse Obligations.

F.     Certain Events of Defaults have occurred and are continuing under the Loan Documents.   The Events of Default currently existing and known to Lender consist of:

i.     Borrower's failure to pay and satisfy the $2,000,000 Required Paydown Amount prior to December 9, 2022 (the Required Paydown Date) pursuant to Section 2.6 of the Loan Agreement, as amended (the "Paydown Default");

ii.    Borrower's failure to pay and deposit the $1,495,104 New DSA Deposit Amount prior to November 18, 2022, the date such deposit was required to be made pursuant to Section 6.22(d) of the Loan Agreement, as amended (the "DSA Deposit Default");

iii.   Borrower's failure to pay and deposit the $1,017,130 OEA Shortfall prior to November 18, 2022, the date such deposit was required to be made pursuant to Section 6.23(d) of the Loan Agreement, as amended (the "OEA Shortfall Deposit Default");

iv.    Borrower's failure to pay and satisfy a late charge in the amount of $36,636.59 (the "Delinquent Late Charge"), which is due and payable as the result of the Borrower's failure to timely pay and satisfy the monthly interest payment due pursuant to the Note and Loan Agreement on December 1, 2022 and thereafter; and

v.     Borrower's failure to pay and satisfy an interest payment shortfall in the amount of $72,621.88 due pursuant to the Note for the period of November 1, 2022 through March 1, 2023 (the "Interest Shortfall");

(the foregoing collectively referred to herein as the "Acknowledged Events of Default").

G.      Pursuant to the Loan Agreement (as amended), the Loan matures on March 31, 2023.   Borrower has informed Lender that Borrower will not pay and satisfy the Loan on or before March 31, 2023.  The failure to pay and satisfy the Loan in full on or before March 31, 2023 will constitute an Event of Default (the "Maturity Event of Default") under the Loan Documents on such date.

H.      As a result of the Acknowledged Events of Default, Lender is entitled to exercise its rights and remedies under the Loan Documents and Guaranty Agreements including: (i) declaring all Indebtedness evidenced by such Loan Documents to be immediately due and payable in full; (ii) foreclosing its liens and security interests; and/or (iii) obtaining a judgment against the Borrower and, subject to the terms and conditions of the Guaranty Agreements, the Guarantor.

I.      Borrower and Guarantor (each a "Credit Party" and collectively, the "Credit Parties") have requested that Lender:

i.       Forbear from exercising its rights and remedies pursuant to the Loan Documents and applicable law on account of the Acknowledged Events of Default and the prospective Maturity Event of Default to permit Borrower to, on or before May 19, 2023, obtain a loan from a third-party lender sufficient in amount to pay and satisfy all obligations owing from Borrower to Lender pursuant to the Note and Loan Agreement on or before May 19, 2023 (the "Refinancing Loan"); and

ii.      Permit the Borrower to pay monthly payments of interest on or before each Loan Payment Date prior to May 19, 2023 in an amount set by the Interest Rate and not by the Default Rate;

J.      Lender has agreed to forbear, and to modify the Borrower's payment obligations, on the terms and conditions set forth in this Agreement.

## AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Accuracy of Preliminary Statement.  Each Party acknowledges the accuracy of the Preliminary Statement and agrees that the Preliminary Statement is a part of this Agreement.

2.      Acknowledged Events of Default.  Each Credit Party agrees that the Acknowledged Events of Default have occurred and are continuing under the Loan Documents and Guaranty Agreements and such occurrence entitles Lender to exercise all of the rights and remedies contained in the Loan Documents, Guaranty Agreements and applicable law without any right of the applicable Credit Party to cure or receive notice.   Each Credit Party agrees that it has no defenses, counterclaims, rights of setoff, claims or demands under the Loan Documents or with respect to the Acknowledged Events of Default.

3.      Acknowledged Loan Balance.  Each Credit Party acknowledges and agrees that as of the date hereof, the aggregate Indebtedness under the Loan Documents (including outstanding principal, accrued interest, and unpaid fees and costs, but excluding attorneys' fees and costs) is $30,599,718.47.  Interest, fees and costs will continue to accrue on such amounts pursuant to the Loan Documents with interest accruing at the Default Rate.

4.      Payment.  Provided Borrower and Guarantor are not in default of their respective obligations pursuant to this Agreement, beginning on April 1, 2023 and continuing to the earlier of (a) a Forbearance Default and (b) the end of the Forbearance Period (each as defined below), Borrower shall pay monthly payments of interest to Lender calculated at the non-Default Rate Interest Rate; *provided*, however, that interest accruing from and after April 1, 2023 and May 1, 2023 in an amount equal to the difference between (i) interest calculated at the Default Rate; and (ii) interest calculated at the non-Default Rate Interest Rate, shall be due and payable on May 19, 2023.

5.      Forbearance.  Subject to the terms and conditions set forth in this Agreement, Lender shall forbear from exercising its rights and remedies under the Loan Documents, Guaranty Agreements and applicable law on

account of the Acknowledged Events of Default and the Maturity Event of Default from the date hereof until the earlier of (a) a breach by Borrower or Guarantor of the terms of this Agreement (a "Forbearance Default"); or (b) May 19, 2023 (the "Forbearance Period").  Notwithstanding any provision in the Loan Documents (including the Guaranty Agreements) or any other documents executed pursuant to this Agreement requiring written notice from Lender, prior to Lender pursuing its rights or remedies under such document or applicable law, upon the occurrence of a Forbearance Default or expiration of the Forbearance Period, Lender shall immediately be entitled to pursue its rights and remedies under any or all of the Loan Documents (including the Guaranty Agreements), any documents executed pursuant to this Agreement, and applicable law without notice.

   6. <u>Conditions of Forbearance</u>.  The obligation of Lender to continue to forbear from exercising any rights or remedies under the Loan Documents and/or Guaranty Agreements on account of the Acknowledged Events of Default is subject to Borrower's strict compliance with the following conditions:

     (a) Borrower shall pay both the Delinquent Late Charge and the Interest Shortfall on or before April 17, 2023.

     (b) Borrower shall make a principal payment on the Loan in the amount of $250,000 on or before April 17, 2023.

     (c) Borrower shall make a principal payment on the Loan in the amount of $500,000 on or before May 15, 2023.

     (d) From and after the date hereof through the end of the Forbearance Period, Borrower shall timely and fully perform its obligations pursuant to the Loan Documents (including the payment of taxes, Insurance Premiums and other operating expenses of the Property as they come due) except for the Paydown Default, the DSA Deposit Default, the OEA Shortfall Deposit Default and the Maturity Default; provided, however, for purposes of clarity, (i) Borrower shall remain obligated to pay and satisfy the Loan and all other obligations owing to Lender pursuant to the Loan Documents in full on or before the earlier of a Forbearance Default or May 19, 2023 and (ii) the Borrower's obligation to make the deposits that are the subject of the DSA Deposit Default and the OEA Shortfall Deposit Default are not hereby released or waived in any manner.  Notwithstanding any of the foregoing in this subsection (d), and so long as the Borrower is otherwise in compliance with this subsection (d), the Borrower shall not be required to deposit any amounts in the Operating Expense Account or the Debt Service Account during the Forbearance Period.

     (e) Borrower shall provide weekly written reports to Lender or its designee regarding the status of Borrower's efforts to obtain the Refinancing Loan.

     (f) Borrower shall, on or before April 14, 2023, produce a fully executed term sheet for the Refinancing Loan that provides for a closing on or before May 19, 2023 and the payment to Lender of all amounts sufficient to pay and satisfy in full the Borrower's obligations under the Loan Documents; provided, however, if the net loan proceeds from the Refinancing Loan are insufficient to satisfy in full the Borrower's obligations under the Loan Documents (as described herein), as consideration for any agreement of Lender to release (or subordinate, as applicable) the Mortgage, Guarantor shall deliver a new guaranty agreement setting forth Guarantor's agreement to remain personally responsible for such shortfall.

     (g) Borrower shall use its best efforts to cooperate with Lender's counsel's consulting expert Newmark Valuation and Advisory in connection with the obtaining of a new appraisal for the Property by providing (i) access to the Property during normal business hours and (ii) financial, engineering, maintenance and other documents reasonably requested by Newmark Valuation and Advisory.

   7. <u>Credit Party Representations, Warranties and Covenants</u>.  As additional consideration to and inducement for Lender to enter into this Agreement, each Credit Party hereby makes the following representations and warranties as to itself, and hereby covenants with Lender as follows:

(a)     Valid Existence; Good Standing; Due Authorization; Legal Capacity; Execution and Delivery.  Borrower validly exists and is in good standing under the laws of the State of Ohio and has the requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  Borrower and Guarantor each has full legal capacity to execute and deliver this Agreement and to perform its respective obligations hereunder.  Each Credit Party has duly executed and delivered this Agreement.

(b)     Representations and Warranties.  Each and all of the representations and warranties of such Credit Party in the Loan Documents are, and will continue to be, true, accurate and correct in all respects except that it is acknowledged that the Acknowledged Events of Default exist.  The representations and warranties of such Credit Party in this Agreement are true, complete and correct as of the date hereof, and will thereafter continue to be true, complete and correct.

(c)     No Defaults.  Except for the Acknowledged Events of Default, each Credit Party is not in default under (i) any of the Loan Documents or the Guaranty Agreements, nor has any event or circumstance occurred that is continuing that, with the giving of notice or the passage of time, or both, would be a default or an event of default by any Credit Party under any of the Loan Documents or the Guaranty Agreements; and (ii) any other material agreement binding upon such Credit Party or any of its property.

(d)     No Material Changes.  Except for the Acknowledged Events of Default, there has been no material adverse change in the financial condition of any Credit Party from the most recent financial statement received by Lender regarding such Credit Party.

(e)     Claims and Defenses.  Lender has timely performed all of its obligations under the Loan Documents, and each Credit Party has no defenses, offsets, counterclaims, claims or demands of any nature which can be asserted against Lender or any affiliate of Lender for damages, with respect to the Loan Documents, or to reduce or eliminate all or any part of the Indebtedness or other obligations owing to Lender under the Loan Documents.

(f)     Binding Agreement.  This Agreement (when executed and delivered on or about the date hereof) and the Loan Documents are and will continue to be the legal, valid and binding obligations of each Credit Party, enforceable against each Credit Party in accordance with their terms.

(g)     Ratification of Loan Documents and Security Interests; No Waiver.  Each Loan Document to which such Credit Party is a party is hereby ratified and affirmed in all respects by such Credit Party as a binding obligation upon it and shall continue in full force and effect.  Furthermore, each Credit Party hereby ratifies and affirms each lien on, and security interest in, any and all real and personal property (tangible or intangible) granted as security to Lender pursuant to the Loan Documents, and such liens and security interests shall continue in full force and effect and are not hereby diminished or released.  This Agreement shall not constitute a waiver of any rights or remedies of Lender in respect of the Loan Documents.

(h)     Reasonably Equivalent Value.  Each Credit Party hereby agrees that it has carefully and independently analyzed the value of the benefits conferred by Lender through the forbearance relief provided herein and that such value is reasonably equivalent to the value of the direct and indirect transfers made, and obligations incurred, by such Credit Party pursuant to this Agreement and the transactions contemplated herein.

8.     Release of Claims.  Each Credit Party hereby fully, finally and forever releases and discharges Lender, its affiliates and its and their respective directors, managers, officers, employees, agents, representatives, attorneys, and accountants from any and all actions, causes of action, claims, debts, demands, liabilities, obligations and suits, of whatever kind or nature, in law or equity, that such Credit Party has or in the future may have, whether known or unknown (i) in respect of the Loan, this Agreement, the Loan Documents or the actions or omissions of Lender in respect of the Loan, this Agreement, or the Loan Documents and (ii) arising from events occurring prior to the date of this Agreement.  EACH CREDIT PARTY EXPRESSLY WAIVES ANY PROVISION OF

STATUTORY OR DECISIONAL LAW TO THE EFFECT THAT A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN SUCH PARTY'S FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH, IF KNOWN BY SUCH PARTY, MUST HAVE MATERIALLY AFFECTED SUCH PARTY'S SETTLEMENT WITH THE RELEASED PARTIES.  Nothing contained in this Section 8 shall release obligations owing from Lender pursuant to the Loan Documents.

9.  <u>Entire Agreement; Change; Discharge; Termination or Waiver; Successors and Assigns</u>.  This Agreement and the Loan Documents contain the entire understanding and agreement of each Credit Party and Lender in respect of the transactions contemplated herein and therein and supersede all prior representations, warranties, agreements and understandings.  No provision of this Agreement or any of the Loan Documents may be changed, discharged, supplemented, terminated or waived except in a writing signed by Lender and the applicable Credit Party thereto.  This Agreement shall be binding upon, and inure to the benefit of, each party hereto and its respective successors, assigns, executors, heirs, personal representatives, and administrators; *provided*, that no Credit Party may assign this Agreement or any of its rights or obligations hereunder except in an instrument consented to by Lender.

10.  <u>Counterpart Execution</u>.  This Agreement may be executed and delivered in one or more counterparts (including via .pdf or other means of electronic transmission), each of which shall be deemed an original and all of which together shall constitute one and the same document.  Signature pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document.

11.  <u>Post-Default Waiver of Collateral Disposition Rights</u>.  A default and an event of default have occurred under the Loan Documents and notwithstanding any forbearance or other provision set forth herein, such default and event of default remain as pre-existing events of default with respect to which the Lender may, upon the occurrence of a Forbearance Default or expiration of the Forbearance Period, send a notice of disposition of collateral under Section 9-611 of the Uniform Commercial Code.

12.  <u>Construction</u>.  This Agreement shall not be construed more strictly against Lender merely by virtue of the fact that the same has been prepared by Lender or its counsel, it being recognized that Credit Parties and Lender have contributed substantially and materially to the preparation of this Agreement, and each of the Credit Parties and Lender acknowledges and waives any claim contesting the existence and the adequacy of the consideration given by any of the other parties hereto in entering into this Agreement.

13.  <u>Consent; Reaffirmation; and Acknowledgement</u>.  Guarantor (a) consents to the terms and conditions of this Agreement; and (b) reaffirms the Guaranty Agreements and confirms and agrees that, notwithstanding this Agreement and consummation of the transactions contemplated thereby, the Guaranty Agreements and all of Guarantor's covenants, obligations, agreements, waivers, and liabilities set forth in the Guaranty Agreements continue in full force and effect in accordance with their terms with respect to the obligations guaranteed thereunder.

14.  <u>Consent to Agreement</u>.  Each Credit Party acknowledges that it has thoroughly read and reviewed the terms and provisions of this Agreement and has had full benefit and advice of counsel of its own selection, or the opportunity to obtain the benefit and advice of counsel of its own selection, and that this Agreement has been entered into by each Credit Party freely, voluntarily, with full knowledge and without duress.

15.  <u>CHOICE OF LAW; VENUE; JURY WAIVER</u>.  This Agreement, and the rights and obligations of the parties hereto shall be construed in accordance with, and governed by, the laws of the State of New York without regard to its principles of conflicts of laws.  FURTHERMORE, THE PARTIES HERETO IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

*[Signature page follows.]*

Executed and effective as of the date first set forth above.

LENDER:

**DEUTSCHE BANK AG, NEW YORK BRANCH**

By: _Jack Hart_
Name:    Jack Hart
Title      Vice President

By: _Paul Rizzo_
Name:  Paul Rizzo
Title      Director


CREDIT PARTIES:

**HH CLEVELAND HUNTINGTON L.P.** an Ohio limited
partnership, as Borrower

By: 925 Euclid Manager, LLC,
        an Ohio limited liability company,
        its General Partner

By: _____
        Frank T. Sinito, Managing Member


_____
**FRANK T. SINITO**
as Guarantor

**EXHIBIT A**

**LOAN DOCUMENTS**

1.  Loan Agreement dated as of July 1, 2021 (as amended by (i) that certain First Omnibus Amendment and Allonge to Promissory Note dated November 15, 2021 (the "First Omnibus Amendment"), between Borrower and Lender; and (ii) that certain Second Omnibus Amendment and Allonge to Promissory Note dated October 19, 2022 (the "Second Omnibus Amendment"), between Borrower and Lender, collectively, the "Loan Agreement"), by and between HH Cleveland Huntington L.P. ("Borrower") and Deutsche Bank AG, New York Branch ("Lender");

2.  Promissory Note in the original principal balance of $35,422,000 made by Borrower in favor of Lender and dated July 15, 2021 (as amended by the First Omnibus Amendment and the Second Omnibus Amendment, collectively, the "Note");

3.  Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated as of July 1, 2021, granted by Borrower, as Mortgagor, to Lender, as Mortgagee (the "Mortgage");

4.  Loan Guaranty dated as of July 1, 2021 executed by Frank T. Sinito, as guarantor for the benefit of Lender (the "Loan Guaranty");

5.  Guaranty of Recourse Obligations dated as of July 1, 2021 by Frank T. Sinito, as guarantor, in favor of Lender (the "Guaranty of Recourse Obligations") (together, the Loan Guaranty and the Guaranty of Recourse Obligations shall be referred to herein as the "Guaranty Agreements"); and

6.  All documents, agreements and instruments ancillary to the foregoing;

(collectively, the "Loan Documents).

| Ex. | Description |
|-----|-------------|
| F | Second Forbearance Agreement dated June 27, 2023 |

EXECUTION COPY

## SECOND FORBEARANCE AGREEMENT

This SECOND FORBEARANCE AGREEMENT ("Agreement") is entered into as of June 27, 2023, by and among (i) DEUTSCHE BANK AG, NEW YORK BRANCH ("Lender"), (ii) HH CLEVELAND HUNTINGTON L.P., an Ohio limited partnership, as borrower ("Borrower"), and (iii) Frank T. Sinito, as guarantor ("Guarantor").

### PRELIMINARY STATEMENT

A.  Pursuant to the loan documents specifically described on the attached <u>Exhibit A</u> (the "Loan Documents"), Lender made a loan in the amount of $35,422,000 (the "Loan") to Borrower on July 15, 2021, which Loan is currently outstanding in the principal amount of $30,240,460.  Pursuant to the Loan Documents, Borrower agreed to pay and satisfy the Loan and fully perform each other term and provision of the Loan Documents.

B.  Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms on <u>Exhibit A</u>, in the Loan Documents or in the First Forbearance Agreement (as defined below), as applicable.

C.  Pursuant to the Mortgage, Borrower granted security interests and liens upon, inter alia, the property, including the Land and Improvements commonly known as 925 Euclid Avenue, Cleveland, OH 44115 (the "Property"), which liens and security interests secure Borrower's payment and performance of all obligations owing to Lender pursuant to the Loan Documents more specifically defined in the Mortgage as the "Secured Obligations".

D.  Also pursuant to the Mortgage, Borrower absolutely assigned to Lender all leases and rents arising from and generated by the Property as more specifically defined in the Mortgage as the "Rents".

E.  Through the Loan Guaranty and the Guaranty of Recourse Obligations, Guarantor irrevocably guaranteed, inter alia, the payment and performance by Borrower of each of Borrower's obligations owing to Lender pursuant to the Loan Documents subject to the terms and conditions set forth in, respectively, the Loan Guaranty and the Guaranty of Recourse Obligations.

F.  Certain Events of Defaults have occurred and are continuing under the Loan Documents.

G.  On April 13, 2023, Lender, Borrower and Guarantor entered into a Forbearance Agreement (the "First Forbearance Agreement"), pursuant to which Borrower and Guarantor agreed that Acknowledged Events of Default, as defined in the First Forbearance Agreement (the "First Forbearance Agreement Acknowledged Events of Default"), had occurred and were continuing.  Such First Forbearance Agreement Acknowledged Events of Default continue to exist.

H.  In addition to the First Forbearance Agreement Acknowledged Events of Default, the Maturity Event of Default (as defined in the First Forbearance Agreement), has occurred and is continuing.

I.  Through the First Forbearance Agreement, Borrower and Guarantor agreed that Lender's agreement to forbear, as specifically set forth in the First Forbearance Agreement, was conditioned upon Borrower's and/or Guarantor's satisfaction of the Conditions to Forbearance set forth in Section 6 of the First Forbearance Agreement (the "First Forbearance Conditions").

J.  Borrower and Guarantor have failed to timely and fully perform the First Forbearance Conditions as specified in that certain April 20, 2023 Notice of Forbearance Defaults delivered by Lender to Borrower and Guarantor (the "First Forbearance Conditions Defaults") and, as a result, Lender is entitled to exercise its rights and remedies under the Loan Documents and Guaranty Agreements including but not limited to: (i) declaring all Indebtedness evidenced by such Loan Documents to be immediately due and payable in full; (ii) foreclosing its liens and security interests; and/or (iii) obtaining a judgment against the Borrower and, subject to the terms and conditions of the Guaranty Agreements, the Guarantor.

K        Borrower and Guarantor (each a "Credit Party" and collectively, the "Credit Parties") have requested that Lender forbear from exercising its rights and remedies pursuant to the Loan Documents and applicable law on account of the Acknowledged Events of Default, the Maturity Event of Default and the First Forbearance Conditions Defaults to permit Borrower to, on or before July 31, 2023, obtain a loan from Reef Private Capital, LLC ("Reef") in amount sufficient to pay and satisfy all (or a portion, as the case may be) of the obligations owing from Borrower to Lender pursuant to the Loan Documents (the "Refinancing Loan").

L.        Lender hereby agrees to forbear, and to modify the Borrower's payment obligations, on the terms and conditions set forth in this Agreement.

## AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.        <u>Accuracy of Preliminary Statement</u>.  Each Party acknowledges the accuracy of the Preliminary Statement and agrees that the Preliminary Statement is a part of this Agreement.

2.        <u>Acknowledged Events of Default</u>.  Each Credit Party agrees that the Acknowledged Events of Default, the Maturity Event of Default and the First Forbearance Conditions Defaults have occurred and are continuing under the Loan Documents, Guaranty Agreements and First Forbearance Agreement and such occurrences entitle Lender to exercise all of the rights and remedies contained in the Loan Documents, Guaranty Agreements and applicable law without any right of the applicable Credit Party to cure or receive notice.   Each Credit Party agrees that it has no defenses, counterclaims, rights of setoff, claims or demands under the Loan Documents or with respect to the Acknowledged Events of Default, the Maturity Event of Default and the First Forbearance Conditions Defaults.

3.        <u>Acknowledged Loan Balance</u>.  Each Credit Party acknowledges and agrees that as of the date hereof, the aggregate Indebtedness under the Loan Documents (including outstanding principal, accrued interest, and unpaid fees and costs, but excluding attorneys' fees and costs) is $30,240,460.  Interest, fees and costs will continue to accrue on such amounts pursuant to the Loan Documents with interest accruing at the Default Rate.

4.        <u>Forbearance</u>.  Subject to the terms and conditions set forth in this Agreement, Lender shall forbear from exercising its rights and remedies under the Loan Documents, Guaranty Agreements and applicable law on account of the Acknowledged Events of Default, the Maturity Event of Default and the First Forbearance Conditions Defaults from the date hereof until the earlier of (a) a breach by Borrower or Guarantor of the terms of this Agreement (a "Second Forbearance Default"); or (b) 11:59 p.m. on July 31, 2023 (the "Second Forbearance Period").  Notwithstanding any provision in the Loan Documents (including the Guaranty Agreements) or any other documents executed pursuant to this Agreement requiring written notice from Lender, prior to Lender pursuing its rights or remedies under such document or applicable law, upon the occurrence of a Second Forbearance Default or expiration of the Second Forbearance Period, Lender shall immediately be entitled to pursue its rights and remedies under any or all of the Loan Documents (including the Guaranty Agreements), any documents executed pursuant to this Agreement and applicable law without notice.

5.        <u>Conditions of Second Forbearance</u>.  The obligation of Lender to continue to forbear from exercising any rights or remedies under the Loan Documents and/or Guaranty Agreements on account of the Acknowledged Events of Default, the Maturity Event of Default and the First Forbearance Conditions Defaults is subject to Borrower's strict compliance with the following conditions:

(a)        Borrower shall, on or before July 11, 2023, pay to Lender $500,000 to be applied to the outstanding principal amount of the Loan pursuant to the Loan Documents.

(b)        Promptly and by not later than July 7, 2023, Borrower shall execute and deliver certain equity interest pledges and/or developer fee pledges for certain properties owned by The Millennia Companies (or certain affiliates or subsidiaries), including specifically, without limitation, in regard to JFK Towers (NC), Hershey Plaza (PA), the Jacksonville Portfolio (FL), St. John's Apartments (AR), Shorter

College Apartments (AR), Inhofe Plaza (OK) and Hyde Park Village (MO), such pledges to be prepared by Lender (or its counsel) with drafts delivered to Borrower by July 6, 2023, which pledges shall be in a form and substance acceptable to Lender in its sole but reasonable discretion.

        (c)      [Reserved].

        (d)      On or before July 6, 2023, Borrower shall pay and satisfy the interest payment to become due pursuant to the Loan Documents on July 1, 2023 (in the amount as invoiced by the Lender Representative).

        (e)      From and after the date hereof through the end of the Second Forbearance Period, Borrower shall timely and fully perform its obligations pursuant to the Loan Documents (including the payment of taxes, Insurance Premiums and other operating expenses of the Property as they come due) except for the obligations comprising the First Forbearance Acknowledged Events of Default and the Maturity Event of Default; provided, however, for purposes of clarity, (i) Borrower shall remain obligated to pay and satisfy the Loan and all other obligations owing to Lender pursuant to the Loan Documents in full on or before the earlier of a Second Forbearance Default or July 31, 2023 and (ii) the Borrower's obligations comprising the First Forbearance Acknowledged Events of Default and the Maturity Event of Default are not hereby released or waived in any manner.  Notwithstanding any of the foregoing in this subsection (e), and so long as the Borrower is otherwise in compliance with this subsection (e), the Borrower shall not be required to deposit any amounts in the Operating Expense Account or the Debt Service Account during the Second Forbearance Period.

        (f)      In regard to the Refinancing Loan, Borrower shall:

        (i)      by not later than June 28, 2023, deliver the following to Lender:

        (a)      a fully executed term sheet for the Refinancing Loan which Borrower will diligently pursue to close as promptly as reasonably possible but by not later than July 31, 2023;

        (b)      a transaction timeline and/or list of critical path items and dates for the Refinancing Loan; and

        (c)      a comprehensive list of the transactions for which The Millennia Companies (or an appropriate affiliate or subsidiary thereof) or the Guarantor is pledging membership or partnership interests, developer fees, equity installments or other available funds to Reef as security for the Refinancing Loan;

        (ii)      by not later than July 14, 2023, deliver the following to Lender:

        (a)      a firm commitment by Reef for a closing of the Refinancing Loan by not later than July 31, 2023; and

        (b)      promptly after Borrower's receipt from Reef, draft loan and collateral documents for the Refinancing Loan; and

        (iii)      beginning the week of July 10, 2023, provide weekly written reports to Lender or its designee regarding the status of Borrower's efforts to close the Refinancing Loan.

        (g)      [Reserved].

        (h)      [Reserved].

(i)     Upon closing of the Refinancing Loan and the accompanying paydown of the Loan, should the net proceeds of the Refinancing Loan received by the Borrower (or the Lender on behalf of the Borrower) be insufficient to pay off the Loan (including outstanding principal, accrued interest, unpaid fees and costs and attorneys' fees and costs) in full (referred to herein as the "Loan Shortfall"), in consideration for the Lender's release of the Mortgage and termination of the Note and the other Loan Documents, the Guarantor and his wife, Malisse Sinito (collectively, the "Obligors"), shall deliver a Promissory Note (the "New Note") and other any related documentation, including, without limitation, any additional equity interest pledges and/or developer fee pledges with respect to the properties listed in Section 5(b) hereof, to evidence the Obligors' ongoing obligation to pay such Loan Shortfall.  The New Note and any other required documentation evidencing such ongoing repayment obligation shall be in such form and contain such terms as may be required by the Lender in its sole but reasonable discretion, including, but not limited to, (A) a maturity date of not later than September 30, 2023, (B) a mandatory prepayment of such New Note in the amount of $700,000 by not later than August 9, 2023 (such amount is expected to be paid from the proceeds of the refinancing of the Florala Portfolio (FL) by Lender on or before such date) and (C) a variable rate of interest comparable to what is currently applied to the Loan.  Lender acknowledges that Guarantor expects to meet the September 30, 2023 New Note payoff deadline set forth in Section 5(i)(A) above from proceeds of the refinancing of the St. John's and Shorter College properties in Arkansas. Lender fully expects to be in a position to close such transactions on or before such date (subject to delays outside of the control of Lender) and will work diligently with Guarantor and others as necessary to do so.

6.     Credit Party Representations, Warranties and Covenants.  As additional consideration to and inducement for Lender to enter into this Agreement, each Credit Party hereby makes the following representations and warranties as to itself, and hereby covenants with Lender as follows:

(a)     Valid Existence; Good Standing; Due Authorization; Legal Capacity; Execution and Delivery.  Borrower validly exists and is in good standing under the laws of the State of Ohio and has the requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  Borrower and Guarantor each has full legal capacity to execute and deliver this Agreement and to perform its respective obligations hereunder.  Each Credit Party has duly executed and delivered this Agreement.

(b)     Representations and Warranties.  Each and all of the representations and warranties of such Credit Party in the Loan Documents are, and will continue to be, true, accurate and correct in all respects except that it is acknowledged that the First Forbearance Acknowledged Events of Default, the Maturity Event of Default and the First Forbearance Conditions Defaults exist.  The representations and warranties of such Credit Party in this Agreement are true, complete and correct as of the date hereof, and will thereafter continue to be true, complete and correct.

(c)     No Defaults.  Except for the First Forbearance Acknowledged Events of Default, the Maturity Event of Default and the First Forbearance Conditions Defaults, each Credit Party is not in default under (i) any of the Loan Documents or the Guaranty Agreements, nor has any event or circumstance occurred that is continuing that, with the giving of notice or the passage of time, or both, would be a default or an event of default by any Credit Party under any of the Loan Documents or the Guaranty Agreements; and (ii) any other material agreement binding upon such Credit Party or any of its property.

(d)     No Material Changes.  Except for the First Forbearance Acknowledged Events of Default, the Maturity Event of Default and the First Forbearance Conditions Defaults, there has been no material adverse change in the financial condition of any Credit Party from the most recent financial statement received by Lender regarding such Credit Party.

(e)     Claims and Defenses.  Lender has timely performed all of its obligations under the Loan Documents, and each Credit Party has no defenses, offsets, counterclaims, claims or demands of any nature which can be asserted against Lender or any affiliate of Lender for damages, with respect to the Loan Documents, or to reduce or eliminate all or any part of the Indebtedness or other obligations owing to Lender under the Loan Documents.

(f)    <u>Binding Agreement</u>.  This Agreement (when executed and delivered on or about the date hereof) and the Loan Documents are and will continue to be the legal, valid and binding obligations of each Credit Party, enforceable against each Credit Party in accordance with their terms.

(g)    <u>Ratification of Loan Documents and Security Interests; No Waiver</u>.  The First Forbearance Agreement and each Loan Document to which such Credit Party is a party is hereby ratified and affirmed in all respects by such Credit Party as a binding obligation upon it and shall continue in full force and effect.  Furthermore, each Credit Party hereby ratifies and affirms each lien on, and security interest in, any and all real and personal property (tangible or intangible) granted as security to Lender pursuant to the Loan Documents, and such liens and security interests shall continue in full force and effect and are not hereby diminished or released.  This Agreement shall not constitute a waiver of any rights or remedies of Lender in respect of the Loan Documents.

(h)    <u>Reasonably Equivalent Value</u>.  Each Credit Party hereby agrees that it has carefully and independently analyzed the value of the benefits conferred by Lender through the forbearance relief provided herein and that such value is reasonably equivalent to the value of the direct and indirect transfers made, and obligations incurred, by such Credit Party pursuant to this Agreement and the transactions contemplated herein.

(i)    <u>Hyde Park Village</u>.  Guarantor hereby represents that Hyde Park Village is not currently encumbered by a mortgage or deed of trust.  Further, Guarantor hereby agrees that it shall not agree to or permit the recording of a mortgage or deed of trust against such property until such time as the Loan has been paid in full.

7.    <u>Release of Claims</u>.  Each Credit Party hereby fully, finally and forever releases and discharges Lender, its affiliates and its and their respective directors, managers, officers, employees, agents, representatives, attorneys, and accountants from any and all actions, causes of action, claims, debts, demands, liabilities, obligations and suits, of whatever kind or nature, in law or equity, that such Credit Party has or in the future may have, whether known or unknown (i) in respect of the Loan, the First Forbearance Agreement, this Agreement, the Loan Documents or the actions or omissions of Lender in respect of the Loan, the First Forbearance Agreement, this Agreement or the Loan Documents and (ii) arising from events occurring prior to the date of this Agreement. EACH CREDIT PARTY EXPRESSLY WAIVES ANY PROVISION OF STATUTORY OR DECISIONAL LAW TO THE EFFECT THAT A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN SUCH PARTY'S FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH, IF KNOWN BY SUCH PARTY, MUST HAVE MATERIALLY AFFECTED SUCH PARTY'S SETTLEMENT WITH THE RELEASED PARTIES.  Nothing contained in this Section 7 shall release obligations owing from Lender pursuant to the Loan Documents.

8.    <u>Entire Agreement; Change; Discharge; Termination or Waiver; Successors and Assigns</u>.  This Agreement, the First Forbearance Agreement and the Loan Documents contain the entire understanding and agreement of each Credit Party and Lender in respect of the transactions contemplated herein and therein and supersede all prior representations, warranties, agreements and understandings.  No provision of this Agreement or any of the Loan Documents may be changed, discharged, supplemented, terminated or waived except in a writing signed by Lender and the applicable Credit Party thereto.  This Agreement shall be binding upon, and inure to the benefit of, each party hereto and its respective successors, assigns, executors, heirs, personal representatives, and administrators; *provided*, that no Credit Party may assign this Agreement or any of its rights or obligations hereunder except in an instrument consented to by Lender.

9.    <u>Counterpart Execution</u>.  This Agreement may be executed and delivered in one or more counterparts (including via .pdf or other means of electronic transmission), each of which shall be deemed an original and all of which together shall constitute one and the same document.  Signature pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document.

10.    <u>Post-Default Waiver of Collateral Disposition Rights</u>.  A default and an event of default have occurred under the Loan Documents and notwithstanding any forbearance or other provision set forth herein, such default and event of default remain as pre-existing events of default with respect to which the Lender may, upon the

occurrence of a Second Forbearance Default or expiration of the Second Forbearance Period, send a notice of disposition of collateral under Section 9-611 of the Uniform Commercial Code.

11.    <u>Construction</u>.  This Agreement shall not be construed more strictly against Lender merely by virtue of the fact that the same has been prepared by Lender or its counsel, it being recognized that Credit Parties and Lender have contributed substantially and materially to the preparation of this Agreement, and each of the Credit Parties and Lender acknowledges and waives any claim contesting the existence and the adequacy of the consideration given by any of the other parties hereto in entering into this Agreement.

12.    <u>Consent; Reaffirmation; and Acknowledgement.</u>  Guarantor (a) consents to the terms and conditions of this Agreement; and (b) reaffirms the Guaranty Agreements and confirms and agrees that, notwithstanding this Agreement and consummation of the transactions contemplated thereby, the Guaranty Agreements and all of Guarantor's covenants, obligations, agreements, waivers, and liabilities set forth in the Guaranty Agreements continue in full force and effect in accordance with their terms with respect to the obligations guaranteed thereunder.

13.    <u>Consent to Agreement</u>.  Each Credit Party acknowledges that it has thoroughly read and reviewed the terms and provisions of this Agreement and has had full benefit and advice of counsel of its own selection, or the opportunity to obtain the benefit and advice of counsel of its own selection, and that this Agreement has been entered into by each Credit Party freely, voluntarily, with full knowledge and without duress.

14.    <u>CHOICE OF LAW; VENUE; JURY WAIVER</u>.  This Agreement, and the rights and obligations of the parties hereto shall be construed in accordance with, and governed by, the laws of the State of New York without regard to its principles of conflicts of laws.  FURTHERMORE, THE PARTIES HERETO IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

15.    <u>Effective Date</u>.  This Agreement is effective as of May 19, 2023.

[*Signature page follows.*]

Executed as of the date first set forth above.

LENDER:

**DEUTSCHE BANK AG, NEW YORK BRANCH**

By: *Jack Hart*
Name:  Jack Hart
Title  Vice President

By:
Name:
Title  Vincent Merceron
Director

CREDIT PARTIES:

**HH CLEVELAND HUNTINGTON L.P.** an Ohio limited
partnership, as Borrower

By:  925 Euclid Manager, LLC,
an Ohio limited liability company,
its General Partner

By:
Frank T. Sinito, Managing Member

**FRANK T. SINITO**
as Guarantor

Electronically Filed 09/30/2025 19:46 / / CV 25 125588 / Confirmation Nbr. 3631064 / CLPXC

**EXHIBIT A**

**LOAN DOCUMENTS**

1. Loan Agreement dated as of July 1, 2021 (as amended by (i) that certain First Omnibus Amendment and Allonge to Promissory Note dated November 15, 2021 (the "First Omnibus Amendment"), between Borrower and Lender; and (ii) that certain Second Omnibus Amendment and Allonge to Promissory Note dated October 19, 2022 (the "Second Omnibus Amendment"), between Borrower and Lender, collectively, the "Loan Agreement"), by and between HH Cleveland Huntington L.P. ("Borrower") and Deutsche Bank AG, New York Branch ("Lender");

2. Promissory Note in the original principal balance of $35,422,000 made by Borrower in favor of Lender and dated July 15, 2021 (as amended by the First Omnibus Amendment and the Second Omnibus Amendment, collectively, the "Note");

3. Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated as of July 1, 2021, granted by Borrower, as Mortgagor, to Lender, as Mortgagee (the "Mortgage");

4. Loan Guaranty dated as of July 1, 2021 executed by Frank T. Sinito, as guarantor for the benefit of Lender (the "Loan Guaranty");

5. Guaranty of Recourse Obligations dated as of July 1, 2021 by Frank T. Sinito, as guarantor, in favor of Lender (the "Guaranty of Recourse Obligations") (together, the Loan Guaranty and the Guaranty of Recourse Obligations shall be referred to herein as the "Guaranty Agreements"); and

6. All documents, agreements and instruments ancillary to the foregoing;

(collectively, the "Loan Documents).

| Ex. | Description |
|-----|-------------|
| G | Third Forbearance Agreement dated September 27, 2023 |

## THIRD FORBEARANCE AGREEMENT

This THIRD FORBEARANCE AGREEMENT ("Agreement") is entered into as of September 27, 2023, by and among (i) DEUTSCHE BANK AG, NEW YORK BRANCH ("Lender"), (ii) HH CLEVELAND HUNTINGTON L.P., an Ohio limited partnership, as borrower ("Borrower"), and (iii) FRANK T. SINITO, as guarantor ("Guarantor").

### PRELIMINARY STATEMENT

A.      Pursuant to the loan documents specifically described on the attached Exhibit A (the "Loan Documents"), Lender made a loan in the amount of $35,422,000 (the "Loan") to Borrower on July 15, 2021, which Loan is currently outstanding in the principal amount of $29,740,460.  Pursuant to the Loan Documents, Borrower agreed to pay and satisfy the Loan and fully perform each other term and provision of the Loan Documents.

B.      Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms on Exhibit A, in the Loan Documents, in the First Forbearance Agreement (as defined below) or in the Second Forbearance Agreement (as defined below), as applicable.

C.      Pursuant to the Mortgage, Borrower granted security interests and liens upon, inter alia, the property, including the Land and Improvements commonly known as 925 Euclid Avenue, Cleveland, OH 44115 (the "Property"), which liens and security interests secure Borrower's payment and performance of all obligations owing to Lender pursuant to the Loan Documents more specifically defined in the Mortgage as the "Secured Obligations".

D.      Also pursuant to the Mortgage, Borrower absolutely assigned to Lender all leases and rents arising from and generated by the Property as more specifically defined in the Mortgage as the "Rents".

E.      Through the Loan Guaranty and the Guaranty of Recourse Obligations, Guarantor irrevocably guaranteed, inter alia, the payment and performance by Borrower of each of Borrower's obligations owing to Lender pursuant to the Loan Documents subject to the terms and conditions set forth in, respectively, the Loan Guaranty and the Guaranty of Recourse Obligations.

F.      Certain Events of Defaults have occurred and are continuing under the Loan Documents.

G.      On April 13, 2023, Lender, Borrower and Guarantor entered into a Forbearance Agreement (the "First Forbearance Agreement"), pursuant to which Borrower and Guarantor agreed that Acknowledged Events of Default, as defined in the First Forbearance Agreement (the "First Forbearance Agreement Acknowledged Events of Default"), had occurred and were continuing.  One or more of such First Forbearance Agreement Acknowledged Events of Default continues to exist.

H.      In addition to the First Forbearance Agreement Acknowledged Events of Default, the Maturity Event of Default (as defined in the First Forbearance Agreement), has occurred and is continuing.

I.      Through the First Forbearance Agreement, Borrower and Guarantor agreed that Lender's agreement to forbear, as specifically set forth in the First Forbearance Agreement, was conditioned upon Borrower's and/or Guarantor's satisfaction of the Conditions of Forbearance set forth in Section 6 of the First Forbearance Agreement (the "First Forbearance Conditions").

J.      Borrower and Guarantor failed to timely and fully perform the First Forbearance Conditions as specified in that certain April 20, 2023 Notice of Forbearance Defaults delivered by Lender to Borrower and Guarantor (the "First Forbearance Conditions Defaults") and, as a result, Lender was entitled to exercise its rights and remedies under the Loan Documents and the Guaranty Agreements including but not limited to: (i) declaring all Indebtedness evidenced by such Loan Documents to be immediately due and payable in full; (ii) foreclosing its liens and security interests; and/or (iii) obtaining a judgment against the Borrower and, subject to the terms and conditions of the Guaranty Agreements, the Guarantor.

K       On June 27, 2023, Lender, Borrower and Guarantor entered into a Second Forbearance Agreement (the "Second Forbearance Agreement"), pursuant to which Borrower and Guarantor agreed that the First Forbearance Conditions Defaults had occurred and were continuing. One or more of such First Forbearance Conditions Defaults continues to exist.

L.      Through the Second Forbearance Agreement, Borrower and Guarantor agreed that Lender's agreement to forbear, as specifically set forth in the Second Forbearance Agreement, was conditioned upon Borrower's and/or Guarantor's satisfaction of the Conditions of Second Forbearance set forth in Section 5 of the Second Forbearance Agreement (the "Second Forbearance Conditions").

M.      Borrower and Guarantor have failed to timely and fully perform the Second Forbearance Conditions as specified in that certain August 10, 2023 Notice of Forbearance Defaults delivered by Lender to Borrower and Guarantor (the "Second Forbearance Conditions Defaults") and, as a result, Lender is entitled to exercise its rights and remedies under the Loan Documents and the Guaranty Agreements including but not limited to: (i) declaring all Indebtedness evidenced by such Loan Documents to be immediately due and payable in full; (ii) foreclosing its liens and security interests; and/or (iii) obtaining a judgment against the Borrower and, subject to the terms and conditions of the Guaranty Agreements, the Guarantor.

N.      Borrower and Guarantor (each a "Credit Party" and collectively, the "Credit Parties") have requested that Lender forbear from exercising its rights and remedies pursuant to the Loan Documents and applicable law on account of the Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults and the Second Forbearance Conditions Defaults to permit Borrower to, on or before November 15, 2023, obtain a loan from Reef Private Capital, LLC or another lender in amount sufficient to pay and satisfy all (or a portion, as the case may be) of the obligations owing from Borrower to Lender pursuant to the Loan Documents (the "Refinancing Loan").

O.      Lender hereby agrees to forbear, and to modify the Borrower's payment obligations, on the terms and conditions set forth in this Agreement.

<div align="center"><b>AGREEMENT</b></div>

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      <u>Accuracy of Preliminary Statement</u>. Each Party acknowledges the accuracy of the Preliminary Statement and agrees that the Preliminary Statement is a part of this Agreement.

2.      <u>Acknowledged Events of Default</u>. Each Credit Party agrees that the Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults and the Second Forbearance Conditions Defaults have occurred, and certain of such defaults are continuing as of the date hereof, under the Loan Documents, the Guaranty Agreements, the First Forbearance Agreement and the Second Forbearance Agreement and such occurrences entitle Lender to exercise the rights and remedies contained in the Loan Documents, the Guaranty Agreements and applicable law without any right of the applicable Credit Party to cure or receive notice. Each Credit Party agrees that it has no defenses, counterclaims, rights of setoff, claims or demands under the Loan Documents or with respect to the continuing Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults and the Second Forbearance Conditions Defaults.

3.      <u>Acknowledged Loan Balance</u>. Each Credit Party acknowledges and agrees that as of September 1, 2023, the aggregate Indebtedness under the Loan Documents (including outstanding principal, accrued interest, and unpaid fees and costs, but excluding attorneys' fees and costs) is $30,018,887.90. Interest, fees and costs will continue to accrue on such amounts pursuant to the Loan Documents with interest accruing at the Default Rate.

4.      <u>Forbearance</u>. Subject to the terms and conditions set forth in this Agreement, Lender shall continue to forbear from exercising its rights and remedies under the Loan Documents, the Guaranty Agreements and applicable law on account of the Acknowledged Events of Default, the Maturity Event of Default, the First

<div align="center">2</div>

Forbearance Conditions Defaults and the Second Forbearance Conditions Defaults from the Effective Date hereof until the earlier of (a) a breach by Borrower or Guarantor of the terms of this Agreement (a "Third Forbearance Default"); or (b) 11:59 p.m. on April 15, 2024 (the "Third Forbearance Period").  Notwithstanding any provision in the Loan Documents (including the Guaranty Agreements) or any other documents executed pursuant to this Agreement requiring written notice from Lender, prior to Lender pursuing its rights or remedies under such document or applicable law, upon the occurrence of a Third Forbearance Default or expiration of the Third Forbearance Period, Lender shall immediately be entitled to pursue its rights and remedies under any or all of the Loan Documents (including the Guaranty Agreements), any documents executed pursuant to this Agreement and applicable law without notice.

5.    Conditions of Third Forbearance.  The obligation of Lender to continue to forbear from exercising any rights or remedies under the Loan Documents (including the Guaranty Agreements), any documents executed pursuant to this Agreement as additional security for Lender with respect to the Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults and the Second Forbearance Conditions Defaults is subject to Borrower's strict compliance with the following conditions:

(a)    Contemporaneously herewith or prior hereto, the Borrower shall pledge all direct or indirect right, title and interest of the Guarantor and/or his wife, Malisse Sinito, as applicable (collectively, the "Obligors") in each of the Projects listed on Exhibit B hereto (collectively, the "Pledged Assets"), in each case to the extent such pledge with respect to the Pledged Assets is permitted without third party consents pursuant to the current loan and equity documents, as applicable, entered into in connection therewith, which pledge shall additionally provide for a springing pledge with respect to each of the Pledged Assets which springs upon the occurrence of a senior debt or equity default, as applicable, with respect to such Pledged Asset;

(b)    Guarantor shall: (i) on or before October 2, 2023, acquire all direct or indirect right, title and interest of Sami Hawwa in each of the Pledged Assets and provide evidence of such acquisition and transfer to Lender; and (ii) on or before October 6, 2023, provide a summary of all consents required to pledge direct and indirect equity interests, interests in distributions (including developer fee distributions) and any other economic or control interests in the Pledged Assets together with copies of all material underlying loan and equity documents, as applicable, and other supporting documents in connection therewith (the "Pledge Summary");

(c)    Commencing on October 6, 2023, Guarantor shall provide weekly written reports to Lender or its designee which may be in email form regarding the status of Guarantor's efforts to close on: (i) the Refinancing Loan; and (ii) the sale of the Alabama Portfolio (as defined on Exhibit B) and the other properties set forth on Exhibit B under the heading "Pledge and Sale Properties," the net proceeds of which sale or sales which are distributable to Obligors or any affiliate of Obligors' (the "Obligors' Related Parties"), as applicable, are to be contemporaneously transmitted to Lender to be applied to the outstanding principal amount of the Loan pursuant to the Loan Documents.  With respect to the Pledge and Sale Properties, the Borrower shall achieve each of the following milestones and provide evidence thereof to the satisfaction of Lender not later than each of the following dates:

1)    Not later than October 10, 2023, evidence that the Pledge and Sale Properties have been placed on the market to potential investors;

2)    Not later than December 15, 2023, evidence of receipt of bids for the Pledge and Sale Properties;

3)    Not later than January 15, 2024, evidence of award(s) to a purchaser(s) and draft purchase and sale agreement(s) with respect to the Pledge and Sale Properties providing for, in Lender's reasonable judgement, expected net proceeds sufficient to repay the Loan in full;

4)    Not later than February 15, 2024, one or more fully executed purchase and sale agreements with respect to the Pledge and Sale Properties (individually, each a "PSA" and collectively the "PSA") which results in sufficient estimated net proceeds, as determined by

Lender in its reasonable discretion, to pay off the Loan together with evidence of deposit of any earnest money in connection therewith (the "Earnest Money");

5)     Not later than April 15, 2024, evidence of the expiration of any due diligence period under one or more PSAs which in the aggregate provide sufficient estimated net proceeds, as determined by Lender in its reasonable discretion, to pay off the Loan and that the Earnest Money has become non-refundable in accordance with the terms of each such PSA ("Expiration of PSA Diligence Period").

6)     If Borrower has satisfied conditions (1) through (3) above and requires more time to finalize PSA(s) in order to satisfy condition (4), the Borrower may elect, at any time prior to the expiration date of such condition, to extend the dates in (4) and (5) above, for a period of ninety (90) days provided that at the time of such election Borrower: (i) is compliance with the terms of this Agreement; and (ii) provides evidence to the reasonable satisfaction of Lender that such time is necessary to finalize such PSA(s) and will not result in the failure of the Borrower to timely meet its other obligations herein, including but not limited to the deadline for achieving Expiration of the PSA Due Diligence Period, as extended in accordance with this subsection (6), and repayment in full of the Loan not later than November 14, 2024.  The Borrower may additionally extend such extended dates for an additional period of period of three months provided that at the time of such second election Borrower: (i) is compliance with the terms of this Agreement; and (ii) $5,000,000 of the Loan has been repaid from proceeds of sales of the Pledge and Sale Properties or earnest money or extension fees with respect to the Pledge and Sale Properties or from other funds of Borrower.  Notwithstanding the foregoing, the Loan must be repaid in full not later than November 14, 2024.

(d)     On or before September 29, 2023 and subject to obtaining the consent of Deutsche Bank AG, New York Branch and, if necessary, The Huntington National Bank, as Mortgagee, Guarantor shall execute and deliver or cause to be executed and delivered to Lender pledges of all direct ownership interests in the project owners with respect to the Alabama Portfolio;

(e)     On or before the closing of the refinancing of the Florala Portfolio (FL), Guarantor shall: (i) pay and satisfy in full the interest payment which was due on September 1, 2023 pursuant to the Loan Documents (in the invoiced amount of $278,427.88); and (ii) cause the greater of: (a) $700,000; or (b) all cash developer fee paid at closing and any net cash proceeds from this refinancing payable to the Obligors or Obligors' Related Parties, to be contemporaneously paid and applied to the outstanding principal amount of the Loan pursuant to the Loan Documents; provided in all events the foregoing conditions must be satisfied by October 6, 2023;

(f)     On or before October 6, 2023, Guarantor shall cause to be executed and delivered to Lender such confirmation and additional pledges of any interests in the Pledged Assets which, following review by Lender and Lender's counsel of the Pledge Summary, Lender may reasonably determine may be pledged without third party consents;

(g)     On or before October 5, 2023, Borrower shall pay and satisfy in full the interest payment to become due pursuant to the Loan Documents on October 1, 2023 (in the amount as invoiced by the Lender Representative);

(h)     On or before November 15, 2023, Borrower shall provide (i) evidence that all taxes on the Property are current and not delinquent (including taxes for the second half of 2022) or (ii) copies of a payment plan or other agreement with respect to the payment thereof with evidence that Borrower is current on its payments under such payment plan or other agreement;

(i)     From and after the date hereof through the end of the Third Forbearance Period, Borrower shall timely and fully perform its obligations pursuant to the Loan Documents (including the payment of taxes (subject to the terms of any forbearance agreement, payment plan or similar agreement in

Electronically Filed 09/30/2025 19:46 / / CV 25 125588 / Confirmation Nbr. 3631064 / CLPXC

regard thereto with any taxing jurisdiction), Insurance Premiums and other operating expenses of the Property as they come due) except for the obligations comprising the First Forbearance Acknowledged Events of Default and the Maturity Event of Default; provided, however, for purposes of clarity, (A) Borrower shall remain obligated to pay and satisfy the Loan and all other obligations owing to Lender pursuant to the Loan Documents in full on or before the earlier of a Third Forbearance Default or April 15, 2024 (the "Forbearance Termination Date") until release in connection with delivery of a New Note is delivered in accordance with the terms herein, and (B) the Borrower's obligations comprising the First Forbearance Acknowledged Events of Default and the Maturity Event of Default are not hereby released or waived in any manner. Notwithstanding any of the foregoing in this subsection (i), and so long as the Borrower is otherwise in compliance with this subsection (i), the Borrower shall not be required to deposit any amounts in the Operating Expense Account or the Debt Service Account during the Third Forbearance Period. Notwithstanding the foregoing and provided that Borrower is, at all times, in compliance with all the terms of this Agreement and no Third Forbearance Default has occurred and is continuing, the Forbearance Termination Date shall be extended to the earlier of: (i) the outside date to close under the PSA(s), as such date may be extended by Guarantor (or its affiliates(s)) or purchaser(s) under the PSA(s); (ii) the date of any termination or revocation of the PSA(s) either (a) in whole or (b) in part which results in insufficient estimated net proceeds, as determined by Lender in its reasonable discretion, under the Pledge and Sale Properties still under contract to pay off the Loan; or (iii) November 15, 2024;

(j)        Should the Borrower move forward with the Refinancing Loan, upon the closing thereof and the accompanying paydown of the Loan, should the net proceeds of the Refinancing Loan received by the Borrower (or the Lender on behalf of the Borrower) be insufficient to pay off the Loan (including outstanding principal, accrued interest, unpaid fees and costs and attorneys' fees and costs) in full after also taking into account any repayment(s) of the Loan including, without limitation, any repayments under subsections (c), (f) and/or (i) above, as may be applicable (such amount referred to herein as the "Loan Shortfall"), in consideration for the Lender's release of the Mortgage and termination of the Note and the other Loan Documents, the Obligors shall deliver a Promissory Note (the "New Note") and other any related documentation, including, without limitation, any additional equity interest pledges and/or developer fee pledges as may be required by Lender in its sole but reasonable discretion, to evidence the Obligors' ongoing obligation to pay such Loan Shortfall. In no event shall the New Note exceed $11,500,000 and any paydown of the Loan not funded with net proceeds of the Refinancing Loan shall be contemporaneously paid from other funds provided by Guarantor. The New Note and any other required documentation evidencing such ongoing repayment obligation shall be in such form and contain such terms as may be required by the Lender in its sole but reasonable discretion, including, but not limited to, (A) a maturity date of not later than April 15, 2024, provided that such date shall be extended together with any extension of the Forbearance Termination Date, and (B) a variable rate of interest comparable to what is currently applicable to the Loan. Lender acknowledges that Guarantor expects to repay the New Note in part from (i) proceeds of the refinancing of the Florala Portfolio properties (to extent such funds have not been previously applied to the Loan balance) and (ii) net proceeds, earnest money, extension fees or other payments distributable to Obligors and Obligors' Related Parties from the sale of Pledge and Sale Properties or pursuant to the related PSA and Guarantor acknowledges that: (i) all net proceeds, earnest money, extension fees or other payments distributable to Obligors and Obligors' Related Parties from the sale of any Pledge and Sale Properties or pursuant to the related PSA shall be distributed to repay the New Note in full prior to any distribution to Obligors and Obligors' Related Parties; and (ii) the New Note shall be immediately due and payable upon expiration of the Forbearance Termination Date.

6.        Credit Party Representations, Warranties and Covenants.  As additional consideration to and inducement for Lender to enter into this Agreement, each Credit Party hereby makes the following representations and warranties as to itself, and hereby covenants with Lender as follows:

(a)        Valid Existence; Good Standing; Due Authorization; Legal Capacity; Execution and Delivery.  Borrower validly exists and is in good standing under the laws of the State of Ohio and has the requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder. Borrower and Guarantor each has full legal capacity to execute and deliver this Agreement and to perform its respective obligations hereunder. Each Credit Party has duly executed and delivered this Agreement.

5

(b)     Representations and Warranties.  Each and all of the representations and warranties of such Credit Party in the Loan Documents are, and will continue to be, true, accurate and correct in all respects except that it is acknowledged that the First Forbearance Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults and the Second Forbearance Conditions Defaults occurred, many of which continue to exist as of the date hereof.  The representations and warranties of such Credit Party in this Agreement are true, complete and correct as of the date hereof, and will thereafter continue to be true, complete and correct.

(c)     No Defaults.  Except for the First Forbearance Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults and the Second Forbearance Conditions Defaults, each Credit Party is not in default under (i) any of the Loan Documents or the Guaranty Agreements, nor has any event or circumstance occurred that is continuing that, with the giving of notice or the passage of time, or both, would be a default or an event of default by any Credit Party under any of the Loan Documents or the Guaranty Agreements; and (ii) any other material agreement binding upon such Credit Party or any of its property.

(d)     No Material Changes.  Except for the First Forbearance Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults and the Second Forbearance Conditions Defaults, there has been no material adverse change in the financial condition of any Credit Party from the most recent financial statement received by Lender regarding such Credit Party.

(e)     Claims and Defenses.  Lender has timely performed all of its obligations under the Loan Documents, and each Credit Party has no defenses, offsets, counterclaims, claims or demands of any nature which can be asserted against Lender or any affiliate of Lender for damages, with respect to the Loan Documents, or to reduce or eliminate all or any part of the Indebtedness or other obligations owing to Lender under the Loan Documents.

(f)     Binding Agreement.  This Agreement (when executed and delivered on or about the date hereof) and the Loan Documents are and will continue to be the legal, valid and binding obligations of each Credit Party, enforceable against each Credit Party in accordance with their terms.

(g)     Ratification of Loan Documents and Security Interests; No Waiver.  The First Forbearance Agreement, the Second Forbearance Agreement and each Loan Document to which such Credit Party is a party is hereby ratified and affirmed in all respects by such Credit Party as a binding obligation upon it and shall continue in full force and effect.  Furthermore, each Credit Party hereby ratifies and affirms each lien on, and security interest in, any and all real and personal property (tangible or intangible) granted as security to Lender pursuant to the Loan Documents, and such liens and security interests shall continue in full force and effect and are not hereby diminished or released.  This Agreement shall not constitute a waiver of any rights or remedies of Lender in respect of the Loan Documents.

(h)     Reasonably Equivalent Value.  Each Credit Party hereby agrees that it has carefully and independently analyzed the value of the benefits conferred by Lender through the forbearance relief provided herein and that such value is reasonably equivalent to the value of the direct and indirect transfers made, and obligations incurred, by such Credit Party pursuant to this Agreement and the transactions contemplated herein.

(i)     Hyde Park Village.  Guarantor hereby represents that Hyde Park Village, located in St. Louis, Missouri, is not currently encumbered by a mortgage or deed of trust.  Further, Guarantor hereby agrees that it shall not agree to or permit the recording of a mortgage or deed of trust against such property until such time as the Loan has been paid in full.

(j)     Timely Distribution of Available Cash Flow.  With respect to any and all distributable cash ("Available Cash Flow") from each of the Pledged Assets, Guarantor shall: (i) not pledge or otherwise encumber such Available Cash Flow for the benefit of any person other than Lender: (ii) to the extent directly or indirectly controlled by Guarantor, cause Available Cash Flow to be calculated and distributed monthly at the times permitted by HUD to the parties entitled thereto (including the Lender as described in

6

(iv) below); (iii) to the extent not directly or indirectly controlled by Guarantor, use its reasonable efforts to cause Available Cash Flow to be calculated and distributed at the times permitted by HUD to the parties entitled thereto (including the Lender as described in (iv) below) and in no event less frequently than permitted by HUD, the debt and equity documents, as applicable with respect to such Pledged Asset; (iv) contemporaneously transfer any Available Cash Flow distributed to Obligors or Obligors' Related Parties to the Lender Representative to be applied to the repayment of the principal amount of the Loan.  With respect to any Pledged Asset that is encumbered by HUD restrictions (the "HUD Projects"), the parties acknowledge that such HUD restrictions generally permits distributions of Available Cash Flow on an annual basis.  Borrower shall use its reasonable efforts to cause Available Cash Flow with respect to HUD Projects to be promptly calculated and distributed when permitted by HUD.

7.    Release of Claims.  Each Credit Party hereby fully, finally and forever releases and discharges Lender, its affiliates and its and their respective directors, managers, officers, employees, agents, representatives, attorneys, and accountants from any and all actions, causes of action, claims, debts, demands, liabilities, obligations and suits, of whatever kind or nature, in law or equity, that such Credit Party has or in the future may have, whether known or unknown (i) in respect of the Loan, the First Forbearance Agreement, the Second Forbearance Agreement, this Agreement, the Loan Documents or the actions or omissions of Lender in respect of the Loan, the First Forbearance Agreement, the Second Forbearance Agreement, this Agreement or the Loan Documents and (ii) arising from events occurring prior to the date of this Agreement.  EACH CREDIT PARTY EXPRESSLY WAIVES ANY PROVISION OF STATUTORY OR DECISIONAL LAW TO THE EFFECT THAT A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN SUCH PARTY'S FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH, IF KNOWN BY SUCH PARTY, MUST HAVE MATERIALLY AFFECTED SUCH PARTY'S SETTLEMENT WITH THE RELEASED PARTIES.  Nothing contained in this Section 7 shall release obligations owing from Lender pursuant to the Loan Documents.

8.    Entire Agreement; Change; Discharge; Termination or Waiver; Successors and Assigns.  This Agreement, the First Forbearance Agreement, the Second Forbearance Agreement and the Loan Documents contain the entire understanding and agreement of each Credit Party and Lender in respect of the transactions contemplated herein and therein and supersede all prior representations, warranties, agreements and understandings.  No provision of this Agreement or any of the Loan Documents may be changed, discharged, supplemented, terminated or waived except in a writing signed by Lender and the applicable Credit Party thereto.  This Agreement shall be binding upon, and inure to the benefit of, each party hereto and its respective successors, assigns, executors, heirs, personal representatives, and administrators; provided, that no Credit Party may assign this Agreement or any of its rights or obligations hereunder except in an instrument consented to by Lender.

9.    Counterpart Execution.  This Agreement may be executed and delivered in one or more counterparts (including via .pdf or other means of electronic transmission), each of which shall be deemed an original and all of which together shall constitute one and the same document.  Signature pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document.

10.    Post-Default Waiver of Collateral Disposition Rights.  A default and an event of default have occurred under the Loan Documents and notwithstanding any forbearance or other provision set forth herein, such default and event of default remain as pre-existing events of default with respect to which the Lender may, upon the occurrence of a Third Forbearance Default or expiration of the Third Forbearance Period, send a notice of disposition of collateral under Section 9-611 of the Uniform Commercial Code.

11.    Construction.  This Agreement shall not be construed more strictly against Lender merely by virtue of the fact that the same has been prepared by Lender or its counsel, it being recognized that Credit Parties and Lender have contributed substantially and materially to the preparation of this Agreement, and each of the Credit Parties and Lender acknowledges and waives any claim contesting the existence and the adequacy of the consideration given by any of the other parties hereto in entering into this Agreement.

12.    Consent; Reaffirmation; and Acknowledgement.  Guarantor (a) consents to the terms and conditions of this Agreement; and (b) reaffirms the Guaranty Agreements and confirms and agrees that, notwithstanding this Agreement and consummation of the transactions contemplated thereby, the Guaranty

7

Agreements and all of Guarantor's covenants, obligations, agreements, waivers, and liabilities set forth in the Guaranty Agreements continue in full force and effect in accordance with their terms with respect to the obligations guaranteed thereunder.

13.      <u>Consent to Agreement</u>.  Each Credit Party acknowledges that it has thoroughly read and reviewed the terms and provisions of this Agreement and has had full benefit and advice of counsel of its own selection, or the opportunity to obtain the benefit and advice of counsel of its own selection, and that this Agreement has been entered into by each Credit Party freely, voluntarily, with full knowledge and without duress.

14.      <u>CHOICE OF LAW; VENUE; JURY WAIVER</u>.  This Agreement, and the rights and obligations of the parties hereto shall be construed in accordance with, and governed by, the laws of the State of New York without regard to its principles of conflicts of laws.  FURTHERMORE, THE PARTIES HERETO IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

15.      <u>Effective Date</u>.  This Agreement is effective as of August 30, 2023.

*[Signature page follows.]*

Electronically Filed 09/30/2025 19:46 / / CV 25 125588 / Confirmation Nbr. 3631064 / CLPXC

Executed as of the date first set forth above.

LENDER:

**DEUTSCHE BANK AG, NEW YORK BRANCH**

By: _____
Name:
Title

By: _____
Name:
Title

CREDIT PARTIES:

**HH CLEVELAND HUNTINGTON L.P.** an Ohio limited
partnership, as Borrower

By: 925 Euclid Manager, LLC,
    an Ohio limited liability company,
    its General Partner

    By: _____
       Frank T. Sinito, Managing Member

_____
**FRANK T. SINITO**
as Guarantor

**EXHIBIT A**

**LOAN DOCUMENTS**

1.  Loan Agreement dated as of July 1, 2021 (as amended by (i) that certain First Omnibus Amendment and Allonge to Promissory Note dated November 15, 2021 (the "First Omnibus Amendment"), between Borrower and Lender; and (ii) that certain Second Omnibus Amendment and Allonge to Promissory Note dated October 19, 2022 (the "Second Omnibus Amendment"), between Borrower and Lender, collectively, the "Loan Agreement"), by and between HH Cleveland Huntington L.P. ("Borrower") and Deutsche Bank AG, New York Branch ("Lender");

2.  Promissory Note in the original principal balance of $35,422,000 made by Borrower in favor of Lender and dated July 15, 2021 (as amended by the First Omnibus Amendment and the Second Omnibus Amendment, collectively, the "Note");

3.  Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated as of July 1, 2021, granted by Borrower, as Mortgagor, to Lender, as Mortgagee (the "Mortgage");

4.  Loan Guaranty dated as of July 1, 2021 executed by Frank T. Sinito, as guarantor for the benefit of Lender (the "Loan Guaranty");

5.  Guaranty of Recourse Obligations dated as of July 1, 2021 by Frank T. Sinito, as guarantor, in favor of Lender (the "Guaranty of Recourse Obligations") (together, the Loan Guaranty and the Guaranty of Recourse Obligations shall be referred to herein as the "Guaranty Agreements"); and

6.  All documents, agreements and instruments ancillary to the foregoing;

(collectively, the "Loan Documents).

Electronically Filed 09/30/2025 19:46 / / CV 25 125588 / Confirmation Nbr. 3631064 / CLPXC

**EXHIBIT B**

| Pledge and Sale Properties | City | State |
|---|---|---|
| Ava Park | Griffin | GA |
| Azalea Point | Mobile | AL |
| Bankhead Towers Apts | Birmingham | AL |
| South Park Village | Laurel | MS |
| Ballard Way | Columbus | GA |
| Blossom Hill | Macon | GA |
| Bonnie Doone | Athens | AL |
| Majestic Gardens | Macon | GA |
| Southern Oaks Village | Florence | AL |
| Country Park | Wichita Falls | TX |
| Highpoint | Wichita Falls | TX |
| Highpoint II | Wichita Falls | TX |
| Parkview Place | Lubbock | TX |
| The Ella | Lubbock | TX |
| Bayou Bend* | Mobile | AL |
| Bayou Plaza* | Mobile | AL |
| Cambridge* | Mobile | AL |
| Driftwood* | Mobile | AL |
| Four Winds* | Birmingham | AL |
| Jefferson* | Mobile | AL |
| Marland* | Birmingham | AL |
| South Haven* | Mobile | AL |
| St. Stephens* | Whistler | AL |
| Shorter College | North Little Rock | AR |
| St. John | Pine Bluff | AR |
| Southeast | Pine Bluff | AR |
| Willow Bend | Jacksonville | AR |
| Blue Valley | Kansas City | MO |
| Olive Park | Kansas City | MO |
| | | |
| **Pledge Only** | **City** | **State** |
| Anchor Bay THs | Saginaw | MI |
| Hilltop Apts | Kirtland | OH |
| Little Traverse Village | Petoskey | MI |
| Glendale Apts | Galax | VA |
| Glenwood Village | Bethesda | OH |
| Hyde Park Village | St. Louis | MO |

---

* Collectively the "Alabama Portfolio"

3

| Ex. | Description |
|-----|-------------|
| H | Fourth Forbearance Agreement dated January 17, 2024 |

*Execution Copy*

## FOURTH FORBEARANCE AGREEMENT

This FOURTH FORBEARANCE AGREEMENT ("Agreement") is entered into as of January 17, 2024, by and among (i) DEUTSCHE BANK AG, NEW YORK BRANCH ("Lender"), (ii) HH CLEVELAND HUNTINGTON L.P., an Ohio limited partnership, as borrower ("Borrower"), and (iii) FRANK T. SINITO, as guarantor ("Guarantor").

## PRELIMINARY STATEMENT

A.     Pursuant to the loan documents specifically described on the attached <u>Exhibit A</u> (the "Loan Documents"), Lender made a loan in the amount of $35,422,000 (the "Loan") to Borrower on July 15, 2021, which Loan is currently outstanding in the principal amount of $29,040,460.  Pursuant to the Loan Documents, Borrower agreed to pay and satisfy the Loan and fully perform each other term and provision of the Loan Documents.

B.     Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms on <u>Exhibit A</u> attached hereto, in the Loan Documents, in the First Forbearance Agreement (as defined below), in the Second Forbearance Agreement (as defined below) or in the Third Forbearance Agreement (as defined below), as applicable.

C.     Pursuant to the Mortgage, Borrower granted security interests and liens upon, *inter alia*, the property, including the Land and Improvements commonly known as 925 Euclid Avenue, Cleveland, OH 44115 (the "Property"), which liens and security interests secure Borrower's payment and performance of all obligations owing to Lender pursuant to the Loan Documents more specifically defined in the Mortgage as the "Secured Obligations".

D.     Also pursuant to the Mortgage, Borrower absolutely assigned to Lender all leases and rents arising from and generated by the Property as more specifically defined in the Mortgage as the "Rents".

E.     Through the Loan Guaranty and the Guaranty of Recourse Obligations, Guarantor irrevocably guaranteed, *inter alia*, the payment and performance by Borrower of each of Borrower's obligations owing to Lender pursuant to the Loan Documents subject to the terms and conditions set forth in, respectively, the Loan Guaranty and the Guaranty of Recourse Obligations.

F.     Certain Events of Defaults have occurred and are continuing under the Loan Documents.

G.     On April 13, 2023, Lender, Borrower and Guarantor entered into a Forbearance Agreement (the "First Forbearance Agreement"), pursuant to which Borrower and Guarantor agreed that the Acknowledged Events of Default, as defined in the First Forbearance Agreement (the "First Forbearance Agreement Acknowledged Events of Default"), had occurred and were continuing.  One or more of such First Forbearance Agreement Acknowledged Events of Default continues to exist.

H.     In addition to the First Forbearance Agreement Acknowledged Events of Default, the Maturity Event of Default (as defined in the First Forbearance Agreement), has occurred and is continuing.

I.     Through the First Forbearance Agreement, Borrower and Guarantor agreed that Lender's agreement to forbear, as specifically set forth in the First Forbearance Agreement, was conditioned upon Borrower's and/or Guarantor's satisfaction of the Conditions of Forbearance set forth in Section 6 of the First Forbearance Agreement (the "First Forbearance Conditions").

J.     Borrower and Guarantor failed to timely and fully perform the First Forbearance Conditions as specified in that certain April 20, 2023 Notice of Forbearance Defaults delivered by Lender to Borrower and Guarantor (the "First Forbearance Conditions Defaults") and, as a result, Lender was entitled to exercise its rights and remedies under the Loan Documents and the Guaranty Agreements including but not limited to: (i) declaring all Indebtedness evidenced by such Loan Documents to be immediately due and payable in full; (ii) foreclosing its liens

and security interests; and/or (iii) obtaining a judgment against the Borrower and, subject to the terms and conditions of the Guaranty Agreements, the Guarantor.

  K.  On June 27, 2023, Lender, Borrower and Guarantor entered into a Second Forbearance Agreement (the "Second Forbearance Agreement"), pursuant to which Borrower and Guarantor agreed that the First Forbearance Conditions Defaults had occurred and were continuing.  One or more of such First Forbearance Conditions Defaults continues to exist.

  L.  Through the Second Forbearance Agreement, Borrower and Guarantor agreed that Lender's agreement to forbear, as specifically set forth in the Second Forbearance Agreement, was conditioned upon Borrower's and/or Guarantor's satisfaction of the Conditions of Second Forbearance set forth in Section 5 of the Second Forbearance Agreement (the "Second Forbearance Conditions").

  M.  Borrower and Guarantor failed to timely and fully perform the Second Forbearance Conditions as specified in that certain August 10, 2023 Notice of Forbearance Defaults delivered by Lender to Borrower and Guarantor (the "Second Forbearance Conditions Defaults") and, as a result, Lender is entitled to exercise its rights and remedies under the Loan Documents and the Guaranty Agreements including but not limited to: (i) declaring all Indebtedness evidenced by such Loan Documents to be immediately due and payable in full; (ii) foreclosing its liens and security interests; and/or (iii) obtaining a judgment against the Borrower and, subject to the terms and conditions of the Guaranty Agreements, the Guarantor.

  N.  On September 27, 2023, Lender, Borrower and Guarantor entered into a Third Forbearance Agreement (the "Third Forbearance Agreement"), pursuant to which Borrower and Guarantor agreed that the First Forbearance Conditions Defaults and the Second Forbearance Conditions Defaults had occurred and were continuing.  One or more of such First Forbearance Conditions Defaults and/or Second Forbearance Conditions Defaults continues to exist.

  O.  Through the Third Forbearance Agreement, Borrower and Guarantor agreed that Lender's agreement to forbear, as specifically set forth in the Third Forbearance Agreement, was conditioned upon Borrower's and/or Guarantor's satisfaction of the Conditions of Third Forbearance set forth in Section 5 of the Third Forbearance Agreement (the "Third Forbearance Conditions").

  P.  Borrower and Guarantor failed to timely and fully perform one or more of the Third Forbearance Conditions (the "Third Forbearance Conditions Defaults") and, as a result, Lender is entitled to exercise its rights and remedies under the Loan Documents and the Guaranty Agreements including but not limited to: (i) declaring all Indebtedness evidenced by such Loan Documents to be immediately due and payable in full; (ii) foreclosing its liens and security interests; and/or (iii) obtaining a judgment against the Borrower and, subject to the terms and conditions of the Guaranty Agreements, the Guarantor.

  Q.  Borrower and Guarantor (each a "Credit Party" and collectively, the "Credit Parties") have requested that Lender forbear from exercising its rights and remedies pursuant to the Loan Documents and applicable law on account of the Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults and the Third Forbearance Conditions Defaults to permit Borrower to (i) obtain a loan from a third-party lender in amount sufficient to pay and satisfy all (or a portion, as the case may be) of the obligations owing from Borrower to Lender pursuant to the Loan Documents (generally referred to herein as the "Refinancing Loan"), or (ii) otherwise pay such obligations in full from other sources and proceeds as further described herein.

  R.  Lender hereby agrees to forbear, and to modify the Borrower's payment obligations, on the terms and conditions set forth in this Agreement.

## AGREEMENT

  For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      <u>Accuracy of Preliminary Statement</u>.  Each Party acknowledges the accuracy of the Preliminary Statement and agrees that the Preliminary Statement is a part of this Agreement.

2.      <u>Acknowledged Events of Default</u>.  Each Credit Party agrees that the Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults and the Third Forbearance Conditions Defaults have occurred, and certain of such defaults are continuing as of the date hereof, under the Loan Documents, the Guaranty Agreements, the First Forbearance Agreement, the Second Forbearance Agreement and the Third Forbearance Agreement and such occurrences entitle Lender to exercise the rights and remedies contained in the Loan Documents, the Guaranty Agreements and applicable law without any right of the applicable Credit Party to cure or receive notice.  Each Credit Party agrees that it has no defenses, counterclaims, rights of setoff, claims or demands under the Loan Documents or with respect to the continuing Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults and the Third Forbearance Conditions Defaults.

3.      <u>Acknowledged Loan Balance</u>.  Each Credit Party acknowledges and agrees that as of January 2, 2024, the aggregate Indebtedness under the Loan Documents (including outstanding principal, accrued interest, and unpaid fees and costs, but excluding attorneys' fees and costs) is $29,312,464.07.  Interest, fees and costs will continue to accrue on such amounts pursuant to the Loan Documents with interest accruing at the Default Rate.

4.      <u>Forbearance</u>.  Subject to the terms and conditions set forth in this Agreement, Lender shall continue to forbear from exercising its rights and remedies under the Loan Documents, the Guaranty Agreements and applicable law on account of the Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults and the Third Forbearance Conditions Defaults from the Effective Date hereof until the earlier of (a) a breach by Borrower or Guarantor of the terms of this Agreement (a "Fourth Forbearance Default"); or (b) 11:59 p.m. on April 15, 2024 as such date may be extended in accordance with the terms of this Agreement (the "Fourth Forbearance Period").  Notwithstanding any provision in the Loan Documents (including the Guaranty Agreements) or any other documents executed pursuant to this Agreement requiring written notice from Lender, prior to Lender pursuing its rights or remedies under such document or applicable law, upon the occurrence of a Fourth Forbearance Default or expiration of the Fourth Forbearance Period, Lender shall immediately be entitled to pursue its rights and remedies under any or all of the Loan Documents (including the Guaranty Agreements), any documents executed pursuant to this Agreement and applicable law without notice.

5.      <u>Conditions of Fourth Forbearance</u>.  The obligation of Lender to continue to forbear from exercising any rights or remedies under the Loan Documents (including the Guaranty Agreements), any documents executed pursuant to this Agreement as additional security for Lender with respect to the Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults and the Third Forbearance Conditions Defaults is subject to Borrower's strict compliance with the following conditions:

(a)      On or before January 19, 2024, Borrower shall pay and satisfy in full the interest payment which became due pursuant to the Loan Documents on January 2, 2024 (in the amount of $272,004.07, as invoiced by the Lender Representative);

(b)      Commencing on December 18, 2023, Guarantor shall provide weekly written reports to Lender or its designee which may be in email form regarding the status of Guarantor's efforts to close on: (i) the Refinancing Loan, to the extent applicable; and (ii) the sale of the Alabama Portfolio (as defined on <u>Exhibit B</u>) and the other properties set forth on <u>Exhibit B</u> under the heading "Pledge and Sale Properties," the net proceeds of which sale or sales which are distributable to Guarantor and/or his wife, Malisse Sinito, as applicable (collectively, the "Obligors") or any affiliate of Obligors' (the "Obligors' Related Parties"), as applicable, are to be contemporaneously transmitted to Lender to be applied to the outstanding principal amount of the Loan pursuant to the Loan Documents (or, alternatively, if the Refinancing Loan has closed prior to the date of such transmittal, to be applied to the outstanding principal amount of the New Note (as defined below)).  With respect to the Pledge and Sale Properties, the Borrower shall achieve each of the following milestones and provide evidence thereof to the satisfaction of Lender not later than each of the following dates:

1)      Not later than October 10, 2023, evidence that the Pledge and Sale Properties have been placed on the market to potential investors [*This requirement has been satisfied*];

2)      Not later than February 1, 2024, evidence of receipt of bids for the Pledge and Sale Properties;

3)      Not later than March 15, 2024, evidence of award(s) to a purchaser(s) and draft purchase and sale agreement(s) with respect to the Pledge and Sale Properties providing for, in Lender's reasonable judgement, expected net proceeds sufficient to repay the Loan (or the New Note, as may be applicable) in full;

4)      Not later than April 15, 2024, one or more fully executed purchase and sale agreements with respect to the Pledge and Sale Properties (individually, each a "PSA" and collectively the "PSA") which results in sufficient estimated net proceeds, as determined by Lender in its reasonable discretion, to pay off the Loan (or the New Note, as may be applicable) together with evidence of deposit of any earnest money in connection therewith (the "Earnest Money");

5)      Not later than June 15, 2024, evidence of the expiration of any due diligence period under one or more PSAs which in the aggregate provide sufficient estimated net proceeds, as determined by Lender in its reasonable discretion, to pay off the Loan (or the New Note, as may be applicable) and that the Earnest Money has become non-refundable in accordance with the terms of each such PSA ("Expiration of PSA Diligence Period").

6)      If Borrower has satisfied conditions (1) through (3) above and requires more time to finalize PSA(s) in order to satisfy condition (4), the Borrower may elect, at any time prior to the expiration date of such condition, to extend the dates in (4) and (5) above, for a period of ninety (90) days provided that at the time of such election Borrower: (i) is in compliance with the terms of this Agreement; and (ii) provides evidence to the reasonable satisfaction of Lender that such time is necessary to finalize such PSA(s) and will not result in the failure of the Borrower to timely meet its other obligations herein, including but not limited to the deadline for achieving Expiration of the PSA Due Diligence Period, as extended in accordance with this subsection (6), and repayment in full of the Loan (or the New Note, as may be applicable) not later than November 15, 2024. Additionally if Borrower has satisfied conditions (1) through (4) above, Borrower may elect at any time prior to the expiration date of such condition, to extend the date in (5) above, for a period of ninety (90) days provided at the time of such election Borrower (i) is in compliance with the terms of this Agreement and (ii) provides evidence to the reasonable satisfaction of Lender that such time is necessary to allow the purchaser(s) to compete due diligence so as to cause the Earnest Money to become non-refundable. The Borrower may additionally extend such extended dates for an additional period of period of sixty (60) days provided that at the time of such second election Borrower: (i) is compliance with the terms of this Agreement; and (ii) $5,000,000 of the Loan (or the New Note, as may be applicable) has been repaid from proceeds of sales of the Pledge and Sale Properties or earnest money or extension fees with respect to the Pledge and Sale Properties or from other funds of Borrower. Notwithstanding the foregoing, the Loan (or the New Note, as may be applicable) must be repaid in full not later than November 15, 2024.

(c)      On or before January 15, 2024, Borrower shall provide (i) evidence that all taxes on the Property are current and not delinquent (including taxes for the second half of 2022 and for the first half of 2023) or (ii) copies of a payment plan or other agreement with respect to the payment thereof with evidence that Borrower is current on its payments under such payment plan or other agreement;

(d)      On or before January 31, 2024, Guarantor shall provide a detailed summary (the "Subordinate Pledge Summary") of all subordinate pledges by Obligor or any Obligor Related Party of equity interests in the Projects listed in <u>Exhibit B</u> hereto (collectively, the "Pledged Assets"); which Subordinate Pledge Summary shall include the amount currently owned to the party or parties listed therein

as pledgee (such Subordinate Pledge Summary need not reflect pledges made in favor of Lender or made in accordance with the loan documents related to each Pledge Asset (the latter such pledges being described in the Pledge Summary));

(e)     On or before January 31, 2024, Borrower shall provide written evidence (satisfactory to Lender in its sole discretion) that all of the items of deferred maintenance as identified by Marous Brothers Construction (and as further described in detail in the various documents attached hereto as <u>Exhibit C</u>) have been fully completed, such written evidence to include, without limitation, confirmation of completion from Marous Brothers Construction;

(f)     On or before February 15, 2024, Guarantor shall cause to be executed and delivered to Lender (i) a revised draft of the Pledge Summary (as defined in the Third Forbearance Agreement) based on comments provided by Lender's counsel to Guarantor's Counsel, and (ii) such confirmation and additional pledges of any interests in the Pledged Assets, which, following review by Lender and Lender's counsel of the Pledge Summary, Lender may reasonably determine may be pledged without third party consents;

(g)     [Reserved];

(h)     From and after the date hereof through the end of the Fourth Forbearance Period, Borrower shall timely and fully perform its obligations pursuant to the Loan Documents (including the payment of taxes (subject to the terms of any forbearance agreement, payment plan or similar agreement in regard thereto with any taxing jurisdiction), Insurance Premiums and other operating expenses of the Property as they come due) except for the obligations comprising the First Forbearance Acknowledged Events of Default and the Maturity Event of Default; provided, however, for purposes of clarity, (A) Borrower shall remain obligated to pay and satisfy the Loan and all other obligations owing to Lender pursuant to the Loan Documents in full on or before the earlier of a Fourth Forbearance Default or April 15, 2024 (the "Forbearance Termination Date") until release in connection with delivery of a New Note is delivered in accordance with the terms herein, and (B) the Borrower's obligations comprising the First Forbearance Acknowledged Events of Default and the Maturity Event of Default are not hereby released or waived in any manner.  Notwithstanding any of the foregoing in this subsection (h), and so long as the Borrower is otherwise in compliance with this subsection (h), the Borrower shall not be required to deposit any amounts in the Operating Expense Account or the Debt Service Account during the Fourth Forbearance Period.  Notwithstanding the foregoing and provided that Borrower is, at all times, in compliance with all the terms of this Agreement and no Fourth Forbearance Default has occurred and is continuing, the Forbearance Termination Date and the Fourth Forbearance Period shall be extended to the earlier of: (i) the outside date to close under the PSA(s), as such date may be extended by Guarantor (or its affiliates(s)) or purchaser(s) under the PSA(s); (ii) the date of any termination or revocation of the PSA(s) either (a) in whole or (b) in part which results in insufficient estimated net proceeds, as determined by Lender in its reasonable discretion, under the Pledge and Sale Properties still under contract (or placed under contract within thirty (30) days after the termination or revocation of the PSA(s)) to pay off the Loan (or the New Note, as may be applicable); or (iii) November 15, 2024; and

(i)     Upon closing of the Refinancing Loan, as may be applicable, and the accompanying paydown of the Loan, should the net proceeds of the Refinancing Loan received by the Borrower (or the Lender on behalf of the Borrower) be insufficient to pay off the Loan (including outstanding principal, accrued interest, unpaid fees and costs and attorneys' fees and costs) in full after also taking into account any repayment(s) of the Loan including, without limitation, any repayments under subsections (b) and/or (h) above, as may be applicable (such amount referred to herein as the "Loan Shortfall"), in consideration for the Lender's release of the Mortgage and termination of the Note and the other Loan Documents, the Obligors shall deliver a Promissory Note (the "New Note") and other any related documentation, including, without limitation, any additional equity interest pledges and/or developer fee pledges as may be required by Lender in its sole but reasonable discretion, to evidence the Obligors' ongoing obligation to pay such Loan Shortfall.  In no event shall the New Note exceed $11,500,000 and any paydown of the Loan not funded with net proceeds of the Refinancing Loan shall be contemporaneously paid from other funds provided by Guarantor. The New Note and any other required documentation evidencing such ongoing

repayment obligation shall be in such form and contain such terms as may be required by the Lender in its sole but reasonable discretion, including, but not limited to, (A) a maturity date of not later than April 15, 2024, provided that such date shall be extended together with any extension of the Forbearance Termination Date, and (B) a variable rate of interest comparable to what is currently applied to the Loan. Lender acknowledges that Guarantor expects to repay the New Note from net proceeds, earnest money, extension fees or other payments distributable to Obligors and Obligors' Related Parties from the sale of Pledge and Sale Properties or pursuant to the related PSA and Guarantor acknowledges that: (i) all net proceeds, earnest money, extension fees or other payments distributable to Obligors and Obligors' Related Parties from the sale of any Pledge and Sale Properties or pursuant to the related PSA shall be distributed to repay the New Note in full prior to any distribution to Obligors and Obligors' Related Parties; and (ii) the New Note shall be immediately due and payable upon expiration of the Forbearance Termination Date.

6.    <u>Credit Party Representations, Warranties and Covenants</u>.  As additional consideration to and inducement for Lender to enter into this Agreement, each Credit Party hereby makes the following representations and warranties as to itself, and hereby covenants with Lender as follows:

(a)    <u>Valid Existence; Good Standing; Due Authorization; Legal Capacity; Execution and Delivery</u>.  Borrower validly exists and is in good standing under the laws of the State of Ohio and has the requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  Borrower and Guarantor each has full legal capacity to execute and deliver this Agreement and to perform its respective obligations hereunder.  Each Credit Party has duly executed and delivered this Agreement.

(b)    <u>Representations and Warranties</u>.  Each and all of the representations and warranties of such Credit Party in the Loan Documents are, and will continue to be, true, accurate and correct in all respects except that it is acknowledged that the First Forbearance Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults and the Third Forbearance Conditions Defaults occurred, many of which continue to exist as of the date hereof.  The representations and warranties of such Credit Party in this Agreement are true, complete and correct as of the date hereof, and will thereafter continue to be true, complete and correct.

(c)    <u>No Defaults</u>.  Except for the First Forbearance Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults and the Third Forbearance Conditions Defaults, each Credit Party is not in default under (i) any of the Loan Documents or the Guaranty Agreements, nor has any event or circumstance occurred that is continuing that, with the giving of notice or the passage of time, or both, would be a default or an event of default by any Credit Party under any of the Loan Documents or the Guaranty Agreements; and (ii) any other material agreement binding upon such Credit Party or any of its property.

(d)    <u>No Material Changes</u>.  Except for the First Forbearance Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults and the Third Forbearance Conditions Defaults, there has been no material adverse change in the financial condition of any Credit Party from the most recent financial statement received by Lender regarding such Credit Party.

(e)    <u>Claims and Defenses</u>.  Lender has timely performed all of its obligations under the Loan Documents, and each Credit Party has no defenses, offsets, counterclaims, claims or demands of any nature which can be asserted against Lender or any affiliate of Lender for damages, with respect to the Loan Documents, or to reduce or eliminate all or any part of the Indebtedness or other obligations owing to Lender under the Loan Documents.

(f)    <u>Binding Agreement</u>.  This Agreement (when executed and delivered on or about the date hereof) and the Loan Documents are and will continue to be the legal, valid and binding obligations of each Credit Party, enforceable against each Credit Party in accordance with their terms.

(g)  Ratification of Loan Documents and Security Interests; No Waiver.  The First Forbearance Agreement, the Second Forbearance Agreement, the Third Forbearance Agreement and each Loan Document to which such Credit Party is a party is hereby ratified and affirmed in all respects by such Credit Party as a binding obligation upon it and shall continue in full force and effect.  Furthermore, each Credit Party hereby ratifies and affirms each lien on, and security interest in, any and all real and personal property (tangible or intangible) granted as security to Lender pursuant to the Loan Documents, and such liens and security interests shall continue in full force and effect and are not hereby diminished or released.  This Agreement shall not constitute a waiver of any rights or remedies of Lender in respect of the Loan Documents.

(h)  Reasonably Equivalent Value.  Each Credit Party hereby agrees that it has carefully and independently analyzed the value of the benefits conferred by Lender through the forbearance relief provided herein and that such value is reasonably equivalent to the value of the direct and indirect transfers made, and obligations incurred, by such Credit Party pursuant to this Agreement and the transactions contemplated herein.

(i)  Hyde Park Village.  Guarantor hereby represents that Hyde Park Village, located in St. Louis, Missouri, is not currently encumbered by a mortgage or deed of trust.  Further, Guarantor hereby agrees that it shall not agree to or permit the recording of a mortgage or deed of trust against such property until such time as the Loan (or the New Note, as may be applicable) has been paid in full.

(j)  Timely Distribution of Available Cash Flow.  With respect to any and all distributable cash from each of the Pledged Assets including, without limitation, the net sale proceeds of any Pledged Asset (collectively, "Available Cash Flow"), Guarantor shall: (i) not, except as described in the Subordinate Pledge Summary, pledge or otherwise encumber such Available Cash Flow for the benefit of any person other than Lender: (ii) to the extent directly or indirectly controlled by Guarantor, cause Available Cash Flow to be calculated and distributed monthly at the times permitted by HUD to the parties entitled thereto (including the Lender as described in (iv) below); (iii) to the extent not directly or indirectly controlled by Guarantor, use its reasonable efforts to cause Available Cash Flow to be calculated and distributed at the times permitted by HUD to the parties entitled thereto (including the Lender as described in (iv) below) and in no event less frequently than permitted by HUD, the debt and equity documents, as applicable with respect to such Pledged Asset; (iv) contemporaneously transfer any Available Cash Flow distributed to Obligors or Obligors' Related Parties to the Lender Representative to be applied to the repayment of the principal amount of the Loan (or the New Note, as may be applicable).  With respect to any Pledged Asset that is encumbered by HUD restrictions (the "HUD Projects"), the parties acknowledge that such HUD restrictions generally permits distributions of Available Cash Flow on an annual basis.  Borrower shall use its reasonable efforts to cause Available Cash Flow with respect to HUD Projects to be promptly calculated and distributed when permitted by HUD.

7.  Amendment of Note.  Lender and the Credit Parties hereby agree that the Note is amended pursuant to this Fourth Forbearance Agreement to provide that the Margin (as such term is defined in the Note) shall be increased from 5.50% (five hundred fifty basis points) (as set forth in the Second Omnibus Amendment) to 6.25% (six hundred twenty-five basis points) effective January 1, 2024.

8.  Lender Legal Fees.  Borrower and Guarantor acknowledge that Kutak Rock LLP ("Lender Counsel") previously received an $80,000 legal deposit (the "Deposit") with respect to the Shorter College and St. John transactions (in Arkansas) and per agreement with the Borrower: 1) previously applied the Deposit to fees and expenses on such transactions (in the amount of $13,038.50); and (ii) applied the remaining balance of the Deposit to (a) invoices #3238598 ($35,176) and #3280739 ($27,429) pertaining to this transaction and (b) additional fees and expenses for work pertaining to this transaction through September 18, 2023.  Total Lender Counsel fees and expenses accrued and unpaid through December 31, 2023 after application of the Deposit are $59,000 (the "Accrued Fees").  Guarantor hereby agrees to pay the Accrued Fees and all future fees and expenses in connection with the transactions contained herein upon invoice and within thirty (30) days of receipt thereof.  Notwithstanding the foregoing, Lender Counsel hereby agrees that the Accrued Fees and any future fees and expenses of Lender Counsel may be paid out of the proceeds received by Guarantor from the sale of the Pledged Assets.

9.      Release of Claims.  Each Credit Party hereby fully, finally and forever releases and discharges Lender, its affiliates and its and their respective directors, managers, officers, employees, agents, representatives, attorneys, and accountants from any and all actions, causes of action, claims, debts, demands, liabilities, obligations and suits, of whatever kind or nature, in law or equity, that such Credit Party has or in the future may have, whether known or unknown (i) in respect of the Loan, the First Forbearance Agreement, the Second Forbearance Agreement, the Third Forbearance Agreement, this Agreement, the Loan Documents or the actions or omissions of Lender in respect of the Loan, the First Forbearance Agreement, the Second Forbearance Agreement, the Third Forbearance Agreement, this Agreement or the Loan Documents and (ii) arising from events occurring prior to the date of this Agreement.  EACH CREDIT PARTY EXPRESSLY WAIVES ANY PROVISION OF STATUTORY OR DECISIONAL LAW TO THE EFFECT THAT A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN SUCH PARTY'S FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH, IF KNOWN BY SUCH PARTY, MUST HAVE MATERIALLY AFFECTED SUCH PARTY'S SETTLEMENT WITH THE RELEASED PARTIES.  Nothing contained in this Section 9 shall release obligations owing from Lender pursuant to the Loan Documents.

10.      Entire Agreement; Change; Discharge; Termination or Waiver; Successors and Assigns.  This Agreement, the First Forbearance Agreement, the Second Forbearance Agreement, the Third Forbearance Agreement and the Loan Documents contain the entire understanding and agreement of each Credit Party and Lender in respect of the transactions contemplated herein and therein and supersede all prior representations, warranties, agreements and understandings.  No provision of this Agreement or any of the Loan Documents may be changed, discharged, supplemented, terminated or waived except in a writing signed by Lender and the applicable Credit Party thereto.  This Agreement shall be binding upon, and inure to the benefit of, each party hereto and its respective successors, assigns, executors, heirs, personal representatives, and administrators; *provided*, that no Credit Party may assign this Agreement or any of its rights or obligations hereunder except in an instrument consented to by Lender.

11.      Counterpart Execution.  This Agreement may be executed and delivered in one or more counterparts (including via .pdf or other means of electronic transmission), each of which shall be deemed an original and all of which together shall constitute one and the same document.  Signature pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document.

12.      Post-Default Waiver of Collateral Disposition Rights.  A default and an event of default have occurred under the Loan Documents and notwithstanding any forbearance or other provision set forth herein, such default and event of default remain as pre-existing events of default with respect to which the Lender may, upon the occurrence of a Fourth Forbearance Default or expiration of the Fourth Forbearance Period, send a notice of disposition of collateral under Section 9-611 of the Uniform Commercial Code.

13.      Construction.  This Agreement shall not be construed more strictly against Lender merely by virtue of the fact that the same has been prepared by Lender or its counsel, it being recognized that Credit Parties and Lender have contributed substantially and materially to the preparation of this Agreement, and each of the Credit Parties and Lender acknowledges and waives any claim contesting the existence and the adequacy of the consideration given by any of the other parties hereto in entering into this Agreement.

14.      Consent; Reaffirmation; and Acknowledgement.  Guarantor (a) consents to the terms and conditions of this Agreement; and (b) reaffirms the Guaranty Agreements and confirms and agrees that, notwithstanding this Agreement and consummation of the transactions contemplated thereby, the Guaranty Agreements and all of Guarantor's covenants, obligations, agreements, waivers, and liabilities set forth in the Guaranty Agreements continue in full force and effect in accordance with their terms with respect to the obligations guaranteed thereunder.

15.      Consent to Agreement.  Each Credit Party acknowledges that it has thoroughly read and reviewed the terms and provisions of this Agreement and has had full benefit and advice of counsel of its own selection, or the opportunity to obtain the benefit and advice of counsel of its own selection, and that this Agreement has been entered into by each Credit Party freely, voluntarily, with full knowledge and without duress.

16.    <u>CHOICE OF LAW; VENUE; JURY WAIVER</u>.  This Agreement, and the rights and obligations of the parties hereto shall be construed in accordance with, and governed by, the laws of the State of New York without regard to its principles of conflicts of laws.  FURTHERMORE, THE PARTIES HERETO IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

17.    <u>Effective Date</u>.  This Agreement is effective as of December 29, 2023.

[*Signatures on Following Page*]

Executed as of the date first set forth above.

LENDER:

DEUTSCHE BANK AG, NEW YORK BRANCH

By: _____
Name: JACK HART
Title: Vice President

By: _____
Name: VINCENT MERCERON
Title: DIRECTOR

CREDIT PARTIES:

HH CLEVELAND HUNTINGTON L.P. an Ohio limited
partnership, as Borrower

By: 925 Euclid Manager, LLC,
   an Ohio limited liability company,
   its General Partner

By: _____
   Frank T. Sinito, Managing Member

_____
FRANK T. SINITO
as Guarantor

## EXHIBIT A

## LOAN DOCUMENTS

1.  Loan Agreement dated as of July 1, 2021 (as amended by (i) that certain First Omnibus Amendment and Allonge to Promissory Note dated November 15, 2021 (the "First Omnibus Amendment"), between Borrower and Lender; and (ii) that certain Second Omnibus Amendment and Allonge to Promissory Note dated October 19, 2022 (the "Second Omnibus Amendment"), between Borrower and Lender, collectively, the "Loan Agreement"), by and between HH Cleveland Huntington L.P. ("Borrower") and Deutsche Bank AG, New York Branch ("Lender");

2.  Promissory Note in the original principal balance of $35,422,000 made by Borrower in favor of Lender and dated July 15, 2021 (as amended by the First Omnibus Amendment and the Second Omnibus Amendment, collectively, the "Note");

3.  Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated as of July 1, 2021, granted by Borrower, as Mortgagor, to Lender, as Mortgagee (the "Mortgage");

4.  Loan Guaranty dated as of July 1, 2021 executed by Frank T. Sinito, as guarantor for the benefit of Lender (the "Loan Guaranty");

5.  Guaranty of Recourse Obligations dated as of July 1, 2021 by Frank T. Sinito, as guarantor, in favor of Lender (the "Guaranty of Recourse Obligations") (together, the Loan Guaranty and the Guaranty of Recourse Obligations shall be referred to herein as the "Guaranty Agreements"); and

6.  All documents, agreements and instruments ancillary to the foregoing;

(collectively, the "Loan Documents).

**EXHIBIT B**

| Pledge and Sale Properties | City | State |
|---|---|---|
| Ava Park | Griffin | GA |
| Azalea Point | Mobile | AL |
| Bankhead Towers Apts | Birmingham | AL |
| South Park Village | Laurel | MS |
| Ballard Way | Columbus | GA |
| Blossom Hill | Macon | GA |
| Bonnie Doone | Athens | AL |
| Majestic Gardens | Macon | GA |
| Southern Oaks Village | Florence | AL |
| Country Park | Wichita Falls | TX |
| Highpoint | Wichita Falls | TX |
| Highpoint II | Wichita Falls | TX |
| Parkview Place | Lubbock | TX |
| The Ella | Lubbock | TX |
| Bayou Bend* | Mobile | AL |
| Bayou Plaza* | Mobile | AL |
| Cambridge* | Mobile | AL |
| Driftwood* | Mobile | AL |
| Four Winds* | Birmingham | AL |
| Jefferson* | Mobile | AL |
| Marland* | Birmingham | AL |
| South Haven* | Mobile | AL |
| St. Stephens* | Whistler | AL |
| Shorter College | North Little Rock | AR |
| St. John | Pine Bluff | AR |
| Southeast | Pine Bluff | AR |
| Willow Bend | Jacksonville | AR |
| Blue Valley | Kansas City | MO |
| Olive Park | Kansas City | MO |
|  |  |  |
| **Pledge Only** | **City** | **State** |
| Anchor Bay THs | Saginaw | MI |
| Hilltop Apts | Kirtland | OH |
| Little Traverse Village | Petoskey | MI |
| Glendale Apts | Galax | VA |
| Glenwood Village | Bethesda | OH |
| Hyde Park Village | St. Louis | MO |

---

* Collectively the "Alabama Portfolio"

**EXHIBIT C**

**DEFERRED MAINTENANCE ITEMS**

[*Follows this Page*]

Construction Management Group



36933 Vine Street | Willoughby, OH 44094
Office:  440.951.3904 | Direct:  440.391.5444 | Cell: 216-570-7920
www.marousbrothers.com

**From:** Thomas Smith <tsmith@marousbrothers.com>
**Sent:** Thursday, August 17, 2023 1:47 PM
**To:** Tom Kroth <tkroth@Millenniacommercial.com>
**Cc:** Curt Sonntag <csonntag@Millenniacommercial.com>; Dave Pavlik <dpavlik@Millenniacommercial.com>; Dave Roberts <droberts@marousbrothers.com>
**Subject:** FW: Pages from Floor Plans - Complete Set 03-25-10.pdf

Tom, please let me know if this works for you or you need any other information.

Areas of previous or current leaks.
 ➢ Level 21 – penthouse along east 9th street.  Roofs 280 and 280A leaking 21, 20, and 19th floor.  280B has minor issues but can be repaired.  Actively leaking, standing water and a lot of wet materials.
 ➢ Level 21 – roof 270 leaking down to level 20.  Actively leaking, standing water and a lot of wet materials.
 ➢ Level 22 – roof 294A – roof is above the condenser water pumps and the area just outside of the high-rise elevator room (14, 15, 16).  Water was hitting the condenser pumps and electrical.  It also ran into the high-rise elevator room (not sure if this has damaged the cabs) and down the elevator shaft to the basement.  Cleaned roof and roof drain to minimize the issue.
 ➢ Level 3 – 6" horizontal storm drain has several holes.  Placed no-hub bands on pipe to minimize leak.  This leaked down to the lobby.  Level 2 and 3 have a great deal of mold.

General maintenance issues.
 ➢ Water in underground ducts.  Only have 1 working pump.  Could use a few ½ HP pumps to remove water.
   ○ I currently have pump in duct where HNB branch AC unit drain line is leaking into duct.  Pump running 24x7 about 7,200 gallons / day.
 ➢ Gutters for light court roofs.  They have been cleaned of bigger materials but still have more work to clean them up.
 ➢ Guvnor pub humidity levels are through the roof and mold is a very big issue that is affecting the arcade level and a respirator is required to walk space.
 ➢ Water in pit for elevators 23 and 24.
 ➢ Water closet continuously running level 2 annex MWR.
 ➢ Various AC units running in the building with blocked filters and some of them have compressor trying to energize but immediately trip off on high head.
 ➢ Fire pump – weekly run is required, and annual flow test is required.  This pump has not run as required. I am not sure when this engine was last run.  If the unit is to run it will trip off on low suction.  It appears that the 8" feed at the 9th and Chester corner is shut off in vault at the street.  The 10" line at the after the backflow preventor is shut off so this leaves only the 6" feed from Chester to feed the fire pump.
 ➢ Emergency generators – weekly run time is required and typically an annual load bank test.  These engines have not run in a very long time.  The newer 400kW generator is projected to be reused and provides emergency power for the elevators and not running unit could lead to a major rebuild of the engine.  The older 400kW engine is for emergency lighting, life safety systems, etc. and is projected to be replaced.  Not sure if these engines will come on during a loss of power.
 ➢ Fire alarm panel – there are over 69 troubles on the panel.  Some of these are from the issues on 21, 20, 19, 3, and 2.  Not sure if the batteries in the field panels are working and this could be a problem at a loss of power.

- ➢ Main electrical vault – there are exhaust fans and filter racks to remove heat from the vault.  The vault filters are blocked or destroyed and could be stressing the exhaust fans.  Room getting very dirty.
- ➢ Arcade level ejector system – collects all waste from arcade level services.  The tank is in very bad shape, there is a wall that separates the income water to the tank and the pump side.  About 2/3rd's of the wall has rusted and broke down into the tank, should the remainder of this wall collapse it will most likely cover up the pumps and cause the tank to flood.
- ➢ There are several openings throughout the building that are paths for OA to enter the building and should be sealed off.
- ➢ Steam trench – there is an active leak on the main line at a flange (east side of trench).  Not sure if this is a Cleveland thermal issue or building to correct.

On another note, can I get a key to the back door at the loading dock?

Thank you.


**Tom Smith |** Superintendent – Construction Management Group



36933 Vine Street | Willoughby, OH 44094
Cell: 440.465.4162
www.marousbrothers.com



November 29, 2022

August Fluker
Millennia Housing Development
127 Public Square
Cleveland, OH 44114

Re:  The Centennial – Building Walkthrough

Dear Mr. Fluker,

On November 21, 2022, Marous Brothers Construction (MBC) completed a building walkthrough to review existing building conditions and review the MEP equipment, below is a list of items identified and will require some correction prior to any onsite mobilization or demolition.

> Climate control - Building heating system was found to be completely off and isolated at the main valve in the steam trench.
>   o Need to verify the operation of the Building Management System to ensure it can control the steam system.
>   o Need to verify the ability to and the operation of this system to ensure it can maintain conditioned space temperatures to protect the finishes from further failures.  (This to include PRV's, condensate return pumps, system leaks, etc.)
>   o Should this system be incapable of providing heat to the building an alternate source of heating will need to be identified.

> The 3rd floor coffered ceiling has significant damage in the area of the internal staircase near the 29th freight.
>   o It is suggested that a consultant be obtained to understand the significance of the damage and to review the rest of this ceiling to determine if shoring should be installed to minimize further damage and to protect those walking or working on the 3rd floor.

> The building fire alarm panel has 69 active troubles.  This system needs to be cleared of all troubles and functional system test completed of all devices.

> The 21st floor penthouse along 9th Street is unsafe.  There is an active roof leak, and a tremendous amount of black mold and damage throughout this penthouse and the 19th and 20th floor, along with very wet conditions, buckets of standing water, etc.  These floors should be cleaned, made safe, and the mold removed in its entirety to understand where the primary leak is coming from on 21.
>   o The results of doing nothing will continue to further damage the building roof structure, building spaces, allow for extensive mold growth, and create serious health risk without remediation.
>   o There is also a good chance that several of the fire alarm panel troubles are related to this active leak.

**General notes:**
> There were several areas of the building where outside air was just rushing into the building.  Several of these areas were on 1st floor as well as some of the upper floors.  Would suggest closing off all outside air to building.

> We found there to be several pieces of equipment / lights running – 4th floor HVAC unit running, Engine room HVAC unit running, lights on in many places.



- ➤ Underground fresh air / exhaust ducts have water in them.
  - ○ We investigated the fresh air duct in the main electrical room and found standing water in this duct. This duct potentially has an open waste line and will need to be investigated.
  - ○ In the Govnor pub restaurant there was standing water in the exhaust duct.

- ➤ We will need to have water in order to perform any abatement work, we only found water on to the building fire pump.

- ➤ We need to ensure the building fire pump is operational and that weekly and annual testing is being performed.

- ➤ 21st floor penthouse along 9th street has a plywood door that is leaking a tremendous amount of air and should be sealed.

- ➤ We identified several waste cans filled with water.

- ➤ The swings in building temperatures have caused problems in the stairwells with the plaster and the topcoat is popping off in many places.

- ➤ We also noticed on several steel condenser water pipes on the 4th floor rusting from the outside due to condensation on the exterior of the pipe, this is the result of temperature swings in the building.

- ➤ Sewer gas odors is very prevalent throughout the building due to dried up water closets and sinks.

- ➤ The sump pump in the arcade fan room was running while onsite. The building systems are shutdown, yet water continues to collect in this pit. Need to investigate where this source of water is coming from. Additionally, one of the pumps is failing and needs to be repaired.

Respectfully,

Tom Smith, Superintendent
Marous Brothers Construction



8/017/2023

Mr. Tom Mignogna
Millennia Housing Development, Ltd.
127 Public Square
Cleveland, OH 44114

RE: **Centennial Building  -  22092-01**
**Roof repairs 270, 280, 280A, 280B**
**Immediate Work Proposal Number:      IWP-1 – Option 1**

Dear  Mr. Mignogna:

Marous/Gilbane Joint Venture is providing pricing for immediate work on the aforementioned project.  Listed below is a summary of work involved and related cost.  Please see the attached sheet for a detailed list of tasks including their related cost.

***Scope of Work***
Roofing
   a.   Set up the project per OSHA approved guidelines.
   b.   Spot roof repairs to roof 280B only
   c.   Complete roof removal to roofs 270, 280, and 208A
       a.   Demolish 11,700 sq of roofing down to the existing concrete deck – 270, 280, 280A
       b.   Prime the deck.
       c.   Torch apply a UV Rated mod. bit cap sheet to the concrete deck
       d.   Flash perimeter walls up 12"/Terminate and 3 course the top to create a watertight condition.
       e.   This will also be able to be used as an part of the overall finished roof system and be covered under warranty once completed in its entirety.
Demo
   a.   Make safe all equipment on roofs 270, 280, 280A, and 280B
   b.   Remove all refrigerant from rooftop equipment.
   c.   Demo all equipment on roofs 270, 280, 280A, and 280B

***Objective***
Create a watertight condition for the upcoming demolition of the space.

\*Based on limited review of the existing conditions below roof deck 280 and 280A, it appears that some of the existing metal decking has been corroded beyond reuse and may require replacement. Further evaluation once roof demo is completed in space may reveal concrete deck replacement to be required as well. These replacements will not be addressed as a part of this cost and therefore application of the vapor barrier may have to be undone and redone as a part of the future project construction, costs for which would be included in the overall GMP. See Option 2 to avoid the rework cost.

We agree to the lump sum price of **Two Hundred Fifty Thousand Two Dollars and 00/100 ($250,002.00)** for the work detailed above.

The work detailed in this proposal will not commence without written authorization.  Full authorization of this work will commence with Prime Contract Change Order execution which shall adjust the current Prime Contract amount.

Please contact the undersigned should you have any questions regarding the aforementioned.



Sincerely,

*David Roberts*

David Roberts, Senior Project Manager
Marous Brothers Construction, Inc.


Marous/Gilbane Joint Venture is directed to proceed with the above work (**IWP-1 Option 1**).  A formal Prime
Contract Change Order will be issued.

_____          _____
Mr. Tom Mignogna                                                            Date

**Immediate Work Proposal Cost Summary**

| | | |
|---|---|---|
| **Job Name:** | Centennial Building | |
| **Job Number:** | 22092-01 | |
| **Project Architect:** | Sandvick Architects | |
| **Prepared By:** | Tom Smith | |

| | |
|---|---|
| **Work Number:** | IWP #1 - Option 1 |
| **Description:** | Roof Repair #270, 280, 280A, 280B |
| **Date:** | 8/8/23 |

| Job Number | Phase Code | Work Number | Cost Type | Description | Contractor | Cost Totals |
|---|---|---|---|---|---|---|
| 22092-01 | | IWP #1-1 | S | Roof Repair #270, 280, 280A, 280B | Industrial First | $ 204,700.00 |
| | | IWP #1-1 | S | Evacuate Refrigerant from Equipment on roof | Geauga Mech | $ 3,000.00 |
| | | IWP #1-1 | S | Demo Equipment from these roofs | Precision Environ | $ 10,000.00 |
| | | IWP #1-1 | S | Electrical make-safe | Gateway Electric | $ 1,600.00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | | |
|---|---|---|---|
| **Sub Total:** | | $ | 219,300.00 |
| **General Conditions:** | 6.00% | $ | 13,158.00 |
| **Overhead:** | 2.00% | $ | 4,386.00 |
| **Profit:** | 6.00% | $ | 13,158.00 |
| **Cost Change Sub Total:** | | **$** | **250,002.00** |

| | | |
|---|---|---|
| **Change Order Request Grand Total:** | **$** | **250,002.00** |



## EXHIBIT C – SCOPE OF WORK

**IWP #1 - EXISTING ROOFING REPAIRS**

**SPECIFICATIONS SECTION(S) INCLUDED:**

    All Division 01 Specifications         – Dated 9/28/2021
    015000 – Temporary Facilities & Controls
    024119 – Selective demolition
    070150 – Preparation for Reroofing
    071413 – Hot Fluid Applied Rubberized Asphalt Waterproofing
    076200 – Sheet Metal Flashing
    077100 – Roof Specialties
    077200 – Roof Accessories

**REPORT(S) CONSIDERED:**

    ENVIRONMENTAL REPORTS

| | |
|---|---|
| Atlas ACM Survey | – Dated 8/6/2021 |
| Atlas ACM Specification | – Dated 8/20/2021 |
| Atlas Soil Survey | – Dated 10/15/2021 |
| Atlas LBP Specifications Report | – Dated 1/26/2022 |
| Atlas LBP Management Plan | – Dated 8/13/2021 |
| Atlas LBP Inspection | – Dated 8/6/2021 |
| EA Group ACM Survey of Annex | – Dated 8/7/2018 |

    HISTORICAL DOCUMENTS
        Union Trust Building Original Structural Drawings (59 pages) Circa 1920
        Union Trust-Part 1 HPCA-AS APPROVED 11-2014
        Union Trust-Part 2 HPCA-AS APPROVED 01-2016

**DRAWINGS INCLUDED:**

    Sandvick – Permit Set 9/28/2021
        Volume A – Demolition
        Volume B – Exterior & Demolition
        Volume C – Architectural & Demolition
        Volume D – MEP

**GENERAL INFORMATION:**

    Provide all labor, material, equipment, engineering, hoisting, supervision, permits, inspections, and associated fees with, but not limited to, the following scope(s) of work.

**SPECIFICATION SECTION – 070150: PREPARATION FOR REROOFING**

1. General Scope Items:

    a. Without exception, should this scope of work of any element create an unsafe condition, fall hazard or otherwise, it is this subcontractor's responsibility to



EXHIBIT C – SCOPE OF WORK

eliminate that hazard by temporary protection. The protection shall be fastened to the wall, floor, or ceiling. Where it cannot be secured, special signage or flagging is required to denote such hazard. If shoring is necessary to support loads, such shoring shall include engineering submitted for approval.

b. Protection and preparation of materials and adjacent surfaces noted to remain in place from contamination using appropriate measures during abatement and demolition in accordance with the contract documents.

Specific Scope Items:

**EXISTING ROOF REPAIRS**

a. This subcontractor shall demolish and move materials to dumpster supplied by this subcontractor all existing roofing materials associated with 21st level existing Roofs #270, 280, and 280A back to the original structure unless noted otherwise.

b. During demolition, caution should be exercised to limit the damage to the adjacent surfaces. It should be assumed that prior documentation of all areas and zones to be demolished has been recorded to evaluate the condition prior to demolition.

c. When working at roof levels, this subcontractor has included parapet edge protection and/or full tie-off of workers to prevent fall hazard.

d. Where demolition occurs that leaves an exposed condition subject to water, wind, or air infiltration, this subcontractor owes temporary construction necessary to infill that opening to prevent such infiltration. This includes but is not limited to roof portals, pipe penetrations, etc.

e. This subcontractor shall remove and dispose of all mechanical fasteners including but not limited to adhesives, screws, nails, hangars, & straps, at metal flashings that would compromise the new system installation.

f. Existing roof ladders may no longer exist at the time for this repair. This subcontractor includes temporary and safe ladder access to the areas of repair.

g. This subcontractor has included preparing the existing deck after demolition to receive primer including scraping and miscellaneous vegetation removal.

h. Furnish and install primer followed by torch applied UV rated modified bit cap sheet at Roof decks #270, 280, 280A. Scope includes flashing up perimeter walls minimum of 12" with termination bar, counterflashing, and caulk to create a watertight condition.

i. Existing Roof #280B will include spot repairs only as needed to establish the same watertight condition.

j. At all roof areas to be repaired, the existing HVAC equipment will be made safe and removed by others prior to this scope. Existing portal curbs, equipment curbs, vents thru roofs, and other penetrations will NOT be removed and will required flashing



## EXHIBIT C – SCOPE OF WORK

to as needed to create watertight condition.

### EXCLUSIONS

1. Existing mechanical equipment refrigerant recovery/removal
2. Isolation of existing electrical, mechanical, plumbing, and low voltage systems as necessary to make ready or safe for demolition.
3. Demolition/removal of existing HVAC and electrical equipment at roof level.
4. Historical element protection.

It is anticipated the building will not be hazardous material free upon completion of construction.

### END OF EXISTING ROOF REPAIRS

# INDUSTRIAL FIRST INC.



**4/20/23**

## RE: 925 Euclid Ave.

Attn: Tom Smith

The total price to provide material, labor and equipment to install roofing and sheet metal for the above mentioned project.

Project size- 11,700 sf

1. Set up the project per OSHA approved guidelines.
2. Demo 117 sq of roofing down to the existing concrete deck
3. Prime the deck.
4. Torch apply a UV Rated mod. bit cap sheet to the concrete deck
5. Flash perimeter walls up 12"/Terminate and 3 course the top to create a watertight condition.
6. This will also be able to be used as an part of the overall finished roof system and be covered under warranty once completed in its entirety.
7. See diagram below for areas selected.

**Our price for this scope of work will be…$204,700.00**

Exclusions
1. Any coping/metal work
2. HVAC
3. Electrical
4. Interior protection (by others)
5. Ramps for the stairs (by others)

Page 1 of 2

Electronically Filed 09/30/2025 19:46 / / CV 25 / Estimate Confirmation Dk9 Sesino Blossevxc

# INDUSTRIAL FIRST INC.





Please do not hesitate to contact me if you have any questions.
Sincerely

Greg Klik
(216) 337-7564
Gklik2@industrialfirst.com
Vice President

Page 2 of 2

Electronically Filed 09/30/2025 19:46 / / CV 25 ... / Confirmation Nbr. ... / CLSLT



8/17/2023

Mr. Tom Mignogna
Millennia Housing Development, Ltd.
127 Public Square
Cleveland, OH 44114

RE: Centennial Building  -  22092-01
    Roof repairs 270, 280, 280A, 280B
    Immediate Work Proposal Number:      IWP-1 Option 2

Dear  Mr. Mignogna:

Marous/Gilbane Joint Venture is providing pricing for immediate work on the aforementioned project.  Listed below is a summary of work involved and related cost.  Please see the attached sheet for a detailed list of tasks including their related cost.

***Scope of Work***
Roofing
    a.   Set up the project per OSHA approved guidelines.
    b.   Spot roof repairs to roof 280B only
    c.   Complete roof removal to roofs 270 only
        a.   Demolish 5500sq of roofing down to the existing concrete deck
        b.   Prime the deck.
        c.   Torch apply a UV Rated mod. bit cap sheet to the concrete deck
        d.   Flash perimeter walls up 12"/Terminate and 3 course the top to create a watertight condition.
        e.   This will also be able to be used as an part of the overall finished roof system and be covered under warranty once completed in its entirety.
    d.   No roof repairs to roofs 280 and 280A

Demo
    a.   Make safe all equipment on roofs 270, 280, 280A, and 280B
    b.   Remove all refrigerant from rooftop equipment.
    c.   Demo all equipment on roofs 270, 280, 280A, and 280B
    d.   Make safe all electrical on level 21 penthouse.
    e.   Mold remediation, abatement, and demolition of all walls, ceilings, and flooring at level 21 penthouse (under roofs 280, 280A, and 280B)

Water Management
    a.   Install drainage tarps to catch and redirect all water from the current leaks (primarily under roofs 280 and 280A) until the new roof is installed.

***Objective***
Create a watertight condition for the upcoming demolition of the space.

Removal of all mold, asbestos, and walls from level 21 will eliminate the current hazardous condition and allow drainage tarps to be installed to catch and redirect infiltrating water to drainage points.

*This Option 2 minimizes the amount of money used on temporary roof repairs that may have to be removed at a later date to replace the roof decking.

We agree to the lump sum price of **Two Hundred Eighty-One Thousand Eight Hundred Fourty-Four Dollars and 49/100 ($281,844.49)** for the work detailed above.



The work detailed in this proposal will not commence without written authorization.  Full authorization of this work will commence with Prime Contract Change Order execution which shall adjust the current Prime Contract amount.

Please contact the undersigned should you have any questions regarding the aforementioned.

Sincerely,

*David Roberts*

David Roberts, Senior Project Manager
Marous Brothers Construction, Inc.

Marous/Gilbane Joint Venture is directed to proceed with the above work (**IWP-1**).  A formal Prime Contract Change Order will be issued.

_____          _____

Mr. Tom Mignogna                                              Date

## Immediate Work Proposal Cost Summary

| | | |
|---|---|---|
| **Job Name:** | Centennial Building | **Work Number:** | IWP #1 - Option 2 |
| **Job Number:** | 22092-01 | **Description:** | Roof Repair #270, 280, 280A, 280B |
| **Project Architect:** | Sandvick Architects | | |
| **Prepared By:** | Tom Smith | **Date:** | 8/17/23 |

| Job Number | Phase Code | Work Number | Cost Type | Description | Contractor | Cost Totals |
|---|---|---|---|---|---|---|
| 22092-01 | | IWP #1-2 | S | Roof Repair #270, 280B | Industrial First | $ 116,148.01 |
| | | IWP #1-2 | S | Evacuate Refrigerant from Equipment on roof | Geauga Mech | $ 3,000.00 |
| | | IWP #1-2 | S | Demo Equipment from these roofs | Allowance | $ 10,000.00 |
| | | IWP #1-2 | S | Electrical make-safe / Temporary power | Gateway Electric | $ 32,000.00 |
| | | IWP #1-2 | S | Demo walls & ceilings under 280 and 280A | Allowance | $ 72,084.00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | |
|---|---|---|
| **Sub Total:** | | $ 233,232.01 |
| **General Conditions** | 6.00% | $ 13,993.92 |
| **Overhead:** | 2.00% | $ 4,664.64 |
| **Profit:** | 6.00% | $ 13,993.92 |
| **Cost Change Sub Total:** | | $ 265,884.49 |

| | |
|---|---|
| **Change Order Request Grand Total:** | $ 265,884.49 |



**EXHIBIT C – SCOPE OF WORK**

**IWP #1 - EXISTING ROOFING REPAIRS – OPTION 2**

**SPECIFICATIONS SECTION(S) INCLUDED:**

All Division 01 Specifications — Dated 9/28/2021
015000 – Temporary Facilities & Controls
024119 – Selective demolition
070150 – Preparation for Reroofing
071413 – Hot Fluid Applied Rubberized Asphalt Waterproofing
076200 – Sheet Metal Flashing
077100 – Roof Specialties
077200 – Roof Accessories

**REPORT(S) CONSIDERED:**

ENVIRONMENTAL REPORTS

Atlas ACM Survey — Dated 8/6/2021
Atlas ACM Specification — Dated 8/20/2021
Atlas Soil Survey — Dated 10/15/2021
Atlas LBP Specifications Report — Dated 1/26/2022
Atlas LBP Management Plan — Dated 8/13/2021
Atlas LBP Inspection — Dated 8/6/2021
EA Group ACM Survey of Annex — Dated 8/7/2018

HISTORICAL DOCUMENTS

Union Trust Building Original Structural Drawings (59 pages) Circa 1920
Union Trust-Part 1 HPCA-AS APPROVED 11-2014
Union Trust-Part 2 HPCA-AS APPROVED 01-2016

**DRAWINGS INCLUDED:**

Sandvick – Permit Set 9/28/2021
Volume A – Demolition
Volume B – Exterior & Demolition
Volume C – Architectural & Demolition
Volume D – MEP

**GENERAL INFORMATION:**

Provide all labor, material, equipment, engineering, hoisting, supervision, permits, inspections, and associated fees with, but not limited to, the following scope(s) of work.

**SPECIFICATION SECTION – 070150: PREPARATION FOR REROOFING**

1.  General Scope Items:

    a.  Without exception, should this scope of work of any element create an unsafe condition, fall hazard or otherwise, it is this subcontractor's responsibility to



EXHIBIT **C** – **SCOPE OF WORK**

<u>eliminate that hazard by temporary protection.</u> The protection shall be fastened to the wall, floor, or ceiling. Where it cannot be secured, special signage or flagging is required to denote such hazard. If shoring is necessary to support loads, such shoring shall include engineering submitted for approval.

b. <u>Protection and preparation of materials</u> and adjacent surfaces noted to remain in place from contamination using appropriate measures during abatement and demolition in accordance with the contract documents.

Specific Scope Items:

**EXISTING ROOF REPAIRS**

a. This subcontractor shall demolish and move materials to dumpster supplied by this subcontractor all existing roofing materials associated with 21st level existing <u>Roofs #270,</u> back to the original structure unless noted otherwise.

b. During demolition, caution should be exercised to <u>limit the damage to the adjacent surfaces</u>. It should be assumed that prior documentation of all areas and zones to be demolished has been recorded to evaluate the condition prior to demolition.

c. When working at roof levels, this subcontractor has included <u>parapet edge protection</u> and/or full tie-off of workers to prevent fall hazard.

d. Where demolition occurs that leaves an exposed condition subject to water, wind, or air infiltration, this subcontractor owes <u>temporary construction</u> necessary to infill that opening to prevent such infiltration. This includes but is not limited to roof portals, pipe penetrations, etc.

e. This subcontractor shall remove and dispose of all mechanical <u>fasteners</u> including but not limited to adhesives, screws, nails, hangars, & straps, at metal flashings that would compromise the new system installation.

f. Existing <u>roof ladders</u> may no longer exist at the time for this repair. This subcontractor includes temporary and safe ladder access to the areas of repair.

g. This subcontractor has included preparing the existing deck after demolition to receive primer including scraping and miscellaneous vegetation removal.

h. Furnish and install primer followed by torch applied UV rated modified bit cap sheet at Roof decks #270. Scope includes flashing up perimeter walls minimum of 12" with termination bar, counterflashing, and caulk to create a watertight condition.

i. Existing Roof #280B will include spot repairs only as needed to establish the same watertight condition.

j. At all roof areas to be repaired, the existing HVAC equipment will be made safe and removed by others prior to this scope. Existing portal curbs, equipment curbs, vents thru roofs, and other penetrations will NOT be removed and will required flashing to as needed to create watertight condition.



EXHIBIT C – SCOPE OF WORK

k.  Make safe all electrical equipment in the level 21 penthouse.

l.  Get the space to dry conditions by removing all mold, asbestos, and walls from level 21 penthouse.

m. Hang drainage tarps to catch and relocate all current leaks.

## EXCLUSIONS

1. Existing mechanical equipment refrigerant recovery/removal
2. Isolation of existing electrical, mechanical, plumbing, and low voltage systems as necessary to make ready or safe for demolition.
3. Demolition/removal of existing HVAC and electrical equipment at roof level.
4. Historical element protection.

It is anticipated the building will not be hazardous material free upon completion of construction.

END OF EXISTING ROOF REPAIRS

| Ex. | Description |
|-----|-------------|
| I | Fifth Forbearance Agreement dated July 8, 2024 |

*Execution Copy*

## FIFTH FORBEARANCE AGREEMENT

This FIFTH FORBEARANCE AGREEMENT ("Agreement") is entered into as of July 8, 2024, by and among (i) DEUTSCHE BANK AG, NEW YORK BRANCH ("Lender"), (ii) HH CLEVELAND HUNTINGTON L.P., an Ohio limited partnership, as borrower ("Borrower"), and (iii) FRANK T. SINITO, as guarantor ("Guarantor").

### PRELIMINARY STATEMENT

A.      Pursuant to the loan documents specifically described on the attached <u>Exhibit A</u> (the "Loan Documents"), Lender made a loan in the amount of $35,422,000 (the "Loan") to Borrower on July 15, 2021, which Loan is currently outstanding in the principal amount of $29,040,460.  Pursuant to the Loan Documents, Borrower agreed to pay and satisfy the Loan and fully perform each other term and provision of the Loan Documents.

B.      Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms on <u>Exhibit A</u> attached hereto, in the Loan Documents, in the First Forbearance Agreement (as defined below), in the Second Forbearance Agreement (as defined below), in the Third Forbearance Agreement (as defined below), or in the Fourth Forbearance Agreement (as defined below), as applicable.

C.      Pursuant to the Mortgage, Borrower granted security interests and liens upon, *inter alia*, the property, including the Land and Improvements commonly known as 925 Euclid Avenue, Cleveland, OH 44115 (the "Property"), which liens and security interests secure Borrower's payment and performance of all obligations owing to Lender pursuant to the Loan Documents more specifically defined in the Mortgage as the "Secured Obligations".

D.      Also pursuant to the Mortgage, Borrower absolutely assigned to Lender all leases and rents arising from and generated by the Property as more specifically defined in the Mortgage as the "Rents".

E.      Through the Loan Guaranty and the Guaranty of Recourse Obligations, Guarantor irrevocably guaranteed, *inter alia*, the payment and performance by Borrower of each of Borrower's obligations owing to Lender pursuant to the Loan Documents subject to the terms and conditions set forth in, respectively, the Loan Guaranty and the Guaranty of Recourse Obligations.

F.      Certain Events of Defaults have occurred and are continuing under the Loan Documents.

G.      On April 13, 2023, Lender, Borrower and Guarantor entered into a Forbearance Agreement (the "First Forbearance Agreement"), pursuant to which Borrower and Guarantor agreed that the Acknowledged Events of Default, as defined in the First Forbearance Agreement (the "First Forbearance Agreement Acknowledged Events of Default"), had occurred and were continuing.  One or more of such First Forbearance Agreement Acknowledged Events of Default continues to exist.

H.      In addition to the First Forbearance Agreement Acknowledged Events of Default, the Maturity Event of Default (as defined in the First Forbearance Agreement), has occurred and is continuing.

I.      Through the First Forbearance Agreement, Borrower and Guarantor agreed that Lender's agreement to forbear, as specifically set forth in the First Forbearance Agreement, was conditioned upon Borrower's and/or Guarantor's satisfaction of the Conditions of Forbearance set forth in Section 6 of the First Forbearance Agreement (the "First Forbearance Conditions").

J.      Borrower and Guarantor failed to timely and fully perform the First Forbearance Conditions as specified in that certain April 20, 2023 Notice of Forbearance Defaults delivered by Lender to Borrower and Guarantor (the "First Forbearance Conditions Defaults") and, as a result, Lender was entitled to exercise its rights and remedies under the Loan Documents and the Guaranty Agreements including but not limited to: (i) declaring all Indebtedness evidenced by such Loan Documents to be immediately due and payable in full; (ii) foreclosing its liens

and security interests; and/or (iii) obtaining a judgment against the Borrower and, subject to the terms and conditions of the Guaranty Agreements, the Guarantor.

K. On June 27, 2023, Lender, Borrower and Guarantor entered into a Second Forbearance Agreement (the "Second Forbearance Agreement"), pursuant to which Borrower and Guarantor agreed that the First Forbearance Conditions Defaults had occurred and were continuing.  One or more of such First Forbearance Conditions Defaults continues to exist.

L. Through the Second Forbearance Agreement, Borrower and Guarantor agreed that Lender's agreement to forbear, as specifically set forth in the Second Forbearance Agreement, was conditioned upon Borrower's and/or Guarantor's satisfaction of the Conditions of Second Forbearance set forth in Section 5 of the Second Forbearance Agreement (the "Second Forbearance Conditions").

M. Borrower and Guarantor failed to timely and fully perform the Second Forbearance Conditions as specified in that certain August 10, 2023 Notice of Forbearance Defaults delivered by Lender to Borrower and Guarantor (the "Second Forbearance Conditions Defaults") and, as a result, Lender was entitled to exercise its rights and remedies under the Loan Documents and the Guaranty Agreements including but not limited to: (i) declaring all Indebtedness evidenced by such Loan Documents to be immediately due and payable in full; (ii) foreclosing its liens and security interests; and/or (iii) obtaining a judgment against the Borrower and, subject to the terms and conditions of the Guaranty Agreements, the Guarantor.

N. On September 27, 2023, Lender, Borrower and Guarantor entered into a Third Forbearance Agreement (the "Third Forbearance Agreement"), pursuant to which Borrower and Guarantor agreed that the First Forbearance Conditions Defaults and the Second Forbearance Conditions Defaults had occurred and were continuing.  One or more of such First Forbearance Conditions Defaults and/or Second Forbearance Conditions Defaults continues to exist.

O. Through the Third Forbearance Agreement, Borrower and Guarantor agreed that Lender's agreement to forbear, as specifically set forth in the Third Forbearance Agreement, was conditioned upon Borrower's and/or Guarantor's satisfaction of the Conditions of Third Forbearance set forth in Section 5 of the Third Forbearance Agreement (the "Third Forbearance Conditions").

P. Borrower and Guarantor failed to timely and fully perform one or more of the Third Forbearance Conditions (the "Third Forbearance Conditions Defaults") and, as a result, Lender was entitled to exercise its rights and remedies under the Loan Documents and the Guaranty Agreements including but not limited to: (i) declaring all Indebtedness evidenced by such Loan Documents to be immediately due and payable in full; (ii) foreclosing its liens and security interests; and/or (iii) obtaining a judgment against the Borrower and, subject to the terms and conditions of the Guaranty Agreements, the Guarantor.

Q. On January 17, 2024, Lender, Borrower and Guarantor entered into a Fourth Forbearance Agreement (the "Fourth Forbearance Agreement"), pursuant to which Borrower and Guarantor agreed that the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults and the Third Forbearance Conditions Defaults had occurred and were continuing.  One or more of such First Forbearance Conditions Defaults, Second Forbearance Conditions Defaults and/or Third Forbearance Conditions Defaults continues to exist.

R. Through the Fourth Forbearance Agreement, Borrower and Guarantor agreed that Lender's agreement to forbear, as specifically set forth in the Fourth Forbearance Agreement, was conditioned upon Borrower's and/or Guarantor's satisfaction of the Conditions of Fourth Forbearance set forth in Section 5 of the Fourth Forbearance Agreement (the "Fourth Forbearance Conditions").

S. Borrower and Guarantor failed to timely and fully perform one or more of the Fourth Forbearance Conditions (the "Fourth Forbearance Conditions Defaults") and, as a result, Lender is entitled to exercise its rights and remedies under the Loan Documents and the Guaranty Agreements including but not limited to: (i) declaring all Indebtedness evidenced by such Loan Documents to be immediately due and payable in full; (ii) foreclosing its liens and security interests; and/or (iii) obtaining a judgment against the Borrower and, subject to the terms and conditions of the Guaranty Agreements, the Guarantor.

T.      Borrower and Guarantor (each a "Credit Party" and collectively, the "Credit Parties") have requested that Lender forbear from exercising its rights and remedies pursuant to the Loan Documents and applicable law on account of the Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults, the Third Forbearance Conditions Defaults and the Fourth Forbearance Conditions Defaults to permit Borrower to (i) obtain a loan from a third-party lender in amount sufficient to pay and satisfy all (or a portion, as the case may be) of the obligations owing from Borrower to Lender pursuant to the Loan Documents (generally referred to herein as the "Refinancing Loan"), or (ii) otherwise pay such obligations in full from other sources and proceeds as further described herein.

U.      Lender hereby agrees to forbear, and to modify the Borrower's payment obligations, on the terms and conditions set forth in this Agreement.

## AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Accuracy of Preliminary Statement.  Each Party acknowledges the accuracy of the Preliminary Statement and agrees that the Preliminary Statement is a part of this Agreement.

2.      Acknowledged Events of Default.  Each Credit Party agrees that the Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults, the Third Forbearance Conditions Defaults and the Fourth Forbearance Conditions Defaults have occurred, and certain of such defaults are continuing as of the date hereof, under the Loan Documents, the Guaranty Agreements, the First Forbearance Agreement, the Second Forbearance Agreement, the Third Forbearance Agreement and the Fourth Forbearance Agreement and such occurrences entitle Lender to exercise the rights and remedies contained in the Loan Documents, the Guaranty Agreements and applicable law without any right of the applicable Credit Party to cure or receive notice.  Each Credit Party agrees that it has no defenses, counterclaims, rights of setoff, claims or demands under the Loan Documents or with respect to the continuing Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults, the Third Forbearance Conditions Defaults and the Fourth Forbearance Conditions Defaults.

3.      Acknowledged Loan Balance.  Each Credit Party acknowledges and agrees that as of the dated date hereof, the aggregate Indebtedness under the Loan Documents (including outstanding principal, accrued interest, and unpaid fees and costs, but excluding attorneys' fees and costs) is $29,609,883.77.  Interest, fees and costs will continue to accrue on such amounts pursuant to the Loan Documents with interest accruing at the Default Rate.

4.      Forbearance.  Subject to the terms and conditions set forth in this Agreement, Lender shall continue to forbear from exercising its rights and remedies under the Loan Documents, the Guaranty Agreements and applicable law on account of the Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults, the Third Forbearance Conditions Defaults and the Fourth Forbearance Conditions Defaults from the Effective Date hereof until the earlier of (a) a breach by Borrower or Guarantor of the terms of this Agreement (a "Fifth Forbearance Default"); (b) a breach by Guarantor or the applicable borrower entity of the terms of the Inhofe Forbearance (as hereinafter defined); (c) the date by which at least 90% of the general partner or managing member interests in the GP Sale Properties (as such term is defined below) have been sold (such 90% minimum being based on the overall value of the portfolio of such interests as set forth in the Projections (defined below) and not the number of properties) or (d) 11:59 p.m. on February 1, 2025 (the "Fifth Forbearance Period").  Notwithstanding any provision in the Loan Documents (including the Guaranty Agreements) or any other documents executed pursuant to this Agreement requiring written notice from Lender, prior to Lender pursuing its rights or remedies under such document or applicable law, upon the occurrence of a Fifth Forbearance Default or expiration of the Fifth Forbearance Period, Lender shall immediately be entitled to pursue its rights and remedies under any or all of the Loan Documents (including the Guaranty Agreements), any documents executed pursuant to this Agreement and applicable law without notice.

5.  <u>Conditions of Fifth Forbearance</u>.  The obligation of Lender to continue to forbear from exercising any rights or remedies under the Loan Documents (including the Guaranty Agreements), any documents executed pursuant to this Agreement as additional security for Lender with respect to the Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults, the Third Forbearance Conditions Defaults and the Fourth Forbearance Conditions Defaults is subject to Borrower's strict compliance with the following conditions:

(a)  By not later than the earlier of (i) the date the Guarantor receives the Initial Earnest Money Deposit (as defined below), or (ii) September 3, 2024, the Borrower shall pay and satisfy in full the interest payments which became due (or are to become due) pursuant to the Loan Documents on April 1, 2024, May 1, 2024, June 1, 2024, July 1, 2024, August 1, 2024 and September 3, 2024 (in the amounts of $289,863.12, $279,560.65, $289,863.12, $289,863.12, $289,863.12 and $289,863.12, respectively, as invoiced by the Lender Representative (totaling $1,728,876.25)) (such interest payments expected to be made from the Initial Earnest Money Deposit); *provided, however*, should the Initial Earnest Money Deposit not be available or sufficient to fund the interest payments required above on or before September 3, 2024, the Borrower or the Guarantor shall nevertheless (and without exception) be required to fund such interest payments in full by such date from other funds of the Borrower or Guarantor;

(b)  Commencing on June 30, 2024, Guarantor shall provide weekly written reports to Lender or its designee which may be in email form regarding the status of Guarantor's efforts to close on: (i) the Refinancing Loan, to the extent applicable; (ii) the sale of the Guarantor's (or an affiliate thereof, as applicable) general partner or managing member interest, as applicable, in the owners of the properties set forth in <u>Exhibit B</u> attached hereto (collectively referred to herein as the "GP Sale Properties"), and (iii) the sale of the properties set forth in <u>Exhibit C</u> attached hereto (the "Additional Pledge and Sale Properties"), the net proceeds of which sale or sales which are distributable to Guarantor and/or his wife, Malisse Sinito, as applicable (collectively, the "Obligors"), or any affiliate of Obligors (the "Obligors' Related Parties"), as applicable, are to be promptly transmitted to Lender to be applied to the outstanding principal amount of the Loan pursuant to the Loan Documents (or, alternatively, if the Refinancing Loan has closed prior to the date of such transmittal, to be applied to the outstanding principal amount of the New Note (as defined below)).  With respect to the GP Sale Properties and the Additional Pledge and Sale Properties (collectively referred to herein as the "Pledged Assets"), the Guarantor shall achieve each of the following milestones and provide evidence thereof to the satisfaction of Lender not later than each of the following dates:

1)  Not later than October 10, 2023, evidence that the Pledged Assets have been placed on the market to potential investors [*This requirement has been satisfied*];

2)  Not later than May 31, 2024, evidence that the Pledged Assets have been placed on the market to potential investors [*This requirement has been satisfied*];

3)  Not later than June 15, 2024, evidence of receipt of bids for the Pledged Assets [*This requirement has been satisfied*];

4)  Not later than July 31, 2024, evidence of award(s) to a purchaser(s) and draft purchase and sale agreement(s) with respect to the Pledged Assets providing for (i) in Lender's reasonable judgement, expected net proceeds sufficient to repay the Loan (or the New Note, as may be applicable) in full and (ii) a fully-earned earnest money deposit (without conditions) by the Guarantor sufficient to make the payment described in Section 5(a) above (referred to herein as the "Initial Earnest Money Deposit");

5)  Not later than September 3, 2024, one or more fully executed purchase and sale agreements with respect to the Pledged Assets (individually, each a "PSA" and collectively the "PSA") which results in sufficient estimated net proceeds, as determined by Lender in its reasonable discretion, to pay off the Loan (or the New Note, as may be applicable) in full together with evidence of the transfer of the necessary funds from the Initial Earnest Money Deposit to the Lender Representative (pursuant to Section 5(a) above);

6)      Not later than October 1, 2024, evidence of the expiration of any due diligence period under one or more PSAs which in the aggregate provide sufficient estimated net proceeds, as determined by Lender in its reasonable discretion, to pay off the Loan (or the New Note, as may be applicable) in full and that the earnest money under such PSAs (the "Earnest Money") has become non-refundable in accordance with the terms thereof (the "Expiration of PSA Diligence Period");

7)      If Guarantor has satisfied conditions (1) through (4) above and requires more time to finalize PSA(s) in order to satisfy condition (5), the Guarantor may elect, at any time prior to the expiration date of such condition, to extend the dates in (5) and (6) above, for a period of thirty (30) days provided that at the time of such election the Guarantor: (i) is in compliance with the terms of this Agreement; and (ii) provides (A) evidence to the reasonable satisfaction of Lender that such time is necessary to finalize such PSA(s) and will not result in the failure of the Guarantor to timely meet its other obligations herein, including but not limited to the deadline for achieving Expiration of the PSA Due Diligence Period, as extended in accordance with this subsection (7), and (B) for repayment in full of the Loan (or the New Note, as may be applicable) by not later than February 1, 2025. Additionally if the Guarantor has satisfied conditions (1) through (5) above, the Guarantor may elect at any time prior to the expiration date of such condition, to extend the date in (6) above, for an additional period of thirty (30) days provided at the time of such election Guarantor (i) is in compliance with the terms of this Agreement and (ii) provides evidence to the reasonable satisfaction of Lender that such time is necessary to allow the purchaser(s) to compete due diligence so as to cause the Earnest Money to become non-refundable (notwithstanding the foregoing, the Loan (or the New Note, as may be applicable) must be repaid in full by not later than February 1, 2025);

8)      Until the Loan (or the New Note, as applicable) is paid in full, prior to the closing of any sale of one or more of the Pledged Assets (or a portfolio of such properties), the Guarantor shall (i) provide to Lender all drafts of the related title company settlement statement (or statements, as applicable) showing the amount of the gross proceeds payable to the Guarantor or an affiliate entity from such sale(s) (the "Net Sale Proceeds"), and (ii) provide direction to the applicable title company (or title companies, as applicable) to send such Net Sale Proceeds directly to Lender (or otherwise at Lender's direction), via wire transfer on the day of closing, for application to the repayment first of any interest due on the Loan and then to the outstanding principal balance of the Loan; and

9)      At such time as Borrower receives a payment of any additional non-refundable earnest deposit from any PSA with respect to the GP Sale Properties, Borrower shall be required to pay Lender any accrued and unpaid interest on the Loan not to exceed the full amount of the additional non-refundable earnest deposit.

Guarantor hereby grants to Lender a security interest in (i) any Net Sale Proceeds (as referenced above) and (ii) its contractual rights to any and all Earnest Money deposits, including, without limitation, the Initial Earnest Money Deposit, which have, by the terms of the applicable PSA, become unrefundable and/or are received by the Guarantor or an affiliate but the security interest in (ii) hereof shall be limited to the amount of any accrued and unpaid interest on the Loan.

(c)      On or before July 15, 2024, Guarantor shall provide an updated summary (the "Subordinate Pledge Summary") of all subordinate pledges by Obligor or any Obligor Related Party of equity interests in the Pledged Assets; which Subordinate Pledge Summary shall include the amount currently owned to the party or parties listed therein as pledgee (such Subordinate Pledge Summary need not reflect pledges made in favor of Lender or made in accordance with the loan documents related to each Pledged Asset (the latter such pledges being described in the below-defined Pledge Summary));

(d)      On or before July 15, 2024, Borrower or Guarantor shall provide written evidence (satisfactory to Lender in its sole discretion) that all of the items of deferred maintenance as identified by

Marous Brothers Construction (and as further described in detail in the various documents attached hereto as <u>Exhibit D</u>) have been fully completed, such written evidence to include, without limitation, confirmation of completion from Marous Brothers Construction;

      (e)      On or before July 15, 2024, Guarantor shall cause to be executed and delivered, as applicable, to Lender (i) a fully-executed amended and restated Pledge Agreement (restating in its entirety that certain Pledge Agreement dated September 27, 2003, from the parties thereto (including Guarantor) in favor of Lender, referred to herein as the "Restated Pledge") of the pledges made thereunder in connection with the Loan, which Restated Pledge shall provide that: (a) the Secured Obligations and the other obligations hereunder are secured pursuant to the Restated Pledge; and (b) each of the Pledged Assets pledged thereunder shall be additionally pledged to secure the Inhofe Forbearance (and the loan specified therein), (ii) a revised draft of the Pledge Summary (as defined in the Third Forbearance Agreement) based on comments provided by Lender's counsel to Guarantor's Counsel, and (iii) such confirmation and additional pledges of any interests in the Pledged Assets, which, following review by Lender and Lender's counsel of the Pledge Summary, Lender may reasonably determine may be pledged without third party consents;

      (f)      On or before August 1, 2024, Borrower or Guarantor shall provide (i) evidence that all taxes on the Property are current and not delinquent (including, without limitation, taxes for (A) the second half of 2022, (B) the first half of 2023 and (C) the second half of 2023) or (ii) copies of a payment plan or other agreement with respect to the payment thereof with evidence that Borrower is current on its payments under such payment plan or other agreement;

      (g)      [Reserved];

      (h)      From and after the date hereof through the end of the Fifth Forbearance Period, Borrower shall timely and fully perform its obligations pursuant to the Loan Documents (including the payment of taxes (subject to the terms of any forbearance agreement, payment plan or similar agreement in regard thereto with any taxing jurisdiction), Insurance Premiums and other operating expenses of the Property as they come due) except for the obligations comprising the First Forbearance Acknowledged Events of Default and the Maturity Event of Default; provided, however, for purposes of clarity, (A) Borrower shall remain obligated to pay and satisfy the Loan and all other obligations owing to Lender pursuant to the Loan Documents in full on or before the earlier of a Fifth Forbearance Default or February 1, 2025 (the "Forbearance Termination Date") until release in connection with delivery of a New Note is delivered in accordance with the terms herein, and (B) the Borrower's obligations comprising the First Forbearance Acknowledged Events of Default and the Maturity Event of Default are not hereby released or waived in any manner. Notwithstanding any of the foregoing in this subsection (h), and so long as the Borrower is otherwise in compliance with this subsection (h), the Borrower shall not be required to deposit any amounts in the Operating Expense Account or the Debt Service Account during the Fifth Forbearance Period. Notwithstanding the foregoing and provided that Borrower is, at all times, in compliance with all the terms of this Agreement and no Fifth Forbearance Default has occurred and is continuing, the Forbearance Termination Date and the Fifth Forbearance Period shall be extended to the earlier of: (i) the outside date to close under the PSA(s), as such date may be extended by Guarantor (or its affiliates(s)) or purchaser(s) under the PSA(s); (ii) the date of any termination or revocation of the PSA(s) either (a) in whole or (b) in part which results in insufficient estimated net proceeds, as determined by Lender in its reasonable discretion, under the Pledged Assets still under contract (or placed under contract within thirty (30) days after the termination or revocation of the PSA(s)) to pay off the Loan (or the New Note, as may be applicable); or (iii) February 1, 2025; and

      (i)      Upon closing of the Refinancing Loan, as may be applicable, and the accompanying paydown of the Loan, should the net proceeds of the Refinancing Loan received by the Borrower (or the Lender on behalf of the Borrower) be insufficient to pay off the Loan (including outstanding principal, accrued interest, unpaid fees and costs and attorneys' fees and costs) in full after also taking into account any repayment(s) of the Loan including, without limitation, any repayments under subsections (b) and/or (h) above, as may be applicable (such amount referred to herein as the "Loan Shortfall"), in consideration for the Lender's release of the Mortgage and termination of the Note and the other Loan Documents, the

Obligors shall deliver a Promissory Note (the "New Note") and other any related documentation, including, without limitation, any additional equity interest pledges and/or developer fee pledges as may be required by Lender in its sole but reasonable discretion, to evidence the Obligors' ongoing obligation to pay such Loan Shortfall.  In no event shall the New Note exceed $14,000,000 and any paydown of the Loan not funded with net proceeds of the Refinancing Loan shall be contemporaneously paid from other funds provided by Guarantor. The New Note and any other required documentation evidencing such ongoing repayment obligation shall be in such form and contain such terms as may be required by the Lender in its sole but reasonable discretion, including, but not limited to, (A) a maturity date of not later than February 1, 2025, and (B) a variable rate of interest comparable to what is currently applied to the Loan.  Lender acknowledges that Guarantor expects to repay the New Note from net proceeds, Earnest Money, extension fees or other payments distributable to Obligors and Obligors' Related Parties from the sale of Pledged Assets or pursuant to the related PSA and Guarantor acknowledges that: (i) all net proceeds, earnest money, extension fees or other payments distributable to Obligors and Obligors' Related Parties from the sale of any Pledged Assets (or portfolio thereof) or pursuant to the related PSA shall be distributed to repay the New Note in full prior to any distribution to Obligors and Obligors' Related Parties; and (ii) the New Note shall be immediately due and payable upon expiration of the Forbearance Termination Date.

For purposes of this Agreement and this Section 5(i) specifically, any Net Sale Proceeds received by the Borrower or the Guarantor from the sale of the Property and applied to the repayment of the Loan (unless the Loan is then paid in full) shall be considered a "Refinancing Loan" hereunder.

(j)     All Net Sale Proceeds distributable to Obligors and Obligors' Related Parties from the sale of any Pledged Assets or pursuant to the related PSA shall first be applied to repay the entire outstanding balance due Lender for the Loan in accordance with the provisions of this Agreement, and thereafter applied to repay the loan made by Lender to an affiliate entity of Guarantor related to the Inhofe Plaza project in Tulsa, Oklahoma (and in accordance with the loan documents and the related Forbearance Agreement(s) among the Lender, the Guarantor and the borrower for that project, collectively, the "Inhofe Forbearance").

(k)     In furtherance of the foregoing, the Borrower and the Guarantor represent, warrant and covenant that: (i) there are no Encumbrances (as defined below) other than those Encumbrances securing the Pledged Assets shown on that certain Master Sales Proceeds worksheet dated June 3, 2024 and furnished to the Lender on June 5, 2024 (the "Projections"); (ii) the Projections do not contain any untrue statement of a material fact with respect to the Borrower, the Guarantor or the Pledged Assets and do not omit to state a material fact with respect to the Borrower, the Guarantor or the Pledged Assets necessary in order to make the Projections not misleading in light of the circumstances under which they were made; and (iii) each of the Borrower and the Guarantor, or any applicable affiliates, will not create or knowingly incur any mortgage, pledge, security interest, encumbrance or other material lien (each, an "Encumbrance") upon the Pledged Assets to any person other than Lender or an affiliate of Lender.

6.     Credit Party Representations, Warranties and Covenants.  As additional consideration to and inducement for Lender to enter into this Agreement, each Credit Party hereby makes the following representations and warranties as to itself, and hereby covenants with Lender as follows:

(a)     Valid Existence; Good Standing; Due Authorization; Legal Capacity; Execution and Delivery.  Borrower validly exists and is in good standing under the laws of the State of Ohio and has the requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  Borrower and Guarantor each has full legal capacity to execute and deliver this Agreement and to perform its respective obligations hereunder.  Each Credit Party has duly executed and delivered this Agreement.

(b)     Representations and Warranties.  Each and all of the representations and warranties of such Credit Party in the Loan Documents are, and will continue to be, true, accurate and correct in all respects except that it is acknowledged that the First Forbearance Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults, the Third Forbearance Conditions Defaults and the Fourth Forbearance Conditions Defaults

occurred, many of which continue to exist as of the date hereof.  The representations and warranties of such Credit Party in this Agreement are true, complete and correct as of the date hereof, and will thereafter continue to be true, complete and correct.

(c)     No Defaults.  Except for the First Forbearance Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults, the Third Forbearance Conditions Defaults and the Fourth Forbearance Conditions Defaults, each Credit Party is not in default under any of the Loan Documents or the Guaranty Agreements, nor has any event or circumstance occurred that is continuing that, with the giving of notice or the passage of time, or both, would be a default or an event of default by any Credit Party under any of the Loan Documents or the Guaranty Agreements.

(d)     No Material Changes.  Except for the First Forbearance Acknowledged Events of Default, the Maturity Event of Default, the First Forbearance Conditions Defaults, the Second Forbearance Conditions Defaults, the Third Forbearance Conditions Defaults and the Fourth Forbearance Conditions Defaults, there has been no material adverse change in the financial condition of any Credit Party from the most recent financial statement received by Lender regarding such Credit Party.

(e)     Claims and Defenses.  Lender has timely performed all of its obligations under the Loan Documents, and each Credit Party has no defenses, offsets, counterclaims, claims or demands of any nature which can be asserted against Lender or any affiliate of Lender for damages, with respect to the Loan Documents, or to reduce or eliminate all or any part of the Indebtedness or other obligations owing to Lender under the Loan Documents.

(f)     Binding Agreement.  This Agreement (when executed and delivered on or about the date hereof) and the Loan Documents are and will continue to be the legal, valid and binding obligations of each Credit Party, enforceable against each Credit Party in accordance with their terms.

(g)     Ratification of Loan Documents and Security Interests; No Waiver.   The First Forbearance Agreement, the Second Forbearance Agreement, the Third Forbearance Agreement, the Fourth Forbearance Agreement and each Loan Document to which such Credit Party is a party is hereby ratified and affirmed in all respects by such Credit Party as a binding obligation upon it and shall continue in full force and effect.  Furthermore, each Credit Party hereby ratifies and affirms each lien on, and security interest in, any and all real and personal property (tangible or intangible) granted as security to Lender pursuant to the Loan Documents, and such liens and security interests shall continue in full force and effect and are not hereby diminished or released.  This Agreement shall not constitute a waiver of any rights or remedies of Lender in respect of the Loan Documents.

(h)     Reasonably Equivalent Value.  Each Credit Party hereby agrees that it has carefully and independently analyzed the value of the benefits conferred by Lender through the forbearance relief provided herein and that such value is reasonably equivalent to the value of the direct and indirect transfers made, and obligations incurred, by such Credit Party pursuant to this Agreement and the transactions contemplated herein.

(i)     Hyde Park Village.  Guarantor hereby represents that Hyde Park Village, located in St. Louis, Missouri, is not currently encumbered by a mortgage or deed of trust.  Further, Guarantor hereby agrees that it shall not agree to or permit the recording of a mortgage or deed of trust against such property until such time as the Loan (or the New Note, as may be applicable) has been paid in full.

(j)     Timely Distribution of Available Cash Flow.  With respect to any and all distributable cash from each of the Pledged Assets including, without limitation, the net sale proceeds of any Pledged Asset (collectively, "Available Cash Flow"), Guarantor shall: (i) not, except as described in the Subordinate Pledge Summary, pledge or otherwise encumber such Available Cash Flow for the benefit of any person other than Lender: (ii) to the extent directly or indirectly controlled by Guarantor, cause Available Cash Flow to be calculated and distributed at the times permitted by HUD to the parties entitled thereto (including the Lender as described in (iv) below); (iii) to the extent not directly or indirectly controlled by

Guarantor, use its reasonable efforts to cause Available Cash Flow to be calculated and distributed at the times permitted by HUD to the parties entitled thereto (including the Lender as described in (iv) below) and in no event less frequently than permitted by HUD, the debt and equity documents, as applicable with respect to such Pledged Asset; (iv) contemporaneously transfer any Available Cash Flow distributed to Obligors or Obligors' Related Parties to the Lender Representative to be applied to the repayment of the principal amount of the Loan (or the New Note, as may be applicable).  With respect to any Pledged Asset that is encumbered by HUD restrictions (the "HUD Projects"), the parties acknowledge that such HUD restrictions generally permit distributions of Available Cash Flow on an annual basis.  Borrower shall use its reasonable efforts to cause Available Cash Flow with respect to HUD Projects to be promptly calculated and distributed when permitted by HUD.

7.      [Reserved].

8.      Lender Legal Fees.  Borrower and Guarantor acknowledge that Kutak Rock LLP ("Lender Counsel") previously received an $80,000 legal deposit (the "Deposit") with respect to the Shorter College and St. John transactions (in Arkansas) and per agreement with the Borrower: 1) previously applied the Deposit to fees and expenses on such transactions (in the amount of $13,038.50); and (ii) applied the remaining balance of the Deposit to (a) invoices #3238598 ($35,176) and #3280739 ($27,429) pertaining to this transaction and (b) additional fees and expenses for work pertaining to this transaction through September 18, 2023.  Total Lender Counsel fees and expenses accrued and unpaid through June 15, 2024 after application of the Deposit are $90,000 (the "Accrued Fees").  Guarantor hereby agrees to pay the Accrued Fees and all future fees and expenses in connection with the transactions contained herein upon invoice and within thirty (30) days of receipt thereof.  Notwithstanding the foregoing, Lender Counsel hereby agrees that the Accrued Fees and any future fees and expenses of Lender Counsel may be paid out of the proceeds received by Guarantor from the sale of the Pledged Assets.

9.      Release of Claims.  Each Credit Party hereby fully, finally and forever releases and discharges Lender, its affiliates and its and their respective directors, managers, officers, employees, agents, representatives, attorneys, and accountants from any and all actions, causes of action, claims, debts, demands, liabilities, obligations and suits, of whatever kind or nature, in law or equity, that such Credit Party has or in the future may have, whether known or unknown (i) in respect of the Loan, the First Forbearance Agreement, the Second Forbearance Agreement, the Third Forbearance Agreement, the Fourth Forbearance Agreement, this Agreement, the Loan Documents or the actions or omissions of Lender in respect of the Loan, the First Forbearance Agreement, the Second Forbearance Agreement, the Third Forbearance Agreement, the Fourth Forbearance Agreement, this Agreement or the Loan Documents and (ii) arising from events occurring prior to the date of this Agreement.  EACH CREDIT PARTY EXPRESSLY WAIVES ANY PROVISION OF STATUTORY OR DECISIONAL LAW TO THE EFFECT THAT A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN SUCH PARTY'S FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH, IF KNOWN BY SUCH PARTY, MUST HAVE MATERIALLY AFFECTED SUCH PARTY'S SETTLEMENT WITH THE RELEASED PARTIES.  Nothing contained in this Section 9 shall release obligations owing from Lender pursuant to the Loan Documents.

10.      Entire Agreement; Change; Discharge; Termination or Waiver; Successors and Assigns.  This Agreement, the First Forbearance Agreement, the Second Forbearance Agreement, the Third Forbearance Agreement, the Fourth Forbearance Agreement and the Loan Documents contain the entire understanding and agreement of each Credit Party and Lender in respect of the transactions contemplated herein and therein and supersede all prior representations, warranties, agreements and understandings.  No provision of this Agreement or any of the Loan Documents may be changed, discharged, supplemented, terminated or waived except in a writing signed by Lender and the applicable Credit Party thereto.  This Agreement shall be binding upon, and inure to the benefit of, each party hereto and its respective successors, assigns, executors, heirs, personal representatives, and administrators; *provided*, that no Credit Party may assign this Agreement or any of its rights or obligations hereunder except in an instrument consented to by Lender.

11.      Counterpart Execution.  This Agreement may be executed and delivered in one or more counterparts (including via .pdf or other means of electronic transmission), each of which shall be deemed an original and all of which together shall constitute one and the same document.  Signature pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document.

12.      Post-Default Waiver of Collateral Disposition Rights.  A default and an event of default have occurred under the Loan Documents and notwithstanding any forbearance or other provision set forth herein, such default and event of default remain as pre-existing events of default with respect to which the Lender may, upon the occurrence of a Fifth Forbearance Default or expiration of the Fifth Forbearance Period, send a notice of disposition of collateral under Section 9-611 of the Uniform Commercial Code.

13.      Construction.  This Agreement shall not be construed more strictly against Lender merely by virtue of the fact that the same has been prepared by Lender or its counsel, it being recognized that Credit Parties and Lender have contributed substantially and materially to the preparation of this Agreement, and each of the Credit Parties and Lender acknowledges and waives any claim contesting the existence and the adequacy of the consideration given by any of the other parties hereto in entering into this Agreement.

14.      Consent; Reaffirmation; and Acknowledgement.  Guarantor (a) consents to the terms and conditions of this Agreement; and (b) reaffirms the Guaranty Agreements and confirms and agrees that, notwithstanding this Agreement and consummation of the transactions contemplated thereby, the Guaranty Agreements and all of Guarantor's covenants, obligations, agreements, waivers, and liabilities set forth in the Guaranty Agreements continue in full force and effect in accordance with their terms with respect to the obligations guaranteed thereunder.

15.      Consent to Agreement.  Each Credit Party acknowledges that it has thoroughly read and reviewed the terms and provisions of this Agreement and has had full benefit and advice of counsel of its own selection, or the opportunity to obtain the benefit and advice of counsel of its own selection, and that this Agreement has been entered into by each Credit Party freely, voluntarily, with full knowledge and without duress.

16.      CHOICE OF LAW; VENUE; JURY WAIVER.  This Agreement, and the rights and obligations of the parties hereto shall be construed in accordance with, and governed by, the laws of the State of New York without regard to its principles of conflicts of laws.  FURTHERMORE, THE PARTIES HERETO IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE LOAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

17.      Effective Date.  This Agreement is effective as of April 15, 2024.

[*Signatures on Following Page*]

Executed as of the date first set forth above.

LENDER:

**DEUTSCHE BANK AG, NEW YORK BRANCH**

By: _____
Name:            Leroi Jiles
Title
                  Vice President

By: _____
Name: Adam Sillins
Title    Associate


CREDIT PARTIES:

**HH CLEVELAND HUNTINGTON L.P.** an Ohio limited
partnership, as Borrower

By:  925 Euclid Manager, LLC,
        an Ohio limited liability company,
        its General Partner

        By: _____
              Frank T. Sinito, Managing Member


_____

**FRANK T. SINITO**
as Guarantor

**EXHIBIT A**

**LOAN DOCUMENTS**

1. Loan Agreement dated as of July 1, 2021 (as amended by (i) that certain First Omnibus Amendment and Allonge to Promissory Note dated November 15, 2021 (the "First Omnibus Amendment"), between Borrower and Lender; and (ii) that certain Second Omnibus Amendment and Allonge to Promissory Note dated October 19, 2022 (the "Second Omnibus Amendment"), between Borrower and Lender, collectively, the "Loan Agreement"), by and between HH Cleveland Huntington L.P. ("Borrower") and Deutsche Bank AG, New York Branch ("Lender");

2. Promissory Note in the original principal balance of $35,422,000 made by Borrower in favor of Lender and dated July 15, 2021 (as amended by the First Omnibus Amendment and the Second Omnibus Amendment, collectively, the "Note");

3. Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing, dated as of July 1, 2021, granted by Borrower, as Mortgagor, to Lender, as Mortgagee (the "Mortgage");

4. Loan Guaranty dated as of July 1, 2021 executed by Frank T. Sinito, as guarantor for the benefit of Lender (the "Loan Guaranty");

5. Guaranty of Recourse Obligations dated as of July 1, 2021 by Frank T. Sinito, as guarantor, in favor of Lender (the "Guaranty of Recourse Obligations") (together, the Loan Guaranty and the Guaranty of Recourse Obligations shall be referred to herein as the "Guaranty Agreements"); and

6. All documents, agreements and instruments ancillary to the foregoing;

(collectively, the "Loan Documents).

**EXHIBIT B**

**GP SALE PROPERTIES**

|  | **City** | **State** |
|---|---|---|
| Armstrong Glen | Cocoa | FL |
| Azure Estates | Riviera Beach | FL |
| Barrington Village Apartments | Indianapolis | IN |
| Brockington Heights Apartments | Darlington | SC |
| Calloway Cove | Jacksonville | FL |
| Canaveral Cove | Titusville | FL |
| Casa Nueva | Fremont | OH |
| Cassady Village Apartments | Columbus | OH |
| Cavelier Court | Memphis | TN |
| Cordoba Courts | Opa-locka | FL |
| Elm Court Apartments | Logan | OH |
| Gospel Gardens | Memphis | TN |
| Greenfield Apartments | Seneca | SC |
| Hershey Plaza Apartments | Hershey | PA |
| Hope Heights Tower | Memphis | TN |
| Hubbard Gardens | Indianapolis | IN |
| Hyde Park Village | St. Louis | MO |
| Jernigan Gardens | Orlando | FL |
| JFK Towers | Durham | NC |
| Jupiter Ridge | Melbourne | FL |
| Kirksville Heights Apartments | Kirksville | MO |
| Lakeside Gardens | East Chicago | IN |
| Langston Commons | Cleveland | OH |
| Lemay Manor I | St. Louis | MO |
| Lemay Manor II | St. Louis | MO |
| Lincoln Meadows | Bucyrus | OH |
| Line Creek Apartments | Kansas City | MO |
| Little Turtle Apartments | Leesburg | FL |
| Log Pond Apartments | Newark | OH |
| Memphis Towers | Memphis | TN |
| Moore Manor | Amory | MS |
| Musicians Towers | Cleveland Heights | OH |
| Oak Park at Nations Ford | Charlotte | NC |
| Oakwood Apartments | Olmsted Township | OH |
| Palmetto Glen | Jacksonville | FL |
| Park Shore Commons | Gary | IN |
| Peace Lake Towers | New Orleans | LA |

| | | |
|---|---|---|
| Prairie Covenant | Getzville | NY |
| Renwyck Place | Rensselaer | NY |
| River Trail | Harrisburg | PA |
| Sandhill Village | Brandon | FL |
| Savanna Landing II | Tulsa | OK |
| St. George Tower | Clinton Township | MI |
| St. Regis Apartments | Kansas City | MO |
| Steamboat Landing | Burlington | IA |
| Stonehaven East Apartments | Charlotte | NC |
| Sunset Village | Cleveland | MS |
| Sycamore Hills | DeSoto | MO |
| The Lakewoods | Dayton | OH |
| Turtle Oaks Apartments | Leesburg | FL |
| Valencia Way | Jacksonville | FL |
| Van Rensselaer Heights | Rensselaer | NY |
| Villages at Franklin Crossing | Kent | OH |
| Villages of Hanna | Fort Wayne | IN |
| Vinton Green | McArthur | OH |
| Watterson Lakeview Apartments | Louisville | KY |
| The Weldon | Jacksonville | FL |
| Windbay Terrace | Tampa | FL |

**EXHIBIT C**

**ADDITIONAL PLEDGE AND SALE PROPERTIES**

|  | City | State |
|---|---|---|
| Ava Park | Griffin | GA |
| Azalea Point | Mobile | AL |
| South Park Village | Laurel | MS |
| Ballard Way | Columbus | GA |
| Blossom Hill | Macon | GA |
| Bonnie Doone | Athens | AL |
| Majestic Gardens (Wilshire) | Macon | GA |
| Southern Oaks Village | Florence | AL |
| Country Park | Wichita Falls | TX |
| Highpoint | Wichita Falls | TX |
| Highpoint II | Wichita Falls | TX |
| Parkview Place | Lubbock | TX |
| The Ella | Lubbock | TX |
| Bayou Bend | Mobile | AL |
| Bayou Plaza | Mobile | AL |
| Cambridge | Mobile | AL |
| Driftwood | Mobile | AL |
| Four Winds | Birmingham | AL |
| Jefferson | Mobile | AL |
| Marland | Birmingham | AL |
| South Haven | Mobile | AL |
| St. Stephens | Whistler | AL |
| Shorter College | North Little Rock | AR |
| St. John | Pine Bluff | AR |
| Southeast | Pine Bluff | AR |
| Willow Bend | Jacksonville | AR |
| Blue Valley | Kansas City | MO |
| Olive Park | Kansas City | MO |
| Anchor Bay THs | Saginaw | MI |
| Hilltop Apts | Kirtland | OH |
| Little Traverse Village | Petoskey | MI |
| Glendale Apts | Galax | VA |
| Elm Terrace (Eagles Landing) | Duncan | OK |
| Riverbend Apts. | St. Louis | MO |
| Plaza Hills East Apts. | Tulsa | OK |
| Jenny Lind Hall Apts. | Springfield | MO |
| Walnut Towers | Winfield | KS |

| | | |
|---|---|---|
| Laurens Terrace Apts. | Laurens | SC |
| Bradford House | Cambridge | MD |
| Brookwood Apts. | Roxboro | NC |
| Eastridge Apts. | Harrisburg | PA |
| Inhofe Plaza | Tulsa | OK |
| Naples Terrace | Durham | NC |
| West Haven Apts. | Apex | NC |
| Brayton Hill | North Adams | MA |
| Carriage Hill Apts | Roanoke Rapids | NC |
| Peachtree Court | Ahoskie | NC |
| Chester Manor Apts. | Chester | SC |
| Greenhaven Townhouses | Charlotte | NC |
| Hannibal Manor | Hannibal | MO |
| Huntington Heights | Watertown | NY |
| Kensington Heights | Kansas City | MO |
| Wood Towers | Pittsburgh | PA |
| Serenity Towers | Memphis | TN |

**<u>EXHIBIT D</u>**

**DEFERRED MAINTENANCE ITEMS**

[***Follows this Page***]

Construction Management Group



36933 Vine Street | Willoughby, OH 44094
Office: 440.951.3904 | Direct:  440.391.5444 | Cell: 216-570-7920
www.marousbrothers.com

**From:** Thomas Smith <tsmith@marousbrothers.com>
**Sent:** Thursday, August 17, 2023 1:47 PM
**To:** Tom Kroth <tkroth@Millenniacommercial.com>
**Cc:** Curt Sonntag <csonntag@Millenniacommercial.com>; Dave Pavlik <dpavlik@Millenniacommercial.com>; Dave Roberts <droberts@marousbrothers.com>
**Subject:** FW: Pages from Floor Plans - Complete Set 03-25-10.pdf

Tom, please let me know if this works for you or you need any other information.

Areas of previous or current leaks.
- Level 21 – penthouse along east 9th street.  Roofs 280 and 280A leaking 21, 20, and 19th floor.  280B has minor issues but can be repaired.  Actively leaking, standing water and a lot of wet materials.
- Level 21 – roof 270 leaking down to level 20.  Actively leaking, standing water and a lot of wet materials.
- Level 22 – roof 294A – roof is above the condenser water pumps and the area just outside of the high-rise elevator room (14, 15, 16).  Water was hitting the condenser pumps and electrical.  It also ran into the high-rise elevator room (not sure if this has damaged the cabs) and down the elevator shaft to the basement.  Cleaned roof and roof drain to minimize the issue.
- Level 3 – 6" horizontal storm drain has several holes.  Placed no-hub bands on pipe to minimize leak.  This leaked down to the lobby.  Level 2 and 3 have a great deal of mold.

General maintenance issues.
- Water in underground ducts.  Only have 1 working pump.  Could use a few ½ HP pumps to remove water.
  - I currently have pump in duct where HNB branch AC unit drain line is leaking into duct.  Pump running 24x7 about 7,200 gallons / day.
- Gutters for light court roofs.  They have been cleaned of bigger materials but still have more work to clean them up.
- Guvnor pub humidity levels are through the roof and mold is a very big issue that is affecting the arcade level and a respirator is required to walk space.
- Water in pit for elevators 23 and 24.
- Water closet continuously running level 2 annex MWR.
- Various AC units running in the building with blocked filters and some of them have compressor trying to energize but immediately trip off on high head.
- Fire pump – weekly run is required, and annual flow test is required.  This pump has not run as required.  I am not sure when this engine was last run.  If the unit is to run it will trip off on low suction.  It appears that the 8" feed at the 9th and Chester corner is shut off in vault at the street.  The 10" line at the after the backflow preventor is shut off so this leaves only the 6" feed from Chester to feed the fire pump.
- Emergency generators – weekly run time is required and typically an annual load bank test.  These engines have not run in a very long time.  The newer 400kW generator is projected to be reused and provides emergency power for the elevators and not running unit could lead to a major rebuild of the engine.  The older 400kW engine is for emergency lighting, life safety systems, etc. and is projected to be replaced.  Not sure if these engines will come on during a loss of power.
- Fire alarm panel – there are over 69 troubles on the panel.  Some of these are from the issues on 21, 20, 19, 3, and 2.  Not sure if the batteries in the field panels are working and this could be a problem at a loss of power.

➢ Main electrical vault – there are exhaust fans and filter racks to remove heat from the vault.  The vault filters are blocked or destroyed and could be stressing the exhaust fans.  Room getting very dirty.

➢ Arcade level ejector system – collects all waste from arcade level services.  The tank is in very bad shape, there is a wall that separates the income water to the tank and the pump side.  About 2/3rd's of the wall has rusted and broke down into the tank, should the remainder of this wall collapse it will most likely cover up the pumps and cause the tank to flood.

➢ There are several openings throughout the building that are paths for OA to enter the building and should be sealed off.

➢ Steam trench – there is an active leak on the main line at a flange (east side of trench).  Not sure if this is a Cleveland thermal issue or building to correct.

On another note, can I get a key to the back door at the loading dock?

Thank you.

**Tom Smith |** Superintendent – Construction Management Group



36933 Vine Street | Willoughby, OH 44094
Cell: 440.465.4162
www.marousbrothers.com



November 29, 2022

August Fluker
Millennia Housing Development
127 Public Square
Cleveland, OH 44114

Re:  The Centennial – Building Walkthrough

Dear Mr. Fluker,

On November 21, 2022, Marous Brothers Construction (MBC) completed a building walkthrough to review existing building conditions and review the MEP equipment, below is a list of items identified and will require some correction prior to any onsite mobilization or demolition.

> Climate control - Building heating system was found to be completely off and isolated at the main valve in the steam trench.
>    o  Need to verify the operation of the Building Management System to ensure it can control the steam system.
>    o  Need to verify the ability to and the operation of this system to ensure it can maintain conditioned space temperatures to protect the finishes from further failures.  (This to include PRV's, condensate return pumps, system leaks, etc.)
>    o  Should this system be incapable of providing heat to the building an alternate source of heating will need to be identified.

> The 3rd floor coffered ceiling has significant damage in the area of the internal staircase near the 29th freight.
>    o  It is suggested that a consultant be obtained to understand the significance of the damage and to review the rest of this ceiling to determine if shoring should be installed to minimize further damage and to protect those walking or working on the 3rd floor.

> The building fire alarm panel has 69 active troubles.  This system needs to be cleared of all troubles and functional system test completed of all devices.

> The 21st floor penthouse along 9th Street is unsafe.  There is an active roof leak, and a tremendous amount of black mold and damage throughout this penthouse and the 19th and 20th floor, along with very wet conditions, buckets of standing water, etc.  These floors should be cleaned, made safe, and the mold removed in its entirety to understand where the primary leak is coming from on 21.
>    o  The results of doing nothing will continue to further damage the building roof structure, building spaces, allow for extensive mold growth, and create serious health risk without remediation.
>    o  There is also a good chance that several of the fire alarm panel troubles are related to this active leak.

**General notes:**
> There were several areas of the building where outside air was just rushing into the building.  Several of these areas were on 1st floor as well as some of the upper floors.  Would suggest closing off all outside air to building.

> We found there to be several pieces of equipment / lights running – 4th floor HVAC unit running, Engine room HVAC unit running, lights on in many places.



- Underground fresh air / exhaust ducts have water in them.
    - We investigated the fresh air duct in the main electrical room and found standing water in this duct. This duct potentially has an open waste line and will need to be investigated.
    - In the Govnor pub restaurant there was standing water in the exhaust duct.

- We will need to have water in order to perform any abatement work, we only found water on to the building fire pump.

- We need to ensure the building fire pump is operational and that weekly and annual testing is being performed.

- 21st floor penthouse along 9th street has a plywood door that is leaking a tremendous amount of air and should be sealed.

- We identified several waste cans filled with water.

- The swings in building temperatures have caused problems in the stairwells with the plaster and the topcoat is popping off in many places.

- We also noticed on several steel condenser water pipes on the 4th floor rusting from the outside due to condensation on the exterior of the pipe, this is the result of temperature swings in the building.

- Sewer gas odors is very prevalent throughout the building due to dried up water closets and sinks.

- The sump pump in the arcade fan room was running while onsite.  The building systems are shutdown, yet water continues to collect in this pit.  Need to investigate where this source of water is coming from. Additionally, one of the pumps is failing and needs to be repaired.


Respectfully,



Tom Smith, Superintendent
Marous Brothers Construction



8/017/2023

Mr. Tom Mignogna
Millennia Housing Development, Ltd.
127 Public Square
Cleveland, OH 44114

**RE: Centennial Building  -  22092-01**
     **Roof repairs 270, 280, 280A, 280B**
     **Immediate Work Proposal Number:     IWP-1 – Option 1**

Dear  Mr. Mignogna:

Marous/Gilbane Joint Venture is providing pricing for immediate work on the aforementioned project.  Listed below is a summary of work involved and related cost.  Please see the attached sheet for a detailed list of tasks including their related cost.

***Scope of Work***
Roofing
    a.   Set up the project per OSHA approved guidelines.
    b.   Spot roof repairs to roof 280B only
    c.   Complete roof removal to roofs 270, 280, and 208A
         a.   Demolish 11,700 sq of roofing down to the existing concrete deck – 270, 280, 280A
         b.   Prime the deck.
         c.   Torch apply a UV Rated mod. bit cap sheet to the concrete deck
         d.   Flash perimeter walls up 12"/Terminate and 3 course the top to create a watertight condition.
         e.   This will also be able to be used as an part of the overall finished roof system and be covered under warranty once completed in its entirety.
Demo
    a.   Make safe all equipment on roofs 270, 280, 280A, and 280B
    b.   Remove all refrigerant from rooftop equipment.
    c.   Demo all equipment on roofs 270, 280, 280A, and 280B

***Objective***
Create a watertight condition for the upcoming demolition of the space.

*Based on limited review of the existing conditions below roof deck 280 and 280A, it appears that some of the existing metal decking has been corroded beyond reuse and may require replacement. Further evaluation once roof demo is completed in space may reveal concrete deck replacement to be required as well. These replacements will not be addressed as a part of this cost and therefore application of the vapor barrier may have to be undone and redone as a part of the future project construction, costs for which would be included in the overall GMP. See Option 2 to avoid the rework cost.

We agree to the lump sum price of **Two Hundred Fifty Thousand Two Dollars and 00/100 ($250,002.00)** for the work detailed above.

The work detailed in this proposal will not commence without written authorization.  Full authorization of this work will commence with Prime Contract Change Order execution which shall adjust the current Prime Contract amount.

Please contact the undersigned should you have any questions regarding the aforementioned.



Sincerely,

*David Roberts*

David Roberts, Senior Project Manager
Marous Brothers Construction, Inc.


Marous/Gilbane Joint Venture is directed to proceed with the above work (**IWP-1 Option 1**).  A formal Prime
Contract Change Order will be issued.

_____          _____
Mr. Tom Mignogna                                                                 Date

## Immediate Work Proposal Cost Summary

| | | |
|---|---|---|
| **Job Name:** | Centennial Building | |
| **Job Number:** | 22092-01 | |
| **Project Architect:** | Sandvick Architects | |
| **Prepared By:** | Tom Smith | |

| | |
|---|---|
| **Work Number:** | IWP #1 - Option 1 |
| **Description:** | Roof Repair #270, 280, 280A, 280B |
| **Date:** | 8/8/23 |

| Job Number | Phase Code | Work Number | Cost Type | Description | Contractor | Cost Totals |
|---|---|---|---|---|---|---|
| 22092-01 | | IWP #1-1 | S | Roof Repair #270, 280, 280A, 280B | Industrial First | $ 204,700.00 |
| | | IWP #1-1 | S | Evacuate Refrigerant from Equipment on roof | Geauga Mech | $ 3,000.00 |
| | | IWP #1-1 | S | Demo Equipment from these roofs | Precision Environ | $ 10,000.00 |
| | | IWP #1-1 | S | Electrical make-safe | Gateway Electric | $ 1,600.00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | | |
|---|---|---|---|
| **Sub Total:** | | $ | 219,300.00 |
| **General Conditions:** | 6.00% | $ | 13,158.00 |
| **Overhead:** | 2.00% | $ | 4,386.00 |
| **Profit:** | 6.00% | $ | 13,158.00 |
| **Cost Change Sub Total:** | | **$** | **250,002.00** |

| | | |
|---|---|---|
| **Change Order Request Grand Total:** | **$** | **250,002.00** |



# EXHIBIT C – SCOPE OF WORK

**IWP #1 - EXISTING ROOFING REPAIRS**

**SPECIFICATIONS SECTION(S) INCLUDED:**

All Division 01 Specifications        – Dated 9/28/2021
015000 – Temporary Facilities & Controls
024119 – Selective demolition
070150 – Preparation for Reroofing
071413 – Hot Fluid Applied Rubberized Asphalt Waterproofing
076200 – Sheet Metal Flashing
077100 – Roof Specialties
077200 – Roof Accessories

**REPORT(S) CONSIDERED:**

ENVIRONMENTAL REPORTS
Atlas ACM Survey              – Dated 8/6/2021
Atlas ACM Specification          – Dated 8/20/2021
Atlas Soil Survey              – Dated 10/15/2021
Atlas LBP Specifications Report      – Dated 1/26/2022
Atlas LBP Management Plan        – Dated 8/13/2021
Atlas LBP Inspection            – Dated 8/6/2021
EA Group ACM Survey of Annex      – Dated 8/7/2018

HISTORICAL DOCUMENTS
Union Trust Building Original Structural Drawings (59 pages) Circa 1920
Union Trust-Part 1 HPCA-AS APPROVED 11-2014
Union Trust-Part 2 HPCA-AS APPROVED 01-2016

**DRAWINGS INCLUDED:**

Sandvick – Permit Set 9/28/2021
Volume A – Demolition
Volume B – Exterior & Demolition
Volume C – Architectural & Demolition
Volume D – MEP

**GENERAL INFORMATION:**

Provide all labor, material, equipment, engineering, hoisting, supervision, permits, inspections, and associated fees with, but not limited to, the following scope(s) of work.

**SPECIFICATION SECTION – 070150: PREPARATION FOR REROOFING**

1.  General Scope Items:

    a.  Without exception, should this scope of work of any element create an unsafe condition, fall hazard or otherwise, it is this subcontractor's responsibility to



eliminate that hazard by temporary protection. The protection shall be fastened to the wall, floor, or ceiling. Where it cannot be secured, special signage or flagging is required to denote such hazard. If shoring is necessary to support loads, such shoring shall include engineering submitted for approval.

b. Protection and preparation of materials and adjacent surfaces noted to remain in place from contamination using appropriate measures during abatement and demolition in accordance with the contract documents.

Specific Scope Items:

**EXISTING ROOF REPAIRS**

a. This subcontractor shall demolish and move materials to dumpster supplied by this subcontractor all existing roofing materials associated with 21st level existing Roofs #270, 280, and 280A back to the original structure unless noted otherwise.

b. During demolition, caution should be exercised to limit the damage to the adjacent surfaces. It should be assumed that prior documentation of all areas and zones to be demolished has been recorded to evaluate the condition prior to demolition.

c. When working at roof levels, this subcontractor has included parapet edge protection and/or full tie-off of workers to prevent fall hazard.

d. Where demolition occurs that leaves an exposed condition subject to water, wind, or air infiltration, this subcontractor owes temporary construction necessary to infill that opening to prevent such infiltration. This includes but is not limited to roof portals, pipe penetrations, etc.

e. This subcontractor shall remove and dispose of all mechanical fasteners including but not limited to adhesives, screws, nails, hangars, & straps, at metal flashings that would compromise the new system installation.

f. Existing roof ladders may no longer exist at the time for this repair. This subcontractor includes temporary and safe ladder access to the areas of repair.

g. This subcontractor has included preparing the existing deck after demolition to receive primer including scraping and miscellaneous vegetation removal.

h. Furnish and install primer followed by torch applied UV rated modified bit cap sheet at Roof decks #270, 280, 280A. Scope includes flashing up perimeter walls minimum of 12" with termination bar, counterflashing, and caulk to create a watertight condition.

i. Existing Roof #280B will include spot repairs only as needed to establish the same watertight condition.

j. At all roof areas to be repaired, the existing HVAC equipment will be made safe and removed by others prior to this scope. Existing portal curbs, equipment curbs, vents thru roofs, and other penetrations will NOT be removed and will required flashing

Electronically Filed 09/30/2025 12:46 / / CV 25 125588 / Confirmation Nbr. 3631064 / CLPXC

**EXHIBIT C – SCOPE OF WORK**

to as needed to create watertight condition.

## EXCLUSIONS
1. Existing mechanical equipment refrigerant recovery/removal
2. Isolation of existing electrical, mechanical, plumbing, and low voltage systems as necessary to make ready or safe for demolition.
3. Demolition/removal of existing HVAC and electrical equipment at roof level.
4. Historical element protection.


It is anticipated the building will not be hazardous material free upon completion of construction.

**END OF EXISTING ROOF REPAIRS**

# INDUSTRIAL FIRST INC.



**4/20/23**

## RE: 925 Euclid Ave.

Attn: Tom Smith

The total price to provide material, labor and equipment to install roofing and sheet metal for the above mentioned project.

Project size- 11,700 sf

1.  Set up the project per OSHA approved guidelines.
2.  Demo 117 sq of roofing down to the existing concrete deck
3.  Prime the deck.
4.  Torch apply a UV Rated mod. bit cap sheet to the concrete deck
5.  Flash perimeter walls up 12"/Terminate and 3 course the top to create a watertight condition.
6.  This will also be able to be used as an part of the overall finished roof system and be covered under warranty once completed in its entirety.
7.  See diagram below for areas selected.

**Our price for this scope of work will be…$204,700.00**

Exclusions
1.  Any coping/metal work
2.  HVAC
3.  Electrical
4.  Interior protection (by others)
5.  Ramps for the stairs (by others)

Page 1 of 2

---

**25840 MILES ROAD CLEVELAND, OHIO 44146**
**PHONE: 216-991-8600 / FAX: 216-991-2139**

# INDUSTRIAL FIRST INC.





Please do not hesitate to contact me if you have any questions.
Sincerely

Greg Klik
(216) 337-7564
Gklik2@industrialfirst.com
Vice President

Page 2 of 2



8/17/2023

Mr. Tom Mignogna
Millennia Housing Development, Ltd.
127 Public Square
Cleveland, OH 44114

RE: Centennial Building  -  22092-01
      Roof repairs 270, 280, 280A, 280B
      Immediate Work Proposal Number:     IWP-1 Option 2

Dear  Mr. Mignogna:

Marous/Gilbane Joint Venture is providing pricing for immediate work on the aforementioned project.  Listed below is a summary of work involved and related cost.  Please see the attached sheet for a detailed list of tasks including their related cost.

*Scope of Work*
Roofing
    a. Set up the project per OSHA approved guidelines.
    b. Spot roof repairs to roof 280B only
    c. Complete roof removal to roofs 270 only
        a. Demolish 5500sq of roofing down to the existing concrete deck
        b. Prime the deck.
        c. Torch apply a UV Rated mod. bit cap sheet to the concrete deck
        d. Flash perimeter walls up 12"/Terminate and 3 course the top to create a watertight condition.
        e. This will also be able to be used as an part of the overall finished roof system and be covered under warranty once completed in its entirety.
    d. No roof repairs to roofs 280 and 280A

Demo
    a. Make safe all equipment on roofs 270, 280, 280A, and 280B
    b. Remove all refrigerant from rooftop equipment.
    c. Demo all equipment on roofs 270, 280, 280A, and 280B
    d. Make safe all electrical on level 21 penthouse.
    e. Mold remediation, abatement, and demolition of all walls, ceilings, and flooring at level 21 penthouse (under roofs 280, 280A, and 280B)

Water Management
    a. Install drainage tarps to catch and redirect all water from the current leaks (primarily under roofs 280 and 280A) until the new roof is installed.

*Objective*
Create a watertight condition for the upcoming demolition of the space.

Removal of all mold, asbestos, and walls from level 21 will eliminate the current hazardous condition and allow drainage tarps to be installed to catch and redirect infiltrating water to drainage points.

*This Option 2 minimizes the amount of money used on temporary roof repairs that may have to be removed at a later date to replace the roof decking.

We agree to the lump sum price of **Two Hundred Eighty-One Thousand Eight Hundred Fourty-Four Dollars and 49/100 ($281,844.49)** for the work detailed above.



The work detailed in this proposal will not commence without written authorization.  Full authorization of this work will commence with Prime Contract Change Order execution which shall adjust the current Prime Contract amount.

Please contact the undersigned should you have any questions regarding the aforementioned.

Sincerely,

*David Roberts*

David Roberts, Senior Project Manager
Marous Brothers Construction, Inc.

Marous/Gilbane Joint Venture is directed to proceed with the above work (**IWP-1**).  A formal Prime Contract Change Order will be issued.

_____          _____
Mr. Tom Mignogna                                                            Date

## Immediate Work Proposal Cost Summary

| | | | |
|---|---|---|---|
| **Job Name:** | Centennial Building | **Work Number:** | IWP #1 - Option 2 |
| **Job Number:** | 22092-01 | **Description:** | Roof Repair #270, 280, 280A, 280B |
| **Project Architect:** | Sandvick Architects | | |
| **Prepared By:** | Tom Smith | **Date:** | 8/17/23 |

| Job Number | Phase Code | Work Number | Cost Type | Description | Contractor | Cost Totals |
|---|---|---|---|---|---|---|
| 22092-01 | | IWP #1-2 | S | Roof Repair #270, 280B | Industrial First | $ 116,148.01 |
| | | IWP #1-2 | S | Evacuate Refrigerant from Equipment on roof | Geauga Mech | $ 3,000.00 |
| | | IWP #1-2 | S | Demo Equipment from these roofs | Allowance | $ 10,000.00 |
| | | IWP #1-2 | S | Electrical make-safe / Temporary power | Gateway Electric | $ 32,000.00 |
| | | IWP #1-2 | S | Demo walls & ceilings under 280 and 280A | Allowance | $ 72,084.00 |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | | |
|---|---|---|---|
| **Sub Total:** | | $ | 233,232.01 |
| **General Conditions** | 6.00% | $ | 13,993.92 |
| **Overhead:** | 2.00% | $ | 4,664.64 |
| **Profit:** | 6.00% | $ | 13,993.92 |
| **Cost Change Sub Total:** | | $ | 265,884.49 |

| | | |
|---|---|---|
| **Change Order Request Grand Total:** | $ | 265,884.49 |



## EXHIBIT C – SCOPE OF WORK

**IWP #1 - EXISTING ROOFING REPAIRS – OPTION 2**

**SPECIFICATIONS SECTION(S) INCLUDED:**

    All Division 01 Specifications         – Dated 9/28/2021
    015000 – Temporary Facilities & Controls
    024119 – Selective demolition
    070150 – Preparation for Reroofing
    071413 – Hot Fluid Applied Rubberized Asphalt Waterproofing
    076200 – Sheet Metal Flashing
    077100 – Roof Specialties
    077200 – Roof Accessories

**REPORT(S) CONSIDERED:**

    ENVIRONMENTAL REPORTS

        Atlas ACM Survey             – Dated 8/6/2021
        Atlas ACM Specification        – Dated 8/20/2021
        Atlas Soil Survey             – Dated 10/15/2021
        Atlas LBP Specifications Report   – Dated 1/26/2022
        Atlas LBP Management Plan     – Dated 8/13/2021
        Atlas LBP Inspection          – Dated 8/6/2021
        EA Group ACM Survey of Annex   – Dated 8/7/2018

    HISTORICAL DOCUMENTS
        Union Trust Building Original Structural Drawings (59 pages) Circa 1920
        Union Trust-Part 1 HPCA-AS APPROVED 11-2014
        Union Trust-Part 2 HPCA-AS APPROVED 01-2016

**DRAWINGS INCLUDED:**

    Sandvick – Permit Set 9/28/2021
        Volume A – Demolition
        Volume B – Exterior & Demolition
        Volume C – Architectural & Demolition
        Volume D – MEP

**GENERAL INFORMATION:**

    Provide all labor, material, equipment, engineering, hoisting, supervision, permits, inspections, and associated fees with, but not limited to, the following scope(s) of work.

**SPECIFICATION SECTION – 070150: PREPARATION FOR REROOFING**

1. General Scope Items:

    a. Without exception, should this scope of work of any element create an unsafe condition, fall hazard or otherwise, it is this subcontractor's responsibility to



**EXHIBIT C – SCOPE OF WORK**

<u>eliminate that hazard by temporary protection.</u> The protection shall be fastened to the wall, floor, or ceiling. Where it cannot be secured, special signage or flagging is required to denote such hazard. If shoring is necessary to support loads, such shoring shall include engineering submitted for approval.

b.  <u>Protection and preparation of materials</u> and adjacent surfaces noted to remain in place from contamination using appropriate measures during abatement and demolition in accordance with the contract documents.

Specific Scope Items:

**EXISTING ROOF REPAIRS**

a.  This subcontractor shall demolish and move materials to dumpster supplied by this subcontractor all existing roofing materials associated with 21st level existing <u>Roofs #270,</u> back to the original structure unless noted otherwise.

b.  During demolition, caution should be exercised to <u>limit the damage to the adjacent surfaces</u>. It should be assumed that prior documentation of all areas and zones to be demolished has been recorded to evaluate the condition prior to demolition.

c.  When working at roof levels, this subcontractor has included <u>parapet edge protection</u> and/or full tie-off of workers to prevent fall hazard.

d.  Where demolition occurs that leaves an exposed condition subject to water, wind, or air infiltration, this subcontractor owes <u>temporary construction</u> necessary to infill that opening to prevent such infiltration. This includes but is not limited to roof portals, pipe penetrations, etc.

e.  This subcontractor shall remove and dispose of all mechanical <u>fasteners</u> including but not limited to adhesives, screws, nails, hangars, & straps, at metal flashings that would compromise the new system installation.

f.  Existing <u>roof ladders</u> may no longer exist at the time for this repair. This subcontractor includes temporary and safe ladder access to the areas of repair.

g.  This subcontractor has included preparing the existing deck after demolition to receive primer including scraping and miscellaneous vegetation removal.

h.  Furnish and install primer followed by torch applied UV rated modified bit cap sheet at Roof decks #270. Scope includes flashing up perimeter walls minimum of 12" with termination bar, counterflashing, and caulk to create a watertight condition.

i.  Existing Roof #280B will include spot repairs only as needed to establish the same watertight condition.

j.  At all roof areas to be repaired, the existing HVAC equipment will be made safe and removed by others prior to this scope. Existing portal curbs, equipment curbs, vents thru roofs, and other penetrations will NOT be removed and will required flashing to as needed to create watertight condition.



**EXHIBIT C – SCOPE OF WORK**

    k.   Make safe all electrical equipment in the level 21 penthouse.

    l.   Get the space to dry conditions by removing all mold, asbestos, and walls from level 21 penthouse.

    m. Hang drainage tarps to catch and relocate all current leaks.

**EXCLUSIONS**
1. Existing mechanical equipment refrigerant recovery/removal
2. Isolation of existing electrical, mechanical, plumbing, and low voltage systems as necessary to make ready or safe for demolition.
3. Demolition/removal of existing HVAC and electrical equipment at roof level.
4. Historical element protection.


It is anticipated the building will not be hazardous material free upon completion of construction.

**END OF EXISTING ROOF REPAIRS**

| Ex. | Description |
|-----|-------------|
| **J** | Account Transaction Listings |

**Transaction Listing**

Column headers: Date | ID | Eff. Date I.R. | Eff. Date 2 R. | PNC Last 4 R. | Trans Name | Trans Amt. | Principal Amt. | Interest Amt. | Late Amt. | Unk Amt. | Net Amt. | Init. | Mtg. Escrow | Suspense Amt. | L/C Amt. | Msc Item Amt. | Principal Balance After | Transaction

Electronically Filed 09/30/2025 19:46 / CV 25 125588 / Confirmation Nbr. 3631064 / CLPXC

| Ex. | Description |
|-----|-------------|
| K | Guaranty dated July 1, 2021 |

**LOAN GUARANTY**

by

**FRANK T. SINITO**, an individual

in favor of

**DEUTSCHE BANK AG, NEW YORK BRANCH**

**Dated as of July 1, 2021**

**Relating to:**

**$35,422,000
HH CLEVELAND HUNTINGTON L.P.
TAXABLE MULTIFAMILY HOUSING MORTGAGE NOTE
(THE CENTENNIAL)**

## LOAN GUARANTY

This **LOAN GUARANTY** dated as of July 1, 2021 (as amended, modified or supplemented from time to time, this "Guaranty"), is made by **FRANK T. SINITO**, an individual (the "Guarantor"), with his principal place of business at 127 Public Square, Suite 4000, Cleveland, Ohio 44114, in favor of DEUTSCHE BANK AG, NEW YORK BRANCH (together with its successors and assigns, the "Lender") and the other beneficiaries named herein.

## WITNESSETH:

**WHEREAS,** HII Cleveland Huntington L.P., an Ohio limited partnership (the "Borrower"), is the owner a building to be converted to a multifamily apartment housing facility, among other uses, consisting of a total of approximately 870 units and related personal property and equipment located in Cleveland, Ohio and to be known as "The Centennial" (the "Project Facilities");

**WHEREAS**, the Borrower has requested that Lender provide funding for the refinancing of the Project Facilities, among other uses, in the form of a loan to the Borrower in the amount of $35,422,000 (the "Loan");

**WHEREAS**, the Lender has agreed to provide the Loan to the Borrower to fund the costs of refinancing the Project Facilities pursuant to that certain Loan Agreement of even date herewith (the "Loan Agreement"), which will be evidenced by that certain Promissory Note dated July 15, 2021 (the "Note"), in the amount of $35,422,000, of the Borrower in favor of the Lender;

**WHEREAS**, the Loan is also secured by a Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of the date hereof (the "Mortgage" and, together with the Loan Agreement and the Note, the "Loan Documents"), made by the Borrower in favor of the Lender; and

**WHEREAS**, the Guarantor expects to derive substantial financial benefit in connection with the advancement of the proceeds of the Loan to the Borrower and the refinancing of the Project Facilities.

NOW, THEREFORE, in consideration of the foregoing premises, the issuance of and loan of the proceeds of the Note to the Borrower and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound hereby, Guarantor hereby covenants and agrees for the benefit of the Lender as follows:

## ARTICLE I
## GUARANTY

Section 1.01.  Guaranteed Obligations.  Guarantor hereby irrevocably guarantees to the Lender, and become surety to the Lender for, the due, punctual and full payment and performance of, and covenant with the Lender to duly, punctually and fully pay and perform, the following (collectively, the "Guaranteed Obligations"):

(a)  Principal due on the Loan on the Maturity Date (as defined in the Note) in accordance with the terms of the Note (referred to herein as the "Loan Maturity Guaranty");

(b)  Principal due on the Loan on the Required Paydown Date (as defined in the Loan Agreement), if any and in accordance with Section 2.6 of the Loan Agreement, in an amount not to exceed $19,000,000; and

(c)    All costs and expenses, including out of pocket expenses and reasonable fees of attorneys and expert witnesses, incurred by Lender in enforcing its rights under this Guaranty.

Section 1.02.    Continuing Guaranty.  The obligations of Guarantor hereunder are continuing and absolute, irrespective of any circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a guarantor or surety.  Without limiting the generality of the foregoing, the obligations of Guarantor hereunder shall remain in full force and effect without regard to, and shall not be released, discharged or in any way affected by:

(a)    any amendment, modification or supplement to the Loan Documents;

(b)    any exercise or nonexercise of or delay in exercising any right, remedy, power or privilege under or in respect of this Guaranty or the Loan Documents (even if any such right, remedy, power or privilege shall be lost thereby), or any waiver, consent, indulgence or other action or inaction in respect thereof;

(c)    any bankruptcy, insolvency, arrangement, composition, assignment for the benefit of creditors or similar proceeding commenced by or against the Borrower or either Guarantor;

(d)    any failure to perfect or continue perfection of, or any release or waiver of, any rights given to the Lender in any property as security for the performance of Borrower's obligations under the Loan Documents;

(e)    any extension of time for payment or performance of any of the Guaranteed Obligations;

(f)    the genuineness, validity or enforceability of the Loan Documents;

(g)    any defense that may arise by reason of the failure of the Lender to file or enforce a claim against the estate of the Borrower in any bankruptcy or other proceeding;

(h)    any voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the property of the Borrower, or any marshaling of assets and liabilities, or other similar proceeding affecting the Borrower or any of its assets;

(i)    the release of the Borrower or the Guarantor from performance or observance of any of the agreements, covenants, terms or conditions contained in the Loan Documents by operation of law;

(j)    the failure of the Lender to keep Guarantor advised of the Borrower's or any other guarantor's financial condition, regardless of the existence of any duty to do so;

(k)    any sale or other transfer of the Collateral or any part thereof or any foreclosure by the Lender of any part thereof;

(l)    failure to make or give notice of presentment and demand for payment of any of the indebtedness or performance of any of the Guaranteed Obligations;

(m)    the compromise, settlement, release or termination of any or all of the Guaranteed Obligations; or

(n)    any other circumstances which might otherwise constitute a legal or equitable discharge of a guarantor or surety.

No set-off, claim, reduction or diminution of any obligation, or any defense of any kind or nature which the Borrower now has or hereafter may have against the Lender shall be available hereunder to Guarantor against the Lender.

Notwithstanding any provision in this Guaranty to the contrary, as a condition to pursuing any claim against the Guarantor hereunder in connection with the Loan Maturity Guaranty, Lender shall first exhaust its remedies against the Borrower under the Loan Documents. After realizing on the value of the Project Facilities through a foreclosure sale or deed in lieu of foreclosure, this Guaranty, and specifically the Loan Payment Guaranty, shall serve as a guaranty to the Lender of any shortfall that may be due and owing to Lender.

Section 1.03.    No Notice or Duty to Exhaust Remedies.  Guarantor hereby waives diligence, presentment, demand, protest and all notices of any kind, and waives any requirement that the Lender exhaust any right or remedy, or proceed first or at any time, against the Borrower or any other guarantor of, or any security for, any of the Guaranteed Obligations.  The Lender may pursue its rights and remedies under this Guaranty and under the other Loan Documents in whatever order, and shall be entitled to payment and performance hereunder notwithstanding any action taken by the Lender or inaction by the Lender to enforce any of its rights or remedies against any other guarantor or any other Person or property whatsoever.

Section 1.04.    SUBORDINATION OF SUBROGATION; WAIVER OF MARSHALING, ETC. NOTWITHSTANDING ANY PAYMENTS MADE OR OBLIGATIONS PERFORMED BY GUARANTOR BY REASON OF THIS GUARANTY (INCLUDING BUT NOT LIMITED TO APPLICATION OF FUNDS ON ACCOUNT OF SUCH PAYMENTS OR OBLIGATIONS), AND EXCEPT AS OTHERWISE PROVIDED IN THE LOAN AGREEMENT, GUARANTOR HEREBY IRREVOCABLY (A) SUBORDINATES TO THE PRIOR PAYMENT IN FULL OF THE LOAN AND THE GUARANTEED OBLIGATIONS ANY AND ALL RIGHTS IT MAY HAVE AT ANY TIME (WHETHER ARISING DIRECTLY OR INDIRECTLY, BY OPERATION OF LAW, CONTRACT OR OTHERWISE) TO COLLECT ON ANY CLAIM AGAINST THE BORROWER OR ANY OTHER PERSON, OR AGAINST ANY DIRECT OR INDIRECT SECURITY, ON ACCOUNT OF PAYMENTS MADE OR OBLIGATIONS PERFORMED UNDER OR PURSUANT TO THIS GUARANTY, INCLUDING WITHOUT LIMITATION ANY AND ALL RIGHTS OF SUBROGATION, REIMBURSEMENT, EXONERATION, CONTRIBUTION OR INDEMNITY (EXCEPT TO THE EXTENT THAT THE FAILURE TO ASSERT SUCH CLAIMS MAY RESULT IN THE BAR OF SUCH CLAIMS BASED UPON ANY LACHES, ESTOPPEL, STATUTE OF LIMITATIONS OR SIMILAR DEFENSE), AND (B) WAIVES AND RELEASES ANY RIGHTS IT MAY HAVE AT ANY TIME TO REQUIRE THE MARSHALING OF ANY ASSETS OF THE BORROWER, WHICH RIGHT OF MARSHALING MIGHT OTHERWISE ARISE FROM PAYMENTS MADE OR OBLIGATIONS PERFORMED UNDER OR PURSUANT TO THIS GUARANTY.

Section 1.05.    Waivers.

(a)    Guarantor acknowledges and consents to the applicable provisions of the Loan Documents and solely for purposes of this Guaranty, hereby waives notice of (i) any loans or advances made by the Lender and/or the Lender Representative to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment, waiver, modification or extension of the Loan Agreement or any of the other Loan Documents (other than an amendment of this Guaranty), (iv) the execution and delivery by Borrower and the Lender of any other loan or credit agreement, or Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Collateral, (v) the occurrence

and continuation of any breach by Borrower or any Event of Default under any of the Loan Documents, (vi) the transfer or disposition of the Indebtedness, or any part thereof, (vii) the sale or foreclosure (or posting or advertising for sale or foreclosure) by judicial foreclosure or exercise of power of sale of the Collateral or any other collateral for the Indebtedness, (viii) protest, proof of non-payment or default by Borrower, (ix) any other action at any time taken or omitted by the Lender and/or the Lender Representative, and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to the Indebtedness and the obligations hereby guaranteed (other than notices expressly required under this Guaranty); and (x) all defenses to the enforcement of this Guaranty, including, without limitation, and any defense based upon an election of remedies by the Lender, including, without limitation, any election to proceed by judicial or nonjudicial foreclosure of any security, whether real property or personal property security, or by deed in lieu thereof, and whether or not every aspect of any foreclosure sale is commercially reasonable, or any election of remedies, including, but not limited to, remedies relating to real property or personal property security, which destroys or otherwise impairs the subrogation rights of Guarantor or the rights of Guarantor to proceed against Borrower or any other guarantor for reimbursement, or both.

(b)     Guarantor acknowledges and agrees that all waivers of defenses arising from any impairment of Guarantor's rights of subrogation, reimbursement, contribution and indemnification and waivers of any other rights, privileges, defenses or protections available to Guarantor are intended by Guarantor to be effective to the maximum extent permitted by applicable law.

(c)     In addition to the other waivers set forth in this Guaranty, Guarantor specifically waives (i) all rights and defenses arising out of an election of remedies by the Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against Borrower (ii) any right to require marshaling of assets, and (iii) the right to require that Lender proceed against the Borrower or any other person (including any other guarantor) or exhaust any security held from any person, or pursue any other available remedy, prior to exercising its rights under this Guaranty.

(d)     Guarantor hereby waives, with respect to the Note or the Loan Documents, as applicable, all rights and defenses that Guarantor may have because the debt of Borrower to the Lender is secured by the Collateral or any other property.  This means, among other things:

(i)     the Lender may collect from Guarantor without first foreclosing on any of the Collateral or any other property collateral pledged by Borrower; and

(ii)     if the Lender forecloses on any of the Collateral or any other property pledged by Borrower: (A) the amount of the debt may be reduced only by the price for which the Collateral or such other property is sold at the foreclosure sale, even if the Collateral or such other property is worth more than the sale price, and (B) the Lender may collect from Guarantor even if the Lender, by foreclosing on the Collateral or other property, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by the Collateral or any other property. These rights and defenses include, but are not limited to, any rights or defenses based upon any anti-deficiency or similar laws which, except for this waiver, might otherwise limit, qualify or reduce the obligations of any party under the Loan Documents or this Guaranty.

## ARTICLE II
## REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 2.01.  Representations and Warranties.  To induce the Lender to enter into the Loan Agreement and the other Loan Documents and to induce the Lender to make the Loan, Guarantor hereby represents, warrants and certifies to the Lender and the Lender Representative as follows:

(a)  The execution, delivery and performance of this Guaranty and the transactions contemplated hereby do not conflict with or result in any breach or contravention of any provision of law, statute, rule or regulation to which Guarantor is subject or any judgment, order, writ, injunction, license or permit applicable to Guarantor, and do not require the approval or consent of, or filing with, any governmental agency or authority which has not already been obtained.

(b)  The execution and delivery of this Guaranty will result in valid and legally binding obligations of Guarantor enforceable against Guarantor in accordance with the terms and provisions hereof, except as enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting generally the enforcement of creditors' rights and except to the extent that availability of the remedy of specific performance or injunctive relief is subject to the discretion of the court before which any proceeding therefor may be brought.

(c)  There have been furnished to the Lender financial statements for Guarantor.  Such financial statements fairly present the financial condition of Guarantor as at the close of business on the date set forth in such statements.

(d)  Since the date of such financial statements, there has occurred no material adverse change in the financial condition or business of the Guarantor as shown on or reflected in the financial statements, other than changes that have not had any material adverse effect in the aggregate on the business or financial condition of the Guarantor.

(e)  There are no actions, suits, proceedings or investigations of any kind pending or, to Guarantor's knowledge, threatened against Guarantor before any court, tribunal or administrative agency or board or any mediator or arbitrator that, if adversely determined, might either in any case or in the aggregate, materially and adversely affect the business, assets or financial condition of Guarantor, or result in any liability not adequately covered by insurance, or which will materially and adversely affect the ability of Guarantor to perform its obligations in the manner contemplated by this Guaranty and the other Loan Documents.

(f)  Guarantor (i) has made or filed, and will make or file in a timely fashion, all federal and state income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject, and (ii) has paid, and will pay when due, all taxes and other governmental assessments and charges shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and by appropriate proceedings; in each case, except where the failure to do so would not have materially and adversely affect the ability of Guarantor to perform its obligations in the manner contemplated by this Guaranty.

Section 2.02.  Covenants.  Guarantor hereby covenants to the Lender that, promptly upon becoming aware thereof, such Guarantor shall give the Lender notice of (i) the commencement, existence or threat of any proceeding by or before any Governmental Authority against or affecting such Guarantor which, if adversely decided, would have a material adverse effect on the business, operations, condition (financial or otherwise) or prospects of such Guarantor or on its ability to perform its obligations hereunder

or (ii) any material adverse change in the business, operations, condition (financial or otherwise) or prospects of such Guarantor.

Section 2.03.  Further Assurances.  From time to time upon the request of the Lender, Guarantor shall promptly and duly execute, acknowledge and deliver any and all such further instruments and documents as the Lender and/or the Lender Representative may reasonably deem necessary to confirm this Guaranty, to carry out the purpose and intent hereof or to enable the Lender and/or the Lender Representative to enforce any of its rights hereunder.

Section 2.04.  Financial Reporting.  Guarantor shall keep and maintain or will cause to be kept and maintained proper and accurate books and records, reflecting the financial affairs of Guarantor.  Upon an Event of Default, the Lender Representative shall have the right from time to time during normal business hours upon reasonable notice to Guarantor to examine such books and records at the office of Guarantor or other Person maintaining such books and records and to make such copies or extracts thereof as the Lender Representative shall desire.

## ARTICLE III
## DEFAULTS; REMEDIES

Section 3.01.  Default; Remedies.  Each of the following shall constitute an "Event of Default" hereunder:

(a)  The failure of Guarantor duly and promptly to pay and perform any of the Guaranteed Obligations within five (5) Business Days after written demand from Lender;

(b)  If any representation or warranty made by Guarantor hereunder, or in any financial statement, certificate or other document delivered by Guarantor to the Lender and/or the Lender Representative to induce such party to accept this Guaranty or to approve the advance of funds to the Borrower, shall be false in any material respect; or

(c)  The breach or failure by Guarantor to perform any other covenant or agreement contained herein in any material respect which is not cured within thirty (30) days after written notice from Lender.

Should an Event of Default occur, the Lender or the Lender Representative may enforce this Guaranty in any court of competent jurisdiction, and shall have all remedies available at law or equity including, without limitation, the right to recover any damages incurred by the Lender or the Lender Representative by reason of Guarantor's failure or refusal to perform Guarantor's obligations hereunder as provided herein.  An Event of Default under this Guaranty shall, at the option of the Lender or the Lender Representative, be an Event of Default under the other Loan Documents.

Section 3.02.  Expenses.  Guarantor agrees to pay or cause to be paid and to save the Lender and the Lender Representative harmless against liability for the payment of all reasonable out-of-pocket expenses, including reasonable fees and expenses of counsel for the Lender and the Lender Representative, incurred by the Lender and the Lender Representative from time to time, arising in connection with the Lender's or the Lender Representative's enforcement of rights under this Guaranty, including but not limited to such expenses as may be incurred by the Lender and the Lender Representative in connection with any default by Guarantor of any of its obligations hereunder.

Section 3.03.  No Implied Waiver; Cumulative Remedies.  No course of dealing and no delay or failure of the Lender or the Lender Representative in exercising any right, power or privilege under this

Guaranty or under the other Loan Documents shall affect any other or future exercise thereof or exercise of any other right, power or privilege; nor shall any single or partial exercise of any such right, power or privilege or any abandonment or discontinuance of steps to enforce such a right, power or privilege preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies of the Lender and the Lender Representative under this Guaranty are cumulative and not exclusive of any rights or remedies which the Lender and the Lender Representative would otherwise have under the Loan Documents and at law or in equity.

## ARTICLE IV
## MISCELLANEOUS

Section 4.01.    Amendments; Third Party Beneficiary.  This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced, and only with the prior written consent of the Lender.  This Guaranty is solely for the benefit of the Lender and the Lender Representative, together with their respective successors and assigns, as express and direct third party beneficiaries.  There are no other third party beneficiaries.

Section 4.02.    Notices.  All notices, requests, demands, directions and other communications (collectively "notices") under the provisions of this Guaranty shall be given in the manner and shall be effective at the times set forth in Section 8.1 of the Loan Agreement, sent to the applicable party addressed, if to the Lender, at its address as set forth in the Loan Agreement, and if to Guarantor, at the address for Guarantor set forth below its signature hereto, or in accordance with the last unrevoked written direction from such party to the other parties hereto.  The Lender may rely on any notice (including telephoned communication) purportedly made by or on behalf of Guarantor, and shall have no duty to verify the identity or authority of the person giving such notice.

Section 4.03.    Consent to Jurisdiction; Venue; Waiver of Jury Trial.  Guarantor hereby irrevocably (i) agrees that any suit, action or other legal proceeding arising out of or relating to this Guaranty may be brought in any federal court located in the State and consents to the jurisdiction of such court in any such suit, action or proceeding, (ii) agrees that any suit, action or other legal proceeding by Guarantor against the Lender or the Lender Representative shall be brought solely in a federal or state court located in the State of New York (except that a defense or counter-claim may be asserted by Guarantor in any court in which Lender or the Lender Representative has asserted a claim against Guarantor), and (iii) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Guarantor hereby irrevocably consents to the service of any and all process in any such suit, action or proceeding by mailing of copies of such process to Guarantor at its address set forth below its signature hereto or pursuant to Section 4.02 hereof.  Guarantor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Legal Requirements.  All mailings under this Section shall be by certified or registered mail, return receipt requested.  Nothing in this Section shall affect the right of the Lender or the Lender Representative to serve legal process in any other manner permitted by applicable Legal Requirements or affect the right of the Lender or the Lender Representative to bring any suit, action or proceeding against Guarantor or its property in the courts of any other jurisdiction.

**TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION ARISING HEREUNDER OR OTHERWISE IN CONNECTION HEREWITH AS WELL AS WITH RESPECT TO ANY OF THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS**

WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. THE LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY GUARANTOR.

Section 4.04.    Severability.  If any term or provision of this Guaranty or the application thereof to any Person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Guaranty, or the application of such term or provision to Persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

Section 4.05.    Counterparts; Electronic Signatures.  This Guaranty may be executed in any number of counterparts and by the different parties hereto on separate counterparts, but all such counterparts shall constitute but one and the same instrument.  To the fullest extent permitted by applicable law, electronically transmitted or facsimile signatures shall constitute original signatures for all purposes under this Guaranty.

Section 4.06.    Governing Law.  This Guaranty and all matters arising out of or related to this Guaranty shall be governed by, and construed in accordance with, the laws of the State of Ohio, without giving effect to any conflict of laws principles.

Section 4.07.    Invalid Provisions.  If any provision of this Guaranty is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

Section 4.08.    Headings.  Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

Section 4.09.    Recitals.  The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

Section 4.10.    Rights and Remedies.  If Guarantor becomes liable for any Indebtedness owing by the Borrower to the Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby, and the rights of the Lender hereunder shall be cumulative of any and all other rights that the Lender may ever have against Guarantor.  The exercise by the Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.  All references herein to actions by the Lender shall mean and include actions by the Lender under the Mortgage.

Section 4.11.    Other Defined Terms.  Any capitalized term utilized herein shall have the meaning as specified in the Loan Agreement, unless such term is otherwise specifically defined herein.

Section 4.12.    Parties Bound; Assignment.  This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided,

however, that Guarantor may not, without the prior written consent of the Lender (which may be granted or withheld in the sole discretion of the Lender), assign or delegate any of its rights, powers, duties or obligations hereunder and any attempted assignment or delegation without such consent shall be void *ab initio*.

     Section 4.13.   [Reserved].

     Section 4.14.   Bankruptcy of Borrower.  Regardless of any modification, discharge, or extension of the Indebtedness or the Loan or any amendment, modification, stay or cure of Lender's rights that may occur in any bankruptcy or reorganization case or proceeding concerning the Borrower, whether permanent or temporary and whether assented to by Lender, Guarantor agrees to be obligated to pay and perform the Guaranteed Obligations and discharge its other obligations in accordance with the terms of the Note and Loan Agreement and this Guaranty in effect on the date hereof.  Guarantor understands and acknowledges, by virtue of Guaranty, a specific assumption of all risks of a bankruptcy or reorganization case of proceeding with respect to the Borrower.  As an example and not in any way of limitation, a subsequent modification of the Indebtedness or the Loan in any reorganization case concerning the Borrower will not affect the obligation of Guarantor to perform the Guaranteed Obligations according to their original terms.

     Section 4.15.   Termination.  This Guaranty and the obligations of Guarantor hereunder shall terminate upon the payment in full or defeasance of the Note and payment in full of all amounts owing hereunder.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, Guarantor has duly executed and delivered this Loan Guaranty as of the day and year first above written.

**FRANK T. SINITO**, a natural person

By: _____

Name:  Frank T. Sinito

Address:      127 Public Square, Suite 4000
              Cleveland, OH 44114-1309

[CENTENNIAL – LOAN GUARANTY]

| Ex. | Description |
|-----|-------------|
| L | Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated July 1, 2021 |


282.00

CUYAHOGA COUNTY
OFFICE OF FISCAL OFFICERS - 33
MORT 7/16/2021 2:55:55 PM
**202107160455**

Prepared by and after recording,
please return to:

Kutak Rock LLP
2300 Main Street, Suite 800
Kansas City, Missouri 64108
Attention:  Jacob S. Lowry

## MORTGAGE, ASSIGNMENT OF RENTS AND LEASES, SECURITY AGREEMENT AND FIXTURE FILING

Dated as of July 1, 2021

by

**HH CLEVELAND HUNTINGTON L.P.**, as Mortgagor,

to

**DEUTSCHE BANK AG, NEW YORK BRANCH,**
as Mortgagee

LOCATION OF PREMISES:

County of:  Cuyahoga
State of:  Ohio

Street Address:  925 Euclid Avenue, Cleveland, OH 44115

**TABLE OF CONTENTS**

ARTICLE 1 COVENANTS AND AGREEMENTS OF THE MORTGAGOR ..............................4

 SECTION 1.01. PAYMENT AND PERFORMANCE OF SECURED OBLIGATIONS ..............................................................4

 SECTION 1.02. MAINTENANCE, REPAIR, ALTERATIONS ............................4

 SECTION 1.03. REQUIRED INSURANCE ......................................................5

 SECTION 1.04. CASUALTIES; INSURANCE PROCEEDS ..............................5

 SECTION 1.05. ASSIGNMENT OF POLICIES UPON FORECLOSURE............6

 SECTION 1.06. CONDEMNATION.................................................................6

 SECTION 1.07. OBLIGATIONS UNCONDITIONAL; WAIVER OF OFFSET.................7

 SECTION 1.08. TAXES AND IMPOSITIONS ...............................................7

 SECTION 1.09. UTILITIES ...........................................................................8

 SECTION 1.10. ACTIONS AFFECTING PROPERTY....................................9

 SECTION 1.11. ACTIONS BY THE MORTGAGEE AND LENDER REPRESENTATIVE TO PRESERVE PROPERTY ....................9

 SECTION 1.12. TRANSFER OF PROPERTY BY THE MORTGAGOR ..........10

 SECTION 1.13. FULL PERFORMANCE REQUIRED; SURVIVAL OF WARRANTIES ...................................................................10

 SECTION 1.14. LIENS.................................................................................10

 SECTION 1.15. MORTGAGEE'S POWERS ................................................11

 SECTION 1.16. TRADE NAMES ................................................................11

 SECTION 1.17. MORTGAGOR REMAINS LIABLE ...................................11

 SECTION 1.18. WARRANTIES AND REPRESENTATIONS OF MORTGAGOR............11

 SECTION 1.19. OTHER INSTRUMENTS ...................................................12

 SECTION 1.20. FURTHER ACTS................................................................12

ARTICLE 2 ASSIGNMENT OF RENTS, ISSUES AND PROFITS ...........................................13

 SECTION 2.01. ASSIGNMENT OF RENTS, ISSUES AND PROFITS................................13

 SECTION 2.02. COLLECTION UPON DEFAULT .....................................13

 SECTION 2.03. FURTHER ASSIGNMENTS .............................................14

ARTICLE 3 REMEDIES UPON DEFAULT ...............................................14

 SECTION 3.01. EVENT OF DEFAULT.......................................................14

 SECTION 3.02. ACCELERATION UPON DEFAULT..................................14

 SECTION 3.03. REMEDIES .......................................................................14

 SECTION 3.04. FORECLOSURE ...............................................................15

SECTION 3.05. APPOINTMENT OF RECEIVER ................................................................17

SECTION 3.06. APPLICATION OF FUNDS AFTER DEFAULT ......................................17

SECTION 3.07. COSTS OF ENFORCEMENT ..................................................................17

SECTION 3.08. REMEDIES NOT EXCLUSIVE ...............................................................18

ARTICLE 4      SECURITY AGREEMENT ........................................................................18

SECTION 4.01. CREATION OF SECURITY INTEREST...................................................18

SECTION 4.02. REPRESENTATIONS, WARRANTIES AND COVENANTS OF
               THE MORTGAGOR.................................................................................18

SECTION 4.03. USE OF PERSONAL PROPERTY BY THE MORTGAGOR...................18

SECTION 4.04. REMEDIES UPON AN EVENT OF DEFAULT .......................................19

SECTION 4.05. SECURITY AGREEMENT .....................................................................20

SECTION 4.06. FIXTURE FILING ...................................................................................20

SECTION 4.07. FINANCING STATEMENTS ...................................................................21

ARTICLE 5      MISCELLANEOUS ..................................................................................21

SECTION 5.01. AMENDMENTS .....................................................................................21

SECTION 5.02. [RESERVED]...........................................................................................21

SECTION 5.03. BUSINESS PURPOSE .............................................................................21

SECTION 5.04. MORTGAGOR WAIVER OF RIGHTS ...................................................21

SECTION 5.05. STATEMENTS BY THE MORTGAGOR ...................................................21

SECTION 5.06. NOTICES .................................................................................................22

SECTION 5.07. CAPTIONS .............................................................................................22

SECTION 5.08. INVALIDITY OF CERTAIN PROVISIONS ...........................................22

SECTION 5.09. SUBROGATION......................................................................................22

SECTION 5.10. ATTORNEYS' FEES ...............................................................................22

SECTION 5.11. GOVERNING LAW ................................................................................22

SECTION 5.12. CONSTRUCTION ...................................................................................23

SECTION 5.13. NON-FOREIGN ENTITY.......................................................................23

SECTION 5.14. ACCESS TO PROPERTY AND DISSEMINATION OF
               INFORMATION .....................................................................................23

SECTION 5.15. SUCCESSORS AND ASSIGNS ...............................................................24

SECTION 5.16. NO MERGER OF LEASE .......................................................................24

SECTION 5.17. COUNTERPARTS; ELECTRONIC SIGNATURES .................................24

SECTION 5.18. INDEMNITY............................................................................................25

ARTICLE 6      STATE SPECIFIC PROVISIONS .............................................................26

SECTION 6.01. OHIO STATE LAW PROVISIONS .........................................................26

ii

## MORTGAGE, ASSIGNMENT OF RENTS AND LEASES,
## SECURITY AGREEMENT AND FIXTURE FILING

DATED:                    July 1, 2021

MORTGAGOR:           **HH CLEVELAND HUNTINGTON L.P.,** an Ohio limited partnership (together with its successors and assigns, the "Mortgagor"), having its principal business address at c/o The Millenia Companies, 127 Public Square, Suite 4000, Cleveland, Ohio 44114

MORTGAGEE:          **DEUTSCHE BANK AG, NEW YORK BRANCH**, having an address at 60 Wall Street, New York, New York 10003

MORTGAGE AMOUNT:    $35,422,000

### W I T N E S S E T H:

WHEREAS, the Mortgagor is the owner of a building to be converted to a multifamily apartment housing facility, among other uses, consisting of a total of approximately 870 units and related personal property and equipment located in Cleveland, Ohio and to be known as "The Centennial," the refinancing of which is being financed with the proceeds of that certain Promissory Note dated July 15, 2021, executed by the Mortgagor in the amount of $35,422,000, in favor of the Mortgagee (as amended, modified, or supplemented from time to time, the "Note"); and

WHEREAS, pursuant to a Loan Agreement dated as of July 1, 2021, by and between the Mortgagee and the Mortgagor (as amended, modified, or supplemented from time to time, the "Loan Agreement"), the Mortgagor is obligated to repay the loan evidenced by the Note (the "Loan") in the amounts and at the times specified in the Note; and

WHEREAS, the Loan Agreement, the Note and any other document or instrument given by the Mortgagor at any time to evidence or further secure any obligations assumed or undertaken by the Mortgagor in connection with the Note are sometimes hereinafter collectively referred to as the "Loan Documents"; and

WHEREAS, all capitalized terms used herein without definition have the meanings given to such terms in the Loan Agreement.

NOW, THEREFORE, FOR AND IN CONSIDERATION of the Loan by the Mortgagee, and of the Indebtedness (as hereinafter defined) and the other covenants and agreements of the Mortgagor hereinafter contained, the Mortgagor does hereby absolutely and irrevocably mortgage, grant, deed, assign, convey and transfer to the Mortgagee, and the successors, successor-in-title and assigns of Mortgagee, all of the following described land and interests in land, estates, easements, rights, improvements, personal property, fixtures, equipment, furniture, furnishings, appliances and appurtenances, now owned by Mortgagor or hereafter acquired by Mortgagor.

ALL OF Mortgagor's interest in the land which is described in Exhibit A (hereinafter sometimes called the "Land");

**TOGETHER WITH** all right, title and interest of the Mortgagor in and to, and remedies under (a) any and all leases, subleases, license agreements, concessions, tenancies and other use or occupancy agreements (whether oral or written), or any part thereof, now or hereafter existing, covering or affecting any or all of the Property (as hereinafter defined), all extensions and renewals thereof, and all modifications, amendments and guaranties thereof (each of which is hereinafter called a "Lease"), and (b) any and all rents, income, receipts, revenues, royalties, issues, profits, contract rights, accounts receivable, or general intangibles growing out of or in connection with the Leases (whether from residential or non-residential space) and other payments, payable to the Mortgagor pursuant to any Lease, including, without limitation, cash or securities deposited under any Lease to secure performance by the tenants of their obligations under the Leases, whether such cash or securities are to be held until the expiration of the term of such Leases or are to be applied to one or more of the installments of rent coming due prior to the expiration of such terms and further including subsidy payments received from any source (collectively, the "Rents"), subject, however, to the provisions hereof, and

**TOGETHER WITH** all right, title and interest of the Mortgagor in and to any and all rights, alleys, ways, tenements, hereditaments, easements, passages, waters, water rights, water courses, riparian rights, licenses, franchises, privileges and appurtenances now or hereafter to the same belonging or in any way appertaining, as well as any after-acquired right, title, interest, franchise, license, reversion and remainder, and

**TOGETHER WITH** all right, title and interest of the Mortgagor, including any after-acquired right, title or reversion, in and to the right of ways, streets, avenues and alleys, open or proposed, located wholly or partially within the boundary of the Land or adjacent thereto, and

**TOGETHER WITH** all right, title and interest of the Mortgagor in and to the buildings, structures, surface parking and other improvements of every kind and description now or hereafter erected or placed on the Land, all additions, alterations and replacements thereto or thereof, and all materials now owned or hereafter acquired by the Mortgagor and intended for the operation, construction, reconstruction, alteration and repair thereof, all of which materials shall be deemed to be included within the Property (hereinafter defined) immediately upon the delivery thereof to the Land (all of which are hereinafter called collectively the "Improvements" and, the Improvements and the Land are hereinafter called the "Premises"), and

**TOGETHER WITH** all right, title and interest of the Mortgagor in and to all of the walls, fences, shrubbery, driveways, fixtures, machinery, apparatus, equipment, fittings, and other goods of every kind and description whatsoever, now owned or hereafter acquired by the Mortgagor and attached to or contained in and used for any present or future operation or management of the Land or the Improvements, including, without limitation, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, motors, furnaces, compressors and transformers; all generating equipment; all pumps, tanks, ducts, conduits, wires, switches, fans, switchboards, and other electrical equipment and fixtures; all telephone equipment; all piping, tubing, plumbing equipment and fixtures; all heating, refrigeration, air conditioning, cooling, ventilating, sprinkling, water, power and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals and compactors, dishwashers, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture installed or to be installed or used or usable in any way in the operation of any Improvements or appurtenant facilities erected or to be erected in or upon the Land; and every renewal, replacement or substitution therefor, whether or not the same are now or

2

hereafter attached to the Land in any manner; all except for any right, title or interest therein held by any tenant of any or all of the Land or the Improvements, or by any other person, so long as such tenant or other person is not a party hereto or bound, with respect to such right, title or interest, by the provisions hereof (it being agreed by the parties hereto that all personal property owned by the Mortgagor and placed by it on the Land shall, so far as permitted by law, be deemed to be affixed to the Land, appropriated to its use, and covered by this Mortgage), and

**TOGETHER WITH** all of the Mortgagor's right, title and interest in and to any and all easements and appurtenances, including, without limitation, any easements and agreements which are or may be established to allow satisfactory ingress to, egress from and operation of the Premises, and

**TOGETHER WITH** all right, title and interest of the Mortgagor in and to any and all judgments, awards of damages (including but not limited to severance and consequential damages), payments, proceeds, settlements or other compensation heretofore or hereafter made, including interest thereon, and the right to receive the same, as a result of, in connection with, or in lieu of (a) any condemnation, either temporarily or permanently, (b) any change or alteration of the grade or widening of any street or road, and (c) any other damage, destruction, or injury to, or decrease in value of, the Land or the Improvements or any part thereof, to the extent of all Secured Obligations at the date of receipt by the Mortgagee of any such judgment, award of damages, payment, proceeds, settlement or other compensation, including interest thereon, and of the reasonable counsel fees, costs and disbursements, if any, incurred by the Mortgagee in connection with the collection of such judgment, award of damages, payment, proceeds, settlement or other compensation, including interest thereon, and

**TOGETHER WITH** all of Mortgagor's rights in and to policies of insurance including any and all payments, proceeds, settlements or other compensation heretofore or hereafter made, including any interest thereon, and the right to receive the same, from any and all insurance policies covering the Land or the Improvements or any portion thereof, and

**TOGETHER WITH** all right, title and interest of the Mortgagor in and to that certain Management Agreement dated as of January 1, 2019, by and between Mortgagor and Millennia Commercial Group, Ltd., and any modifications, amendments, extensions, renewals, replacements or substitutions thereof thereafter made, and

**TOGETHER WITH** all contract rights (including any contract deposits), but not any contract obligations or liabilities, relating to or arising out of any agreement to sell, transfer, assign, convey or encumber the Land, the Improvements, any portion thereof, any interest therein, or any ownership interest in Mortgagor, and

**TOGETHER WITH** all plans and specifications, surveys, reports, diagrams, drawings, service contracts, accounting records, invoices, change orders, licenses, authorizations, certificates, variances, approvals and other permits necessary or appropriate to permit the construction, reconstruction, repair or alteration, addition, improvement, use, operation and management of the Land and the Improvements, and

**TOGETHER WITH** all of the Mortgagor's cash, bank accounts, notes and other instruments, documents, accounts receivable, contract rights, permits, receipts, sales and promotional literature and forms, advertising materials and the like, trademarks, names, logos, copyrights and other items of intangible personal property now or hereafter owned by the Mortgagor relating to the ownership, operation, development, leasing or management of the Land or the Improvements, and

3

**TOGETHER** with Mortgagor's rights under Section 365(h)(1)(A) and Section 365(h)(1)(B) of the Bankruptcy Code;

**TO HAVE AND TO HOLD** the Land, the Improvements, fixtures, personal property, tenements, hereditaments, appurtenances and other property interests granted hereinabove (hereinafter collectively called the "Property") unto the Mortgagee, its successors and assigns, for the benefit of the Mortgagee, its successors and assigns, subject only to the Permitted Encumbrances.

**FOR THE PURPOSE OF SECURING**:

(a)      the payment of the Indebtedness including the Loan and all interest, principal, premiums, fees and charges evidenced by or owing under the Note or any of the other Loan Documents;

(b)      payment and performance of each and every other obligation, covenant and agreement of the Mortgagor contained in the Note and the Loan Documents from and after the execution and delivery thereof together with all extensions, modifications, renewals, restatements and refinancings of the foregoing;

(c)      performance of every obligation, covenant and agreement of the Mortgagor contained in any other Loan Document or in any other agreement or instrument now or hereafter executed by the Mortgagor which recites that the obligations thereunder are secured by this Mortgage;

(d)      payment of all sums, with interest thereon at the rate set forth in the Note or the Loan Documents that may become due and payable to or for the benefit of the Mortgagee pursuant to the terms of this Mortgage; and

(e)      the reimbursement of the Mortgagee or Lender Representative for all money advanced, as provided herein, and all expenses (including, reasonable attorneys' fees) incurred or paid by, the Mortgagee or the Lender Representative or the on account of any action (whether formal litigation or otherwise) that may arise in connection with this Mortgage, the Loan Documents or the Property, or in obtaining possession of the Property as hereinafter provided.

The obligations described in subparagraphs (a) through (e) above shall hereinafter be referred to collectively as the "Secured Obligations." The stated final maturity date of the Note is July 1, 2022.

TO PROTECT THE SECURITY GRANTED BY THIS MORTGAGE, THE MORTGAGOR AGREES AS FOLLOWS:

<div align="center">

**ARTICLE 1**
COVENANTS AND AGREEMENTS OF THE MORTGAGOR

</div>

Section 1.01. <u>Payment and Performance of Secured Obligations</u>.  The Mortgagor shall pay and perform when due all of the Secured Obligations, including all of the Mortgagor's obligations under the Loan Agreement and all of the other Loan Documents, in accordance with the terms thereof.

Section 1.02. <u>Maintenance, Repair, Alterations</u>.  The Mortgagor (i) shall maintain, keep and preserve the Property in accordance with the terms of the Loan Agreement, this Mortgage and the other Loan Documents; (ii) shall not commit or permit any waste or deterioration of the Property (normal wear

<div align="center">4</div>

and tear excepted); (iii) shall comply with the provisions of all Leases in all material respects; (iv) shall not abandon the Property or any portion thereof or leave the Premises vacant or deserted; (v) shall not, without Mortgagee's prior written consent, initiate, join in or consent to any change in any zoning ordinance, general plan, specific plan, private restrictive covenant or other public or private restriction limiting the uses which may be made of the Premises other than Permitted Encumbrances; (vi) shall secure and maintain in full force and effect all permits necessary for the use, occupancy and operation of the Premises; (vii) shall not cause or permit any fixture or any article of Personal Property (as defined in Article 4 below) to be removed from the Premises without the prior written consent of the Lender Representative except in accordance with Section 4.02(a); and (viii) except as otherwise prohibited or restricted by the Loan Documents, shall do any and all other acts which may be reasonably necessary to protect and preserve the value of the Property and the rights of the Mortgagee with respect thereto.

Section 1.03.  Required Insurance.  The Mortgagor shall at all times provide, maintain and keep in force, or cause to be provided, maintained and kept in force, at no expense to the Mortgagee, policies of insurance in form and amounts, issued by such insurance companies, associations or organizations, and covering such casualties, risks, perils, liabilities and other hazards as are required under Section 6.4 of the Loan Agreement.

Section 1.04.  Casualties; Insurance Proceeds.

(a)    The Mortgagor shall give prompt written notice to the Mortgagee and the Lender Representative of the occurrence of any casualty to or in connection with the Premises or any part thereof that Mortgagor reasonably believes exceeds $100,000 to repair, whether or not covered by insurance.  So long as no Event of Default has occurred and is continuing (provided that Mortgagee and Lender Representative shall have no obligation to accept a cure of any Event of Default except as otherwise required by law), the Mortgagor shall have the right to settle, adjust or compromise any casualty that Mortgagor reasonably believes does not exceed $500,000 to repair (a "Material Casualty") without the consent of the Mortgagee and/or the Lender Representative and shall have the right to apply any such insurance proceeds to the restoration of the Premises.

(b)    The Mortgagor shall not have the right to settle, adjust or compromise any and all claims for loss, damage or destruction that constitute a Material Casualty under any policy or policies of insurance without the consent of the Lender Representative (on behalf of the Mortgagee), provided, however that during the occurrence and continuance of any Event of Default, the Lender Representative (on behalf of the Mortgagee) shall have the right to settle all such claims without the consent of Mortgagor.  In the event of a Material Casualty, all proceeds of insurance shall be payable to the Mortgagee and Mortgagee may elect to hold (or to have the Lender Representative hold) such proceeds in a segregated account, and the Mortgagor hereby authorizes and directs any affected insurance company to make payment of such proceeds directly to the Mortgagee.  If the Mortgagor receives any proceeds of insurance resulting from a Material Casualty, the Mortgagor shall promptly pay over such proceeds to the Mortgagee.  In the event of any Material Casualty, the Mortgagee shall apply all loss proceeds remaining after deduction of all expenses of collection and settlement thereof, including reasonable attorneys' and adjustor's fees and expenses, to the restoration of the Improvements, so long as (i) no Event of Default, or event or conditions that with the passage of time, the giving of notice or both would constitute an Event of Default, then exists and is continuing (other than as a direct result of the applicable casualty) (provided that Mortgagee and Lender Representative shall have no obligation to accept a cure of any Event of Default except as otherwise required by law); (ii) such loss proceeds (including proceeds of property and rental interruption insurance) shall be in an amount sufficient to complete the restoration of the Improvements and, pay during the period

of restoration and re-leasing all debt service or, if such loss proceeds are insufficient, the Mortgagor shall have deposited with the Mortgagee an amount equal to any deficiency within ten (10) Business Days of the determination of such deficiency and in any event prior to application of any loss proceeds to restoration of the Improvements; (iii) the plans, specifications, construction contracts, architect's agreements and all other material agreements relating to the restoration shall be approved by the Mortgagee in writing using Mortgagee's usual underwriting guidelines; and (iv) the Mortgagee determines, in its sole discretion, that the Premises are capable of being fully restored by the earlier of (A) the date which is twelve (12) months from the receipt of insurance proceeds and the approval by Lender Representative of the items set forth in subjection (iii) above and (B) the Maturity Date (as set forth in the Note). If the foregoing conditions are met, the Mortgagee shall disburse the loss proceeds on a monthly basis in accordance with customary construction loan practices upon submission of requisitions approved by the Lender Representative (on behalf of the Mortgagee), and only as restoration is effected and continuing and expenses become due and payable.

(c)     If any one or more of the above conditions are not met, the Mortgagee may direct that all or part of the loss proceeds, after deductions as herein provided, shall be applied to the mandatory prepayment of the Note in accordance with Section 8 thereof. The Mortgagor irrevocably appoints the Mortgagee its true and lawful attorney-in-fact for the purpose of executing and delivering such notices, certificates and other documents and instruments, in the name of the Mortgagor, as may be required under the Loan Documents to effect such prepayment. If the loss proceeds are not sufficient to satisfy fully the Secured Obligations, the Mortgagor shall deposit with the Mortgagee any deficiency with respect thereto within twenty (20) Business Days of the determination of said deficiency. Nothing herein contained shall be deemed to excuse the Mortgagor from repairing or maintaining the Property as provided in Section 1.02 or restoring all damage or destruction to the Premises. The application or release by the Mortgagee of any insurance proceeds shall not cure or waive any default or notice of default or Event of Default under this Mortgage or invalidate any act done pursuant to such notice.

Section 1.05. <u>Assignment of Policies Upon Foreclosure</u>.  In the event of foreclosure of this Mortgage, exercise of the power of sale hereunder or other transfer of title or assignment of the Property in extinguishment, in whole or in part, of the Secured Obligations, all right, title and interest of the Mortgagor in and to all policies of property insurance maintained with respect to all or any portion of the Property and all other policies of insurance required by the Loan Agreement or the other Loan Documents and relating to the Property shall inure to the benefit of and pass to the successor in interest to the Mortgagor or the purchaser or mortgagee of the Property, to the extent the same may be assigned.

Section 1.06. <u>Condemnation</u>.

(a)     The Mortgagor shall promptly notify the Mortgagee and the Lender Representative if the Mortgagor shall become aware of the threat or institution of any proceeding or negotiations for the taking of the Premises, or any part thereof, whether for permanent or temporary use and occupancy in condemnation or by the exercise of the power of eminent domain or by agreement of interested parties in lieu of such condemnation (all the foregoing herein called a "taking"); shall keep the Mortgagee and the Lender Representative currently advised, in detail, as to the status of such proceedings or negotiations and will promptly give to the Mortgagee copies of all notices, pleadings, judgments, determinations and other papers received or delivered by the Mortgagor therein. For purposes of this Mortgage, a taking that will decrease the value of the Premises by more than $500,000, will materially restrict access to the Property, or will affect more than ten percent (10%) of the rentable square footage of the Improvements shall be a "Material Taking." The Mortgagee and the Lender Representative shall have the right to appear and

6

participate in any proceedings or negotiations in connection with a Material Taking (or in connection with any taking if at such time an Event of Default has occurred and is continuing), and in connection with such proceedings the Lender Representative and the Mortgagee may be represented by counsel of their choice. The Mortgagor will not, without the Mortgagee's prior written consent, enter into any agreement in a Material Taking for the taking of the Premises, or any part thereof, with anyone authorized to acquire the same by eminent domain or in condemnation.

(b)    In the event of any Material Taking, the awards payable in connection therewith are hereby assigned to the Mortgagee, and the Mortgagor shall pay over such awards remaining after deduction of all expenses of collection and settlement, to the Mortgagee and Mortgagee may elect to hold such awards in a segregated account or have the Lender Representative hold such awards in a segregated account. Subject to the satisfaction of the conditions set forth in Section 1.04(b)(i)-(iv) hereof, the Mortgagee shall cause such awards to be applied to the costs to repair, rebuild or replace the portion of the Premises that was not subject to the taking, upon the terms and conditions as set forth in Section 1.04(b). If any of the conditions set forth in Section 1.04(b)(i)-(iv) hereof are not met, the Mortgagee may cause such awards to be applied to the mandatory prepayment of the Note pursuant to Section 8 thereof.

(c)    If, in the event of the happening of any permanent taking, the Mortgagee shall be obligated to apply any awards received by it in connection with such taking towards the restoration of the Premises, the Mortgagor shall promptly, whether or not the awards, if any, shall be sufficient for the purpose, commence and diligently continue to restore, repair and rebuild the portion of the Premises that was not subject to the taking as nearly as possible to its value, condition and character immediately prior to such taking.

Section 1.07.  <u>Obligations Unconditional; Waiver of Offset</u>.  All sums payable by the Mortgagor under this Mortgage shall be paid without notice, demand, counterclaim, set-off, deduction or defense and without abatement, suspension, deferment, diminution or reduction, and the obligations and liabilities of the Mortgagor hereunder shall in no way be released, discharged or otherwise affected (except as expressly provided herein or in any of the Loan Documents) by reason of: (i) any damage to or destruction of or any condemnation or similar taking of the Property or any part thereof; (ii) any restriction or prevention of or interference by any third party with any use of the Property or any part thereof; (iii) any title defect or encumbrance or any eviction from the Premises or the Improvements or any part thereof by title paramount or otherwise; (iv) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to the Mortgagee, or any action taken with respect to this Mortgage by a trustee or receiver of the Mortgagee, or by any court, in any such proceeding; (v) any claim which the Mortgagor has or might have against the Mortgagee; (vi) any default or failure on the part of the Mortgagee to perform or comply with any of the terms hereof; (vii) any default or failure on the part of the Mortgagee to perform or comply with any of the terms of any other agreement with the Mortgagor; (viii) any homestead or similar rights; or (ix) any other occurrence whatsoever, whether similar or dissimilar to the foregoing; whether or not the Mortgagor has notice or knowledge of any of the foregoing. Except as expressly provided herein, the Mortgagor waives all rights now or hereafter conferred by statute or otherwise to any abatement, suspension, deferment, diminution or reduction of any sum secured hereby and payable by the Mortgagor.

Section 1.08.  <u>Taxes and Impositions</u>.

(a)    Except as set forth in Section 6.23 of the Loan Agreement, the Mortgagor shall pay all taxes and insurance and provide evidence of such payment to Mortgagee and Lender Representative. If at

7

any time and for any reason the funds so deposited in the Operating Expense Account are or will be insufficient to pay such amounts as may be then or subsequently due for the payment of all Impositions and the insurance premiums for policies required hereunder and under the Loan Agreement, the Mortgagee or the Lender Representative may, without any obligation to do so, advance any amounts required to make up the deficiency, which advances, if any, shall be secured hereby and shall be repayable to the Mortgagee for the reimbursement of the Mortgagee as herein elsewhere provided.

(b)     The Mortgagor shall not suffer, permit or initiate the joint assessment of any real or personal property which may constitute all or a portion of the Property or suffer, permit or initiate any other procedure whereby the lien of the real property taxes and the lien of the personal property taxes shall be assessed, levied or charged to the Property as a single lien; provided, however, that the Mortgagor shall have the right before any delinquency occurs to contest or object to the amount or validity of any such taxes, assessments or charges by appropriate proceedings, but this shall not be deemed or construed in any way as relieving, modifying or extending the Mortgagor's covenant to pay any such taxes, assessments or charges at the time and in the manner provided in this Section 1.08, unless the Mortgagor has given prior written notice to the Mortgagee of the Mortgagor's intent to so contest or object to a tax, assessment or charge, and unless, at the Mortgagee's sole option, (i) the Mortgagor shall demonstrate to the Mortgagee's reasonable satisfaction that the proceedings to be initiated by the Mortgagor shall conclusively operate to prevent the sale of the Property, or any part thereof, to satisfy such tax, assessment or charge prior to final determination of such proceedings; and (ii) the Mortgagor shall furnish a good and sufficient bond or surety as reasonably requested by and satisfactory to the Mortgagee; and (iii) the Mortgagor shall demonstrate to the Mortgagee's reasonable satisfaction that the Mortgagor has provided a good and sufficient undertaking as may be required or permitted by law to accomplish a stay of any such sale.

(c)     The Mortgagor hereby agrees to pay and indemnify the Mortgagee and the Lender Representative from the payment of all documentary stamp taxes and intangible taxes that may be levied upon the holder of the Secured Obligations imposed by Ohio State or U.S. Federal Law, the indebtedness evidenced by the other Loan Documents, the making or recording of this Mortgage or any evidence of indebtedness secured hereby, or, except as otherwise expressly provided therein, the transactions contemplated by the Loan Agreement, this Mortgage or any of the other Loan Documents, including interest, penalties and costs. The Mortgagee shall promptly provide written notice to Mortgagor of any claim made for the payment of any tax for which Mortgagee and/or Lender Representative would be indemnified hereunder and Mortgagor has the right to contest in good faith the imposition of any such taxes with the applicable taxing authority, provided that any such contest shall not expose the Mortgagee and/or Lender Representative to any risk of penalties, fees, taxes, costs or expenses. The Mortgagor agrees to pay the Mortgagee and the Lender Representative reasonable attorneys' fees and costs incurred in connection with any inquiry from or assertion by governmental authority that any such taxes have not been paid promptly when due.

Section 1.09.  Utilities. Except as set forth in Section 6.23 of the Loan Agreement, the Mortgagor shall pay or cause to be paid prior to delinquency all utility charges incurred by the Mortgagor for the benefit of the Premises or which may become a charge or lien against the Premises for gas, electricity, water or sewer services furnished to the Premises and all other assessments or charges of a similar nature, whether public or private, affecting or related to the Premises or any portion thereof, whether or not such taxes, assessments or charges are or may become liens thereon. The Mortgagor may contest any such charge in good faith and by appropriate proceedings promptly initiated and diligently conducted if (i) such proceedings do not in the opinion of the Lender Representative (acting on behalf of the Mortgagee) involve the risk of the sale, forfeiture or loss of the Property subject to such lien or interfere with the operation of

8

the Premises, (ii) the Mortgagor shall have established a reserve or made other appropriate provision as requested by and satisfactory to the Lender Representative (acting on behalf of the Mortgagee), and (iii) any foreclosure, distraint, sale or other similar proceedings shall have been effectively stayed.

Section 1.10.  <u>Actions Affecting Property</u>.  The Mortgagor shall give the Mortgagee and the Lender Representative prompt written notice of the assertion of any claim with respect to, or the filing of any action or proceeding purporting to affect, the Property, the security of this Mortgage or the rights or powers of the Mortgagee.  The Mortgagor shall appear in and contest, in accordance with the direction of the Lender Representative (acting on behalf of the Mortgagee), any such action or proceeding and shall pay all reasonable costs and expenses, including costs of evidence of title and attorneys' fees, in any such action or proceeding.

Section 1.11.  <u>Actions by the Mortgagee and the Lender Representative to Preserve Property</u>.  If an Event of Default occurs and is continuing (provided that the Mortgagee and Lender Representative shall have no obligation to accept a cure of any Event of Default except as otherwise required by law) (or prior to an Event of Default if the Mortgagee or the Lender Representative determines in its sole judgment that the same is necessary to preserve the Premises or the lien of this Mortgage or the other Loan Documents thereon or on any other collateral securing the Secured Obligations, or is necessary to protect the life, health or safety of any persons on or near the Premises or the property of any such person), the Mortgagee or the Lender Representative in its reasonable discretion, without obligation to do so and without releasing the Mortgagor from any obligation, and, except as provided in the next succeeding sentences, may make any such payment, or perform any other act or take any appropriate action, including, without limitation, entry on the Premises and performance of work thereon, in such manner and to such extent as it may deem necessary to protect the security hereof.  Except in the case of an emergency, the Mortgagee or the Lender Representative shall use reasonable efforts to notify the Mortgagor prior to making any such payment or doing any such act; provided, however, that the failure to provide such notice shall not in any way affect the Mortgagor's obligation to reimburse the Mortgagee and/or Lender Representative in accordance with this Section nor shall either the Mortgagee or the Lender Representative incur any liability to the Mortgagor as a result of such failure.  In connection therewith (without limiting its general powers, whether conferred herein, in any other of the Loan Documents or by law), the Mortgagee or the Lender Representative shall have and is hereby given the right, but not the obligation, at any time after the occurrence of and during the continuance of an Event of Default (provided that the Mortgagee and Lender Representative shall have no obligation to accept a cure of any Event of Default except as otherwise required by law) (i) to enter upon the Premises and take possession of the Property; (ii) to make additions, alterations, repairs and improvements to the Property which it may consider necessary or proper to keep the Premises in good condition and repair; (iii) to appear and participate in any action or proceeding affecting or which may affect the security of this Mortgage or the rights or powers of the Mortgagee; (iv) to pay, purchase, contest or compromise any encumbrance, claim, charge, lien or debt which in its judgment may affect the security of this Mortgage or be prior or superior hereto; and (v) in exercising such powers, to pay necessary expenses, including reasonable attorneys' fees and costs or other necessary or desirable consultants.  The Mortgagor shall, immediately upon demand therefor by the Mortgagee or the Lender Representative, pay to the Mortgagee and/or the Lender Representative an amount equal to all of their reasonable respective costs and expenses incurred in connection with the exercise by the Mortgagee and/or Lender Representative of the foregoing rights, including costs of evidence of title, court costs, appraisals, surveys and receiver's, trustee's, and attorneys' fees, together with interest thereon from the date of such expenditures to the date of payment at the Default Rate.

9

Section 1.12.  Transfer of Property by the Mortgagor.  The Mortgagor agrees that, except for Permitted Transfers (as defined in the Loan Agreement), and except for the making of leases as expressly permitted in the Loan Agreement, the Mortgagor shall not transfer the Property or any portion thereof or interest therein (a "Transfer") without the prior written consent of the Mortgagee.  In the event of any Transfer of the Property or any portion thereof or interest therein (other than Permitted Transfers or as expressly permitted hereunder or under the Loan Documents, or with the prior written consent of the Mortgagee), the Mortgagee shall have the absolute right at the option of the Lender Representative (acting on behalf of the Mortgagee), without prior demand or notice, to declare all of the Secured Obligations for which the Mortgagor is then liable to be immediately due and payable.  Consent to one such Transfer shall not be deemed to be a waiver of the Mortgagee's right to require consent to future or successive transfers. With respect to any Transfer that requires the consent of the Mortgagee, the Mortgagee may grant or deny such consent in its sole and reasonable discretion, and may charge a reasonable fee and, in addition, be reimbursed for its out-of-pocket expenses in connection with such request for consent.  If consent is given, and if this Mortgage is not released to the extent of the transferred portion of the Property by a writing executed by the Mortgagee and recorded in the proper city, town, or county records, then any such Transfer shall be subject to this Mortgage, and any such transferee shall, by accepting such Transfer, assume all obligations hereunder and agree to be bound by all provisions contained herein.  Such assumption shall not, however, release the Mortgagor or any maker or guarantor of any of the Secured Obligations from any liability hereunder or thereunder prior to the date of such Transfer without the prior written consent of the Mortgagee.  The covenants contained in this Section shall run with the Land and shall remain in full force and effect until all of the Secured Obligations are fully paid and fully performed.  The Mortgagee may, without notice to the Mortgagor, deal with any transferees with reference to the Secured Obligations in the same manner as the Mortgagor, without in any way altering or discharging the Mortgagor's liability with respect thereto.

Section 1.13.  Full Performance Required; Survival of Warranties.  All obligations, representations, warranties and covenants of the Mortgagor contained in any Loan Document shall survive the execution and delivery of this Mortgage and shall remain continuing obligations, warranties, representations and covenants of the Mortgagor so long as any portion of the Secured Obligations remains outstanding, and the Mortgagor shall fully and faithfully satisfy and perform all such obligations, representations, warranties and covenants.

Section 1.14.  Liens.  Except for Permitted Encumbrances, the Mortgagor shall not create, incur, or permit to exist any lien, encumbrance or charge upon the Property, or any portion thereof or interest therein (individually, a "Lien" or "Encumbrance" and collectively, "Liens or Encumbrances") without the prior written consent of the Mortgagee in its reasonable discretion.  If the Mortgagor fails to remove and discharge any Lien or Encumbrance or contest the same in good faith after the same shall have been bonded over to the satisfaction of the Mortgagee, then, in addition to any other right or remedy of the Mortgagee, (i) the Mortgagee or the Lender Representative may, but shall not be obligated to, take such action as the Mortgagee or Lender Representative deems warranted to discharge any Lien or Encumbrance either by paying the amount claimed to be due, or by procuring the discharge of such Lien or Encumbrance by depositing in a court a bond or the amount claimed or otherwise giving security for such claim, or by procuring such discharge in such manner as is or may be prescribed by law and (ii) the Mortgagee shall have the absolute right, without prior demand or notice, to declare all of the Secured Obligations for which the Mortgagor is then liable to be immediately due and payable.  The Mortgagor shall, immediately upon demand therefor by the Mortgagee or Lender Representative, pay to the Mortgagee or the Lender Representative an amount equal to all costs and expenses incurred by the Mortgagee or the Lender Representative in connection with the exercise by the Mortgagee or the Lender Representative of the

10

foregoing right to discharge any such Lien or Encumbrance, together with interest thereon from the date of such expenditure to the date of payment at the Default Rate.

Section 1.15. <u>Mortgagee's Powers</u>.  None of the following actions by or caused by the Mortgagee, with or without notice to any person, shall have any effect on either (a) the liability of any other person liable for the payment of any of the Secured Obligations, or (b) the lien or charge of this Mortgage upon any portion of the Property not then or theretofore released as security for the full amount of all unpaid or unperformed Secured Obligations:  (i) the release of any person so liable, (ii) the extension of the maturity or the alteration of any of the terms of any of the Secured Obligations, (iii) the grant of any other indulgences, (iv) the release or reconveyance of all or any portion of the Property, (v) the taking or release of any other or additional security for any of the Secured Obligations, or (vi) the making of arrangements with debtors in relation thereto.

Section 1.16. <u>Trade Names</u>.  At the request of the Mortgagee, the Mortgagor shall execute a certificate in form reasonably satisfactory to the Mortgagee listing all of the trade names and fictitious business names under which the Mortgagor operates, or intends to operate, any portion of the Property or any business located thereon and representing and warranting that the Mortgagor does business under no other trade names or fictitious business names with respect to any portion of the Property.  The Mortgagor shall immediately notify the Mortgagee and the Lender Representative in writing of any change in said trade names or fictitious business names, and will, upon request of the Mortgagee, execute any additional financing statements and other certificates necessary to reflect any change in said trade names or fictitious business names.

Section 1.17. <u>Mortgagor Remains Liable</u>.  Anything herein to the contrary notwithstanding, (a) the Mortgagor shall remain liable under all contracts and agreements relating to the Property, to the extent set forth therein, to perform all of its duties and obligations thereunder to the same extent as if this Mortgage had not been executed, (b) the exercise by the Mortgagee or the Lender Representative of any of its rights hereunder shall not release the Mortgagor from any of the Mortgagor's duties or obligations under any contracts and agreements related to the Property, and (c) the Mortgagee and the Lender Representative shall not have any obligations or liability under any of the contracts or agreements related to the Property by reason of this Mortgage and shall not be obligated to perform any of the obligations or duties of the Mortgagor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

Section 1.18. <u>Warranties and Representations of Mortgagor</u>.  The Mortgagor represents and warrants to the Mortgagee as follows:

(a)     The Mortgagor is the owner of a fee simple interest in the Land and the Improvements and the owner of the remainder of the Property free and clear of any lien, security interest, charge or encumbrance, except for the lien and charge of this Mortgage and the Permitted Encumbrances and will warrant and defend title to the Property against all claims and demands (subject to the Permitted Encumbrances).

(b)     The Mortgagor has good, right and lawful authority to encumber the Property with and grant the lien and charge created by this Mortgage, and the execution, delivery and performance by the Mortgagor of this Mortgage have been duly authorized by all necessary parties and do not and will not (i) violate the certificate of limited partnership, partnership agreement or other organizational documents of the Mortgagor or any direct or indirect constituent partner of the Mortgagor or any provision of any law, rule or regulation, order, writ, judgment, injunction, decree,

11

determination or award presently in effect having applicability to the Mortgagor, or (ii) result in a breach of or constitute a default under any material indenture or loan or credit agreement or any other material agreement, lease or instrument to which the Mortgagor is a party or by which the Mortgagor or its properties may be bound or affected. The Mortgagor will warrant and defend its title to the Property against claims of all persons and entities whomsoever (other than Permitted Encumbrances), and the Mortgagor will maintain and preserve the lien and charge of this Mortgage so long as any of the Secured Obligations are outstanding.

        (c)      No authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body, other than the recordation of this Mortgage in the official records of the city, town or county in which the Property is located, is required (i) for the grant by the Mortgagor of the lien created hereby or for the execution, delivery and performance by the Mortgagor of this Mortgage, or (ii) for the perfection of the security interests granted hereunder or the exercise by the Mortgagee of the rights and remedies conferred hereunder (except as may be required by the express terms of this Mortgage).

Section 1.19. <u>Other Instruments</u>. The Mortgagor shall punctually pay all amounts due and payable under, and shall promptly and faithfully perform or observe each and every other obligation or condition to be performed or observed under the Loan Documents, each mortgage, deed to secure debt, deed of trust, security agreement or other lien or security interest, or encumbrance, lease, sublease, declaration, covenant, condition, restriction, license, order or other instrument or agreement which affects the Property, in law or in equity.

Section 1.20. <u>Further Acts</u>. The Mortgagor shall do and perform all acts necessary to keep valid and effective the charges and lien hereof and to carry into effect its objectives and purposes, in order to protect the Mortgagee. Promptly upon written request, from time to time, of the Mortgagee or the Lender Representative and at the Mortgagor's expense, the Mortgagor shall execute, acknowledge and deliver to the Mortgagee such other and further instruments and do such other acts as in the opinion of the Mortgagee or the Lender Representative may be necessary or appropriate to (a) grant to the Mortgagee the priority perfected lien and security interest in respect of the Property to secure all of the Secured Obligations, (b) grant to the Mortgagee , to the fullest extent permitted by applicable law, the right to foreclose on the Property judicially or nonjudicially, as permitted by applicable law, or to exercise the power of sale, (c) correct any defect, error or omission which may be discovered in the contents of this Mortgage (including all exhibits and/or schedules hereto) or any of the other Loan Documents, (d) identify more fully and subject to the liens, encumbrances and security interests and assignments created hereby and properly intended by the terms hereof to be covered hereby (including any renewals, additions, substitutions, replacements or appurtenances to the Property), (e) assure the intended priority of this Mortgage and of such liens, encumbrances, security interests and assignments, and (f) otherwise effect the intent of this Mortgage. Without limiting the generality of the foregoing, the Mortgagor, upon the Mortgagee's or the Lender Representative's written request, at such times and as often as may be reasonably necessary, and, to the extent consistent with applicable law, at the Mortgagor's own expense, shall promptly record, rerecord, file and refile in such offices, this Mortgage, and every other instrument in addition or supplemental hereto, including applicable financing statements, as may be necessary to create, perfect, maintain and preserve the liens, encumbrances and security interests (and priority thereof) intended to be created hereby and the rights and remedies of the Mortgagee hereunder. Upon written request by the Mortgagee or the Lender Representative, the Mortgagor shall supply evidence of fulfillment of its obligations under this Section 1.20.

## ARTICLE 2
### ASSIGNMENT OF RENTS, ISSUES AND PROFITS

Section 2.01. <u>Assignment of Rents, Issues and Profits</u>. As part of the consideration for the Secured Obligations, and not as additional security therefor, the Mortgagor hereby irrevocably, absolutely, presently, and unconditionally assigns to the Mortgagee all of the Rents and hereby gives to and confers upon the Mortgagee the right, power and authority to collect such Rents. The Mortgagor irrevocably appoints the Mortgagee its true and lawful attorney-in-fact, at any time and from time to time, to demand, receive and enforce payment, to give receipts, releases and satisfactions, and to sue in its name or in the name of the Mortgagor, for all such Rents, and apply the same to the payment of the Secured Obligations; provided, however, that the Mortgagor shall have and is hereby granted the right, in the form of a revocable license, to enforce payment, give satisfactions, sue for and collect such Rents (but not more than one month in advance unless the written approval of the Mortgagee has first been obtained), and to retain and enjoy the same, so long as an Event of Default shall not have occurred hereunder and be continuing (provided that Mortgagee shall have no obligation to accept a cure of any Event of Default except as otherwise required by law). The assignment of the Leases and the Rents in this Article 2 is intended to be an absolute assignment from the Mortgagor to the Mortgagee and not merely the passing of a security interest. The Mortgagor and the Mortgagee further agree that, solely for the purposes of any bankruptcy of Mortgagor or its partners, during the term of this Mortgage, the Rents shall not constitute property of Mortgagor (or of any estate of Mortgagor) within the meaning of 11 U.S.C. §541, as amended from time to time. This is an absolute assignment, not an assignment for security only; however, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the State of Ohio, then, notwithstanding anything in this Mortgage to the contrary, such assignment is intended for security and shall create and perfect a lien on Rents in favor of Mortgagee.

Section 2.02. <u>Collection Upon Default</u>. Upon the occurrence and during the continuation of an Event of Default hereunder (provided that Mortgagee shall have no obligation to accept a cure of any Event of Default), the license granted to the Mortgagor in Section 2.01 shall be automatically revoked without notice (which license shall be automatically reinstated upon such cure of such Event of Default to the Mortgagee's satisfaction or the delivery by the Mortgagee to the Mortgagor of the Mortgagee's express written waiver of such Event of Default). The Mortgagee or the Lender Representative may, at any time without notice, upon the written direction of the Mortgagee or the Lender Representative, either in person, by agent or by a receiver appointed by a court, and without regard to the adequacy of any security for the Secured Obligations, enter upon and take possession of the Premises, or any part thereof, and, with or without taking possession of the Premises or any part hereof, in its own name sue for or otherwise collect such Rents (including those past due and unpaid, and all prepaid rents and all other monies which may have been or may hereafter be deposited with Mortgagor by any lessee or tenant of Mortgagor to secure the payment of any rent or for any services thereafter to be rendered by Mortgagor for any other obligation of any tenant to Mortgagor arising under any Lease). The Mortgagor agrees that, upon the occurrence and during the continuance of any Event of Default hereunder, the Mortgagor shall promptly deliver all such Rents and monies to the Mortgagee. The Mortgagee shall apply such Rents and monies (other than security deposits), less costs and expenses of operation and collection (including reasonable attorneys' fees whether or not suit is brought or prosecuted to judgment) to the payment of any Secured Obligations, in such order as the Mortgagee may determine, notwithstanding that said indebtedness or the performance of said obligation may not then be due. The collection of such Rents, or the entering upon and taking possession of the Premises, or the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done in response to such default or pursuant to such notice of default

13

or be deemed or construed to make the Mortgagee a mortgagee-in-possession of the Premises or any portion thereof.

Section 2.03. <u>Further Assignments</u>.  Upon written demand of the Mortgagee or the Lender Representative, the Mortgagor shall, from time to time hereafter, execute and deliver to the Mortgagee recordable assignments of any and all Leases or other agreements relating to, or affecting the use, occupancy, management or maintenance of, or services provided to, the Property or now or hereafter affecting the Property or any portion thereof. Each such assignment shall be made by an instrument (herein, an "Assignment of Leases") in form and substance reasonably satisfactory to the Mortgagee; provided, however, that no such Assignment of Leases shall be construed as imposing upon the Mortgagee any obligation with respect to the Leases or any of them. The Mortgagee or the Lender Representative may exercise its rights hereunder or under any such Assignment of Leases, and such exercise shall not constitute a waiver of any right hereunder or thereunder. All Leases (and all Rents and security deposits derived therefrom or associated therewith) to which any such Assignment of Leases refers shall be controlled by the terms and provisions of said instrument to the extent that the provisions of this Mortgage are inconsistent therewith.   To the extent not inconsistent, all rights and remedies of the Mortgagee and Lender Representative under any such Assignment of Leases and under this Mortgage shall be cumulative.

**ARTICLE 3**
REMEDIES UPON DEFAULT

Section 3.01. <u>Event of Default</u>.  The term "Event of Default" as used herein means an "Event of Default" as defined in the Loan Agreement.

Section 3.02. <u>Acceleration Upon Default</u>.

(a)     Upon the occurrence and during the continuance of an Event of Default (provided that the Mortgagee shall have no obligation to accept a cure of any Event of Default except as otherwise required by law), the Mortgagee may declare all Secured Obligations to be immediately due and payable without any presentment, demand, protest or notice of any kind; provided no such declaration shall be required, and acceleration shall be deemed to have occurred, if the default is an event set forth in Section 7.1(g) of the Loan Agreement.  Mortgagor acknowledges that the power of sale granted in this Mortgage may be exercised by Mortgagee without judicial hearing.  Mortgagee will be entitled to collect all actual costs and expenses incurred in pursuing such remedies, including reasonable attorneys' fees and costs, costs of documentary evidence, abstracts and title reports.

(b)     Mortgagee may, at Mortgagee's option, also foreclose this Mortgage for any portion of the Indebtedness which is then due and payable, subject to the continuing Lien of this Mortgage for the balance of the Indebtedness.

Section 3.03. <u>Remedies</u>.

(a)     Upon the occurrence and during the continuance of an Event of Default (provided that the Mortgagee shall have no obligation to accept a cure of any Event of Default except as otherwise required by law), the Mortgagee may either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of its security,

14

(i)      enter upon the Premises and take possession of the Property, or any part thereof, in its own name, and do any act which it deems necessary or desirable to preserve the value, marketability or rentability of the Property, or part thereof or interest therein, increase the income therefrom or protect the security hereof;

(ii)      with or without taking possession of the Premises, sue for or otherwise collect the Rents including those past due and unpaid, and apply the same, less costs and expenses of operation and collection including reasonable attorneys' fees, to the payment of any Secured Obligations, all in such order as the Mortgagee may determine;

(iii)      specifically enforce any of the covenants hereof; or

(iv)      exercise all other rights and remedies provided herein, in any of the other Loan Documents, or provided by law or equity.

(b)      The entering upon the Premises and taking possession of the Property, the collection of such Rents and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done in response to such default or pursuant to such notice of default and, notwithstanding the continuance in possession, by the Mortgagee or a receiver of all or any portion of the Property or the collection, receipt and application of any of the Rents thereby, the Mortgagee shall be entitled to exercise every right provided for in any of the Loan Documents or by law upon occurrence of any Event of Default.

Section 3.04.  Foreclosure.

(a)      When the Secured Obligations, or any part thereof, shall become due, whether upon maturity, by acceleration, or otherwise, the Mortgagee may institute an action of foreclosure against the Property, or take such other action at law or in equity of the enforcement of this Mortgage and realization on the Property or any other security herein or elsewhere provided for as the law may allow, and may proceed therein to final judgment and execution for the entire unpaid balance of the Secured Obligations, with interest from and after the occurrence of the Event of Default at the Default Rate together with all other sums due by the Mortgagor in accordance with the provisions of this Mortgage and the other Loan Documents including all sums which may have been paid, incurred or advanced by or on behalf of the Mortgagee or the Lender Representative for taxes, water or sewer rents, charges or claims, payments of prior liens, insurance appraiser's charges, publication costs, and costs (which may be estimated as to items to be expended after entry of judgment) of procuring all such abstracts of title, title searches and examinations, title insurance policies, and similar data and assurances with respect to title as the Mortgagee or the Lender Representative may deem reasonably necessary either to prosecute such suit or to evidence to bidders at any sale which may be had pursuant to such judgment the true condition of the title to or the value of the Property, all costs of suit, together with interest at the Default Rate on any judgment obtained by the Mortgagee from and after the date of such judgment including the period from and after the date of any judicial sale until actual payment is made of the full amount due the Mortgagee as a result of such sale, and a reasonable attorney's commission for collection.

(b)      When the Secured Obligations, or any part thereof, shall become due, whether upon maturity, by acceleration, or otherwise, the Mortgagee may:

15

(i)    proceed to sell the same at auction at the Property or at other place in the city or county in which the Property or the greater part hereof lies, or in the corporate limits of any city surrounded by or contiguous to such county, or in the case of annexed land, in the county of which the land was formerly a part, as Mortgagee may select upon such terms and conditions as Mortgagee may deem best after first advertising such sale as and when required under applicable Ohio law.

(ii)    The Mortgagee shall deliver to the purchaser at any such sale its deed, without warranty, or in such other form as may be required by applicable law, which shall convey to the purchaser the interest in the property which Mortgagor has or has the power to convey at the time of the execution of this Mortgage, and such as it may have acquired hereafter.  The deed shall recite the facts showing that the sale was conducted in compliance with all the requirements of law and of this Mortgage, which recital shall be prima facie evidence of such compliance and conclusive evidence thereof in favor of bona fide purchasers and encumbrances for value.  With respect to any notices required or permitted under the Uniform Commercial Code, Mortgagor agrees that ten (10) days' prior written notice shall be deemed commercially reasonable.  At any such sale (A) whether made under the power herein contained, the Uniform Commercial Code, any other legal requirement or by virtue of any judicial proceedings or any other legal right, remedy or recourse, it shall not be necessary for Mortgagee to be physically present at or to have constructive possession of the Property (the Mortgagor shall deliver to Mortgagee any portion of the Property not actually or constructively possessed by Mortgagee immediately upon demand by Mortgagee), and the title to and right of possession of any such property shall pass to the purchaser thereof as completely as if Mortgagee had been actually present and delivered same to purchaser at such sale, (B) each instrument of conveyance executed by Mortgagee shall contain a general warranty of title, binding upon Mortgagor, (C) each recital contained in any instrument of conveyance made by Mortgagee shall conclusively establish the truth and accuracy of the matters recited therein, including, without limitation, nonpayment of the Secured Obligations, advertisement and conduct of such sale in the manner provided herein and otherwise by law, and appointment of any successor Mortgagee hereunder, (D) any prerequisites to the validity of such sale shall be conclusively presumed to have been performed, (E) the receipt of Mortgagee or other party making the sale shall be a sufficient discharge to the purchaser or purchasers for his or their purchase money and no such purchaser or purchasers, or his or their assigns or personal representatives, shall thereafter be obligated to see to the application of such purchase money or be in any way answerable for any loss, misapplication or nonapplication thereof, and (F) to the fullest extent permitted by law, Mortgagor shall be completely and irrevocably divested of all of its right, title, interest, claim, equity, equity of redemption, and demand whatsoever, either at law or in equity, in and to the property sold and such sale shall be a perpetual bar both at law and in equity against Mortgagor, and against all other persons claiming or to claim the property sold or any part thereof, by, through or under the Mortgagor.  Mortgagee may be a purchaser at such sale and if Mortgagee is the highest bidder, may credit the portion of the purchase price that would be distributed to Mortgagee against the Secured Obligations in lieu of paying cash.  If Mortgagee so elects, Mortgagee may sell the personal property covered by this Mortgage at one or more separate sales in any manner permitted by the UCC.  If the Secured Obligations are now or hereafter further secured by any chattel mortgages, pledges, contracts of guaranty, assignments of lease or other security instruments, Mortgagee may at its option exhaust the remedies granted under any of said security instruments either concurrently or independently, and in such order as Mortgagee may determine.

(c)    If any or all of the Premises or any estate or interest therein is to be sold under the provisions of this Mortgage, by virtue of a judicial sale, it may be sold, as an entirety or in one or more parcels, by one

16

sale or by several sales held at one time or at different times, with such postponement of any such sale as the Mortgagee may deem appropriate and without regard to any right of the Mortgagor or any other person to the marshaling of assets.  The Mortgagee or the Lender Representative may bid and become the purchaser at any such sale.

(d)    Upon any sale of the Mortgagor's interest in any or all of the Property, whether by other foreclosure or judicial proceedings, the proceeds of such sale, together with any other sum then held as security hereunder or due under any of the provisions hereof as part of the Property (after paying all expenses of sale, including reasonable attorneys' fees, and all taxes, assessments or impositions in connection with the Property which the Mortgagee deems it advisable or expedient to pay and all sums advanced, with interest thereon, as herein provided shall be applied) to the payment of the Secured Obligations then due and owing under the Loan Documents and secured hereby and interest thereon to the date of payment and prepayment fees, if any, paying over the surplus, if any, less the expense, if any, of obtaining possession, to the Mortgagor or any person entitled thereto upon the surrender and delivery to the purchaser of possession of the Property.

Section 3.05.  Appointment of Receiver.  Upon the occurrence and during the continuance of an Event of Default (provided that the Mortgagee shall have no obligation to accept a cure of any Event of Default except as required by law), the Mortgagee may apply for the appointment of a receiver of the Premises and/or the Rents, without notice except as required by law, and shall be entitled to the appointment of the receiver as a matter of right, without consideration of the value of the Premises, the solvency of any person liable for the payment of the Secured Obligations, or the effect of the receivership on the operation of the Premises or the Mortgagor's business thereon.

Section 3.06.  Application of Funds After Default.  Except as otherwise herein provided or provided in the other Loan Documents, upon the occurrence and during the continuance of an Event of Default hereunder (provided that the Mortgagee shall have no obligation to accept a cure of any Event of Default), the Mortgagee may, at any time without notice, apply any or all sums or amounts received and held by the Mortgagee (other than the security deposits from tenant leases) to pay insurance premiums, taxes, assessments and other impositions in connection with the Property, or apply amounts received as rents or income of the Property, or as insurance or condemnation proceeds, and all other sums or amounts received by the Mortgagee from or on account of the Mortgagor or the Property, or otherwise, to any of the Secured Obligations then due and payable, in such manner and order as the Mortgagee may elect, notwithstanding that said indebtedness or the performance of said obligation may not yet be due.  The receipt, use or application of any such sum or amount shall not be construed (i) to affect the maturity of any Secured Obligations or any of the rights or powers of the Mortgagee hereunder or under the terms of the Loan Documents; or (ii) any of the obligations of the Mortgagor or any guarantor hereunder or under the Loan Documents; or (iii) to cure or waive any default or notice of default hereunder or under any of the Loan Documents; or (iv) to invalidate any act of the Mortgagee.

Section 3.07.  Costs of Enforcement.  If any Event of Default occurs and is continuing (provided that the Mortgagee shall have no obligation to accept a cure of any Event of Default), the Mortgagee and the Lender Representative may employ an attorney or attorneys to protect their respective rights hereunder. The Mortgagor agrees to pay to the Mortgagee or the Lender Representative (as applicable), on demand, the reasonable fees and expenses of such attorneys and all other costs of enforcing the obligations secured hereby, including recording fees, receivers' fees and expenses, and all other expenses, of whatever kind or nature, incurred by the Mortgagee, in connection with the enforcement of the Secured Obligations, whether

17

or not such enforcement includes the filing of a lawsuit.  Until paid, such sums shall be secured hereby and shall bear interest, from date of expenditure, at the Default Rate.

Section 3.08.  <u>Remedies Not Exclusive</u>.  The Mortgagee shall be entitled to enforce payment and performance of any Secured Obligations and to exercise all rights and powers under this Mortgage or under any Loan Documents or other agreement or any law now or hereafter in force, notwithstanding some or all of the Secured Obligations may now or hereafter be otherwise secured, whether by guaranty, mortgage, deed of trust, deed to secure debt, pledge, lien, assignment or otherwise.  Neither the acceptance of this Mortgage nor its enforcement, whether by court action or other powers herein contained, shall prejudice or in any manner affect the Mortgagee's rights to realize upon or enforce any other security now or hereafter held by the Mortgagee, it being agreed that the Mortgagee shall be entitled to enforce this Mortgage and any other security now or hereafter held by the Mortgagee in such order and manner as the Mortgagee in its sole discretion may direct.  No remedy herein conferred upon or reserved to the Mortgagee is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder now or hereafter existing at law or in equity or by statute, to the maximum extent permitted by applicable law.  Every power or remedy given hereunder or under any of the Loan Documents to the Mortgagee or to which the Mortgagee may be otherwise entitled may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by the Mortgagee.

<div align="center">

**ARTICLE 4**
SECURITY AGREEMENT

</div>

Section 4.01.  <u>Creation of Security Interest</u>.  The Mortgagor hereby grants to the Mortgagee a security interest in all rights, titles, interests, estates, power and privileges that the Mortgagor now has or may hereafter acquire in and to that portion of the Property, which, under applicable law, may be subject to a security interest under the Uniform Commercial Code of the State of Ohio (the "Personal Property") to secure the Secured Obligations.

Section 4.02.  <u>Representations, Warranties and Covenants of the Mortgagor</u>.  The Mortgagor hereby represents, warrants and covenants as follows:

(a)  The tangible portion of the Personal Property shall be kept on or at the Premises and the Mortgagor shall not, without the prior written consent of the Mortgagee, remove any material portion of the Personal Property except such portions or items of Personal Property as are consumed or worn out in ordinary usage, all of which shall be promptly replaced by the Mortgagor with similar items of comparable value if required for the efficient operation of the Premises;

(b)  The Mortgagor shall promptly notify the Mortgagee and the Lender Representative of any material claim against the Personal Property adverse to the interest of the Mortgagee therein; and

(c)  Without the prior written consent of the Mortgagee, the Mortgagor shall not create or suffer to be created pursuant to the Uniform Commercial Code any other security interest in the Personal Property, including replacements and additions thereto.

Section 4.03.  <u>Use of Personal Property by the Mortgagor</u>.  Until the occurrence and during the continuation of an Event of Default hereunder (provided that the Mortgagee shall have no obligation to

<div align="center">18</div>

accept a cure of any Event of Default), the Mortgagor may have possession of the Personal Property and use it in any lawful manner not inconsistent with this Mortgage and not inconsistent with any policy of insurance covering the Premises or the Personal Property.

Section 4.04.  <u>Remedies Upon an Event of Default</u>.

(a)    In addition to the remedies provided in Article 3, upon the occurrence of an Event of Default and during the continuation thereof (provided that the Mortgagee shall have no obligation to accept a cure of any Event of Default), the Mortgagee may at its option do any one or more of the following, subject to applicable law:

(i)    Either personally, or by means of a court appointed receiver, take possession of all or any of the Personal Property and exclude therefrom the Mortgagor and all others claiming under the Mortgagor, and thereafter hold, store, use, operate, manage, maintain and control, make repairs, replacements, alterations, additions and improvements to and exercise all rights and powers of the Mortgagor with respect to the Personal Property or any part thereof;

(ii)    Without notice to or demand upon the Mortgagor, make such payments and do such acts as the Mortgagee or the Lender Representative may direct to protect the Mortgagee's security interest in the Personal Property (including paying, purchasing, contesting or compromising any Lien or Encumbrance (other than Permitted Encumbrances), whether superior or inferior to such security interest) and in exercising any such powers or authority to pay all expenses (including litigation costs and reasonable attorneys' fees) incurred in connection therewith;

(iii)    Require the Mortgagor from time to time to assemble the Personal Property, or any portion thereof, at a place designated by the Mortgagee and promptly deliver such Personal Property to the Mortgagee or an agent or representative designated by the Mortgagee;

(iv)    Realize upon the Personal Property or any part thereof as herein provided or in any manner permitted by law and exercise any and all of the other rights and remedies conferred upon the Mortgagee by this Mortgage or by any of the other Loan Documents or by law, either concurrently or in such order as the Mortgagee or the Lender Representative may determine;

(v)    Sell or cause to be sold in such order as the Mortgagee or the Lender Representative may determine, as a whole or in such parcels as the Mortgagee or the Lender Representative may determine, the Personal Property;

(vi)    Sell, lease or otherwise dispose of the Personal Property at public or private sale, upon terms and in such manner as the Mortgagee or the Lender Representative may determine, and the Mortgagee or the Lender Representative may be a purchaser at any sale; and

(vii)    Exercise any remedies of a secured party under the Uniform Commercial Code or any other applicable law.

The Mortgagee and the Lender Representative and their respective agents and representatives shall have the right to enter upon any or all of the Premises to exercise the Mortgagee's rights hereunder.

Electronically Filed 09/30/2025 19:46 /  / CV 25 125588 / Confirmation Nbr. 3631064 / CLPXC

(b)     Unless the Personal Property is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Mortgagee shall give the Mortgagor at least ten (10) days' prior written notice of the time and place of any public sale of the Personal Property or other intended disposition thereof to be made, which notice the Mortgagor agrees is reasonable. Such notice may be mailed to the Mortgagor at its address set forth in the opening paragraph of this Mortgage.

(c)     Subject to the terms of the Loan Agreement, the proceeds of any sale under Section 4.04(a)(vi) shall be applied as follows:

(i)     to the repayment of the costs and expenses of taking, holding and preparing for the sale and the selling of the Personal Property (including costs of litigation and reasonable attorneys' fees) and the discharge of all Impositions, Liens and Encumbrances, and claims thereof, if any, on the Personal Property prior to the security interest granted herein (except any Impositions or Liens and Encumbrances subject to which such sale shall have been made);

(ii)     the payment of the Secured Obligations, including interest, in such order as the Mortgagee shall determine;

(iii)     to be held as collateral for any obligation of the Mortgagor to the Mortgagee under the Loan Documents; and

(iv)     the surplus, if any, shall be paid to the Mortgagor or to whosoever may be lawfully entitled to receive the same, or as a court of competent jurisdiction may direct.

(d)     The Mortgagee shall have the right to enforce one or more remedies under this Section 4.04 successively or concurrently and such action shall not operate to stop or prevent the Mortgagee from pursuing any further remedy that it may have. Any repossession or retaking or sale of the Personal Property pursuant to the provisions hereof shall not operate to release the Mortgagor until full payment of any deficiency has been made in cash.

Section 4.05.  <u>Security Agreement</u>. This Mortgage constitutes and shall be deemed to be a "security agreement" for all purposes of the Uniform Commercial Code; and the Mortgagee shall be entitled to all the rights and remedies of a "secured party" under the Uniform Commercial Code as to any Personal Property. Information concerning the security interest in Personal Property can be obtained from the Mortgagee at its address set forth in the opening paragraph of this Mortgage. The mailing address of the Mortgagor (debtor) is also set forth in the opening paragraph of this Mortgage.

Section 4.06.  <u>Fixture Filing</u>. Some of the Personal Property is or is to become fixtures on the Premises and this instrument is to be recorded in the real estate records. This Mortgage, upon being filed for record in the real estate records of the county wherein such fixtures are situated, shall be effective as a financing statement filed as a fixture filing, executed by the Mortgagor, as debtor, in favor of the Mortgagee, as secured party, with respect to all fixtures included in the Property and the Personal Property. Products of the collateral are also covered. Information concerning the security interest in fixtures can be obtained from the Mortgagee at its address set forth in the opening paragraph of this Mortgage. The mailing address of the Mortgagor (debtor) is also set forth in the opening paragraph of this Mortgage. The Mortgagor's organizational identification number is 2392205.

20

Section 4.07.  <u>Financing Statements</u>.  The Mortgagor hereby authorizes the Mortgagee to file any financing statements, as well as extensions, renewals and amendments thereof, and any reproductions of this Mortgage in such form as the Mortgagee may require to perfect a security interest with respect to such items.  The Mortgagor shall pay all reasonable costs of filing such financing statements and any extensions, renewals, amendments and releases thereof, and shall pay all reasonable costs and expenses of any record searches for financing statements as the Mortgagee or the Lender Representative may require.  The filing of such financing statements shall under no circumstance be construed as impairing either the Mortgagee's remedies or the priority of the lien granted hereby, and the Mortgagor agrees that all items of Personal Property are, and at all times, for all purposes and in all proceedings (both legal and equitable) shall be, at the election of the Mortgagee, regarded as part of the real estate encumbered by this Mortgage.  It is understood and agreed that the Mortgagee shall have no duty or obligation to file financing statement hereunder, and such duty shall be solely that of the Mortgagor.

<div align="center">

**ARTICLE 5**
MISCELLANEOUS

</div>

Section 5.01.  <u>Amendments</u>.  No amendment or waiver of any provision of this Mortgage nor consent to any departure by the Mortgagor herefrom shall in any event be effective unless the same shall be in writing and signed by the Mortgagee, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  All amendments shall be made in accordance with any applicable provisions of the Loan Agreement.

Section 5.02.  [Reserved].

Section 5.03.  <u>Business Purpose</u>.  The Mortgagor hereby stipulates and warrants that the Secured Obligations are a commercial facility and that such facility is being granted solely to acquire or carry on a business, professional or commercial enterprise or activity.

Section 5.04.  <u>Mortgagor Waiver of Rights</u>.  The Mortgagor waives, to the extent permitted by law, (a) the benefit of all laws now existing or that may hereafter be enacted providing for any appraisement before sale of any portion of the Property, (b) all rights of redemption, valuation, appraisement, stay of execution, notice of election to mature or declare due the whole of the indebtedness secured hereby and marshaling in the event of foreclosure of the liens hereby created, (c) all rights and remedies which Mortgagor may have or be able to assert by reason of applicable laws pertaining to the rights and remedies of sureties, (d) the right to assert any statute of limitations as a bar to the enforcement of the lien of this Mortgage or to any action brought to enforce the Note or any other obligation secured by this Mortgage, and (e) any rights, legal or equitable, to require marshaling of assets or to require upon foreclosure sales in a particular order and (f) all homestead rights.

Mortgagee shall have the right to determine the order in which any or all of the Property shall be subjected to the remedies provided by this Mortgage.  Mortgagee shall have the right to determine the order in which any or all portions of the Secured Obligations are satisfied from the proceeds realized upon the exercise of the remedies provided by this Mortgage.

Section 5.05.  <u>Statements by the Mortgagor</u>.  The Mortgagor shall, within ten (10) days after a request from the Mortgagee or the Lender Representative, deliver to the Mortgagee and the Lender Representative a written statement setting forth the then unpaid amounts of the Secured Obligations and stating whether any offset or defense exists against payment of such amounts.

<div align="center">

21

</div>

Section 5.06.  Notices.  All notices, requests and demands to be made hereunder to the parties hereto shall be in writing and shall be given in the manner prescribed in the Loan Agreement, to the addresses provided therein.  All notices provided herein to the Mortgagee shall also be provided to the Lender Representative.

Section 5.07.  Captions.  The captions or headings at the beginning of each Section hereof are for the convenience of the parties and are not a part of this Mortgage.

Section 5.08.  Invalidity of Certain Provisions.  Every provision of this Mortgage is intended to be severable.  In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.  If the lien of this Mortgage is invalid or unenforceable as to any part of the Secured Obligations, or if the lien is invalid or unenforceable as to any part of the Property, the unsecured or partially secured portion of the Secured Obligations shall be completely paid prior to the payment of the remaining secured or partially secured portion of the Secured Obligations, and all payments made under the Secured Obligations, whether voluntary or under foreclosure or other enforcement action or procedure, shall be considered to have been first paid on and applied to the full payment of that portion of the Secured Obligations which is not secured or fully secured by the lien of this Mortgage.

Section 5.09.  Subrogation.  To the extent that the Mortgagee or the Lender Representative pays any outstanding lien, charge or prior encumbrance against the Property, the Mortgagee or the Lender Representative, as applicable, shall be subrogated to any and all rights and liens held by any owner or holder of such outstanding liens, charges and prior encumbrances, irrespective of whether said liens, charges or encumbrances are released.

Section 5.10.  Attorneys' Fees.  If the Secured Obligations are not paid when due or if any Event of Default occurs and continues, the Mortgagor agrees to pay all reasonable costs of enforcement and collection incurred by the Mortgagee or the Lender Representative, including reasonable attorneys' fees, whether or not such enforcement and collection includes the filing of a lawsuit.  As used herein, the terms "attorneys' fees" and "attorneys' fees and costs" shall each mean the reasonable fees and expenses of counsel to the parties hereto, which may include printing, photocopying, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals, librarians and others not admitted to the bar but performing services under the supervision of an attorney.  The terms "attorneys' fees" and "attorneys' fees and costs" shall also each include all such reasonable fees and expenses incurred with respect to appeals, arbitrations and bankruptcy proceedings, and whether or not any action or proceeding is brought with respect to the matter for which said fees and expenses were incurred and shall also include all such fees and expenses incurred in enforcing any judgment.  This agreement to pay costs is part of and not a limitation on any obligation on the part of the Mortgagor to pay costs and expenses under the Loan Agreement or the other Loan Documents.

Section 5.11.  Governing Law.

(a)  THIS MORTGAGE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF OHIO, WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PRINCIPLES.

22

(b)     NOTWITHSTANDING THE FOREGOING, TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES STIPULATE AND AGREE THAT THE MORTGAGEE MAY ENFORCE, IN ACCORDANCE WITH THE LAW OF THE STATE OF OHIO, ANY OR ALL OF ITS RIGHTS TO SUE THE MORTGAGOR, TO COLLECT ANY INDEBTEDNESS IN OHIO OR ELSEWHERE, BEFORE OR AFTER FORECLOSURE.

Section 5.12.  <u>Construction</u>.  Whenever required by the context hereof, the singular shall be deemed to include the plural, and the plural shall be deemed to include the singular, and the masculine, feminine and neuter genders shall each be deemed to include the others.  Except as otherwise indicated herein, all section and exhibit references in this Mortgage shall be deemed to refer to the sections and exhibits of and to this Mortgage, and the terms "herein", "hereof", "hereto", "hereunder" and similar terms refer to this Mortgage generally rather than to the particular provision in which such term is used.  Whenever the words "including", "include" or "includes" are used in this Mortgage, they shall be interpreted as though immediately followed by the words "without limitation."  As used herein, the word "person" includes corporation, partnership, limited liability company, and any other form of association, as well as any governmental or quasi-governmental body or agency.

Section 5.13.  <u>Non-foreign Entity</u>.  Section 1445 of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code") provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.  To inform the Mortgagee that the withholding of tax will not be required in the event of the disposition of the Property pursuant to the terms of this Mortgage, Mortgagor hereby certifies, under penalty of perjury, that the Mortgagor is not a foreign corporation, foreign partnership, foreign trust or foreign estate, as those terms are defined in the Internal Revenue Code and the regulations promulgated thereunder, that the Mortgagor's U.S. employer identification number has been previously provided to the Mortgagee and that the Mortgagor's principal place of business is as set forth on the first page of this Mortgage.  It is understood that the Mortgagee may disclose the contents of this certification to the Internal Revenue Service and that any false statement contained herein could be punished by fine, imprisonment or both.  The Mortgagor shall execute such further certificates, which shall be signed under penalty of perjury, as the Mortgagee shall reasonably require.  The covenants set forth in this Section shall survive the foreclosure of the lien of this Mortgage or acceptance of a deed in lieu thereof.

Section 5.14.  <u>Access to Property and Dissemination of Information</u>.  The Mortgagor hereby authorizes the Mortgagee and the Lender Representative, any prospective bidder at any foreclosure sale and their respective officers, directors, employees, agents and independent contractors, upon reasonable prior written notice and so long as such persons do not unreasonably interfere with the Mortgagor's operations on the Premises or the rights of tenants, to enter upon all or any portion of the Premises at any time and from time to time (following the occurrence and during the continuance of an Event of Default) for the purpose of conducting such tests, inspections, inquiries, examinations, studies, analyses, samples, surveys and other information-gathering activities (collectively, "Tests and Studies") with respect to the Premises as any of them may from time to time deem reasonably necessary or appropriate, including Tests and Studies with respect to the structural integrity of the Improvements and the presence of hazardous substances in or around the Premises, provided, however, that all Tests and Studies shall be conducted (i) in accordance with all applicable laws and regulations and (ii) in a professional manner in accordance with applicable standards of professional diligence and care.  The Lender Representative shall use commercially reasonable efforts to ensure any third party entering the Premises has reasonable liability and workers compensation insurance.  The Mortgagor hereby covenants and agrees to reasonably cooperate with such persons and entities in their efforts to conduct Tests and Studies, and further covenants and agrees to make reasonably available to such persons and entities such portions of the Premises as any of them may

23

designate. The results of all Test and Studies shall be and at all times remain the property of such persons and entities, and under no circumstances shall any such person have any obligation whatsoever to disclose or otherwise make available to the Mortgagor or any other person such results or any other information obtained by them in connection with such Tests and Studies, unless such Tests and Studies are used to demonstrate or provide evidence of an Event of Default. Notwithstanding the foregoing provisions of this Section, the Mortgagee reserves the right, and the Mortgagor expressly authorizes the Mortgagee, to make available to any person (including any governmental agency or authority and any prospective bidder at any foreclosure sale of the Property) any and all information which the Mortgagee may have with respect to the Premises, whether provided by the Mortgagor or any other person or obtained as a result of Tests and Studies (including environmental reports, surveys and engineering reports). During the continuance of any Event of Default, the Mortgagor consent to the Mortgagee's notifying any person (either as a part of a notice of sale or otherwise) of the availability of any or all of the Tests and Studies and the information contained therein. The Mortgagor acknowledges that the Mortgagee cannot control or otherwise assure the truthfulness or accuracy of the Tests and Studies, and that the release of the Tests and Studies or any information contained therein to prospective bidders at any foreclosure sale of the Property may have a material and adverse effect upon the amount which a person may bid at such sale. The Mortgagor agrees that the Mortgagee shall have no liability whatsoever as a result of delivering in accordance with this Section 5.14 any or all of the Tests and Studies or any information contained therein to any person, and the Mortgagor hereby releases, remises and forever discharges the Mortgagee from any and all claims, damages or causes of action arising out of, connected with or incidental to the Tests and Studies or the delivery thereof in accordance with this Section 5.14 to any person.

Section 5.15. <u>Successors and Assigns</u>. This Mortgage applies to, inures to the benefit of and binds the Mortgagor and its heirs, legatees, devisees, administrators, personal representatives, executors and the successors and assigns thereof, and the Mortgagee. The term "Mortgagee" means the Person named herein as the Mortgagee, and its successors-in-interest or assigns under the Loan Documents from time to time, whether or not named as the Mortgagee herein and any such successor or assignee shall be for all purposes the sole Mortgagee after the date of such substitution. Without limiting the generality of the foregoing, the parties acknowledge that the Lender Representative is and shall be an express third party Mortgagee of the rights of the Mortgagee hereunder. The term "Mortgagor" means the Mortgagor named herein and the successors-in-interest, if any, of the named the Mortgagor in and to the Property or any part thereof. If there is more than one Mortgagor hereunder, their obligations are joint and several. This Section shall not be deemed a waiver of any of the provisions of Section 1.12 hereof and Section 6.11 of the Loan Agreement.

Section 5.16. <u>No Merger of Lease</u>. Upon the foreclosure of the lien created by this Mortgage on the Property or the exercise of the power of sale granted hereunder pursuant to the provisions hereof, any Lease then existing and affecting all or any portion of the Property shall not be destroyed or terminated by application of the law of merger or as a matter of law or as a result of such foreclosure unless the Mortgagee or any purchaser at such foreclosure or exercise of the power of sale shall so elect. If both the lessor's and lessee's estate under any Lease or any portion thereof which constitutes a part of the Property shall at any time become vested in one owner, this Mortgage and the lien created hereby shall not be destroyed or terminated by application of the doctrine of merger unless the Mortgagee so elects as evidenced by recording a written declaration so stating, and, unless and until the Mortgagee so elects, the Mortgagee shall continue to have and enjoy all of the rights and privileges of the Mortgagee hereunder as to the separate estates.

Section 5.17. <u>Counterparts; Electronic Signatures</u>. This Mortgage may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same

24

instrument.  To the fullest extent permitted by applicable law, electronically transmitted or facsimile signatures shall constitute original signatures for all purposes under this Mortgage.

       Section 5.18.  <u>Indemnity</u>.

       (a)     The Mortgagor shall indemnify, defend, protect and hold harmless the Mortgagee and the Lender Representative, their respective parents, subsidiaries, directors, officers, employees, representatives, agents, successors, and assigns from and against any and all liabilities, compensatory economic damages, actual losses, actual costs and out-of-pocket expenses (including, without limitation, reasonable attorneys' fees and expenses), action, proceeding, claim or dispute incurred or suffered by the foregoing parties so indemnified except as the result of the gross negligence or willful misconduct of any party so indemnified, whether voluntarily or involuntarily incurred or suffered, in respect of the following:

       (i)     any litigation concerning this Mortgage or the Property, or any interest of the Mortgagor or the Mortgagee therein, or the right of occupancy thereof by the Mortgagor or the Mortgagee, whether or not any such litigation is prosecuted to a final, non-appealable judgment;

       (ii)     any dispute among or between any of the constituent parties or other partners or venturers of the Mortgagor if the Mortgagor is a general or limited partnership, or among or between any employees, officers, directors, shareholders, members or managers of the Mortgagor if the Mortgagor is a corporation or limited liability company, or among or between any members, trustees or other responsible parties if Mortgagor is an association, trust or other entity;

       (iii)     any action taken or not taken by the Mortgagee or the Lender Representative which is allowed or permitted under this Mortgage relating to the Mortgagor, the Property, any constituent parties or otherwise in connection with this Mortgage, including without limitation, the protection or enforcement of any lien, security interest or other right, remedy or recourse created or afforded by this Mortgage;

       (iv)     any action brought by the Mortgagee against the Mortgagor under this Mortgage, whether or not such action is prosecuted to a final, non-appealable judgment; and

       (v)     any and all loss, damage, costs, expense, action, causes of action, or liability (including reasonable attorneys' fees and costs) directly or indirectly arising from or attributable to the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal, or presence of a hazardous substance on, in, under or about the property, whether known or unknown at the time of the execution hereof, including without limitation (1) all foreseeable consequential damages of any such use, generation, manufacture, production, storage, release, threatened release, discharge, disposal, or presence; and (2) the costs of any required or necessary environmental investigation or monitoring, any repair, cleanup, or detoxification of the property, and the preparation and implementation of any closure, remedial, or other required plans.

**THE MORTGAGEE AND/OR THE LENDER REPRESENTATIVE MAY EMPLOY AN ATTORNEY OR ATTORNEYS TO PROTECT OR ENFORCE ITS RIGHTS, REMEDIES AND RECOURSES UNDER THIS MORTGAGE AND THE OTHER LOAN DOCUMENTS, AND TO ADVISE AND DEFEND MORTGAGEE AND/OR THE LENDER REPRESENTATIVE WITH RESPECT TO ANY SUCH ACTIONS AND OTHER MATTERS.  THE MORTGAGOR SHALL REIMBURSE MORTGAGEE AND/OR THE LENDER REPRESENTATIVE FOR THEIR**

RESPECTIVE ATTORNEYS' FEES AND EXPENSES (INCLUDING EXPENSES AND COSTS FOR EXPERTS) IMMEDIATELY UPON RECEIPT OF A WRITTEN DEMAND THEREFOR, WHETHER ON A MONTHLY OR OTHER TIME INTERVAL, AND WHETHER OR NOT AN ACTION IS ACTUALLY COMMENCED OR CONCLUDED.  ALL OTHER REIMBURSEMENT AND INDEMNITY OBLIGATIONS HEREUNDER SHALL BECOME DUE AND PAYABLE WHEN ACTUALLY INCURRED BY THE MORTGAGEE AND/OR THE LENDER REPRESENTATIVE.  ANY PAYMENTS NOT MADE WITHIN TEN (10) DAYS AFTER WRITTEN DEMAND THEREFOR SHALL BEAR INTEREST AT THE DEFAULT RATE FROM THE DATE OF SUCH DEMAND UNTIL FULLY PAID. THE PROVISIONS OF THIS SECTION 5.18 SHALL SURVIVE REPAYMENT OF THE INDEBTEDNESS AND PERFORMANCE OF THE OBLIGATIONS, THE RELEASE OF THE LIEN OF THIS MORTGAGE, ANY FORECLOSURE (OR ACTION IN LIEU OF FORECLOSURE), THE TRANSFER BY THE MORTGAGOR OF ANY OR ALL OF ITS RIGHT, TITLE AND INTEREST IN OR TO THE PROPERTY AND THE EXERCISE BY MORTGAGEE OR THE LENDER REPRESENTATIVE OF ANY AND ALL REMEDIES SET FORTH HEREIN.

## ARTICLE 6

## STATE SPECIFIC PROVISIONS

In the event of any inconsistencies between the terms and conditions of this Article 6 and the other terms and conditions of this Mortgage, the terms and conditions of this Article 6 shall control and be binding.

Section 6.01.Acceleration; Remedies.  At any time during the existence of an Event of Default, Mortgagee, at Mortgagee's option, may declare all of the Secured Obligations to be immediately due and payable without further demand, may foreclose the Lien of this Mortgage for such Secured Obligations, and may invoke any other remedies permitted by Ohio law or provided in this Mortgage, the Loan Agreement or in any other Loan Document.  In any suit or proceeding to foreclose the Lien of this Mortgage, there will be allowed and included as additional Secured Obligations in the decree for sale, (i) all reasonable attorneys' fees and costs, (ii) expenditures and expenses which may be paid or incurred by or on behalf of the Mortgagee for procuring all title searches and examinations, title insurance policies and similar data and assurances with respect to title as Mortgagee will deem reasonably necessary either to prosecute such suit or to evidence to bidders at sales which may be had pursuant to such decree the true conditions of the title to or the value of the Property, and (iii) the reasonable fees and expenses of environmental consultants.

Section 6.02.Release.  In connection with the prepayment of the Note in full, in accordance with the terms thereof, Mortgagor may provide to Mortgagee a release of this Mortgage, evidencing the fact of its satisfaction without representation warranty or recourse and Mortgagee shall, at the direction of the Lender Representative, execute the same and return same to the Mortgagor for filing in the appropriate county recorder's office.  Mortgagor shall pay any fees required for the recording and will reimburse Mortgagee's and Lender Representative's reasonable costs incurred in connection with the satisfaction of this Mortgage.

Section 6.03.Priority of Mortgage Lien.  Mortgagee is authorized and empowered to do all things provided to be done by a mortgagee under Section 1311.14 of the Revised Code of Ohio, as amended.

Section 6.04.<u>Certain Advances</u>.  Mortgagor and Mortgagee confirm that all amounts disbursed by Mortgagee under the Loan Documents, for payment of taxes, insurance premiums and other costs and expenses in connection with the operation, protection or preservation of the Property, are intended to comply with §5301.233 of the Revised Code of Ohio.  In addition to any other debt or obligation, this Mortgage will secure unpaid balances of advances made with respect to the Property for the payment of taxes, assessments, insurance premiums or costs incurred for the protection of the Property.

Section 6.05.<u>**WAIVER OF TRIAL BY JURY.**</u>

**(a)      MORTGAGOR AND MORTGAGEE EACH COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS MORTGAGOR AND MORTGAGEE THAT IS TRIABLE OF RIGHT BY A JURY.**

**(b)      MORTGAGOR AND MORTGAGEE EACH WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Mortgagor has executed this Mortgage as of the day and year first above written.

<div style="margin-left: 40%;">

**HH CLEVELAND HUNTINGTON L.P.,**
an Ohio limited partnership

By:  925 Euclid Manager, LLC,
an Ohio limited liability company,
its General Partner

By: _____
Frank T. Sinito, Managing Member

</div>

<div align="center">

**ACKNOWLEDGMENT**

</div>

| | |
|---|---|
| **STATE OF OHIO** | ) |
| | ) |
| **COUNTY OF CUYAHOGA** | ) |

On this 28 day of JUNE, 2021, before me, LAWRENCE LINDBERG personally appeared **Frank T. Sinito**, known to me or proven on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same in his authorized capacity as the Managing Member of 925 Euclid Manager, LLC, the General Partner of **HH CLEVELAND HUNTINGTON L.P.**, and that by his signature on the instrument the entity on behalf of which he acted executed the instrument.

WITNESS my hand and official seal.

_____
Notary

My Commission expires:

LAWRENCE V. LINDBERG, Attorney at Law
Notary Public – State of Ohio
My Commission Has No Expiration Date.
Section 147.03 O.R.C.

(SEAL)

<div align="center">

[THE CENTENNIAL – MORTGAGE]

</div>

<div align="center">

S-1

</div>

EXHIBIT A

DESCRIPTION OF REAL PROPERTY

Parcel No. 1: (For informational purposes only: PPN: 101-36-013)

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being part of Original Two Acre Lot Nos. 154 and 155, and Sublots Nos, 45, 46, 47, 48, 49 and part of Sublot 50 in J.M. Woolsey's Subdivision of part of Original Two Acre Lot Nos. 156 to 167 both inclusive, as shown by the recorded plat of said subdivision in Volume N of Deeds, Page 486 of Cuyahoga County Records, together forming a parcel of land, bounded and described as follows:

Beginning on the northerly line of Euclid Avenue at a point 145 feet 9-1/8 inches easterly, measured along said northerly line, from its point of intersection with the easterly line of East 9th Street (formerly Erie Street); Thence westerly along said northerly line of Euclid Avenue, 145 feet 9-1/8 inches to its point of intersection with the easterly line of East 9th Street; Thence northerly along said easterly line of East 9th Street 258 feet 6-5/8 inches to its point of intersection with the southerly line of Chester Avenue N.E. (formerly known as Chestnut Avenue); Thence easterly along said southerly line of Chester Avenue N.E. 385 feet 1/4 inch to a point 12 feet westerly measured along said southerly line, from the northeasterly corner of said Sublot No. 50, which point is also at the intersection of said southerly line with the westerly line of a 12 foot alley; Thence southerly along said westerly line of said alley 133 feet, more or less, to a point on the southerly line of said Sublot 50 which is also the northerly line of Hickory Court N.E. (formerly Hickory Lane) 12 feet westerly measured along said southerly line of Sublot 50, from the southeasterly corner of said Sublot 50; Thence westerly along the southerly line of said Sublot Nos. 50, 49, 48, and 47, 170 feet 11-1/2 inches to its point of intersection with a line drawn northerly at right angles with said northerly line of Euclid Avenue from the place of beginning; Thence southerly 200 feet 9-1/4 inches to the place of beginning, according to the survey made by The F.A. Pease Engineering Company, August, 1919. Be the same more or less, but subject to all legal highways.

Parcel No. 2: (For informational purposes only: PPN: 101-36-002)

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being Sublot No. 52 in J.M. Woolsey's Subdivision of part of Original Two Acre Lot Nos. 156 to 167 both inclusive, as shown by the recorded plat of said Subdivision in Volume N of Deeds, Page 486 of Cuyahoga County Records, bounded and described as follows:

Beginning at a point in the southerly line of Chester Avenue N.E. (formerly Chestnut Avenue) 463 feet 1/4 inch easterly measured along said southerly line from its point of intersection with the easterly line of East 9th Street (formerly Erie Street), said point of beginning, being also the northeasterly corner of land described in a lease to Frank C. Newcomer dated July 16, 1919 and recorded in Lease Volume 92, Page 16 of Cuyahoga County Records; Thence easterly along said southerly line of Chester Avenue N.E. 66 feet to the northeasterly corner of said Sublot 52; Thence southerly along the easterly line of Sublot 52, 133 feet to the southeast corner of said Sublot 52; Thence westerly along the southerly line of Sublot 52, which is also the northerly line of Hickory Court N.E. (formerly Hickory Lane), 66 feet to the southwest corner of said Sublot 52; Thence northerly along the westerly line of said Sublot 52, 133 feet to the place of beginning, as appears by said plat, be the same more or less, but subject to all legal highways, and the rights of the public, if any, in the portion of the foregoing parcel which is used as an alley and approach to loading docks.

Parcel No. 3: (For informational purposes only: PPN: 101-36-001)

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being the northerly part of Sublot 51 in J.M. Woolsey's Subdivision of part of Original Two Acre Lot Nos. 156 to 167 both inclusive, as shown by the recorded plat of said subdivision in Volume N of Deeds, Page 486 of Cuyahoga County Records, bounded and described as follows:

Beginning at a point in the southerly line of Chester Avenue N.E. (formerly Chestnut Avenue) 397 feet 1/4 inch easterly measured along said southerly line from its point of intersection with the easterly line of East 9th Street (formerly Erie Street), said point of beginning being also the point of intersection of said southerly line with the easterly line of a 12 foot alley; Thence southerly along the westerly line of said Sublot 51, which is also the easterly line of said 12 foot alley, 100 feet; Thence easterly parallel with the southerly line of Chester Avenue N.E. 66 feet to the easterly line of said Sublot 51; Thence northerly along said easterly line of Sublot 51, 100 feet to said southerly line of Chester Avenue N.E.; Thence westerly along said southerly line of Chester Avenue N.E. 66 feet to the place of beginning, as appears by said plat, be the same more or less, but subject to all legal highways.

Parcel No. 4:

Part A:

Together with an appurtenant right established by Ordinance No. 58,522 as shown by the City Record Volume 19, Page 767, granting Union Lennox Co., its successors and assigns the authority and permission to construct, maintain and use a bridge over East 11th Place.

Part B:

Together with an easement for pedestrian tunnel granted by the City of Cleveland to The Union Commerce Bank, dated December 15, 1967, filed for record December 15, 1967, and recorded in Volume 12183, Page 181 of Cuyahoga County Records.

| Ex. | Description |
|-----|-------------|
| M   | Preliminary Judicial Report |



**Report No.:  42891-1-JR-25-1566-2025.8148435-234947643**

## PRELIMINARY JUDICIAL REPORT

Order No.:  JR-25-1566

Deutsche Bank AG, New York Branch
60 Wall Street
New York, NY 10005

Pursuant to your request for a Preliminary Judicial Report (hereinafter "the Report") for use in judicial proceedings, COMMONWEALTH LAND TITLE INSURANCE COMPANY  (hereinafter "the Company") hereby guarantees in an amount not to exceed $35,000,000.00 that it has examined the public records in Cuyahoga County, Ohio as to the land described in Schedule A, that the record title to the land is at the date hereof vested in HH Cleveland Huntington L.P. by instrument recorded in AFN 201611150700 and free from all encumbrances, liens or defects of record, except as shown in Schedule B.

This is a guarantee of the record title only and is made for the use and benefit of the Guaranteed Party and the purchaser at judicial sale thereunder and is subject to the Exclusions from Coverage, the Exceptions contained in Schedule B and the Conditions and Stipulations contained herein.

This Report shall not be valid or binding until it has been signed by either an authorized agent or representative of the Company and Schedules A and B have been attached hereto.

Effective Date:  09/09/2025 08:00:00 AM

Issued By:  COMMONWEALTH LAND TITLE INSURANCE COMPANY

By: _____
Authorized Officer or Agent
Greg W. Stebelton, President/Agent

By:

Michael J. Nolan
President

Attest:

Marjorie Nemzura
Secretary

OTIRB Record Products

Preliminary Judicial Report
(04/15/2010)

ORDER NO.  JR-25-1566

PRELIMINARY JUDICIAL REPORT

SCHEDULE A

DESCRIPTION OF LAND

Parcel 1:  (PPN:  101-36-013)

Situated in the City of Cleveland, County of Cuyahoga, and State of Ohio:

And known as being part of Original 2 Acre Lot Nos. 154 and 155, and Sublots Nos. 45, 46, 47, 48, 49 and part of Sublot 50, in J. M. Woolsey's Subdivision of part of Original Two Acre Lot Nos. 156 to 167 both inclusive, as shown by the recorded plat of said Subdivision In Volume N of Deeds, Page 486 of Cuyahoga County Records, together forming a parcel of land, bounded and described as follows:

Beginning on the Northerly line of Euclid Avenue at a point 145 feet 9-1/8 inches Easterly, measured along said Northerly line, from its point of intersection with the Easterly line of East 9th Street (formerly Erie Street);

Thence Westerly along said Northerly line of Euclid Avenue 145 feet 9-1/8 inches to its point of intersection with the Easterly line of East 9th Street;

Thence Northerly along said Easterly line of East 9th Street 258 feet 6-5/8 inches to its point of intersection with the Southerly line of Chester Avenue N.E. (formerly known as Chestnut Avenue);

Thence Easterly along said Southerly line of Chester Avenue N.E. 385 feet 1/4 inch to a point 12 feet Westerly measured along said Southerly line, from the Northeasterly corner of said Sublot No. 50, which point is also at the intersection of said Southerly line with the Westerly line of a 12 foot alley;

Thence Southerly along said Westerly line of said alley 133 feet more or less, to a point on the Southerly line of said Sublot 50 which is also the Northerly line of Hickory Court N.E. (formerly Hickory Lane) 12 feet Westerly measured along said Southerly line of Sublot 50 from the Southeasterly corner of said Sublot 50;

Thence Westerly along the Southerly line of said Sublot Nos. 50, 49, 48, and 47, a distance of 170 feet 11-1/2 inches to its point of intersection with a line drawn Northerly at right angles with said Northerly line of Euclid Avenue from the place of beginning;

Thence Southerly 200 feet 9-1/4 inches to the place of beginning, according to the survey made by The F.A. Pease Engineering Company, August, 1919, be the same more or less, but subject to all legal highways.

909-925 Euclid Ave.
Cleveland, Ohio 44115

Parcel 2:  (PPN:  101-36-002)

Situated in the City of Cleveland, County of Cuyahoga, and State of Ohio:

And known as being Sublot No. 52 in J.M. Woolsey's Subdivision of part of Original Two Acre Lot Nos. 156 to 167 both inclusive, as shown by the recorded plat of said subdivision in Volume N of Deeds, Page 486 of Cuyahoga County Records, bounded and described as follows:

Electronically Filed 09/30/2025 19:46 / / CV 25 125588 / Confirmation Nbr. 3631064 / CLPXC

Beginning at a point in the Southerly line of Chester Avenue N.E. (formerly Chestnut Avenue) 463 feet 1/4 inch Easterly measured along said Southerly line from its point of intersection with the Easterly line of East 9th Street (formerly Erie Street) said point of beginning being also the Northeasterly corner of land described in a lease to Frank C. Newcomer dated July 16, 1919 and recorded in Lease Volume 92, Page 16 of Cuyahoga County Records;

Thence Easterly along said Southerly line of Chester Avenue N.E. 66 feet to the Northeasterly corner of said Sublot 52;

Thence Southerly along the Easterly line of Sublot 52, a distance of 133 feet to the Southeast corner of said Sublot 52;

Thence Westerly along the Southerly line of said Sublot 52 which is also the Northerly line of Hickory Court N.E. (formerly Hickory Lane), 66 feet to the Southwest corner of said Sublot 52;

Thence Northerly along the Westerly line of said Sublot 52, a distance of 133 feet to the place of beginning, as appears by said plat, be the same more or less, but subject to all legal highways, and the rights of the public, if any, in the portion of the foregoing parcel which is use as an alley and approach to loading docks, be the same more or less. but subject to all legal highways.

Chester Ave.
Cleveland, Ohio 44114

Parcel 3:  (PPN: 101-36-001)

Situated in the City of Cleveland, County of Cuyahoga, and State of Ohio:

And known as being the Northerly part of Sublot 51 in J. M. Woolsey's Subdivision of part of Original Two Acre Lot Nos. 156 to 167 both inclusive, as shown by the recorded plat of said Subdivision in Volume N of Deeds, Page 486 of Cuyahoga County Records bounded and described as follows:

Beginning at a point in the Southerly line of Chester Avenue N.E. (formerly Chestnut Avenue) 397 feet 1/4 inch Easterly measured along said Southerly line from its point of intersection with the Easterly line of East 9th Street (formerly Erie Street) said point of beginning being also the point of intersection of said Southerly line with the Easterly line of a 12 foot alley;

Thence Southerly along the Westerly line of said Sublot 51, which is also the Easterly line of said 12 foot alley, 100 feet;

Thence Easterly parallel with the Southerly line of Chester Avenue N.E. 66 feet to the Easterly line of said Sublot 51;

Thence Northerly along said Easterly line of Sublot 51, a distance of 100 feet to said Southerly line of Chester Avenue N.E.;

Thence Westerly along said Southerly line of Chester Avenue N.E. 66 feet to the place of beginning, as appears by said plat, be the same more or less, but subject to all legal highways.

1100-02 Chester Ave.
Cleveland, Ohio 44114

Easement Parcel No. 4:

Part A:

Nonexclusive appurtenant rights established by Ordinance No. 58,522 as shown by the City Record Volume 19, Page 767, granting Union Lennox Co., its successors and assigns the authority and permission to construct, maintain and use a bridge over East 11th Place.

Part B:

Nonexclusive rights set forth in the easement for pedestrian tunnel granted by the City of Cleveland to The Union Commerce Bank, dated December 15, 1967, filed for record December 15, 1967, and recorded in Volume 12183, Page 181 of Cuyahoga County Records.

OTIRB Record Products

909 Euclid Ave.
Cleveland, Ohio 44115

(JR-25-1566.PFD/JR-25-1566/16)

*OTIRB Record Products*

Preliminary Judicial Report
(04/15/2010)

## SCHEDULE B

The matters shown below are exceptions to this Preliminary Judicial Report and the Company assumes no liability arising therefrom.

1. Taxes or Special Assessments which are not shown as existing liens by the Public Records.

2. Rights or claims of parties in possession not shown by the Public Records.

3. Any tax increase occasioned by retroactive revaluation arising out of the change in land usage, on account of errors or omissions and changes in the valuation of the property by legally constituted authorities, or liability for tax increases based on the loss of any homestead exemption status for insured premises.

4. Easements, restrictions, setback lines, declarations, conditions, covenants, reservations, rights of way, gas rights and oil and gas leases, of any kind.

5. Mortgage from HH Cleveland Huntington, L.P. to Deutsche Bank AG, in the amount of $35,422,000.00, and filed on July 16, 2021, and recorded in AFN 202107160455, of the Cuyahoga County Records.

6. Financing Statement from HH Cleveland Huntington, L.P. (debtor) to Deutsche Bank AG (secured party), filed for record July 16, 2021, in AFN 202107169196, of the Cuyahoga County Records.

7. Mortgage from HH Cleveland Huntington L.P. to County of Cuyahoga, Ohio, in the amount of $5,000,000.00, and filed on November 12, 2021, and recorded in AFN 202111120689, of the Cuyahoga County Records.

8. Taxes for the First Half of 2025 and subsequent years are a lien, but are not yet due and payable.
   The County Treasurer's General Tax Records for the tax year 2024 are as follows
   PPN 101-36-013
   Taxes for the first half are not paid including prior delinquences, interest and penalties thereof, if any.
   Taxes for the second half, plus penalty, are not paid, including prior delinquencies, interest and penalties thereof, if any.
   Per half amount $381,764.26 first half; $381,813.02 second half.

   The above amount includes the following special assessments:

   Assessment for M919352 - Downtown Cleve Impvt District in the amount of $16,777.50 per half year.

9. Taxes for the First Half of 2025 and subsequent years are a lien, but are not yet due and payable.
   The County Treasurer's General Tax Records for the tax year 2024 are as follows
   PPN 101-36-001
   Taxes for the first half are Paid.
   Taxes for the second half, plus penalty incuding prior delinquencies, interest and penalties thereof, if any.
   Per half amount $26,744.07 first half; $26,751.03 second half.

   The above amount includes the following special assessments:

   Assessment for C170101B - NEORSD - Delinquent Stormwater in the amount of $430.26 per half year.

   Assessment for M919352 - Downtown Cleve Impvt District in the amount of $1,336.51 per half year.

OTIRB Record Products

<div align="right">Preliminary Judicial Report<br>(04/15/2010)</div>

10.     Taxes for the First Half of 2025 and subsequent years are a lien, but are not yet due and payable.
The County Treasurer's General Tax Records for the tax year 2024 are as follows
PPN 101-36-002
Taxes for the first half are Paid.
Taxes for the second half plus penalty, are not paid inlcuding prior delinquencies, interest and penalties thereof, if any.
Per half amount $13,404.13 first half; $13,407.65 second half.

        The above amount includes the following special assessments:

        Assessment for M919352 - Downtown Cleve Impvt District in the amount of $750.35 per half year.

## CONDITIONS AND STIPULATIONS
## OF THIS PRELIMINARY JUDICIAL REPORT

1. Definition of Terms

"Guaranteed Party":  The party or parties named herein or the purchaser at judicial sale.

"Guaranteed Claimant":  Guaranteed Party claiming loss or damage hereunder.

"Land":  The land described specifically or by reference in Schedule A, and improvements affixed thereto, which by law constitute real property; provided however the term "land" does not include any property beyond the lines of the area specifically described or referred to in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, lanes, ways or waterways.

"Public Records":  Those records under state statute and, if a United States District Court resides in the county in which the Land is situated, the records of the clerk of the United States District Court, which impart constructive notice of matters relating to real property to purchasers for value without knowledge and which are required to be maintained in certain public offices in the county in which the land is situated.

2. Determination of Liability

This Report together with any Final Judicial Report or any Supplement or Endorsement thereof, issued by the Company is the entire contract between the Guaranteed Party and the Company.

Any claim of monetary loss or damage, whether or not based on negligence, and which arises out of the status of the title to the estate or interest guaranteed hereby or any action asserting such claim, shall be restricted to this Report.

3. Liability of Company

This Report is a guarantee of the record title of the Land only, as disclosed by an examination of the Public Records herein defined.

4. Notice of Claim to be given by Guaranteed Party

In case knowledge shall come to the Guaranteed Party of any lien, encumbrance, defect, or other claim of title guaranteed against and not excepted in this Report, whether in a legal proceeding or otherwise, the Guaranteed Party shall notify the Company within a reasonable time in writing and secure to the Company the right to oppose such proceeding or claim, or to remove said lien, encumbrance or defect at its own cost.  Any action for the payment of any loss under this Report must be commenced within one year after the Guaranteed Party receives actual notice that they may be required to pay money or other compensation for a matter covered by this Report or actual notice someone claims an interest in the Land covered by this Report.

5. Extent of Liability

The liability of the Company shall in no case exceed in all the amount stated herein and shall in all cases be limited to the actual loss, including but not limited to attorneys fees and costs of defense, only of the Guaranteed Claimant. Any and all payments under this Report shall reduce the amount of this Report *pro tanto* and the Company's liability shall terminate when the total amount of the Report has been paid.

6. Options to Pay or Otherwise Settle Claims; Termination of Liability

The Company in its sole discretion shall have the following options:

    a.  To pay or tender to the Guaranteed Claimant the amount of the Report or the balance remaining thereof, less any attorneys fees, costs or expenses paid by the Company to the date of tender.  If this option is exercised, all liability of the Company under this Report terminates including but not limited to any liability for attorneys fees, or any costs of defense or prosecution of any litigation.

    b.  To pay or otherwise settle with other parties for or in the name of the Guaranteed Claimant any claims guaranteed by this Report.

    c.  To continue, re-open or initiate any judicial proceeding in order to adjudicate any claim covered by this Report.  The Company shall have the right to select counsel of its choice (subject to the right of the Guaranteed Claimant to object for reasonable cause) to represent the Guaranteed Claimant and will not pay the fees of any other counsel.

    d.  To pay or tender to the Guaranteed Claimant the difference between the value of the estate or interest as guaranteed and the value of the estate or interest subject to the defect, lien or encumbrance guaranteed against by this Report.

7. Notices

All notices required to be given to the Company shall be given promptly and any statements in writing required to be furnished to the Company shall be addressed to the Company at its office, P.O. Box 45023, Jacksonville, Florida 32232-5023.

## EXCLUSIONS FROM COVERAGE

1.   The Company assumes no liability under this Report for any loss, cost or damage resulting from any physical condition of the Land.

2.   The Company assumes no liability under this Report for any loss, cost or damage resulting from any typographical, clerical or other errors in the Public Records.

3.   The Company assumes no liability under the Report for matters affecting title subsequent to the date of this Report or the Final Judicial Report or any supplement thereto.

4.   The Company assumes no liability under this Report for the proper form or execution of any pleadings or other documents to be filed in any judicial proceedings.

5.   The Company assumes no liability under this Report for any loss, cost, or damage resulting from the failure to complete service on any parties shown in Schedule B of the Preliminary Judicial Report and the Final Judicial Report or any Supplemental Report issued thereto.

| Ex. | Description |
|---|---|
| N | UCC Financing Statement SOS No. OH00254681402 on July 19, 2021 |



| | FS Number: | OH00254681402 |
|---|---|---|
| | Date Filed: | 19 July 2021 |
| | | 15:36:47 |

# UCC FINANCING STATEMENT

**FOR FILING OFFICE USE ONLY**

**NAME OF CONTACT AT FILER:**   Jacob S. Lowry, Esq.
**PHONE NUMBER:**   866-945-4200
**EMAIL CONTACT AT FILER:**   dplesec@everestland.com
**SEND ACKNOWLEDGEMENT TO:**   Kutak Rock LLP
2300 Main Street, Suite 800
Kansas City
MISSOURI
64108
United States

## DEBTOR INFORMATION

**ORGANIZATION'S NAME:**   HH Cleveland Huntington L.P.

**MAILING ADDRESS:**   127 Public Square, Suite 4000

**CITY:** Cleveland    **STATE:** OHIO    **POSTAL CODE:** 44114    **COUNTRY:** United States

## SECURED PARTY INFORMATION

**ORGANIZATION'S NAME:**   Deutsche Bank AG, New York Branch

**MAILING ADDRESS:**   60 Wall Street, 3rd Floor

**CITY:** New York    **STATE:** NEW YORK    **POSTAL CODE:** 10005    **COUNTRY:** United States

## COLLATERAL INFORMATION

**This financing statement covers the following collateral:**

All assets of the Debtor, whether now owned or existing or hereafter acquired or arising, and all proceeds and products thereof, including, without limitation, all fixtures on the premises described on Exhibit A (consisting of 2 pages) attached hereto and made a part hereof.

## FILING TYPE

Transmitting Utility: No

Public Finance: No

Manufactured Home: No

Agriculture Lien: No

Non-Ucc Filling: No

## ALTERNATIVE DESIGNATION

Lessee/Lessor: No

Consignee/Consignor: No

Seller/Buyer: No

Bailee/Bailor: No

Licensee/Licensor: No

## OPTIONAL FILER REFERENCE DATA:

File with the Ohio Secretary of State 33307.33 Centennial 4841-8443-9532

## EXHIBIT A

Parcel No. 1: (For informational purposes only: PPN: 101-36-013)

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being part of Original Two Acre Lot Nos. 154 and 155, and Sublots Nos, 45, 46, 47, 48, 49 and part of Sublot 50 in J.M. Woolsey's Subdivision of part of Original Two Acre Lot Nos. 156 to 167 both inclusive, as shown by the recorded plat of said subdivision in Volume N of Deeds, Page 486 of Cuyahoga County Records, together forming a parcel of land, bounded and described as follows:

Beginning on the northerly line of Euclid Avenue at a point 145 feet 9-1/8 inches easterly, measured along said northerly line, from its point of intersection with the easterly line of East 9th Street (formerly Erie Street); Thence westerly along said northerly line of Euclid Avenue, 145 feet 9-1/8 inches to its point of intersection with the easterly line of East 9th Street; Thence northerly along said easterly line of East 9th Street 258 feet 6-5/8 inches to its point of intersection with the southerly line of Chester Avenue N.E. (formerly known as Chestnut Avenue); Thence easterly along said southerly line of Chester Avenue N.E. 385 feet 1/4 inch to a point 12 feet westerly measured along said southerly line, from the northeasterly corner of said Sublot No. 50, which point is also at the intersection of said southerly line with the westerly line of a 12 foot alley; Thence southerly along said westerly line of said alley 133 feet, more or less, to a point on the southerly line of said Sublot 50 which is also the northerly line of Hickory Court N.E. (formerly Hickory Lane) 12 feet westerly measured along said southerly line of Sublot 50, from the southeasterly corner of said Sublot 50; Thence westerly along the southerly line of said Sublot Nos. 50, 49, 48, and 47, 170 feet 11-1/2 inches to its point of intersection with a line drawn northerly at right angles with said northerly line of Euclid Avenue from the place of beginning; Thence southerly 200 feet 9-1/4 inches to the place of beginning, according to the survey made by The F.A. Pease Engineering Company, August, 1919. Be the same more or less, but subject to all legal highways.

Parcel No. 2: (For informational purposes only: PPN: 101-36-002)

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being Sublot No. 52 in J.M. Woolsey's Subdivision of part of Original Two Acre Lot Nos. 156 to 167 both inclusive, as shown by the recorded plat of said Subdivision in Volume N of Deeds, Page 486 of Cuyahoga County Records, bounded and described as follows:

Beginning at a point in the southerly line of Chester Avenue N.E. (formerly Chestnut Avenue) 463 feet 1/4 inch easterly measured along said southerly line from its point of intersection with the easterly line of East 9th Street (formerly Erie Street), said point of beginning, being also the northeasterly corner of land described in a lease to Frank C. Newcomer dated July 16, 1919 and recorded in Lease Volume 92, Page 16 of Cuyahoga County Records; Thence easterly along said southerly line of Chester Avenue N.E. 66 feet to the northeasterly corner of said Sublot 52; Thence southerly along the easterly line of Sublot 52, 133 feet to the southeast corner of said Sublot 52; Thence westerly along the southerly line of Sublot 52, which is also the northerly line of Hickory Court N.E. (formerly Hickory Lane), 66 feet to the southwest corner of said Sublot 52; Thence northerly along the westerly line of said Sublot 52, 133 feet to the place of beginning, as appears by said plat, be the same more or less, but subject to all legal highways, and the rights of the public, if any, in the portion of the foregoing parcel which is used as an alley and approach to loading docks.

Parcel No. 3: (For informational purposes only: PPN: 101-36-001)

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being the northerly part of Sublot 51 in J.M. Woolsey's Subdivision of part of Original Two Acre Lot Nos. 156 to 167 both inclusive, as shown by the recorded plat of said subdivision in Volume N of Deeds, Page 486 of Cuyahoga County Records, bounded and described as follows:

Beginning at a point in the southerly line of Chester Avenue N.E. (formerly Chestnut Avenue) 397 feet 1/4 inch easterly measured along said southerly line from its point of intersection with the easterly line of East 9th Street (formerly Erie Street), said point of beginning being also the point of intersection of said southerly line with the easterly line of a 12 foot alley; Thence southerly along the westerly line of said Sublot 51, which is also the easterly line of said 12 foot alley, 100 feet; Thence easterly parallel with the southerly line of Chester Avenue N.E. 66 feet to the easterly line of said Sublot 51; Thence northerly along said easterly line of Sublot 51, 100 feet to said southerly line of Chester Avenue N.E.; Thence westerly along said southerly line of Chester Avenue N.E. 66 feet to the place of beginning, as appears by said plat, be the same more or less, but subject to all legal highways.

Parcel No. 4:

Part A:

Together with an appurtenant right established by Ordinance No. 58,522 as shown by the City Record Volume 19, Page 767, granting Union Lennox Co., its successors and assigns the authority and permission to construct, maintain and use a bridge over East 11th Place.

Part B:

Together with an easement for pedestrian tunnel granted by the City of Cleveland to The Union Commerce Bank, dated December 15, 1967, filed for record December 15, 1967, and recorded in Volume 12183, Page 181 of Cuyahoga County Records.

| Ex. | Description |
|-----|-------------|
| O | UCC Financing Statement Cuyahoga County Fixture Filing on July 16, 2021 |



## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

CUYAHOGA COUNTY
OFFICE OF FISCAL OFFICERS - 7
FIX 7/16/2021 2:55:55 PM
**202107169196**

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Jacob S. Lowry, Esq.  (816) 960-0090

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

Kutak Rock LLP
2300 Main Street, Suite 800
Kansas City, Missouri 64108
Attention:  Jacob S. Lowry, Esq.

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1b blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| HH Cleveland Huntington L.P. | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 127 Public Square, Suite 4000 | Cleveland | OH | 44114 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Deutsche Bank AG, New York Branch | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 60 Wall Street, 3rd Floor | New York | NY | 10005 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

Debtor grants Secured Party a security interest in all estate, right, title and interest which Debtor now has or may later acquire in and to the following property described on <u>Exhibit B</u> hereto and in the collateral described on <u>Exhibit A</u> hereto pursuant to that certain Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of July 1, 2021, from Debtor in favor of Secured Party (the "<u>Mortgage</u>").

5. Check only if applicable and check only one box:  Collateral is ☐ held in a Trust (see UCC1Ad, Item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
File in Cuyahoga County, Ohio Official Public Records (Mortgage Fixture)   33307.33  Centennial  4816-3620-3244

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

| | |
|---|---|
| **9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because individual Debtor name did not fit, check here ☐ | |

**9a. ORGANIZATION'S NAME**
HH Cleveland Huntington L.P.

OR

**9b. INDIVIDUAL'S SURNAME**

**FIRST PERSONAL NAME**

**ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name: do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c.

**10a. ORGANIZATION'S NAME**

OR

**10b. INDIVIDUAL'S SURNAME**

**INDIVIDUAL'S FIRST PERSONAL NAME**

**INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX**

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

**11a. ORGANIZATION'S NAME**

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

**13.** ☒ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

**14.** This FINANCING STATEMENT:
☐ covers timber to be cut ☐ covers as-extracted collateral ☒ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:
See Exhibit B attached hereto and incorporated herein.

**17. MISCELLANEOUS:**

INTERNATIONAL ASSOCIATION OF COMMERCIAL ADMINISTRATORS (IACA)

**EXHIBIT A**
to
**UCC-1 FINANCING STATEMENT**

DEBTOR:           HH Cleveland Huntington L.P.

SECURED PARTY:  Deutsche Bank AG, New York Branch

<u>DESCRIPTION OF COLLATERAL</u>

In connection with the real property described in Exhibit B (the "Land") and/or the improvements on such real property (collectively, the "Premises"), all of Debtor's present and future right, title and interest in and to:

1.      All right, title and interest of the Debtor in and to, and remedies under (a) any and all leases, subleases, license agreements, concessions, tenancies and other use or occupancy agreements (whether oral or written), or any part thereof, now or hereafter existing, covering or affecting any or all of the Property (as hereinafter defined), all extensions and renewals thereof, and all modifications, amendments and guaranties thereof (each of which is hereinafter called a "Lease"), and (b) any and all rents, income, receipts, revenues, royalties, issues, profits, contract rights, accounts receivable, or general intangibles growing out of or in connection with the Leases (whether from residential or non-residential space) and other payments, payable to the Debtor pursuant to any Lease, including, without limitation, cash or securities deposited under any Lease to secure performance by the tenants of their obligations under the Leases, whether such cash or securities are to be held until the expiration of the term of such Leases or are to be applied to one or more of the installments of rent coming due prior to the expiration of such terms and further including subsidy payments received from any source (collectively, the "Rents"), subject, however, to the provisions in the below-described Mortgage; and

2.      All right, title and interest of the Debtor in and to any and all rights, alleys, ways, tenements, hereditaments, easements, passages, waters, water rights, water courses, riparian rights, licenses, franchises, privileges and appurtenances now or hereafter to the same belonging or in any way appertaining, as well as any after-acquired right, title, interest, franchise, license, reversion and remainder; and

3.      All right, title and interest of the Debtor, including any after-acquired right, title or reversion, in and to the right of ways, streets, avenues and alleys, open or proposed, located wholly or partially within the boundary of the Land or adjacent thereto; and

4.      All right, title and interest of the Debtor in and to the buildings, structures, surface parking and other improvements of every kind and description now or hereafter erected or placed on the Land, all additions, alterations and replacements thereto or thereof, and all materials now owned or hereafter acquired by the Debtor and intended for the operation, construction, reconstruction, alteration and repair thereof, all of which materials shall be deemed to be included within the Property (hereinafter defined) immediately upon the delivery thereof to the Land (all of which are hereinafter called collectively the "Improvements" and, the Improvements and the Land are hereinafter called the "Premises"); and

5.      All right, title and interest of the Debtor in and to all of the walks, fences, shrubbery, driveways, fixtures, machinery, apparatus, equipment, fittings, and other goods of every kind and description whatsoever, now owned or hereafter acquired by the Debtor and attached to or contained

in and used for any present or future operation or management of the Land or the Improvements, including, without limitation, all lighting, laundry, incinerating and power equipment; all engines, boilers, machines, motors, furnaces, compressors and transformers; all generating equipment; all pumps, tanks, ducts, conduits, wires, switches, fans, switchboards, and other electrical equipment and fixtures; all telephone equipment; all piping, tubing, plumbing equipment and fixtures; all heating, refrigeration, air conditioning, cooling, ventilating, sprinkling, water, power and communications equipment, systems and apparatus; all water coolers and water heaters; all fire prevention, alarm and extinguishing systems and apparatus; all cleaning equipment; all lift, elevator and escalator equipment and apparatus; all partitions, shades, blinds, awnings, screens, screen doors, storm doors, exterior and interior signs, gas fixtures, stoves, ovens, refrigerators, garbage disposals and compactors, dishwashers, cabinets, mirrors, mantles, floor coverings, carpets, rugs, draperies and other furnishings and furniture installed or to be installed or used or usable in any way in the operation of any Improvements or appurtenant facilities erected or to be erected in or upon the Land; and every renewal, replacement or substitution therefor, whether or not the same are now or hereafter attached to the Land in any manner; all except for any right, title or interest therein held by any tenant of any or all of the Land or the Improvements, or by any other person, so long as such tenant or other person is not a party thereto or bound, with respect to such right, title or interest, by the provisions thereof (it being agreed by the parties thereto that all personal property owned by the Debtor and placed by it on the Land shall, so far as permitted by law, be deemed to be affixed to the Land, appropriated to its use, and covered by this Financing Statement); and

6.    All of the Debtor's right, title and interest in and to any and all easements and appurtenances, including, without limitation, any easements and agreements which are or may be established to allow satisfactory ingress to, egress from and operation of the Land and the Improvements; and

7.    All right, title and interest of the Debtor in and to any and all judgments, awards of damages (including but not limited to severance and consequential damages), payments, proceeds, settlements or other compensation heretofore or hereafter made, including interest thereon, and the right to receive the same, as a result of, in connection with, or in lieu of (a) any condemnation, either temporarily or permanently, (b) any change or alteration of the grade or widening of any street or road, and (c) any other damage, destruction, or injury to, or decrease in value of, the Land or the Improvements or any part thereof, to the extent of all Secured Obligations at the date of receipt by the Beneficiary of any such judgment, award of damages, payment, proceeds, settlement or other compensation, including interest thereon, and of the reasonable counsel fees, costs and disbursements, if any, incurred by the Beneficiary in connection with the collection of such judgment, award of damages, payment, proceeds, settlement or other compensation, including interest thereon; and

8.    All of Debtor's rights in and to policies of insurance including any and all payments, proceeds, settlements or other compensation heretofore or hereafter made, including any interest thereon, and the right to receive the same, from any and all insurance policies covering the Land or the Improvements or any portion thereof; and

9.    All right, title and interest of the Debtor in and to that certain Management Agreement dated as of January 1, 2019, by and between the Debtor and Millennia Commercial Group, Ltd., and any modifications, amendments, extensions, renewals, replacements or substitutions thereof thereafter made; and

10.    All contract rights (including any contract deposits), but not any contract obligations or liabilities, relating to or arising out of any agreement to sell, transfer, assign, convey or encumber

the Land, the Improvements, any portion thereof, any interest therein, or any ownership interest in the Debtor; and

11.     All plans and specifications, surveys, reports, diagrams, drawings, service contracts, accounting records, invoices, change orders, licenses, authorizations, certificates, variances, approvals and other permits necessary or appropriate to permit the construction, reconstruction, repair or alteration, addition, improvement, use, operation and management of the Land and the Improvements; and

12.     All of the Debtor's cash, bank accounts, notes and other instruments, documents, accounts receivable, contract rights, permits, receipts, sales and promotional literature and forms, advertising materials and the like, trademarks, names, logos, copyrights and other items of intangible personal property now or hereafter owned by the Debtor relating to the ownership, operation, development, leasing or management of the Land or the Improvements; and

13.     All of Debtor's rights under Section 365(h)(1)(A) and Section 365(h)(1)(B) of the Bankruptcy Code.

The Land, the Improvements, fixtures, personal property, tenements, hereditaments, appurtenances and other property interests granted hereinabove is collectively called the "Property."

All capitalized but undefined terms above shall have the meaning ascribed to them by that certain Mortgage (as amended, restated and/or supplemented from time to time), to be recorded in the Official Public Records of Cuyahoga County, Ohio.

**EXHIBIT B**

**Legal Description**

Parcel No. 1: (For informational purposes only: PPN: 101-36-013)

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being part of Original Two Acre Lot Nos. 154 and 155, and Sublots Nos, 45, 46, 47, 48, 49 and part of Sublot 50 in J.M. Woolsey's Subdivision of part of Original Two Acre Lot Nos. 156 to 167 both inclusive, as shown by the recorded plat of said subdivision in Volume N of Deeds, Page 486 of Cuyahoga County Records, together forming a parcel of land, bounded and described as follows:

Beginning on the northerly line of Euclid Avenue at a point 145 feet 9-1/8 inches easterly, measured along said northerly line, from its point of intersection with the easterly line of East 9th Street (formerly Erie Street); Thence westerly along said northerly line of Euclid Avenue, 145 feet 9-1/8 inches to its point of intersection with the easterly line of East 9th Street; Thence northerly along said easterly line of East 9th Street 258 feet 6-5/8 inches to its point of intersection with the southerly line of Chester Avenue N.E. (formerly known as Chestnut Avenue); Thence easterly along said southerly line of Chester Avenue N.E. 385 feet 1/4 inch to a point 12 feet westerly measured along said southerly line, from the northeasterly corner of said Sublot No. 50, which point is also at the intersection of said southerly line with the westerly line of a 12 foot alley; Thence southerly along said westerly line of said alley 133 feet, more or less, to a point on the southerly line of said Sublot 50 which is also the northerly line of Hickory Court N.E. (formerly Hickory Lane) 12 feet westerly measured along the southerly line of Sublot 50, from the southeasterly corner of said Sublot 50; Thence westerly along the southerly line of said Sublot Nos. 50, 49, 48, and 47, 170 feet 11-1/2 inches to its point of intersection with a line drawn northerly at right angles with said northerly line of Euclid Avenue from the place of beginning; Thence southerly 200 feet 9-1/4 inches to the place of beginning, according to the survey made by The F.A. Pease Engineering Company, August, 1919.  Be the same more or less, but subject to all legal highways.

Parcel No. 2: (For informational purposes only: PPN: 101-36-002)

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being Sublot No. 52 in J.M. Woolsey's Subdivision of part of Original Two Acre Lot Nos. 156 to 167 both inclusive, as shown by the recorded plat of said Subdivision in Volume N of Deeds, Page 486 of Cuyahoga County Records, bounded and described as follows:

Beginning at a point in the southerly line of Chester Avenue N.E. (formerly Chestnut Avenue) 463 feet 1/4 inch easterly measured along said southerly line from its point of intersection with the easterly line of East 9th Street (formerly Erie Street), said point of beginning, being also the northeasterly corner of land described in a lease to Frank C. Newcomer dated July 16, 1919 and recorded in Lease Volume 92, Page 16 of Cuyahoga County Records; Thence easterly along said southerly line of Chester Avenue N.E. 66 feet to the northeasterly corner of said Sublot 52; Thence southerly along the easterly line of Sublot 52, 133 feet to the southeast corner of said Sublot 52; Thence westerly along the southerly line of Sublot 52, which is also the northerly line of Hickory Court N.E. (formerly Hickory Lane), 66 feet to the southwest corner of said Sublot 52; Thence northerly along the westerly line of said Sublot 52, 133 feet to the place of beginning, as appears by said plat, be the same more or less, but subject to all legal highways, and the rights of the public, if any, in the portion of the foregoing parcel which is used as an alley and approach to loading docks.

Parcel No. 3: (For informational purposes only: PPN: 101-36-001)

Situated in the City of Cleveland, County of Cuyahoga and State of Ohio:

And known as being the northerly part of Sublot 51 in J.M. Woolsey's Subdivision of part of Original Two Acre Lot Nos. 156 to 167 both inclusive, as shown by the recorded plat of said subdivision in Volume N of Deeds, Page 486 of Cuyahoga County Records, bounded and described as follows:

Beginning at a point in the southerly line of Chester Avenue N.E. (formerly Chestnut Avenue) 397 feet 1/4 inch easterly measured along said southerly line from its point of intersection with the easterly line of East 9th Street (formerly Erie Street), said point of beginning being also the point of intersection of said southerly line with the easterly line of a 12 foot alley; Thence southerly along the westerly line of said Sublot 51, which is also the easterly line of said 12 foot alley, 100 feet; Thence easterly parallel with the southerly line of Chester Avenue N.E. 66 feet to the easterly line of said Sublot 51; Thence northerly along said easterly line of Sublot 51, 100 feet to said southerly line of Chester Avenue N.E.; Thence westerly along said southerly line of Chester Avenue N.E. 66 feet to the place of beginning, as appears by said plat, be the same more or less, but subject to all legal highways.

Parcel No. 4:

Part A:

Together with an appurtenant right established by Ordinance No. 58,522 as shown by the City Record Volume 19, Page 767, granting Union Lennox Co., its successors and assigns the authority and permission to construct, maintain and use a bridge over East 11th Place.

Part B:

Together with an easement for pedestrian tunnel granted by the City of Cleveland to The Union Commerce Bank, dated December 15, 1967, filed for record December 15, 1967, and recorded in Volume 12183, Page 181 of Cuyahoga County Records.